MATTHEW M. MARTINO (*pro hac vice forthcoming*)
matthew.martino@skadden.com
MICHAEL H. MENITOVE (*pro hac vice forthcoming*)
michael.menitove@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

LANCE A. ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
ABRAHAM A. TABAIE (SBN 260727)
abraham.tabaie@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Attorneys for Plaintiff*
*FLANNERY ASSOCIATES LLC*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Flannery Associates LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>Barnes Family Ranch Associates, LLC, Lambie Ranch Associates, LLC, Kirby Hill Associates, LLC, Barnes Family Ranch Corporation, Lambie Ranch Corporation, Kirby Hill Corporation, Kirk Beebe, Susan Beebe Furay, Murray Bankhead (individually and as trustee for the Baumbach Family Trust), Michael Rice (individually and as trustee for the Rice Family Trust);<br><br>Christine Mahoney Limited Partnership, Christine Mahoney Limited Partnership Management Company, Emigh Land LP, El General Partner, LLC, Christine Mahoney (individually and as trustee of the Mahoney 2005 Family Trust), Daniel Mahoney (individually and as trustee of the Mahoney 2005 Family Trust);<br><br>Ian Anderson (individually and as trustee of the Ian and Margaret Anderson Family Trust), | Case No.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>**(1) Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, for Price Fixing**<br><br>**(2) Violation of Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, for Price Fixing**<br><br>**(3) Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, for Price Fixing** |

1

1  Margaret Anderson (individually and as trustee
   of the Ian and Margaret Anderson Family
2  Trust), Neil Anderson, Maryn Anderson,
   William Dietrich (individually and as trustee of
3  the Child's Trust FBO William C. Dietrich, a
   subtrust under the Trust of William C. Dietrich
4  and Ivanna S. Dietrich), Paul Dietrich
   (individually and as trustee of the Child's Trust
5  FBO Paul S. Dietrich, a subtrust under the
   Trust of William C. Dietrich and Ivanna S.
6  Dietrich), John Alsop (individually and as
   trustee of the John G. Alsop Living Trust),
7  Nancy Roberts (individually and as trustee of
   the Nancy C. Roberts Living Trust), Janet
8  Zanardi (individually and as trustee of Trust A
   under the Zanardi Revocable Trust), Ronald
9  Gurule (individually and as trustee of the
   Ronald Gurule 2013 Family Trust), Richard
10 Anderson (individually and as trustee of the
   REA Properties Trust), David Anderson
11 (individually and as trustee of the Irwin E.
   Anderson Survivor's Trust), Deborah
12 Workman (individually and as trustee of the
   Irwin E. Anderson Survivor's Trust), Carol
13 Hoffman (individually and as trustee of the
   Irwin E. Anderson Survivor's Trust), Ned
14 Anderson (individually and as trustee of the
   Ned Kirby Anderson Trust), Neil Anderson,
15 Glenn Anderson, Janet Blegen (individually
   and as trustee of the Janet Elizabeth Blegen
16 Separate Property Trust), Robert Anderson
   (individually and as trustee of the Robert Todd
17 Anderson Living Trust), Stan Anderson, Lynne
   Mahre, Sharon Totman, Amber Bauman,
18 Christopher Wycoff;

19 and JOHN DOES 1-50,

20          Defendants.

21

22       Plaintiff Flannery Associates LLC ("Flannery"), by and through its undersigned counsel,

23 brings these claims against the above-named defendants ("Defendants," and together with the

24 "Hamilton Conspirators,"[1] as defined below, the "Conspirators"). Flannery bases its allegations on

25 personal knowledge as to certain allegations and on information and belief as to all other allegations.

26

27 [1] The Hamilton Conspirators are not named as defendants in this complaint because under a
   settlement agreement with the Hamilton Conspirators dated March 31, 2023, Flannery provisionally
28 released its claims against the Hamilton Conspirators.

2

## JURISDICTION

1.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover damages caused by, and to secure injunctive relief against, Defendants for their past and continuing violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

2.      This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      The Conspirators have engaged in an illegal price-fixing conspiracy regarding the sale of their properties, and this conspiracy has had – and (unless enjoined) will continue to have – a substantial effect on interstate commerce (*see infra* ¶ 167).

## VENUE

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391. Many of the Defendants reside in this district, and a substantial part of the events and injury giving rise to the claims set forth herein occurred in this district. Defendants have engaged in anticompetitive conduct in this district, namely the illegal price-fixing conspiracy regarding the sale of their properties located in this district.

## NATURE OF THE CASE

5.      This is a simple case about a group of wealthy landowners who saw an opportunity to conspire, collude, price fix, and illegally overcharge Flannery, a buyer who had approached these landowners on an individual basis to buy their properties in the Jepson Prairie and Montezuma Hills area of Solano County, California. This area hosts several utility-scale commercial wind farms, transmission lines, substations, and other energy infrastructure, as well as numerous environmental conservation and mitigation projects.

6.      If the Conspirators had acted independently, they could have each individually negotiated a sale with Flannery and made tens of millions of dollars in profits.

7.      ***But the Conspirators wanted to make hundreds of millions***. To do so, they formed a secret conspiracy to drive up prices to supracompetitive levels by eliminating the free market competition in the sale of properties that would have otherwise occurred among the Conspirators.

3

Acting in flagrant disregard of federal and state law, the Conspirators agreed to sell to Flannery only at supracompetitive prices.

8.      Federal and state antitrust and unfair competition laws apply to the purchase and sale of real property as much as to any other market. This price-fixing conspiracy is a textbook violation of these federal[2] and state[3] laws.

9.      In fact, the United States Department of Justice routinely prosecutes conspiracies involving the purchase and sale of real property as violations of the Sherman Act, and defendants have been fined and sentenced to prison – including in the Eastern District of California. After ten people were sentenced to prison terms and/or fines for conspiring in connection with sales of real property, the then-Acting Assistant Attorney General of the Department of Justice's Antitrust Division stated that the "*sentences send a strong message that conspiracies to eliminate competition in any area of our economy will not be tolerated.*"[4]

10.     Direct "smoking gun" evidence of a price-fixing conspiracy is exceedingly rare. But Flannery already has such "smoking gun" evidence, including text messages and emails involving Defendant Kirk Beebe, Conspirator Richard Hamilton, Defendant Ian Anderson, Defendant Christine Mahoney, Defendant Susan Beebe Furay, and Defendant Michael Rice. Flannery now brings this action for damages and injunctive relief.

11.     Flannery estimates that, to date, the Conspirators and their illegal price-fixing conspiracy have caused damages to Flannery from overpayment for properties from the Conspirators, their co-owners, and third parties of at least $170 million ($170,000,000.00), and that Defendants are therefore jointly and severally liable to pay Flannery treble damages in the amount of at least $510 million ($510,000,000.00). These damages from overpayment for properties continue to increase. In

---

[2] Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*: (1) a contract, combination, or conspiracy among two or more persons or distinct business entities; (2) which is intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition; and (4) that harms the plaintiff as a result of the anticompetitive aspect of the practice under scrutiny.

[3] California's Cartwright Act (Cal. Bus. & Prof. Code § 16720) prohibits, *inter alia*, "acts by two or more persons . . . [t]o create or carry out restrictions in trade or commerce."

[4] https://www.justice.gov/opa/pr/ten-eastern-california-real-estate-investors-sentenced-roles-bid-rigging-and-mail-fraud

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

addition, Defendants are jointly and severally liable to pay Flannery treble damages for lost profits.[5]

12.     Since 2018, Flannery has been purchasing rangeland properties in the Jepson Prairie and Montezuma Hills area of Solano County. Flannery has purchased or is under contract to purchase approximately 140 properties. The aggregate amount invested or committed to purchases in escrow exceeds $800 million. Except for the initial few purchases, Flannery's purchases have been at a substantial premium to fair market values.

13.     During the five years that Flannery has been investing in this area, not a single other buyer has emerged who would offer even a fraction of the prices and terms that Flannery was offering. The lack of any other buyers at those prices and terms demonstrated that Flannery was paying multiples of fair market value.

14.     As a result, the vast majority of the landowners in the area understandably took advantage of Flannery's above-market offers and sold their properties. Such landowners included some of the most sophisticated investors and institutions in the region. For example, Thomas McCormack, a director of the Bank of Rio Vista (which his family founded and ran for over a century), sold his approximately 2,500 acres to Flannery on December 18, 2019 for $20,876,500 – or about $8,400/acre.

15.     But a group of landowners – the above-referenced Conspirators – repeatedly engaged with Flannery to discuss possible sales, only to defer further negotiations under various pretenses. The conduct of these four Conspirator groups made no sense, for several reasons.

16.     First, the Conspirators want – and have wanted – to sell their properties. This reality is confirmed by the Conspirators' conduct, including selling certain properties to Flannery, offering to sell other properties to Flannery, and their subsequently disclosed communications discussed below.

17.     Second, many of the Conspirators recently paid between $470/acre and $2,800/acre to buy their properties. Moreover, many of the Conspirators recently represented to state and federal

---

[5] Section 4 of the Clayton Act (15 U.S.C. § 15) provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained." Similarly, the Cartwright Act allows a plaintiff to sue "to recover three times the damages sustained by him or her."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

tax authorities (including the United States Internal Revenue Service) that their properties were worth between $1,100/acre and $4,000/acre.

18.     Yet even when Flannery increased its offers to over $15,000/acre, which would have given these Conspirators a profit of up to approximately ***32,000% (32 times)*** on their investment in only a few years, they countered Flannery's offers by demanding even higher payments.

19.     At the last Flannery offer, the BLK Defendants (defined below) would have made approximately $45 million, the Mahoney Defendants (defined below) would have made approximately $100 million, and the Anderson Defendants (defined below) would have made approximately $60 million. These amounts are 2-3 times more than what these properties are worth in the open market, and what anyone other than Flannery would pay for any comparable property in this area. In addition, Flannery offered the Conspirators a variety of other benefits, such as the Conspirators retaining existing income streams from wind energy and natural gas storage (or receiving an additional amount for such income stream), the Conspirators being able to continue using these properties rent-free for decades under free leasebacks, capital budgets whereby Flannery would pay for new farmworker housing and other improvements, and the Conspirators receiving significant grants from Flannery for charitable giving, to be used at the Conspirators' discretion to support local schools and other non-profits.

20.     But that was not enough for the Conspirators, who saw an opportunity to collude by secretly agreeing not to compete with each other in the sale of their properties, and by doing so, extract hundreds of millions of dollars of illegal profits from Flannery.

- BLK Defendants – the BLK Defendants attempted to extract over $150 million dollars from Flannery (*see infra* ¶ 176)

- Mahoney Defendants – the Mahoney Defendants attempted to extract over $200 million from Flannery (*see infra* ¶ 202)

- Anderson Defendants – the Anderson Defendants attempted to extract over $150 million from Flannery (*see infra* ¶ 218)

21.     The reasons for the Conspirators' conduct finally became clear in the spring of 2023 when Flannery learned, through discovery in separate litigation, that the Conspirators have been

6

engaged in a *per se* illegal price-fixing scheme to artificially inflate sale prices for their properties.

22.     For example, on July 22, 2022, in an exchange attached as ***Exhibit A*** to this complaint, Conspirator Richard Hamilton texted Defendant Kirk Beebe. In his text message, referencing a conversation with Defendant Ian Anderson, Richard Hamilton wrote: "In talking with Ian Anderson, ***he agrees that the remaining property owners should be in agreement on what we would want to sell our properties***. *So [Flannery's attorney] cannot play owners against owners*. I think we should have a meeting in the next two weeks to talk about Flannery." (Ex. A (emphasis added).)

23.     Kirk Beebe responded: "***Agree***. I am talking with your attorney tomorrow . . . ." (*Id.* (emphasis added).)

24.     Highlighting the importance that Defendant Kirk Beebe placed on this conversation with Conspirator Richard Hamilton, he then took a screenshot on his iPhone, and emailed a copy of this exchange to his father (Kenneth Beebe), Defendant Susan Beebe Furay, and their attorney, all of whom appear to have played a role in the illegal price-fixing conspiracy.

25.     Three days later, on July 25, 2022, Defendant Christine Mahoney emailed Defendant Kirk Beebe a map of Flannery holdings, adding: "I heard you talked with Hamiltons[.] That's great that we can support each other!" This email is attached as ***Exhibit B*** to this complaint.

26.     On August 8, 2022, in an exchange attached as ***Exhibit C*** to this complaint, Defendant Susan Beebe Furay emailed Defendants Michael Rice, Kirk Beebe, and others, writing: "[Flannery's] hyper aggressive behavior seems to indicate that we are in a very good position and it is best not to engage with them at this point. ***No one is suggesting that we don't sell, the question is when and at what price***. ***Several of the other major land owners in the area*** are basically taking their time as well and not engaging with Flannery." (Ex. C (emphasis added).)

27.     ***That same day***, on August 8, 2022, the attorney for Defendant Ian Anderson – after engaging in negotiations with Flannery for months – emailed Flannery's attorney, writing: "[T]he andersons have advised me that they are not interested in continuing negotiations at this point. ***I assume*** they will be back in touch if/when they are interested in resuming negotiations (they have not offered any indication of if or when that might occur)." This email is attached as ***Exhibit D*** to this complaint.

_____
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

28.     These text messages and emails are the "smoking guns" that constitute direct evidence of the Conspirators' illegal price-fixing conspiracy against Flannery. According to evidence obtained by Flannery, which is further described below, this conspiracy began sometime in 2018 when Defendants Kirk Beebe and Christine Mahoney, and their fathers and other family members, started conspiring against Flannery. Because the Conspirators fraudulently concealed their illegal agreement, Flannery could not reasonably have learned of the conspiracy earlier, and any applicable statute of limitations should be tolled – enabling Flannery to recover damages dating back to the outset of the conspiracy.

29.     This conspiracy – and its impact on other landowners – is further confirmed by a conversation that Flannery's attorney had on April 28, 2023 with another local landowner who had for months been wanting to put together a deal whereby his extended family (who owned the relevant property together) would sell to Flannery. This landowner told Flannery that he recently called his cousin about the sale, who said he would not sell to Flannery and "[i]f you want to know why, you can go ask the Andersons, the Emighs,[6] the Hamiltons, and the Beebes." The cousin who did not want to sell named four landowners as his reasons for not selling, and the four names *exactly* match the four Conspirator groups.

30.     Because of the Conspirators' influence in the area, the conspiracy has affected third parties and their decisions about selling their properties to Flannery. Specifically, as described further below, Flannery alleges that the conspiracy has resulted in third-party landowners either demanding supracompetitive prices to sell to Flannery, or delaying selling until the Conspirators do, both of which have severely damaged Flannery. Defendants are jointly and severally liable to Flannery for these damages.

31.     This price-fixing conspiracy is unethical and illegal, but it is unfortunately entirely consistent with the character of the Conspirators. For example, in an exchange that illustrates *both* the questionable character of the Conspirators and *the fact that they want to sell*, on June 3, 2022,

---

[6] Christine Mahoney is the daughter of Richard Emigh. Christine Mahoney also controls Emigh Land LP. Landowners, brokers, and attorneys in this area use the names Emigh and Mahoney interchangeably. This complaint uses the term "Mahoney Defendants" as a shorthand for "Mahoney/Emigh Defendants."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Defendant Kirk Beebe emailed Defendant Susan Beebe Furay: "Wonder when we will get a note from **gassy bitch Leslie** or her sister. Lol." Leslie Erven is a 78-year-old woman who has an ownership interest in the BLK LLCs (defined below), who wanted to sell, and who was unaware of the conspiracy. Leslie Erven is also Defendant Kirk Beebe's aunt. Despite Ms. Erven's age, that she is his aunt, and that he owed her fiduciary duties, Defendant Kirk Beebe called her the "**gassy bitch**." Defendant Susan Beebe Furay responded "Don't hold your breath!" Kirk Beebe replied in turn: "I hope she holds hers **until we sell**." This email is attached as **Exhibit E**.

32.     As a result of the illegal price-fixing conspiracy, Flannery has suffered, and will continue to suffer, damages: (A) by overpaying for property purchased from the Conspirators and their co-owners; (B) in the form of lost profits attributable to Flannery's inability to purchase property that the Conspirators have thus far refused to sell to Flannery; (C) by overpaying for property purchased from third parties; and (D) in the form of lost profits attributable to Flannery's inability to purchase property that third parties have thus far refused to sell to Flannery.

33.     Accordingly, Flannery brings this action seeking treble damages for the amount it has been overcharged, treble damages for its lost profits, injunctive relief, and its costs of suit – including reasonable attorneys' fees.

## THE PARTIES

### A.     Flannery

34.     Flannery Associates LLC is a Delaware limited liability company.[7]

### B.     BLK Defendants

35.     Defendant Barnes Family Ranch Associates, LLC ("Barnes LLC") is a California limited liability company. It is managed by Defendant Barnes Family Ranch Corporation ("Barnes Corp.").

36.     Defendant Lambie Ranch Associates, LLC ("Lambie LLC") is a California limited liability company. It is managed by Defendant Lambie Ranch Corporation ("Lambie Corp.").

37.     Defendant Kirby Hill Associates, LLC ("Kirby LLC") is a California limited liability

---

[7] References to Flannery include its wholly owned subsidiary Diversified Land LLC. All relevant claims belonging to Diversified Land LLC have been assigned to Flannery.

9

company. It is managed by Defendant Kirby Hill Corporation ("Kirby Corp.").

38.     Barnes LLC, Lambie LLC, and Kirby LLC are referred to herein as the "BLK LLCs."

39.     Defendant Barnes Corp. is a California corporation and the manager of Barnes LLC.

40.     Defendant Lambie Corp. is a California corporation and the manager of Lambie LLC.

41.     Defendant Kirby Corp. is a California corporation and the manager of Kirby LLC.

42.     Barnes Corp., Lambie Corp., and Kirby Corp. are referred to herein as the "Beebe Corporations." Defendant Kirk Beebe and Defendant Susan Beebe Furay collectively own approximately 99.7% of the Beebe Corporations.[8]

43.     Defendant Kirk Beebe is a resident of California. He is the Vice President of each of the Beebe Corporations. At all times relevant to the allegations herein, Kirk Beebe was acting on behalf of himself individually, the Beebe Corporations, and the BLK LLCs.

44.     Defendant Susan Beebe Furay is a resident of California. She is the Secretary of each of the Beebe Corporations. At all times relevant to the allegations herein, Susan Beebe Furay was acting on behalf of herself individually, the Beebe Corporations, and the BLK LLCs.

45.     Defendant Murray Bankhead is a resident of California. He is the trustee for the Baumbach Family Trust, which is a member of the BLK LLCs. He is named as a defendant both individually and in his capacity as the trustee for the Baumbach Family Trust. At all times relevant to the allegations herein, Mr. Bankhead acted on behalf of himself and in his capacity as the trustee for the Baumbach Family Trust.

46.     Defendant Michael Rice is a resident of California and trustee for the Rice Family Trust, which is a member of the BLK LLCs. He is named as a defendant both individually and in his capacity as the trustee for the Rice Family Trust. At all times relevant to the allegations herein, Mr. Rice acted on behalf of himself and in his capacity as the trustee for the Rice Family Trust.

47.     As used herein, the "BLK Defendants" consist of the BLK LLCs, the Beebe

---

[8] Janet Beebe, Kirk Beebe, and Susan Beebe Furay each initially owned one-third of each Beebe Corporation, by owning 10,000 out of the total 30,000 shares in each corporation. Subsequently, in the transaction described below (*see infra* ¶ 159), and a similar transaction for Kirby Corp. in 2012, Janet Beebe assigned 9,900 of her shares in each corporation to Kirk Beebe and Susan Beebe Furay, such that Defendants Kirk Beebe and Susan Beebe Furay now own 29,900 out of 30,000 shares in each corporation.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Corporations, Kirk Beebe, Susan Beebe Furay, Murray Bankhead, and Michael Rice.

**C.  Mahoney Defendants**

48.  Defendant Christine Mahoney Limited Partnership is a California limited partnership ("Mahoney LP").

49.  Defendant Christine Mahoney Limited Partnership Management Company LLC is a California limited liability company that is the general partner of Defendant Mahoney LP.

50.  Defendant Emigh Land LP is a California limited partnership.

51.  Defendant El General Partner LLC is a California limited liability company that is the general partner of Emigh Land LP.

52.  Defendant Christine Mahoney is a resident of California. She is the trustee of the Mahoney 2005 Family Trust, the manager of Christine Mahoney Limited Partnership Management Company LLC, and a manager of El General Partner LLC. She is named as a defendant both individually and in her capacity as the trustee for the Mahoney 2005 Family Trust. At all times relevant to the allegations herein, Ms. Mahoney acted on behalf of herself and in her capacity as the trustee for the Mahoney 2005 Family Trust ("Mahoney Trust"). Christine Mahoney is the daughter of Richard Emigh and together with him controls Defendant Emigh Land LP (through Defendant El General Partner LLC).

53.  Defendant Daniel Mahoney is a resident of California. He is the trustee of the Mahoney Trust. He is named as a defendant both individually and in his capacity as the trustee for the Mahoney Trust. At all times relevant to the allegations herein, Mr. Mahoney acted on behalf of himself and in his capacity as the trustee for the Mahoney Trust. Daniel Mahoney is the husband of Christine Mahoney.

54.  As used herein, the "Mahoney Defendants" consists of Mahoney LP, Christine Mahoney Limited Partnership Management Company LLC, Emigh Land LP, El General Partner LLC, Christine Mahoney, and Daniel Mahoney.

**D.  Anderson Defendants**

55.  Defendant Ian Anderson is a resident of California. He is a trustee of the Ian and Margaret Anderson Family Trust. He is named as a defendant both individually and in his capacity

11

as the trustee for the Ian and Margaret Anderson Family Trust. At all times relevant to the allegations herein, Mr. Anderson acted on behalf of himself and in his capacity as the trustee for the Ian and Margaret Anderson Family Trust.

56. Defendant Margaret Anderson is a resident of California. She is a trustee of the Ian and Margaret Anderson Family Trust. She is named as a defendant both individually and in her capacity as the trustee for the Ian and Margaret Anderson Family Trust. At all times relevant to the allegations herein, Ms. Anderson acted on behalf of herself and in her capacity as the trustee for the Ian and Margaret Anderson Family Trust.

57. Defendant Neil Anderson is a resident of California.

58. Defendant Maryn Anderson is a resident of California.

59. Defendant William Dietrich is a resident of California. He is the trustee of the Child's Trust FBO William C. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich. He is named as a defendant both individually and in his capacity as the trustee for the Child's Trust FBO William C. Dietrich. At all times relevant to the allegations herein, Mr. Dietrich acted on behalf of himself and in his capacity as the trustee for the Child's Trust FBO William C. Dietrich.

60. Defendant Paul Dietrich is a resident of California. He is the trustee of the Child's Trust FBO Paul S. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich. He is named as a defendant both individually and in his capacity as the trustee for the Child's Trust FBO Paul Dietrich. At all times relevant to the allegations herein, Mr. Dietrich acted on behalf of himself and in his capacity as the trustee for the Child's Trust FBO Paul Dietrich.

61. Defendant John Alsop is a resident of California. He is the trustee of the John G. Alsop Living Trust. He is named as a defendant both individually and in his capacity as the trustee for the John G. Alsop Living Trust. At all times relevant to the allegations herein, Mr. Alsop acted on behalf of himself and in his capacity as the trustee for the John G. Alsop Living Trust.

62. Defendant Nancy Roberts is a resident of California. She is the trustee of the Nancy C. Roberts Living Trust. She is named as a defendant both individually and in her capacity as the trustee for the Nancy C. Roberts Living Trust. At all times relevant to the allegations herein, Ms.

1  Roberts acted on behalf of herself and in her capacity as the trustee for the Nancy C. Roberts Living
2  Trust.

3      63.    Defendant Janet Zanardi is a resident of California. She is the trustee of Trust A under
4  the Zanardi Revocable Trust. She is named as a defendant both individually and in her capacity as
5  the trustee for Trust A under the Zanardi Revocable Trust. At all times relevant to the allegations
6  herein, Ms. Zanardi acted on behalf of herself and in her capacity as the trustee for Trust A under the
7  Zanardi Revocable Trust.

8      64.    Defendant Ronald Gurule is a resident of California. He is the trustee of the Ronald
9  Gurule 2013 Family Trust. He is named as a defendant both individually and in his capacity as the
10  trustee for the Ronald Gurule 2013 Family Trust. At all times relevant to the allegations herein, Mr.
11  Gurule acted on behalf of himself and in his capacity as the trustee for the Ronald Gurule 2013
12  Family Trust.

13      65.    Defendant Richard Anderson is a resident of California. He is the trustee of the REA
14  Properties Trust. He is named as a defendant both individually and in his capacity as the trustee for
15  the REA Properties Trust. At all times relevant to the allegations herein, Mr. Anderson acted on
16  behalf of himself and in his capacity as the trustee for the REA Properties Trust.

17      66.    Defendant David Anderson is a resident of California. He is a trustee of the Irwin E.
18  Anderson Survivor's Trust. He is named as a defendant both individually and in his capacity as the
19  trustee for the Irwin E. Anderson Survivor's Trust. At all times relevant to the allegations herein, Mr.
20  Anderson acted on behalf of himself and in his capacity as the trustee for the Irwin E. Anderson
21  Survivor's Trust.

22      67.    Defendant Deborah Workman is a resident of California. She is a trustee of the Irwin
23  E. Anderson Survivor's Trust. She is named as a defendant both individually and in her capacity as
24  the trustee for the Irwin E. Anderson Survivor's Trust. At all times relevant to the allegations herein,
25  Ms. Workman acted on behalf of herself and in her capacity as the trustee for the Irwin E. Anderson
26  Survivor's Trust.

27      68.    Defendant Carol Hoffman is a resident of California. She is a trustee of the Irwin E.
28  Anderson Survivor's Trust. She is named as a defendant both individually and in her capacity as the

1   trustee for the Irwin E. Anderson Survivor's Trust. At all times relevant to the allegations herein,

2   Ms. Hoffman acted on behalf of herself and in her capacity as the trustee for the Irwin E. Anderson

3   Survivor's Trust.

4         69.      Defendant Ned Anderson is a resident of California. He is a trustee of the Ned Kirby

5   Anderson Trust. He is named as a defendant both individually and in his capacity as the trustee for

6   the Ned Kirby Anderson Trust. At all times relevant to the allegations herein, Mr. Anderson acted

7   on behalf of himself and in his capacity as the trustee for the Ned Kirby Anderson Trust.

8         70.      Defendant Neil Anderson is a resident of Idaho.

9         71.      Defendant Glenn Anderson is a resident of California.

10        72.      Defendant Janet Blegen is a resident of California. She is a trustee of the Janet

11  Elizabeth Blegen Separate Property Trust. She is named as a defendant both individually and in her

12  capacity as the trustee for the Janet Elizabeth Blegen Separate Property Trust. At all times relevant

13  to the allegations herein, Ms. Blegen acted on behalf of herself and in her capacity as the trustee for

14  the Janet Elizabeth Blegen Separate Property Trust.

15        73.      Defendant Robert Anderson is a resident of California. He is the trustee of the Robert

16  Todd Anderson Living Trust. He is named as a defendant both individually and in his capacity as the

17  trustee for the Robert Todd Anderson Living Trust. At all times relevant to the allegations herein,

18  Mr. Anderson acted on behalf of himself and in his capacity as the trustee for the Robert Todd

19  Anderson Living Trust.

20        74.      Defendant Stan Anderson is a resident of California.

21        75.      Defendant Lynne Mahre is a resident of California.

22        76.      Defendant Sharon Totman is a resident of California.

23        77.      Defendant Amber Bauman is a resident of Oregon.

24        78.      Defendant Christopher Wycoff is a resident of Oregon.

25        79.      As used herein, the "Anderson Defendants" consist of Ian Anderson, Margaret

26  Anderson, Neil Anderson, Maryn Anderson, William Dietrich, Paul Dietrich, John Alsop, Nancy

27  Roberts, Janet Zanardi, Ronald Gurule, Richard Anderson, David Anderson, Deborah Workman,

28  Carol Hoffman, Ned Anderson, Neil Anderson, Glenn Anderson, Janet Blegen, Robert Anderson,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman, and Christopher Wycoff.

2 **E.** **The Hamilton Conspirators**

3 80.     Conspirator Richard Hamilton is a resident of California, trustee of the Richard R.

4 and Anastasia D. Hamilton Family Trust, trustee of the Hamilton Family Mineral Trust, co-trustee

5 of the Burrows P. Hamilton Trust, and manager of Hamilton Montezuma Properties, LLC.

6 81.     Conspirator Anastasia (Stacy) Hamilton is a resident of California and trustee of the

7 Richard R. and Anastasia D. Hamilton Family Trust.

8 82.     Conspirator David Hamilton Sr. is a resident of California, trustee of the David C.

9 Hamilton Family Trust dated September 15, 2011, and a manager of David Hamilton Properties

10 LLC.

11 83.     Conspirator David Hamilton Jr. is a resident of California and a manager of David

12 Hamilton Properties LLC.

13 84.     Conspirator Catherine Hamilton is a resident of California, trustee of the Catherine

14 M. Hamilton Trust, and a manager of David Hamilton Properties LLC.

15 85.     Conspirator Peter Hamilton is a resident of California, co-trustee of the Burrows P.

16 Hamilton Trust, and trustee of the Peter Scott Hamilton Living Trust.

17 86.     Conspirator Charles Hamilton is a resident of California. Charles Hamilton is one of

18 the beneficial owners of Hamilton Montezuma Properties LLC.

19 87.     Conspirator Clayton Hamilton-Alexander is a resident of California.

20 88.     Conspirator Margaret Hamilton Giordanengo is a resident of California.

21 89.     Conspirator David Hamilton Properties LLC is a California limited liability company.

22 It is owned by David Hamilton Sr., along with David Hamilton Jr., and Catherine Hamilton. At all

23 relevant times, David Hamilton Sr., David Hamilton Jr., and Catherine Hamilton acted as managers

24 of David Hamilton Properties LLC.

25 90.     Conspirator Hamilton Montezuma Properties LLC is a California limited liability

26 company. It is owned by Richard Hamilton, Peter Hamilton, and Charles Hamilton. At all relevant

27 times, Richard Hamilton acted as manager of Hamilton Montezuma Properties LLC.

28 91.     The "Hamilton Conspirators" consist of Richard Hamilton, Anastasia Hamilton,

15

1  David Hamilton Sr., David Hamilton Jr., Catherine Hamilton, Peter Hamilton, Charles Hamilton,

2  Clayton Hamilton-Alexander, Margaret Hamilton Giordanengo, David Hamilton Properties LLC,

3  and Hamilton Montezuma Properties LLC.

4      **F.    JOHN DOES 1-50**

5      92.    Defendants John Does 1-50 are additional conspirators unknown to Flannery at this

6  time. For example, Flannery does not yet know (though its investigation is ongoing and more

7  information undoubtedly will be revealed through discovery in this case) if any other landowners

8  were or are participants in the price-fixing conspiracy.

9                                **FACTUAL BACKGROUND**

10  **I.    The Conspirators Own Multiple Properties in Solano County, California**

11     93.    The following properties in Solano County were owned, are owned, or are under

12  contract to be purchased, by the Conspirators, as individuals and through their trusts and/or corporate

13  entities.

14      **A.    BLK Properties**

15     94.    "Barnes Property": APN[9] 0042-100-160, owned by Barnes LLC.

16     95.    "Lambie Property": APNs 0048-010-110, 0048-010-220, 0048-010-240, 0048-020-

17  430, 0048-020-510, 0048-020-520, and 0048-020-530, owned by Lambie LLC.

18     96.    "Kirby Property": APNs 0046-180-070, 0046-180-080, and 0048-070-20, owned by

19  Kirby LLC.

20     97.    The "BLK Properties" means the Barnes Property, Lambie Property, and Kirby

21  Property collectively.

22      **B.    Mahoney Properties**

23     98.    "Emigh 279 Property": APN 0042-170-270, formerly owned by Emigh Land LP and

24  purchased by Flannery on December 7, 2018.

25     99.    "Emigh 45 Property" APN 0048-010-490, formerly owned by Emigh Land LP and

26  purchased by Flannery on June 4, 2021.

27  ─────────────────

28  [9] APNs mean "Assessor's Parcel Numbers," which are used to identify properties throughout this
    complaint. Whenever acreage is given in this complaint, the acreage is approximate.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

100. "Emigh Industrial Property": APNs 0042-110-440, 0042-110-450, 0042-100-290, 0042-110-430, 0042-110-420, 0048-020-560, 0048-020-550, 0048-020-580, 0048-020-590, 0048-010-430, 0048-010-470, and 0048-010-460, formerly owned by Emigh Land LP and purchased by Flannery on April 20, 2023.

101. "Goosehaven Property": APNs 0042-110-210 and 0048-010-030, owned by Mahoney LP.

102. "Antenna Property": APN 0048-010-170, formerly owned by Mahoney LP and purchased by Flannery on May 11, 2023.

103. "Marianno Property": APNs 0090-190-190 and 0090-190-200, formerly owned by Mahoney LP and purchased by Flannery on May 11, 2023.

104. "Shannon Property": APN 0048-050-310, owned by Mahoney LP and under contract to be purchased by Flannery.

105. "Denverton Property": APNs 0048-020-070, 0048-020-080, 0048-020-300, and 0048-020-370, formerly owned by Mahoney LP and purchased by Flannery on May 11, 2023.

106. "Souza Property": APNs 0048-010-290, 0048-010-300, 0048-010-440, 0048-010-450, and 0048-050-040, formerly owned by Mahoney Trust and purchased by Flannery on May 11, 2023.

107. "Mahoney 607 Property": APNs 0048-120-400, 0048-120-410, and 0048-130-200, owned by Mahoney Trust.

108. "Nielsen Property": APNs 0048-160-210 and 0048-160-220, owned by Mahoney LP.

109. "Mahoney 370 Property": APN 0048-130-210, formerly owned by Flannery and purchased by Mahoney Trust on May 11, 2023.

110. "Currie Property": APNs 0048-100-150, 0048-100-420, and 0048-160-200, formerly owned by Flannery and purchased by Mahoney LP on May 11, 2023.

111. "Ila Property": APN 0090-190-050, first owned by Anderson Defendants, then purchased by Flannery on May 10, 2023, and then immediately purchased by Mahoney Trust on May 11, 2023, under the swap transaction described below (*see infra* ¶ 199).

112. "McKinnon 18 Property": APN 0090-190-240, currently owned by Anderson

17

Defendants, now under contract to be purchased by Flannery, and under a separate contract to be then immediately purchased by Mahoney LP, under the swap transaction described below (*see infra* ¶ 199).

113.     "McKinnon 160 Property": APN 0090-190-230 owned by Flannery and under contract to be purchased by Mahoney LP, under the swap transaction described below (*see infra* ¶ 199).

114.     The "Mahoney Properties" means the properties described in this section.

115.     The purchases and sales between Mahoney Defendants and Flannery referenced in this section are discussed in more detail below (*see infra* ¶¶ 178-202).

**C.     Anderson Properties**

116.     "Mason Property": APNs 0048-060-220, 0048-060-230, 0048-060-240, 0048-060-250, 0048-060-260, 0048-070-350, and 0048-070-360, owned by Ian Anderson and Margaret Anderson.

117.     "Zadwick Property": APN 0048-070-440, owned by Ian Anderson and Margaret Anderson.

118.     "Neil Anderson Property": APN 0090-070-310, owned by Neil Anderson.

119.     "Maryn Anderson Property": APN 0090-090-350, owned by Ian Anderson, Margaret Anderson, and Maryn Anderson.

120.     "Russell Property": APN 0090-090-230, owned by Ian Anderson and Margaret Anderson.

121.     "Dietrich Property": APNs 0048-130-220, 0048-160-350, and 0048-160-360, owned by William Dietrich and Paul Dietrich.

122.     "Alsop Property": APNs 0048-100-200, 0048-160-240, and 0048-160-370, owned by John Alsop, Nancy Roberts, and Janet Zanardi.

123.     "Gurule Property": APNs 0048-160-230, 0048-160-250, 0048-160-290, and 0090-190-020, owned by Ronald Gurule.

124.     "Richard Anderson Property": APNs 0090-200-100 and 0048-130-203, owned by Richard Anderson.

18

125.    "Irwin Anderson Property": APNs 0090-190-250 and 0048-130-240, owned by David Anderson, Carol Hoffman, and Deborah Workman.

126.    "Ila Property": (*see supra* ¶ 111).

127.    "McKinnon 18 Property": (*see supra* ¶ 112).

128.    "Anderson 1,005 Property": APNs 0090-090-170, 0090-110-080, 0090-090-100, 0090-090-110, 0090-100-140, and 0090-100-150, owned by Ned Anderson, Neil Anderson, Glenn Anderson, Janet Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman, and Christopher Wycoff.

129.    "Anderson 153 Property": APNs 0090-090-300, 0090-090-310, and 0090-100-020, owned by Janet Blegen, Robert Anderson, and Stan Anderson.

130.    The "Anderson Properties" means the properties described in this section.

131.    In addition, all the Anderson Defendants own mineral rights under each other's properties. By way of example, Defendant Paul Dietrich owns a share of mineral rights under not just the Dietrich Property but also under the Neil Anderson, Maryn Anderson, Alsop, Gurule, etc. properties, and the same is true for all other Anderson Defendants.

### D.    **Hamilton Properties**

132.    "Hamilton 235": APN 0049-310-060, owned or under contract to be owned by Hamilton Conspirators.

133.    "Hamilton 200": APN 0049-310-050, owned or under contract to be owned by Hamilton Conspirators.

134.    "Hamilton 265": APNs 0049-320-040 and 0049-0360-010, owned or under contract to be owned by Hamilton Conspirators.

135.    "Hamilton Hoyt": APNs 0048-160-010, 0048-060-070, 0048-100-290, and 0048-100-620, owned or under contract to be owned by Flannery.

136.    "Hamilton HMP": APNs 0048-050-060 and 0048-100-310, owned or under contract to be owned by Flannery.

137.    "Hamilton Thomas": APNs 0042-150-230, 0048-150-080, and 0042-150-290, owned or under contract to be owned by Flannery.

138.    "Hamilton ACR": APNs 0042-050-030, 0042-050-90, 0042-100-080, 0042-100-090, 0042-110-010, 0042-110-040, 0042-110-050, 0042-110-060, 0042-110-290, 0042-110-300, 0042-110-330, and 0042-110-030, owned or under contract to be owned by Flannery.

139.    The "Hamilton Properties" means the properties described in this section.

140.    Flannery now owns or is under contract to own some of the Hamilton Properties because the Hamilton Conspirators sold their interests in such properties to Flannery as part of a settlement of separate litigation against them, as discussed in more detail below (*see infra* ¶ 248).

## II.    The Conspirators Paid Between $470/Acre and $2,800/Acre for Their Properties

### A.    Transactions With and Without Wind Lease Income

141.    Roughly half of the properties in this area have wind energy turbines on them. The wind turbines are built and operated by national energy firms under long-term leases from the landowners.

142.    Except for properties with orchards on them, the income from such wind leases far exceeds any income generated from agricultural activities in this area. Whether a property has a wind lease on it, and whether the wind lease income is conveyed in a sale, is therefore one of the most important factors that determines the sale price of any property.

143.    In most historical transactions in this area, including in most purchases by the Conspirators, when a property had a wind lease on it, the wind lease income was conveyed to the buyer.

144.    In contrast, Flannery has in its offers and in its purchases almost universally agreed that in addition to paying premium prices, it would let sellers of property keep their income from wind leases for the remainder of such leases (which generally terminate between 2037 and 2057, depending on the property). In fact, the Mahoney Defendants and Anderson Defendants recently purchased properties **with** wind lease income included, and then sold or attempted to sell the same properties to Flannery **without** the wind lease income (by reserving it to themselves in the sale).

145.    Because Flannery's offers and purchases have been for properties without the wind lease income (the wind lease income being reserved to the seller), all per-acre prices provided in this complaint are on a "land only, without wind lease income" basis.

20

146.     In situations when the Conspirators have purchased properties with wind lease income for a given purchase price, this complaint provides Flannery's estimates of how much of the purchase price the Conspirators paid for the wind lease income, and how much was the residual amount they paid for the land. This attribution is possible because the wind lease income is simple to value by applying a capitalization rate to the annual income. This is the same method used by institutional investors who are in the business of purchasing wind lease income streams and other similar annuities, several of whom have previously made purchases in this area of wind lease income streams.

**B.     The Conspirators' Recent Purchases**

147.     Prior to Flannery initiating its purchases in 2018, many of the Conspirators purchased properties for between $470/acre and $2,800/acre.

148.     On November 6, 2012, Defendant Emigh Land LP purchased the Marianno Property for $1,050,000, or approximately $3,300/acre for these 320 acres. Emigh Land LP paid $3,300/acre for the property while *also* receiving substantial wind lease income. Flannery estimates that roughly $900,000[10] of the purchase price was attributable to the wind lease income, meaning that Emigh Land LP only paid about $150,000 for the land, i.e., $470/acre for the 320 acres. Emigh Land LP subsequently sold this property to its affiliate Mahoney LP, as described below (*see infra* ¶ 156).

149.     On April 6, 2016, Defendant Emigh Land LP purchased the Shannon Property for $450,000, or approximately $2,800/acre for its 162 acres. Emigh Land LP subsequently sold this property to its affiliate Mahoney LP, as described below (*see infra* ¶ 156).

150.     On January 31, 2017, Defendants Ian Anderson and Margaret Anderson purchased through their trust the Zadwick Property for $229,500, or approximately $1,500/acre for these 153 acres.

151.     On August 21, 2013, Conspirator Hamilton Montezuma Properties LLC purchased the Hamilton HMP Property for $1,414,500, or approximately $3,000/acre for these 470 acres. This

---

[10] The property likely generates an income stream of approximately $63,000/year from the wind lease. At a capitalization rate of 7%, this income stream values the wind lease alone at $900,000.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

purchase included substantial wind lease income. Flannery estimates that roughly $900,000[11] of the purchase price was attributable to the wind lease income, meaning that Defendant Hamilton Montezuma Properties LLC only paid about $514,500 for the land, i.e., approximately $1,100/acre for the 470 acres.

### III. The Conspirators Represented To Tax Authorities That Their Properties Are Worth a Fraction of the Prices They Attempted To Extract From Flannery

152.    On January 1, 2017, Defendants Ian Anderson and Margaret Anderson sold a 100% interest in the Neil Anderson Property to Defendant Neil Anderson. On the grant deed for the property, Defendants Ian Anderson and Margaret Anderson declared to tax authorities that the property was worth approximately $3,950/acre.[12]

153.    On January 1, 2017, Defendants Ian Anderson and Margaret Anderson sold a 50% interest in the Maryn Anderson Property to Defendant Maryn Anderson. On the grant deed for the property, Defendants Ian Anderson and Margaret Anderson declared to tax authorities that the property was worth approximately $4,310/acre.[13]

154.    However, both of these sales included the wind lease income. This means that the price these Defendants declared to tax authorities for the land (excluding the wind lease income) was much lower, an estimated $1,100/acre.[14]

155.    In addition to the tax declaration on the grant deed, Flannery alleges that these Anderson Defendants also submitted tax returns to the United States Internal Revenue Service in which they represented that the land excluding the wind lease income was worth approximately

---

[11] The Marianno Property contains 320 acres. The portion of the Hamilton HMP Property subject to the wind lease is also approximately 320 acres. The value of both wind leases is therefore estimated to be the same – $900,000.

[12] Defendants Ian Anderson and Margaret Anderson declared on the grant deed a transfer tax of $1,100, implying a sale price of $1,000,000, or approximately $3,950/acre for these 253 acres.

[13] Defendants Ian Anderson and Margaret Anderson declared on the grant deed a transfer tax of $550, implying a sale price of $500,000, or approximately $4,310/acre for the 50% interest in these 232 acres.

[14] Using the Neil Anderson Property as an example, the property likely generates an income stream of approximately $50,000/year from the wind lease. Capitalized at a capitalization rate of 7%, this income stream values the wind lease alone at $714,258 and the residual land at $285,715, or approximately $1,100/acre. The analysis for the Maryn Anderson Property is similar.

22

$1,100/acre.

156.    On June 6, 2019, Defendant Emigh Land LP sold 1,204 acres of irrigated lands (not subject to this complaint) and 2,718 acres of rangelands subject to this complaint (Goosehaven Property, Antenna Property, Marianno Property, Denverton Property, Shannon Property, Nielsen Property) to Defendant Mahoney LP. On the grant deed for the property, Defendant Emigh Land LP declared to the tax authorities that the 2,178 acres of rangelands were worth approximately $3,100/acre.[15]

157.    Similarly to the Neil Anderson and Maryn Anderson transactions, the $3,100/acre price for rangelands also included substantial wind lease income. But unlike the former transactions that included properties that were all generating wind lease income, on the Emigh Land LP transaction, only some of the rangelands included wind lease income (specifically, Marianno Property and Nielsen Property). According to Flannery's estimates, the Mahoney Defendants represented to the tax authorities that the land excluding the wind lease income was worth approximately $2,500/acre.

158.    In addition to the tax declaration on the grant deed, Flannery alleges that the Mahoney Defendants also submitted tax returns to the United States Internal Revenue Service in which they represented that the land excluding the wind lease income was worth approximately $2,500/acre.

159.    On or about October 2021, Janet Beebe, along with her children Defendants Kirk Beebe and Susan Beebe Furay, received an appraisal dated August 8, 2021, valuing the property owned by Barnes LLC and Lambie LLC at approximately $4,000/acre. Based on that appraisal, Janet Beebe and Defendants Kirk Beebe and Susan Beebe Furay executed an estate planning transaction whereby Janet Beebe gifted 9,900 of her 10,000 shares in Defendants Barnes Corp. and Lambie Corp. to Defendants Kirk Beebe and Susan Beebe Furay.

160.    Flannery alleges that Janet Beebe, Kirk Beebe, and Susan Beebe Furay submitted tax

---

[15] The transfer tax on the grant deed was $17,488.90, implying a sale price of $15,899,000. This sale included both irrigated properties and rangeland. In this area, irrigated properties generally trade at a 100% premium to rangeland (i.e., twice the price per acre). Based on this estimate, the sale valued the irrigated properties at $7,469,000 ($6,200/acre for 1,204 acres) and rangelands at $8,430,000 ($3,100/acre for 2,718 acres).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

returns to the United States Internal Revenue Service in which they represented that the Barnes Property and the Lambie Property are worth $4,000/acre.

## IV.    Flannery's Purchases in the Area

161.    Before Flannery initiated its purchases of properties in the Jepson Prairie and Montezuma Hills area of Solano County, the fair market value of properties in this area ranged between $1,500/acre and $4,000/acre.

162.    In 2017, Flannery agreed to purchase several properties that had been listed at prices around $4,500/acre. Flannery closed on these transactions in early 2018 and thereafter started making additional offers at or above those prices.

163.    In November 2018, Flannery sent out offers to most landowners in this area. To purchase properties that were not listed for sale, Flannery offered both higher cash prices and non-cash concessions to sellers, such as allowing sellers to retain their income from wind turbines on the properties for the duration of their current leases (which generally terminate between 2037 and 2057, depending on the property) and/or allowing sellers to stay on the properties rent-free under long-term leasebacks or life estates.

164.    Between 2018 and 2023, the premiums Flannery offered fluctuated depending on both the general macroeconomic situation (for example, during the 2020 pandemic-related economic crisis, the premiums were lower) and on the details of each specific transaction (for example, properties in which a seller wished to retain a rent-free leaseback/life estate would be at a lower premium, whereas "free and clear" sales were at higher premiums).

165.    During this period, the vast majority of landowners in this area concluded that Flannery's offers were simply too good to pass up and negotiated sales. Flannery has purchased or is under contract to purchase approximately 140 properties from approximately 400 individual beneficial owners (because some of the properties were owned by many individual beneficial owners).

166.    The parties who decided to sell include many of the largest and most sophisticated landowners in this area. For example, Thomas McCormack, a director of the Bank of Rio Vista (which his family founded and ran for over a century), sold his approximately 2,500 acres to Flannery

24

1  for $20,876,500 (~$8,400/acre) plus the right to keep receiving income from wind turbines on the

2  property for the duration of the current wind lease (approximately until 2047).

3       167.   Flannery's purchases (both completed and currently under contract) have or will

4  involve over $800 million of invested capital, and the properties Flannery has acquired and/or has

5  attempted to acquire are used for purposes of interstate commerce. For example, NextEra, which is

6  incorporated and headquartered in Florida, and Avangrid, which is incorporated in New York and

7  headquartered in Connecticut, operate significant wind farms on property that Flannery has

8  purchased. Moreover, given the scale of Flannery's holdings and the amount of capital invested, any

9  future uses of the property that Flannery has acquired and/or has attempted to acquire are also likely

10 to involve significant interstate commerce. For example, the California Independent System Operator

11 recently awarded a contract to build a new substation on Flannery-owned property to LS Power,

12 which is headquartered in New York. As another example, Flannery received a proposal to build a

13 battery storage facility on its property from Clearway Energy Group, a renewable energy operator

14 headquartered in New Jersey. As a third example, Flannery received a proposal for a carbon

15 sequestration project from Air Liquide, a multinational industrial gas company with U.S.

16 headquarters in Texas and Pennsylvania. These are just examples. Every month, Flannery receives

17 new proposals for projects in areas such as renewable energy and environmental mitigation, most of

18 which come from out-of-state parties.

19 **V.    Flannery's Attempts To Purchase Property From the Conspirators**

20       168.   Throughout the 2018 through 2023 period, Flannery made repeated offers and had

21 multiple discussions with the Conspirators about purchasing their properties.

22       **A.    BLK Properties**

23       169.   In early 2018, Flannery made an offer to purchase the Barnes Property and Lambie

24 Property (i.e., the BLK Properties excluding the Kirby Property) for $10,000,000 (~$4,800/acre).

25 Flannery delivered the offer to Defendant Kirk Beebe, who did not disclose Flannery's offer to the

26 other members of the BLK LLCs before letting it expire.

27       170.   In late 2018, Flannery made an offer to purchase the BLK Properties for $27,089,500

28 ($8,500/acre). In the cover email to the offer, Flannery wrote that it was open to negotiating a

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

reservation of income from wind, oil, and gas operations on the properties. Flannery delivered the offer to Defendant Kirk Beebe, who again did not disclose this offer to the other members of the BLK LLCs before letting it expire.

171.    In February 2020, Flannery made a new offer to purchase the BLK Properties for $36,000,000 ($11,300/acre). This offer also formalized the above-referenced concession allowing Kirby LLC to retain income from the natural gas storage lease on the property through 2055. On March 2, 2020, after a month of not engaging with Flannery, Defendant Kirk Beebe's attorney rejected this offer on behalf of the BLK LLCs.

172.    Frustrated with Defendant Kirk Beebe's refusal to engage with Flannery's previous offers, one of the largest members of the BLK LLCs engaged a broker to represent it with respect to its various holdings. In initial phone calls with this broker, Defendant Kirk Beebe admitted to the broker that "we need to sell" and invited the broker to ask Flannery for a live offer.

173.    On April 19, 2021, Flannery delivered a binding live offer to this broker, and on April 24, 2021, Flannery delivered the same offer to the attorney for BLK Defendants. The offer was on the same terms as the February 2020 offer, except that Flannery provided additional assurances and indemnities regarding the reservation of the natural gas storage lease income. On June 9, 2021, Defendants Kirk Beebe, Susan Beebe Furay, and the Beebe Corporations rejected the offer. Though Flannery had no way of knowing at the time (because it was unaware of the conspiracy), the letter from Defendant Kirk Beebe invoked fraudulent reasons for rejecting Flannery's offer, including a pretextual claim that the offer was "confusing."

174.    On June 10, 2021, Flannery made a fourth offer to purchase the BLK Properties, this time for $39,000,000 (~$12,250/acre). Flannery sent this offer to expressly address issues raised by Defendant Kirk Beebe as pretenses for rejecting the April 19, 2021 offer. First, the offer was at approximately $12,250/acre, which matched the highest price Flannery had paid to any other landowner in the area at that time, and included an express invitation for the BLK Defendants to counter the offer, acknowledging that Flannery was willing to negotiate. Second, because Kirk Beebe used the potential of a new income stream on the properties from carbon sequestration as a pretense for rejecting the offer, the new offer allowed the BLK LLCs to retain 50% of any royalties received

26

from such activities. While some members of the BLK LLCs voted in favor of negotiating a sale to Flannery, Defendants Kirk Beebe, Susan Beebe Furay, and the Beebe Corporations induced the other members to not even negotiate.

175.    As explained above (*see supra* ¶¶ 26, 31, 172), the BLK Defendants have admitted they want to sell their properties. For example, on August 8, 2022, Defendant Susan Beebe Furay wrote: "No one is suggesting that we don't sell, the question is when and at what price." (Ex. C.)

176.    For the past few years, in internal communications among the BLK Defendants and other members of the BLK LLCs, the BLK Defendants have planned to, and in external communications with Flannery the BLK Defendants have attempted to, extract from Flannery over $150 million in supracompetitive payments.

177.    In April 2023, Flannery obtained independent appraisals of the BLK Properties from the independent appraiser firm of Edwards, Lien & Toso, Inc. The appraisals valued the BLK Properties (excluding the natural gas storage lease) at a total of $16,325,000. Even with the natural gas storage lease included, the appraisals valued the BLK Properties at $32,705,000.

**B.    Mahoney Properties**

178.    On September 28, 2018, Flannery made an offer to purchase the Emigh 279 Property to Emigh Land LP. The offer was negotiated, and on October 26, 2018, Emigh Land LP signed an agreement to sell this property to Flannery for $1,600,000, or about $5,700/acre for the 279 acres. The sale closed on December 7, 2018.

179.    On November 13, 2018, Flannery made an offer to purchase 5,303 acres of rangelands from Emigh Land LP and the Mahoney Trust. Flannery offered $45,075,500 ($8,500/acre) for the properties, allowing the sellers to retain 100% of wind lease income, and a rent-free leaseback for five years. In December 2019, the Mahoney Defendants declined the offer.

180.    The fact that Emigh Land LP sold the Emigh 279 Property to Flannery at $5,700/acre shows that the Mahoney Defendants believed that $5,700/acre was an attractive price. Emigh Land LP sold the property at this price because the sale was agreed to in October 2018, before Flannery sent out offers to most landowners in the area in November 2018, and therefore, before the Mahoney Defendants realized the potential to conspire against Flannery.

181.    The Mahoney Defendants started conspiring with the BLK Defendants immediately afterwards. This emerging price-fixing conspiracy explains why on October 26, 2018, the Mahoney Defendants agreed to sell one of their properties for $5,700/acre, but when offered $8,500/acre only two weeks later, they would not sell a single acre.

182.    On November 7, 2019, Flannery made another offer to purchase 5,627 acres from Emigh Land LP, Mahoney LP, and Mahoney Trust. The offer was for rangelands, plus a portion of the Emigh Industrial Property.

183.    The Emigh Industrial Property technically has industrial zoning (unlike all other properties at issue in this complaint, which have agricultural zoning). But approximately 90% of the property is undeveloped, vacant, and used for grazing livestock, i.e., the exact same use as all other properties at issue. Therefore, the industrial zoning has little apparent value, as currently there is no demand to purchase or lease the vacant industrial acreage at industrial prices. This is confirmed by the fact that Emigh Land LP had the Emigh Industrial Property listed for sale with the national brokerage firm of Cushman & Wakefield between 2016 and 2023, and was unable to find a single buyer during this period, including during what was the most robust market for industrial properties in history.

184.    Flannery offered $66,341,450 (approximately $11,800/acre) for the properties, with a limited amount of premium placed on the Emigh Industrial Property compared to agricultural properties. Flannery offered for sellers to retain 100% of wind lease income, plus a rent-free leaseback for 11 years. Mahoney Defendants declined the offer.

185.    In early 2021, Emigh Land LP approached Flannery with an offer to sell the Emigh 45 Property. Flannery eventually purchased the property for $560,000 (approximately $12,400/acre) plus a rent-free leaseback for 15 years to R. Emigh Livestock, the livestock company affiliated with the Mahoney Defendants. Emigh Land LP sold this property because it knew that as a result of the price-fixing conspiracy that artificially depressed supply of property in the area, it could get Flannery to purchase this property at the supracompetitive price of $12,400/acre. This price was outrageous for two reasons. First, unlike other agricultural properties in the area, this property was formerly used by the military and as an animal testing facility, both of which have created a range of "Recognized

28

Environmental Conditions" on the property (as evidenced by a Phase One Environmental Site Assessment obtained by Flannery). And second, many of the buildings used for the animal testing facility were still on the property and contained asbestos and lead paint, requiring expensive remediation that Flannery will have to pay for. To sum up, Emigh Land LP used the illegal price-fixing conspiracy to dump its worst property onto Flannery – at a supracompetitive price.

186.    On May 6, 2021, Flannery made another proposal to purchase 4,437 acres (3,514 acres of rangelands, plus 923 acres of the Emigh Industrial Property) to Emigh LP, Mahoney LP, and Mahoney Trust. The proposal included extensive non-price concessions to the sellers (e.g., leasebacks of properties being sold, leasebacks of other properties, allowances for tenant improvements, reservations of wind lease income and mineral rights, matching contributions for charitable giving by sellers), and included blank spaces for the purchase prices and other key parameters. Flannery expressly asked the Mahoney Defendants to consider its offer and provide a counteroffer of what terms would be acceptable to the Mahoney Defendants. The Mahoney Defendants declined to provide a counteroffer.

187.    On July 22, 2021, after the broker for the Mahoney Defendants told Flannery that the Mahoney Defendants would perhaps consider a smaller sale, Flannery made an offer to Mahoney LP on the Denverton Property and Shannon Property only. Flannery offered $4,300,000 (approximately $12,250/acre), plus a rent-free leaseback to the seller for 15 years. The Mahoney Defendants declined the offer.

188.    In early 2022, Flannery heard through brokers that the Emigh Industrial Property had still not sold, six years after being listed for sale with the national brokerage firm of Cushman & Wakefield. As a result, on April 5, 2022, Flannery made an offer to purchase 925 acres of the Emigh Industrial Property for $16,000,000 (approximately $17,300/acre). This offer was at a lower price than the listing for the Emigh Industrial Property, but at a higher price than prices that Flannery was paying for rangeland properties next to the Emigh Industrial Property. This offer reflected the mixed facts – on the one hand, the property had industrial zoning; on the other hand, there was little demand from purchasers or tenants of industrially-zoned properties in this area, and approximately 90% of the property was being used for grazing livestock. The Mahoney Defendants declined the offer.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

189.    In the summer of 2022, puzzled as to why none of the Conspirators would engage in negotiations (because it was still unaware of the conspiracy), and being unable to complete its purchases as a result, Flannery proposed to the Mahoney Defendants a property swap that would have resulted in both parties obtaining more contiguous and valuable holdings. As part of the swap, Flannery offered to provide rent-free long-term leases of its properties to R. Emigh Livestock, at roughly 50% discount to market rents.

190.    This swap made commercial sense for all parties as a stand-alone transaction. This was confirmed on July 28, 2022, when Flannery's attorney met with Ryan Mahoney, the son of Defendant Christine Mahoney and the President of R. Emigh Livestock. After Flannery proposed a swap, Mr. Mahoney said that a swap would make sense, especially if Flannery would offer to the Mahoney Defendants properties in the Montezuma Hills, which had better soil and wind lease income, both of which were things the Mahoney Defendants had wanted.

191.    On August 4, 2022, Flannery delivered a proposal for such a swap to Mahoney LP and Mahoney Trust, which involved a swap of properties with roughly similar fair market values, with Mahoney LP and Mahoney Trust getting properties with better soil and wind lease income, and with R. Emigh Livestock receiving a long-term lease at 50% discount to market rents on both properties involved in the swap and other Flannery-owned properties.

192.    The Mahoney Defendants asked for more time to evaluate the proposal, but by November 2022, they still had not responded or engaged in negotiations.

193.    Unbeknownst to Flannery (which at this time was still unaware of the conspiracy), the Mahoney Defendants saw an opportunity. First, they would use their illegal price-fixing conspiracy to force Flannery to engage in the swap rather than an outright purchase, such that they would first make their holdings more valuable (e.g., by swapping non-income producing properties for income-producing ones), and then continue to engage in the ongoing conspiracy and drive up prices even further (but now, they would be receiving ill-gotten additional income every year as they waited). And second, they would use this opportunity to also force Flannery to purchase the Emigh Industrial Property – which they had been unable to sell despite having it listed with a national brokerage for six years – for a supracompetitive price.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

194.     On November 4, 2022, unknowingly forced to do so by the price-fixing conspiracy, Flannery delivered an offer to the Mahoney Defendants whereby Flannery conceded that it would purchase 925 acres of the Emigh Industrial Property for $40,300,000 ($43,560/acre) if the Mahoney Defendants also entered into the August 4, 2022 swap.

195.     To create more time to negotiate the swap, in respect of the Mahoney Defendants' family situation following the passing of a family member, Flannery agreed that it would get under contract on the Emigh Industrial Property (with only $25,000 of the deposit being non-refundable) and begin its due diligence, while the parties finalized the long-form agreements for the August 4, 2022 swaps over the coming months (as the legal language for these long-form agreements would take a while to finalize).

196.     The Mahoney Defendants continued to use the illegal price-fixing conspiracy to extract additional supracompetitive profits from Flannery. As a condition of proceeding with Flannery's proposal, they required Flannery to agree to purchase not just 925 acres but the entire 1,047 acres of the Emigh Industrial Property, and to pay additional amounts for buildings on the property. On November 30, 2022, Flannery entered into an agreement to purchase the Emigh Industrial Property from Defendant Emigh Land LP for $43,560/acre for the land plus additional payments for buildings and Emigh Land LP's broker commission, in a total amount of over $50 million.

197.     Not satisfied with using the illegal price-fixing conspiracy (which at this point, Flannery was still unaware of) to force Flannery to purchase the Emigh Industrial Property for a supracompetitive price, the Mahoney Defendants at this point decided to go further, and renegotiate the August 4, 2022 swap agreement that was a condition of the Emigh Industrial Property purchase in a way that would further benefit them.

198.     In early 2023, Flannery contacted the Mahoney Defendants to complete the agreements regarding the swap. To Flannery's surprise, the Mahoney Defendants claimed that they never agreed to the swap and attempted to brazenly renegotiate the swap deal on terms far more advantageous to them and far worse for Flannery.

31

199.   The parties continued negotiating for several weeks. Eventually, with its options limited by the illegal price-fixing conspiracy, Flannery conceded on most points and agreed to swap transactions that were far more advantageous to the Mahoney Defendants, and far worse for Flannery, than the August 4, 2022 proposal. For example, the Mahoney Defendants made it a "deal-breaker" condition that they would not sell to Flannery the Goosehaven Ranch (even though Flannery's offer on the Emigh Industrial Property clearly stated that the swap of Goosehaven Ranch was an essential condition to Flannery's purchase of the industrial property), and separately, the Mahoney Defendants insisted on acquiring properties from Flannery that Flannery did not include in the August 4, 2022 swap (the Currie, Ila, and McKinnon 18 Properties). Both of these changes severely reduced the benefit of the swap to Flannery.

200.   To achieve their goals, the Mahoney Defendants refused to enter into the swap transaction with Flannery until Flannery also *de facto* guaranteed that it would purchase the Emigh Industrial Property at a supracompetitive price. Specifically, the Mahoney Defendants included in the swap agreements an express closing condition in favor of the Mahoney Defendants that required Flannery to increase its **non-refundable** deposit in escrow for the Emigh Industrial Property from **$25,000 to $20,000,000**. Because this non-refundable deposit was about 40% of the approximately $50 million purchase price, this condition essentially guaranteed that Flannery had to close on the Emigh Industrial Property (or otherwise it would lose the $20 million deposit).

201.   Flannery closed on the purchase of the Emigh Industrial Property on April 20, 2023. Only thereafter did Mahoney LP and Mahoney Trust close on their swap transactions with Flannery. Three of the four swaps closed on May 11, 2023. The remaining fourth swap is scheduled to close in a few months, following the completion of a required lot line adjustment that is under way.

202.   The illegal price-fixing conspiracy has been enormously lucrative for the Mahoney Defendants. First, they dumped their worst property with environmental issues onto Flannery at a supracompetitive price. Second, they manipulated Flannery into paying them over $50 million dollars for the Emigh Industrial Property, which they had been unable to sell despite listing it with a national brokerage firm for six years. Third, they then brazenly broke an oral agreement on the terms of the swap and forced Flannery to enter into the swap on terms far more advantageous to them and

32

1  far worse for Flannery. And finally, they still retained ownership of thousands of acres in the area.

2  At the prices the Conspirators have been attempting to extract from Flannery, the Mahoney

3  Defendants would have extracted another $150 million from Flannery for these holdings, bringing

4  their total illegal profits to over $200 million.

5      **C.**    **Anderson Properties**

6          1.    Mason, Zadwick, Neil Anderson, Maryn Anderson, and Russell Properties

7      203.    On November 13, 2018, Flannery made an offer to purchase the Mason Property,

8  Zadwick Property, Neil Anderson Property, and Maryn Anderson Property. Flannery offered

9  $13,532,000 ($8,500/acre) for the properties, allowing the sellers to retain 100% of wind lease

10  income, and a rent-free leaseback for eight years. Defendant Ian Anderson declined the offer.

11      204.    During 2019 and 2020, Flannery had many conversations with Defendants Ian

12  Anderson and Neil Anderson about purchasing land from them. Defendants Ian Anderson and Neil

13  Anderson acknowledged that Flannery was offering terms significantly above market values and that

14  they had discussed selling with their co-owners, but then they always deferred the discussion and

15  said that they would maybe consider selling in the future.

16      205.    During this time, Flannery also heard from a broker representing Defendants Ian

17  Anderson, Margaret Anderson, Neil Anderson, and Maryn Anderson that they may be interested in

18  selling if such sale would also include certain non-purchase price benefits, such as Flannery agreeing

19  to change the leases it had with Defendants Ian Anderson and Neil Anderson (which covered almost

20  5,000 acres and four residences) from being year-to-year paid leases to being long-term rent-free

21  leases.

22      206.    Eventually, Flannery agreed to offer such terms to these Defendants.

23      207.    On March 1, 2021, Flannery made a second offer to purchase the Mason Property,

24  Zadwick Property, Neil Anderson Property, and Maryn Anderson Property from Defendants Ian

25  Anderson, Margaret Anderson, Neil Anderson, and Maryn Anderson. Flannery offered $19,300,000

26  ($12,125/acre), plus an extraordinary list of other seller concessions. These concessions were based

27  on what the Andersons' broker told Flannery the Andersons wanted before agreeing to a deal.

28      208.    After receiving the offer, Defendants Ian Anderson, Margaret Anderson, Neil

33

Anderson, and Maryn Anderson engaged in a series of delay tactics similar to those employed by the other Conspirators. They did not immediately respond to Flannery, but kept talking to their broker about the offer, including specific terms and adjustments, keeping the offer alive while constantly delaying. This behavior continued for well over a year.

209.   During these discussions, according to an email from his broker, Defendant Ian Anderson told the broker in May 2022 that "$12,000/acre is fine," and then confirmed in numerous emails to the broker that he was actively working on the sale, including by meeting with his accountant and attorneys.

210.   On June 9, 2022, attorneys for Defendants Ian Anderson and Margaret Anderson contacted Flannery and asked for a Microsoft Word copy of the March 1, 2021 offer, saying that their clients wanted to make a counteroffer. Flannery provided the Word copy.

211.   On July 14, 2022, the attorneys for Defendants Ian Anderson and Margaret Anderson delivered a written counteroffer to Flannery's March 1, 2021 offer. The counteroffer was for $32,000/acre. In addition, Defendants Ian Anderson and Margaret Anderson demanded: everything Flannery offered in its list of extraordinary concessions; additional reservations of any new income streams from energy generation or storage; a leaseback of the Mason Property rent-free for 25 years; a leaseback of all other properties Defendants Ian and Margaret Anderson were leasing from Flannery (which were more than five times larger in size than the Mason Property being sold) rent-free for between 15 and 25 years; the right to lease any other property Flannery owned in the area for 25 years if existing tenant terminated; and other benefits.

212.   In sum, Defendants Ian Anderson and Margaret Anderson offered to sell their property to Flannery at $32,000/acre, which is a markup of approximately ***28,000% (28 times)*** over the $1,100/acre they had just told tax authorities that the land was worth (*see supra* ¶¶ 152-55). But that was not enough for their endless greed. In addition, they demanded an outrageous list of additional concessions. If such benefits were to be appraised and added to the cash purchase price they asked for, Defendants Ian Anderson and Margaret Anderson were likely asking Flannery to pay over $45,000/acre, which is a markup of approximately ***41,000% (41 times)*** over the $1,100/acre they had just told the tax authorities the land was worth.

34

213.    Later the same day, Flannery responded to the Andersons' attorney with shock and disbelief. But still attempting to negotiate in good faith (because it was unaware of the conspiracy), Flannery provided additional comparable sale figures, explained that its original offer was already at several times fair market value (not even including the extremely generous seller concessions Flannery offered), and delivered two counteroffers.

214.    Flannery's first counteroffer stated a price of approximately $12,200/acre (matching the highest prices paid by Flannery in the area), and re-iterated the original list of seller concessions from Flannery's March 1, 2021 offer, with some additional concessions in favor of Defendants Ian Anderson and Margaret Anderson. Flannery's second alternative counteroffer increased the purchase price to approximately $17,750/acre in exchange for removing all the various non-cash seller concessions. Flannery explained that it provided the second option so that if Defendants Ian Anderson and Margaret Anderson were looking merely for the highest cash price, they had that option and could weigh that against the first option, which included the extensive concessions.

215.    Over the ensuing days, Flannery's attorney and the attorney for Defendants Ian Anderson and Margaret Anderson exchanged a series of emails. In these emails, Flannery was generally trying to make the point that it was offering roughly three times fair market value plus all the various seller concessions, and that the parties should try to work out a deal. The Andersons' attorney, in contrast, was essentially saying "This is what they want."

216.    Unbeknownst to Flannery, Defendant Ian Anderson was conspiring with Conspirator Richard Hamilton and the other Conspirators about how to reduce competition in the sale of land. Angry that Flannery did not agree to the Andersons' outrageous demands to be paid 28-50 times more than what they told the tax authorities that the land was worth, Defendant Ian Anderson wanted to ensure that Flannery would be forced to pay them this extortionate amount. To do that, he needed to ensure that other major landowners would not sell Flannery their property at lower prices, so that Flannery would eventually have to accept the terms he and Defendant Margaret Anderson had set.

217.    Defendant Ian Anderson did exactly that. As reflected in ***Exhibit A***, ***only a week after the Andersons' July 14, 2022 counter***, Conspirator Richard Hamilton texted Defendant Kirk Beebe on July 22, 2022, writing: "***In talking with Ian Anderson, he agrees that the remaining property***

35

*owners should be in agreement on what we would want to sell our properties*. So [Flannery's attorney] cannot play owners against owners." (Ex. A (emphasis added).)

218.   Flannery alleges, based on information and belief, that in addition to conspiring with Conspirator Richard Hamilton, Defendants Ian Anderson and Margaret Anderson brought the remaining Anderson Defendants into this illegal price-fixing conspiracy, in which they attempted to extract the $32,000/acre price from Flannery for the entire 4,984 acres that are or were owned by the Anderson Defendants, with the goal of illegally extracting from Flannery over $150 million in supracompetitive payments.

2.   Dietrich, Alsop, and Gurule Properties

219.   Between 2019 and 2023, Flannery delivered at least three offers to the Anderson Defendants who own the Dietrich Property, Alsop Property, and Gurule Property. The offers were on terms consistent with other offers Flannery made on other properties at such times, such as those discussed above in this complaint.

220.   In phone discussions that Flannery's attorney had with Paul Dietrich and Nancy Roberts, as the *de facto* "speakers" for the Dietrich Property and Alsop Property ownership group, the primary recurring theme was these Defendants implying that they would sell if Defendant Ian Anderson decided to sell.

221.   With regard to the Gurule Property, Defendant Ronald Gurule would not engage with Flannery directly, but Defendant Ian Anderson confirmed that Defendant Ronald Gurule was considering selling when he admitted to Flannery's attorney that Defendant Ronald Gurule asked Defendant Ian Anderson about his thoughts on selling to Flannery.

3.   Ila, Richard Anderson, Irwin Anderson, and McKinnon 18 Properties

222.   Between 2019 and 2023, Defendants Richard Anderson, Carol Hoffman, Deborah Workman, David Anderson, and their agents have been engaged in a back-and-forth discussion with Flannery about selling their properties – Ila Property, Richard Anderson Property, Irwin Anderson Property, and McKinnon 18 Property.

223.   During that period, the broker for these Defendants told Flannery's attorney that David Anderson wanted to sell his interests all along, and that Richard Anderson told him he was

36

1    willing to sell his interests once Flannery was willing to pay $14,000-$15,000/acre.

2    224.    As a result of this ongoing interest, throughout this period, Flannery made a series of

3    offers to these Defendants, including in July 2019, December 2020, May 2021, and March 2022.

4    With each of these offers, Flannery expressly invited these Defendants to submit a counteroffer, and

5    in 2021 and 2022, Flannery made it clear that it would consider paying the $14,000-$15,000/acre

6    that Richard Anderson said he wanted, depending on other terms.

7    225.    But these Defendants always just delayed negotiations, did not submit a counteroffer,

8    and allegedly told their broker that it was not the right time yet, that they would revisit this later, and

9    so on. They did not say they would not sell, but instead continually deferred discussions.

10    226.    In December 2022, the parties finally agreed on a transaction. But Richard Anderson,

11    Carol Hoffman, Deborah Workman, and David Anderson refused to sell unless Flannery agreed to

12    pay them a supracompetitive price of approximately $17,200/acre (plus an additional amount to

13    purchase their wind lease income stream), and even then, they would only sell to Flannery the Ila

14    Property and the McKinnon 18 Property. The Ila Property sale closed on May 10, 2023. The sale of

15    the McKinnon 18 Property is scheduled to close in a few months, following the completion of a

16    required lot line adjustment that is under way.

17                    4.    Anderson 1,005 and 153 Properties

18    227.    In early January 2019, Flannery's attorney spoke to Defendant Stan Anderson about

19    Mr. Anderson's lease of a property that Flannery had just purchased from another landowner. In that

20    conversation, Defendant Stan Anderson expressed an interest in selling and *expressly* asked

21    Flannery's attorney for an offer on the properties he had an interest in, specifically the Anderson

22    1,005 Property and Anderson 153 Property.

23    228.    On January 14, 2019, Flannery delivered an offer on the Anderson 1,005 Property and

24    Anderson 153 Property to their owners. Flannery offered $10,000,000 (approximately $8,700/acre),

25    allowing the sellers to retain 100% of wind lease income, and a rent-free leaseback for five years.

26    The Defendant owners did not accept or counter the offer.

27    229.    In the summer of 2019, a local broker spoke to several of the ten Anderson Defendants

28    with interest in these properties, who showed an interest in selling and asked for a new offer.

37

According to the broker: (i) many of the ten owners thought they owned a lot more than they did, and when they realized they only owned between 7% and 14% of the property each (as tenants-in-common), they were interested in selling; (ii) Defendant Stan Anderson was interested in selling and told Defendants Janet Blegen and Defendant Robert Anderson that he wanted to sell; (iii) Defendant Glenn Anderson was willing to sell as long as he received a life estate on the portion of the property where he lived; and (iv) Defendant Ned Anderson wanted to sell.

230.    On July 31, 2019, Flannery delivered a second offer on the Anderson 1,005 Property and Anderson 153 to the broker, who distributed it to the owners. Flannery offered similar terms to the previous offer, except that the offer included a life estate for Defendant Glenn Anderson on a large portion of the property, and a rent-free leaseback for ten years on the remainder. The broker told Flannery that several of the owners showed interest in selling, but because the properties were owned by ten different Anderson Defendants, they would need more time to discuss the offer. Flannery did not hear much after that, except that someone was "poisoning the well" and convincing the owners not to sell.

231.    On January 21, 2020, Flannery made a third offer on the Anderson 1,005 Property only, which was delivered directly to the ten Anderson Defendants who co-owned this property. Flannery offered similar terms to the previous offers, except that the price was now $10,800,000 (approximately $10,700/acre). Flannery did not receive a clear response, except from Defendants Sharon Totman, Robert Anderson, and Janet Blegen.

232.    Defendant Sharon Totman exchanged phone calls and emails with Flannery's attorney. She said that she and Defendant Lynne Mahre had spoken, and they wanted to sell their interests, but they were having issues convincing the other family members. Defendant Sharon Totman asked Flannery's attorney whether Flannery would purchase the undivided interests held by just her and Defendant Lynne Mahre if the other co-owners did not agree to a sale. Flannery told her that while it would consider buying a majority interest in the properties, at the time it was not able to purchase the minority 14% interest that Defendants Sharon Totman and Lynne Mahre owned.

233.    On February 14, 2020, Flannery received a voicemail response from Defendant Robert Anderson, in which he said: "I saw the offer and I'm not interested *at that price*."

38

234.     Around the same time, the husband of Defendant Janet Blegen left a voicemail with Flannery saying that Defendant Janet Blegen was not interested in selling.

235.     In February 2021, Flannery's attorney spoke to Defendant Stan Anderson again in the context of Flannery's leases with him (on properties that Flannery purchased from third parties). During that conversation, Flannery's attorney asked Defendant Stan Anderson what happened with his and his co-owners' interest to sell. Defendant Stan Anderson said that his co-owners did not want to sell unless they got paid $27,000/acre.

236.     On May 19, 2021, Flannery delivered two separate new offers to Defendants Sharon Totman and Defendant Lynne Mahre. In these offers, Flannery said it was following up on prior conversations with Defendant Sharon Totman, and that in light of changed circumstances, it would be able to purchase each of their respective undivided interests. The offers were on similar terms as previous offers, except that each offer was for their respective undivided interest only, and did not require other co-owners to sell. A few weeks later, Flannery was contacted by Ryan Totman, son of Defendant Sharon Totman, who said they did not wish to sell because the offered price was too low. Flannery alleges based on information and belief that this change of opinion from February 2020 happened because by then, these Anderson Defendants had joined the illegal price-fixing conspiracy.

237.     On May 11, 2022, Flannery delivered yet another offer to these ten Anderson Defendants. Flannery offered $12,500,000 ($12,400/acre), allowing the sellers to retain 100% of wind lease income, a life estate for Glenn Anderson on a large portion of the property, and a rent-free leaseback for 10 years on the remainder. This offer also did not receive a response.

### D.     Hamilton Properties

238.     The Hamilton Properties used to be owned by 38 owners, consisting of the Hamilton Conspirators and 27 other parties.

239.     On November 13, 2018, Flannery made an offer to purchase Hamilton Hoyt and Hamilton HMP. Flannery offered $13,643,500 ($8,500/acre) for the properties, allowing the sellers to retain 100% of wind lease income, and a rent-free leaseback for eight years. In December 2019, Conspirator Richard Hamilton declined the offer on behalf of the Hamilton Conspirators and other co-owners.

39

240.    On January 31, 2020, Flannery made a combined offer to purchase Hamilton Hoyt, Hamilton HMP, Hamilton 265, and Hamilton 200 from the Hamilton Conspirators and third parties with ownership interests for $23,000,000 (~$11,300/acre), plus a reservation of wind lease income to sellers, and a rent-free leaseback for ten years.

241.    On February 12, 2020, Conspirator Richard Hamilton responded to Flannery via a letter, where he wrote that "we are not interested in *the most current* . . . offer," but then clearly indicated the Hamilton Conspirators' willingness to sell their properties, including by providing Flannery detailed instructions on how to style its next offer, such as how to divide the offers between individual Hamilton Properties and how to specify what income streams would be subject to the reservation by sellers.

242.    In response, on February 26, 2020, Flannery made a new offer to purchase Hamilton Hoyt, Hamilton HMP, Hamilton 265, and Hamilton 200 in line with Conspirator Richard Hamilton's requests, including separate offers for each of the properties and more detailed explanations of the income reservations. The Hamilton Conspirators did not accept this offer and did not even engage in further discussions.

243.    This decision by the Hamilton Conspirators was odd to Flannery because by then a local real estate broker told Flannery that the 38 owners of the Hamilton Properties were in a "Hatfields & McCoys" situation, in which most of these 38 owners other than the Hamilton Conspirators wanted to sell to Flannery, but that the Hamilton Conspirators were blocking the sale. But out of respect for Richard Hamilton, Flannery continued to direct most communications to him, rather than making separate offers to each owner.

244.    On July 27, 2020, according to an email received by Flannery, Conspirators Richard and Charles Hamilton met with another local broker and expressed their interest in selling their properties to Flannery "on the right terms."

245.    In 2021, Flannery reached out to the other 27 owners directly. Thereafter, through a series of independent transactions that took place in 2021 and 2022, every single one of the 27 owners other than the Hamilton Conspirators sold their interests in the Hamilton Properties to Flannery (or to its subsidiaries Arran LLC and Kingstree LLC).

246.    During the same period, Flannery made multiple offers to the Hamilton Conspirators, both oral and written. The Hamilton Conspirators declined such offers.

247.    Moreover, under various pretenses and threats, the Hamilton Conspirators repeatedly attempted to discourage their co-owners from selling, including attempting to unlawfully interfere in such acquisitions by Flannery, both during negotiations and after the transactions closed, through a series of unlawful acts that became the basis of separate state court litigation, *see Arran LLC v. Hamilton*, No. FCS059438 (Cal. Super. Ct. Dec. 14, 2022); *Arran LLC v. Hamilton*, No. FCS8059372 (Cal. Super. Ct. Dec. 16, 2022) (and related arbitrations).

248.    The litigation and arbitrations were provisionally settled on March 31, 2023, when Flannery and the Hamilton Conspirators executed a Purchase and Sale and Joint Release Agreement. Pursuant to this agreement, Flannery and the Hamilton Conspirators agreed to execute a series of transactions that would result in (i) Flannery owning 100% of the interests in Hamilton Hoyt, Hamilton HMP, Hamilton ACR, and Hamilton Thomas, and (ii) the Hamilton Conspirators owning 100% of the interests in Hamilton 200, Hamilton 235, and Hamilton 265, plus other properties (outside of this area and not subject to this complaint) formerly owned by Flannery and the Hamilton Conspirators. The parties agreed that in these swaps the properties would be valued at fair market values (as appraised by independent third parties), with either Flannery or the Hamilton Conspirators paying any remaining balance in cash. In connection with these transactions, Flannery also agreed, effective upon the closing of such transactions, to release the Hamilton Conspirators from liability for certain claims. The closing is scheduled to occur in the next few weeks.

## VI.    **The Conspirators Agreed To Fix Prices at Artificially High Levels**

249.    Discovery has revealed that the Conspirators started working together against Flannery in or around late 2018 – shortly after Flannery began acquiring properties in this area.

250.    For example, on October 29, 2018, Defendant Christine Mahoney emailed Defendant Kirk Beebe: "I wanted to share with you that we are proceeding to sell a 278 acre parcel to the Flannery LLC 'mystery guy' we spoke about." This sale occurred before Flannery made the November 2018 round of offers described above (*see supra* ¶ 163), and therefore before the Mahoney

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Defendants and BLK Defendants realized the scale of Flannery's acquisitions, and the resulting opportunity for them to collude and conspire to price fix to extract supracompetitive payments.

251.    Immediately after hearing about the sale from Defendant Christine Mahoney, Defendant Kirk Beebe emailed his father, Kenneth Beebe, writing: "See below. Why don't you call Dick to see what you can find out." Richard (Dick) Emigh is the father of Defendant Christine Mahoney. The fact that the BLK Defendants and Mahoney Defendants conspired over the years is further evidenced by a March 11, 2020 email, in which Kirk Beebe wrote to the Mahoney Defendants' broker Brooks Pedder of Cushman & Wakefield: "My dad got his info [about Flannery] from Dick Emigh."

252.    The BLK Defendants and Mahoney Defendants are close because the BLK Defendants have been leasing the BLK Properties to the Mahoney Defendants or their affiliates for many years. The BLK Defendants and the Mahoney Defendants communicate frequently both directly and through their brokers.

253.    The Mahoney Defendants, the Hamilton Conspirators, and many of the Anderson Defendants all live near each other, know each other well, and communicate frequently. These Conspirators have discussed selling their properties to Flannery. According to his broker, on or around February 28, 2022, Ian Anderson told the broker that if Richard Hamilton made a deal with Flannery, then Ian and Margaret Anderson would join in.

254.    All the Anderson Defendants are closely related. First, all the Anderson Defendants are immediate or extended family members of each other. Second, all the Anderson Defendants own mineral rights under each other's properties. By way of example, Defendant Paul Dietrich owns a share of mineral rights under not just the Dietrich Property but also under the Neil Anderson, Maryn Anderson, Alsop, Gurule, etc. properties, and the same situation applies to all other Anderson Defendants. Finally, all the Anderson Defendants lease their property to Ian Anderson and Margaret Anderson, to Neil Anderson, or to Stan Anderson.

255.    Many of the Anderson Defendants (such as Defendants Paul Dietrich, Nancy Roberts, and Richard Anderson) repeatedly implied to Flannery they would sell once Defendant Ian Anderson did. Similarly, Defendant Ian Anderson confirmed that Defendant Ronald Gurule was considering

42

1  selling by telling Flannery's attorney that Defendant Ronald Gurule discussed selling with Defendant

2  Ian Anderson.

3    256.    Direct "smoking gun" evidence of a price-fixing conspiracy is exceedingly rare. But

4  through discovery in separate litigation, Flannery obtained the "smoking gun" evidence in the spring

5  of 2023. Flannery could not have reasonably discovered this evidence, or the existence of the price-

6  fixing conspiracy, any earlier in time – despite its diligence.

7    257.    Although the conspiracy appears to have started in or around late 2018, it became

8  evident through a series of text messages, emails, and actions that took place in the summer of 2022

9  and that were only recently disclosed to Flannery.

10    258.    For example, in the exchange attached as ***Exhibit A*** to this complaint, Conspirator

11  Richard Hamilton texted Defendant Kirk Beebe. Referencing a conversation with Defendant Ian

12  Anderson, Richard Hamilton wrote: "In talking with Ian Anderson, ***he agrees that the remaining***

13  ***property owners should be in agreement on what we would want to sell our properties***. So Melynk

14  [sic] cannot play owners against owners. I think we should have a meeting in the next two weeks to

15  talk about Flannery." (Ex. A (emphasis added).)[16]

16    259.    Kirk Beebe responded: "***Agree***. I am talking with your attorney tomorrow . . . ." (*Id.*

17  (emphasis added).)

18    260.    Highlighting the importance that Defendant Kirk Beebe placed on this conversation

19  with Conspirator Richard Hamilton, he then took a screenshot on his iPhone, and emailed this

20  exchange to his father Kenneth Beebe, Defendant Susan Beebe Furay, and their attorney.

21    261.    Three days later, on July 25, 2022, Defendant Christine Mahoney emailed Defendant

22  Kirk Beebe a map of Flannery holdings, writing: "I heard you talked with Hamiltons[.] That's great

23  that we can support each other!" (Ex. B.)

24

_____

25  [16] Starting in 2018, Flannery's attorney, Richard Melynk, became its sole representative when
negotiating with landowners. Thereafter, the Conspirators – both directly and through brokers and

26  attorneys – all had extensive dealings with Mr. Melynk, including emails, phone calls, and personal
meetings. In emails and other correspondence, the Conspirators sometimes used "Melnyk" or

27  "Melynk" interchangeably with Flannery. The Conspirators also appear to have had other code
names for Richard Melynk. For example, Defendant Kirk Beebe and his father (Kenneth Beebe)

28  appear to have referred to Richard Melnyk as "melted dick" in their emails.

43

262.    On August 8, 2022, Defendant Susan Furay emailed Defendants Michael Rice, Kirk Beebe, and others: "[Flannery's] hyper aggressive behavior seems to indicate that we are in a very good position and it is best not to engage with them at this point. No one is suggesting that we don't sell, the question is when and at what price. Several of the other major land owners in the area are basically taking their time as well and not engaging with Flannery." (Ex. C.)

263.    That same day, on August 8, 2022, the attorney for Defendant Ian Anderson – after engaging in negotiations with Flannery for months and providing a written counteroffer – emailed Flannery's attorney (while copying Defendants Ian and Margaret Anderson), writing: "[T]he andersons have advised me that they are not interested in continuing negotiations at this point. *I assume* they will be back in touch if/when they are interested in resuming negotiations (they have not offered any indication of if or when that might occur)." (Ex. D.)

264.    In the fall of 2022, Defendant Richard Anderson was negotiating a sale of the Ila Property with Flannery (at one of the highest prices Flannery ever paid, $17,200/acre plus an additional separate amount for the wind income). At the time, Flannery was unaware of the conspiracy. When asked by Flannery's attorney who Richard Anderson would retain to represent him as his attorney in the sale, Richard Anderson stated that he may hire Defendant Kirk Beebe's attorney, stating of the attorney: "That guy is a cool dude."

265.    Given the allegations above, upon information and belief, Flannery alleges that the Conspirators used Defendant Kirk Beebe's attorney as one of the conduits to coordinate their price-fixing conspiracy. Indeed, in furtherance of the ongoing illegal conspiracy, Defendant Kirk Beebe emailed his attorney a screenshot of his texts about the price-fixing conspiracy with Conspirator Richard Hamilton (which included description of conversations about the price-fixing conspiracy with Defendant Ian Anderson). This email was redacted on attorney-client privilege grounds, but Flannery intends to challenge that privilege claim – and any other assertion of attorney-client privilege regarding communications in furtherance of the conspiracy – on the basis of the crime-fraud exception.

266.    In December 2022, Defendant Paul Dietrich told Flannery's attorney in a phone conversation that he had recently spoken to Defendant Ian Anderson, and that this conversation made

44

1  him even less interested in selling.

2  267.   Also, in early 2023, in discussions about a sale by the BLK LLCs to Ranchlands LLC

3  or to Flannery, the BLK Defendants repeatedly brought up the fact that Flannery was under contract

4  to purchase the Emigh Industrial Property for $43,560/acre. This purchase did not close and was not

5  recorded in public records until April 20, 2023. The fact that the Mahoney Defendants informed the

6  BLK Defendants that they were selling to Flannery – including the sale price – confirms the close

7  and ongoing illegal price-fixing conspiracy among Defendants.

8  268.   On April 28, 2023, Flannery's attorney had a call with another local landowner who

9  had wanted to put together a deal whereby his extended family (who owned the relevant property

10  together) would sell to Flannery. This landowner told Flannery that he recently called his cousin

11  about the sale, who said he would not sell to Flannery and "[i]f you want to know why, you can go

12  ask the Andersons, the Emighs, the Hamiltons, and the Beebes."

13  269.   Defendant Kirk Beebe brought into his confidence Defendants Mike Rice and Murray

14  Bankhead, who are members of the BLK LLCs, informing them of the conspiracy and telling them

15  that the BLK LLCs needed to hold out on Flannery's offers until the conspiracy could yield a higher

16  price.

17  270.   Mr. Bankhead is a real estate attorney. Mr. Bankhead aided Defendants Kirk Beebe

18  and Susan Beebe Furay by agreeing to oppose a sale by the BLK LLCs until supracompetitive prices

19  are achieved and by encouraging other members of the BLK LLCs to reject Flannery's offers.

20  271.   Mr. Rice is a real estate developer. Mr. Rice assisted Defendants Kirk Beebe and

21  Susan Beebe Furay by echoing their statements to members of the BLK LLCs that Flannery's offers

22  were too low and agreeing not to sell until supracompetitive prices are achieved. Mr. Rice did so

23  despite knowing that the BLK Properties' valuations were lower than the prices of the Emigh

24  Industrial Property that Kirk Beebe was touting to other members as a relevant price benchmark

25  (because the Barnes and Lambie Properties are near the Emigh Industrial Property). Indeed, when

26  asked in a deposition if "[Mr. Rice] or Kirk believe that the value of these properties should be in

27  line with the sale prices of property in the industrial park," Mr. Rice testified: "It would be

28  substantially less than that. It's not in an industrial park right now."

45

**VII.    Flannery Has Suffered Antitrust Injury as a Result of the Price-Fixing Conspiracy**

272.    The price-fixing conspiracy has resulted in the suppression and elimination of competition, leading to artificially high prices and fewer transactions.

273.    Flannery has standing to bring claims against Defendants because it has been the direct target of Defendants' illegal conduct.

274.    Flannery also has standing to bring claims against Defendants because it has been not only the largest, but also the *de facto* only, purchaser of properties in this area during this period.

275.    As a result of the illegal price-fixing conspiracy, Flannery has suffered, and will continue to suffer, damages: (A) by overpaying for property purchased from the Conspirators and their co-owners; (B) in the form of lost profits attributable to Flannery's inability to purchase property that the Conspirators have thus far refused to sell to Flannery; (C) by overpaying for property purchased from third parties; and (D) in the form of lost profits attributable to Flannery's inability to purchase property that third parties have thus far refused to sell to Flannery.

**A.    Overcharge Damages for Purchases
From the Conspirators and Their Co-Owners**

1.    Purchases From the Conspirators

276.    As a result of the price-fixing conspiracy, Flannery has been overcharged for properties purchased from, or swapped with, the Conspirators.

277.    Flannery purchased the Emigh 45 Property and Emigh Industrial Property from Emigh Land LP.

278.    Flannery purchased the Ila Property from Defendants Richard Anderson, Carol Hoffman, Deborah Workman, and David Anderson.

279.    Flannery is contracted to purchase the McKinnon 18 Property from Defendants Carol Hoffman, Deborah Workman, and David Anderson.

280.    Flannery entered into a series of swap transactions with Mahoney LP and Mahoney Trust.

281.    As a result of the illegal price-fixing conspiracy, Flannery was damaged by (i) purchasing the Emigh 45 Property, the Emigh Industrial Property, the Ila Property, and the

46

McKinnon 18 Property at supracompetitive prices and with supracompetitive concessions to sellers, and (ii) entering into the swap transactions with Mahoney LP and Mahoney Trust on supracompetitive terms that favored Mahoney Defendants and penalized Flannery.

2.   Purchases From Co-Owners of the Conspirators

282.    As a result of the price-fixing conspiracy, Flannery has been overcharged for properties purchased from 27 co-owners of the Hamilton Properties with the Hamilton Conspirators.

283.    As a result of the above-described settlement with the Hamilton Conspirators, Flannery currently owns or is contracted to own 100% of Hamilton Hoyt, Hamilton HMP, Hamilton ACR, and Hamilton Thomas.

284.    But as a result of the price-fixing conspiracy, Flannery has incurred millions of dollars in costs above what Flannery would have otherwise paid for these properties.

285.    First, the purchases from the 27 owners other than the Hamilton Conspirators required Flannery to pay a premium for "breaking up with the family" and crossing Richard Hamilton. In the absence of the price-fixing conspiracy, Flannery would either not have had to pay such premiums at all for partial interests (most likely, it would have been given a discount), or the Hamilton Conspirators would have joined the sale along with their family and Flannery would have purchased 100% interests in the Hamilton Properties at a lower price.

286.    Second, purchasing these properties through many independent transactions for partial tenancy-in-common interests and LLC interests instead of simple 100% fee purchases has caused Flannery substantial additional expenses (such as brokerage and legal fees), none of which would have been necessary absent the price-fixing conspiracy.

287.    Third, because of the price-fixing conspiracy, when buying from the 27 owners, Flannery had to purchase all the interests the sellers co-owned with the Hamilton Conspirators (because to cross Richard Hamilton, such parties required a "buy me out of everything I own with them" deal), which included interests in various properties that Flannery did not wish to purchase. Purchasing these properties has caused substantial additional expense to Flannery, including acquisition and due diligence costs, brokerage fees, legal fees, financing costs, property management fees, property taxes, and disposition costs.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

288.     Fourth, because of the price-fixing conspiracy, the Hamilton Conspirators have engaged in certain behaviors that were intended to prevent Flannery from purchasing from their co-owners, which resulted in the above-referenced litigation that has caused substantial additional expenses to Flannery.

**B.     Lost Profits From Inability To Purchase Properties From the Conspirators**

289.     As a result of the price-fixing conspiracy, Flannery has been unable to purchase the below properties owned by the Conspirators.

290.     With regard to the BLK Defendants, Flannery has been unable to purchase the Barnes Property, the Lambie Property, and the Kirby Property.

291.     With regard to the Mahoney Defendants, Flannery has been unable to purchase the Goosehaven Property, the Nielsen Property, the Mahoney 607 Property, the Mahoney 370 Property (which Flannery purchased from a third party but had to sell to the Mahoney Defendants as a condition of a swap), the Currie Property (same as the Mahoney 370 Property), the McKinnon 160 Property (same as the Mahoney 370 Property and the Currie Property), the McKinnon 18 Property (which Flannery purchased from the Anderson Defendants but had to sell to the Mahoney Defendants as a condition of a swap), and the Ila Property (same as the McKinnon 18 Property).

292.     With regard to the Anderson Defendants, Flannery has been unable to purchase the Mason Property, Zadwick Property, Neil Anderson Property, Maryn Anderson Property, Russell Property, Dietrich Property, Alsop Property, Gurule Property, Richard Anderson Property, Irwin Anderson Property, Anderson 1,005 Property, and Anderson 153 Property.

293.     With regard to the Hamilton Conspirators, Flannery has been unable to purchase Hamilton 200, Hamilton 235, and Hamilton 265 – each of which Flannery partially purchased but had to sell to the Hamilton Conspirators as part of the swap.

294.     The inability to purchase these properties has resulted in lost profits for Flannery. A large holding of contiguous assembled property under common ownership is more valuable than if such assemblage is missing properties that could not be purchased due to this price-fixing conspiracy. If Flannery had been able to purchase the above-referenced properties, Flannery's overall portfolio

1  would be significantly more valuable. Flannery was deprived of these benefits by this price-fixing

2  conspiracy.

3        **C.**    **Overcharge Damages for Purchases From Third Parties**

4      295.    As a result of the price-fixing conspiracy, prices in the Jepson Prairie and Montezuma

5  Hills area of Solano County have been artificially inflated, causing dozens of other landowners (who

6  are not currently alleged to be parties to the conspiracy) to demand higher prices to sell to Flannery

7  than they would have otherwise (discussed in this section) and/or to refuse to sell – while waiting

8  until the Conspirators sell (discussed in the next section).

9      296.    The Conspirators are some of the largest and most respected landowners in this area.

10  Accordingly, they have existing relationships with most – and likely all – other landowners. For

11  example, the Conspirators have extensive relationships with the following other large landowners

12  (who are currently not alleged to be parties to the conspiracy):

13        •   Albert Medvitz and Jeanne McCormack – Mr. Medvitz and Ms. McCormack are

14           neighbors and friends of Conspirators Richard and Anastasia Hamilton, and they lease

15           a portion of their property to Conspirator Charles Hamilton; they are also friends of

16           Defendants Ian and Margaret Anderson and lease another portion of their property to

17           Defendants Ian Anderson, Margaret Anderson, and/or Neil Anderson.

18        •   Thomas, Wesley, and Loren Stewart – the Stewarts are neighbors of Defendants Ian

19           Anderson and Margaret Anderson, and they lease or formerly leased their property to

20           them.[17] The Stewarts also have existing relationships with the Hamilton Conspirators

21           and other Anderson Defendants, and the Stewarts have admitted to Flannery's

22           attorney that they discussed selling to Flannery with the Anderson Defendants and

23           Hamilton Conspirators.

24        •   Dexter Mayhood – Mr. Mayhood has been leasing his property to the Mahoney

25

26  [17] In fact, the Stewart property is surrounded by properties owned by Anderson Defendants on all sides (Zadwick to the west, Mason to the north, Russell to the east, and Neil Anderson and Maryn Anderson to the south). Flannery's prior purchases offer extensive evidence that once all neighbors

27  of a given landowner sell, that landowner generally sells shortly thereafter. The fact that the Anderson Defendants have not sold as a result of the price-fixing conspiracy has therefore likely

28  been a significant factor that influenced the Stewarts' decision not to sell to Flannery.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Defendants for many years. He is also a neighbor of the Hamilton Conspirators.

297.   Because the BLK Defendants, Mahoney Defendants, Anderson Defendants, and Hamilton Conspirators are some of the largest landowners in the area, other landowners of all sizes have viewed them as shrewd operators and have based their decisions about selling their properties to Flannery on whether the Conspirators had already sold.

298.   In addition, Defendant Kirk Beebe is a Senior Vice President at CBRE, a Fortune 500 company and one of the largest commercial real estate services and investment firms in the world, with 2021 revenues of over $27 billion. On the CBRE website, Defendant Kirk Beebe's profile reads: "Kirk is responsible for assisting office space users execute real estate transactions, specifically acquiring and disposing of leased and owned properties, as well as project leasing for institutional owners and developers. During Kirk's career, he has leased or sold more than 26,000,000 square feet of office space with a consideration of 3 billion dollars."

299.   Because of Defendant Kirk Beebe's senior role at the prestigious CBRE, many landowners in the area gave significant weight to his decisions and decisions of the BLK Defendants when deciding whether to sell to Flannery, and on what terms. Because Defendant Kirk Beebe and BLK Defendants have not sold their property as a result of this illegal price-fixing conspiracy, those landowners have also decided to either demand supracompetitive prices to sell (discussed in this section), or to delay selling at all until the BLK Defendants sell (discussed in the next section).

300.   In Flannery's discussions with potential sellers of properties, as well as with brokers and attorneys involved in such negotiations, Flannery was constantly asked whether the Beebes, the Mahoneys, the Andersons, and the Hamiltons had sold yet. When Flannery said that they had not, other landowners interpreted this to mean that they also should hold out for more money.

301.   Flannery alleges, based on information and belief, that in addition to this effect of the illegal price-fixing conspiracy, the Conspirators likely also actively discouraged other landowners from selling in order to help the Conspirators drive up prices to supracompetitive levels, even if they did not directly involve such other landowners in the conspiracy. For example, the Conspirators have likely tried to convince others not to sell by appealing to emotional ties to the land, even though the "smoking gun" texts and emails and other evidence in Flannery's possession show that for the

50

1   Conspirators, this was about money, and they wanted to sell.

2   302.   The Conspirators influenced the decisions of many landowners in the area to demand

3   higher supracompetitive prices before selling.

4   303.   For example, on December 5, 2022, Flannery completed a purchase of 400 acres from

5   Nick and Enina Orciuoli for $7 million, or about $17,500/acre. This was significantly more than the

6   amount the Orciuolis indicated in earlier negotiations, when they said they would accept just over $5

7   million ($12,500/acre). The Orciuoli property is immediately next to the Lambie Property. Flannery

8   alleges based on information and belief that Nick and Enina Orciuoli knew who the BLK Defendants

9   (and Defendant Kirk Beebe in particular) were, and likely based their decision to demand more

10  money to sell in significant part on the fact that their neighbors, the BLK Defendants, and in

11  particular Defendant Kirk Beebe who is a Senior Vice President at the prestigious CBRE, had not

12  sold their property.

13  304.   Flannery will provide additional examples in this category once transactions currently

14  in escrow close.

15  305.   As a result of the illegal price-fixing conspiracy, Flannery was damaged by

16  purchasing the Orciuoli property and other properties from third parties at supracompetitive prices

17  and with supracompetitive concessions to sellers.

18     **D.     Lost Profits From Inability To Purchase Properties From Third Parties**

19  306.   The previous section described how the illegal price-fixing conspiracy has influenced

20  decisions by landowners who are currently not alleged to be parties to the conspiracy.

21  307.   For some of those landowners, the illegal price-fixing conspiracy resulted in them

22  demanding supracompetitive payments before selling, as discussed in the previous section.

23  308.   For other landowners, the illegal price-fixing conspiracy resulted in them deciding to

24  delay selling until the Conspirators themselves sold. Flannery has had dealings with many such third-

25  party landowners who were initially interested in selling to Flannery, but when they became aware

26  that the Conspirators had not sold (or possibly when the Conspirators manipulated them into not

27  selling), they decided to follow these "shrewd operators" and to also not sell. The following are just

28  a few examples.

51

309.    In the summer of 2020, a local broker had several conversations with Jeanne McCormack and Albert Medvitz, and told Flannery's attorney in a series of emails that they were interested in selling. Flannery alleges, based on information and belief, that shortly thereafter, Defendants Ian Anderson and Margaret Anderson, who have a long-standing relationship with Jeanne McCormack and Albert Medvitz, "poisoned the well" and turned Jeanne McCormack and Albert Medvitz against selling in order to improve their own negotiating position and reduce the supply of land available for sale in the market.

310.    In a second example, on November 12, 2021, Flannery purchased a 605-acre property owned by Dexter Mayhood. During the negotiation of this transaction and afterwards, the parties repeatedly discussed that this was an initial sale, and that once the first portion closed, Mr. Mayhood may be interested in selling some of his remaining 2,097 acres. This expectation was memorialized by Flannery and Dexter Mayhood entering into a Right of First Offer and Right of First Refusal Agreement that covered the remaining 2,097 acres. In this initial purchase in November 2021, Flannery paid approximately $12,300/acre. Over the next year, the illegal price-fixing conspiracy successfully cornered Flannery into increasing its prices further. As a result, in November 2022, Flannery offered $30,000,000 to Mr. Mayhood to purchase another 1,605 acres, i.e., approximately $18,600/acre, a 51% premium to the price from just a year earlier. Despite this, Mr. Mayhood decided not to sell any additional acreage. Flannery alleges, based on information and belief, that the Conspirators' influence was a significant factor that convinced Mr. Mayhood not to sell.

311.    In a third example, on April 29, 2019, Cattey Ranch LLC ("Cattey"), a local landowner, delivered a binding counteroffer to Flannery to sell its property for $10,000/acre. Flannery entered into negotiations with Cattey regarding certain non-price terms of its counteroffer regarding wind lease rights, but Cattey eventually withdrew from negotiations. Over the next few years, Cattey repeatedly re-engaged in negotiations, both directly and through its brokers and attorneys, but would never commit to a sale and would always defer any decisions. In negotiations, Cattey would repeatedly ask whether the other major landowners – such as the Conspirators – had sold their properties yet. Flannery was never able to purchase the property from Cattey.

312.    In another example, in 2018, Flannery's broker spoke to Marilyn Riley, another local

landowner, about purchasing the property she owned with her husband. Ms. Riley said they would sell the property for $4 to $5 million, indicating a premium roughly in line with many other eventual Flannery purchases. In early 2022, the Rileys even agreed to have two separate appraisers hired by Flannery enter the property to prepare appraisals that could be used as basis for negotiations. The appraisers valued the property at $1,430,000 and $1,725,000, respectively. But by October 2022, the Rileys increased the asking price for their property to $12 million. In those same discussions with Flannery, the Rileys repeatedly asked whether the Anderson Defendants and Hamilton Conspirators had sold their properties. In addition, the Rileys are close to the Mahoney Defendants.

313.   The Conspirators' conduct discouraged many landowners from selling and caused them to delay selling until the Conspirators – whom they respected and looked up – did. As a result, Flannery suffered damage due to lost business opportunities from being unable to purchase properties from such landowners. The inability to purchase these properties has resulted in lost profits for Flannery. A large holding of contiguous assembled property under common ownership is more valuable than if such assemblage is missing properties that could not be purchased due to this price-fixing conspiracy. If Flannery had been able to purchase properties from such third parties who did not sell because of this price-fixing conspiracy, Flannery's overall portfolio would be significantly more valuable. Flannery was deprived of these benefits by this price-fixing conspiracy.

## CAUSES OF ACTION

## COUNT ONE

## (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

314.   Flannery repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 313 as if fully set forth herein.

315.   Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*: (1) a contract, combination, or conspiracy among two or more persons or distinct business entities; (2) which is intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition; and (4) that harms the plaintiff as a result of the anticompetitive aspect of the practice under scrutiny.

316.   The Conspirators are distinct individuals and business entities who have entered into

53

1  an explicit agreement for the purpose of restraining trade in the sale of property.

2  317.    The Conspirators have illegally agreed with one another to only sell their properties

3  at artificially high and supracompetitive levels.

4  318.    But for their illegal conspiracy, the Conspirators would compete with one another as

5  sellers of property.

6  319.    The Conspirators' agreement is *per se* illegal under Section 1 of the Sherman Act.

7  320.    As a result of the illegal price-fixing conspiracy, Flannery has suffered, and will

8  continue to suffer, damages: (A) by overpaying for property purchased from the Conspirators and

9  their co-owners; (B) in the form of lost profits attributable to Flannery's inability to purchase

10 property that the Conspirators have thus far refused to sell to Flannery; (C) by overpaying for

11 property purchased from third parties; and (D) in the form of lost profits attributable to Flannery's

12 inability to purchase property that third parties have thus far refused to sell to Flannery.

13 321.    The Conspirators' illegal agreement has injured and will continue to injure Flannery

14 through the imposition of supracompetitive prices and/or lost profits.

15 322.    Accordingly, Flannery is entitled to treble damages, injunctive relief, and costs of

16 suit, including its reasonable attorneys' fees.

17 ## COUNT TWO

18 ### (Violation of Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*)

19 323.    Flannery repeats and incorporates by reference the allegations set forth in Paragraphs

20 1 through 313 as if fully set forth herein.

21 324.    This Court has jurisdiction over this cause of action based on the doctrine of

22 supplemental jurisdiction (28 U.S.C. § 1367) because this cause of action arises from a common

23 nucleus of operative facts as alleged in the federal cause of action above.

24 325.    The Cartwright Act (Cal. Bus. & Prof. Code § 16720) prohibits, *inter alia*, "acts by

25 two or more persons . . . [t]o create or carry out restrictions in trade or commerce."

26 326.    As alleged herein, the Conspirators are separate individuals and entities that hold

27 interests in property. The Conspirators formed a conspiracy by agreeing to only sell their properties

28 at artificially high and supracompetitive prices.

54

327.     The Conspirators are direct horizontal competitors in the sale of their property, and but for this illegal conspiracy, would have competed as such.

328.     As a purchaser and potential purchaser of the property subject to the Conspirators' illegal conspiracy, Flannery has suffered and will continue to suffer injury.

329.     As a result of the illegal price-fixing conspiracy, Flannery has suffered, and will continue to suffer, damages: (A) by overpaying for property purchased from the Conspirators and their co-owners; (B) in the form of lost profits attributable to Flannery's inability to purchase property that the Conspirators have thus far refused to sell to Flannery; (C) by overpaying for property purchased from third parties; and (D) in the form of lost profits attributable to Flannery's inability to purchase property that third parties have thus far refused to sell to Flannery.

330.     The Conspirators' illegal agreement has injured and will continue to injure Flannery through the imposition of supracompetitive prices and/or lost profits.

331.     Pursuant to California Business & Professional Code § 16750, Flannery is entitled to monetary damages, injunctive relief to enjoin this illegal conspiracy in restraint of trade, as well as its costs of suit – including reasonable attorneys' fees.

## COUNT THREE

### (Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

332.     Flannery repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 313 as if fully set forth herein.

333.     This Court has jurisdiction over this cause of action based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this cause of action arises from a common nucleus of operative facts as alleged in the federal cause of action above.

334.     As alleged herein, the Conspirators' conduct is illegal. The Conspirators' violations of the federal antitrust laws satisfy the illegal prong of California Business & Professional Code § 17200.

335.     As alleged herein, the Conspirators' conduct also constitutes "unfair" business practices because conduct (like the conduct by the Conspirators) that significantly threatens or harms competition, or threatens an incipient violation of an antitrust law, is unfair for purposes of the

55

California Unfair Competition Law.

336.    The injuries to Flannery and competition described herein are the result of the Conspirators' illegal and unfair practices and conduct.

337.    Unless enjoined and declared illegal, the Conspirators' illegal conduct will continue, Flannery will continue to sustain financial injury and damages to its business and property, and competition will continue to decrease for the sale of property.

338.    In the absence of injunctive relief, Flannery will suffer irreparable harm from the Conspirators' unfair and illegal business practices. Certain elements of the harm caused by the Conspirators, including harm as a result of the inability to purchase property due to the Conspirators' conduct, may not readily lend themselves to precise calculation such that monetary relief alone is an inadequate remedy.

339.    Pursuant to California Business & Professional Code § 17203, Flannery is entitled to permanent and mandatory injunctive relief against Defendants to enjoin their ongoing wrongful illegal conduct. An injunction is needed to enable and restore competition for the sale of property in this area.

## **PRAYER FOR RELIEF**

WHEREFORE, Flannery demands that judgment be entered in its favor and against Defendants, including treble damages and injunctive relief. Specifically, Flannery seeks the following:

(a) Treble damages for overcharges paid to the Conspirators, their co-owners, and third parties, as a result of the price-fixing conspiracy, in the amount of at least $510 million ($510,000,000.00), to be further determined at trial;

(b) Treble damages for lost profits resulting from Flannery's inability to acquire property from the Conspirators and third parties, as a result of the price-fixing conspiracy, in an amount to be determined at trial;

(c) Pre-judgment and post-judgment interest on such monetary relief;

(d) Flannery's costs of bringing this suit, including its reasonable attorneys' fees;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(e) Injunctive relief, including enjoining Defendants from continuing their price-fixing conspiracy; and

(f) All other relief to which Flannery may be entitled at law or equity.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

DATED:  May 18, 2023                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        By: _____ /s/ Abraham A. Tabaie _____
                                                    Abraham A. Tabaie
                                                    *Attorney for Plaintiff*
                                                    *Flannery Associates LLC*


## DEMAND FOR JURY TRIAL

Plaintiff Flannery Associates LLC respectfully requests a jury trial in this matter.

DATED:  May 18, 2023                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        By: _____ /s/ Abraham A. Tabaie _____
                                                    Abraham A. Tabaie
                                                    *Attorney for Plaintiff*
                                                    *Flannery Associates LLC*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF