1   GLYNN, FINLEY, MORTL,
    HANLON & FRIEDENBERG, LLP
2   CLEMENT L. GLYNN, Bar No. 57117
    cglynn@glynnfinley.com
3   ADAM FRIEDENBERG, Bar No. 205778
    afriedenberg@glynnfinley.com
4   ROBERT C. PHELPS, Bar No. 106666
    bphelps@glynnfinley.com
5   MORGAN K. LOPEZ, Bar No. 215513
    mlopez@glynnfinley.com
6   One Walnut Creek Center
    100 Pringle Avenue, Suite 500
7   Walnut Creek, CA 94596
    Telephone: (925) 210-2800
8   Facsimile: (925) 945-1975

9   Attorneys for Defendants Ian Anderson
    (Individually and as Trustee of the Ian and
10  Margaret Anderson Family Trust), Margaret
    Anderson (Individually and as Trustee of the Ian
11  and Margaret Anderson Family Trust), Neil
    Anderson, and Maryn Anderson

12

13  BUCHALTER                                    HOGE, FENTON, JONES & APPEL, INC.
    A Professional Corporation                   STEVEN J. KAHN
14  KEVIN T. COLLINS (SBN: 185427)               ALEXANDER H. RAMON
    ADAM SMITH (SBN: 322035)                     6801 Koll Center Parkway, Suite 210
15  NATALIYA SHTEVNINA (SBN: 339094)             Pleasanton, CA 94566
    500 Capitol Mall, Suite 1900                 Telephone: (925) 224-7780
16  Sacramento, CA  95814                        steven.kahn@hogefenton.com
    Telephone: 916.945.5170                      alex.ramon@hogefenton.com
17  Email:  kcollins@buchalter.com
            apsmith@buchalter.com                Attorneys for Defendant
18          nshtevnina@buchalter.com             Ronald Gurule (individually and as trustee of
                                                 the Ronald Gurule 2013 Family Trust)
19  Attorneys for Defendants
    Ned Anderson (individually and as trustee of
20  the Ned Kirby Anderson Trust), Neil          DAVIS WRIGHT TREMAINE LLP
    Anderson, Glenn Anderson, Janet Blegen       ALLISON A. DAVIS
21  (individually and as trustee of the Janet    SANJAY M. NANGIA
    Elizabeth Blegen Separate Property Trust),   50 California Street, 23rd Floor
22  Robert Anderson (individually and as trustee San Francisco, CA 94111
    of the Robert Todd Anderson Living Trust),   Telephone: (415) 276-6500
23  Stan Anderson, Lynne Mahre, Sharon Totman,   allisondavis@dwt.com
    Amber Bauman and Christopher Wycoff          sanjaynangia@dwt.com
24                                               Attorneys for Defendant
                                                 WILLIAM DIETRICH
25                                               (individually and as trustee of the Child's Trust
                                                 FBO William C. Dietrich, a subtrust under the
26                                               Trust of William C. Dietrich and Ivanna S.
                                                 Dietrich)
27

28

1    RIMON, P.C.                                   ROPERS MAJESKI PC
     GABRIEL G. GREGG (SBN 187333)                MICHAEL J. IOANNOU (SBN: 95208)
2    gabriel.gregg@rimonlaw.com                    DAVID B. DRAPER (SBN: 107790)
     800 Oak Grove Avenue, Suite 250               KEVIN W. ISAACSON (SBN: 281067)
3    Menlo Park, California 94025                  333 West Santa Clara St., Suite 910
     Telephone: 650.461.4433                       San Jose CA 95113
4    Facsimile: 650.461.4433                       Telephone: (650) 814 5987
                                                   david.draper@ropers.com
5    Attorneys for the
     MAHONEY DEFENDANTS                            Attorneys for Defendants
6                                                  Paul Dietrich (individually and as trustee of the
                                                   Child's Trust FBO Paul S. Dietrich, a subtrust
7                                                  under the Trust of William C. Dietrich and
                                                   Ivanna S. Dietrich; John Alsop (individually
8                                                  and as trustee of the John G. Alsop Living
                                                   Trust), Nancy Roberts (individually and as
9                                                  trustee of the Nancy C. Roberts Living Trust),
                                                   Janet Zanardi (individually and as trustee of
10                                                 Trust A under the Zanardi Revocable Trust)

11

12
                         UNITED STATES DISTRICT COURT
13
                         EASTERN DISTRICT OF CALIFORNIA
14

15                                          )     Case No. 2:23-cv-00927-TLN-AC
                                            )
16   FLANNERY ASSOCIATES LLC,               )     **DEFENDANTS' JOINT NOTICE OF**
                                            )     **MOTION AND MOTION TO DISMISS**
17                   Plaintiff,             )     **PLAINTIFF'S COMPLAINT**
                                            )     **PURSUANT TO FED. R. CIV. P.**
18             vs.                          )     **12(b)(6); MEMORANDUM OF POINTS**
                                            )     **AND AUTHORITIES IN SUPPORT**
19   BARNES FAMILY RANCH                    )
     ASSOCIATES, LLC, LAMBIE RANCH          )
20   ASSOCIATES, LLC, KIRBY HILL            )
     ASSOCIATES, LLC, BARNES FAMILY         )
21   RANCH CORPORATION, LAMBIE              )     **Date:       August 24, 2023**
     RANCH CORPORATION, KIRBY HILL          )     **Time:       2:00 p.m.**
22   CORPORATION, KIRK BEEBE, SUSAN         )     **Dept.:      Courtroom 2, 15th Floor**
     BEEBE FURAY, MURRAY BANKHEAD           )     **Before:     Hon. Troy L. Nunley**
23   (INDIVIDUALLY AND AS TRUSTEE           )
     FOR THE BAUMBACH FAMILY TRUST),        )     Trial Date:  None Set
24   MICHAEL RICE (INDIVIDUALLY AND         )
     AS TRUSTEE FOR THE RICE FAMILY         )
25   TRUST); CHRISTINE MAHONEY              )
     LIMITED PARTNERSHIP, CHRISTINE         )
26   MAHONEY LIMITED PARTNERSHIP            )
     MANAGEMENT COMPANY, EMIGH              )
27   LAND LP, EL GENERAL PARTNER, LLC,      )
     CHRISTINE MAHONEY

28
                                          - 2 -
─────────────────────────────────────────────────────────────

| | |
|---|---|
| 1 | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| | THE MAHONEY 2005 FAMILY TRUST), ) |
| 2 | DANIEL MAHONEY (INDIVIDUALLY ) |
| | AND AS TRUSTEE OF THE MAHONEY ) |
| 3 | 2005 FAMILY TRUST); IAN ANDERSON ) |
| | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| 4 | THE IAN AND MARGARET ANDERSON ) |
| | FAMILY TRUST), MARGARET ) |
| 5 | ANDERSON (INDIVIDUALLY AND AS ) |
| | TRUSTEE OF THE IAN AND ) |
| 6 | MARGARET ANDERSON FAMILY ) |
| | TRUST), NEIL ANDERSON, MARYN ) |
| 7 | ANDERSON, WILLIAM DIETRICH ) |
| | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| 8 | THE CHILD'S TRUST FBO WILLIAM C. ) |
| | DIETRICH, A SUBTRUST UNDER THE ) |
| 9 | TRUST OF WILLIAM C. DIETRICH AND ) |
| | IVANNA S. DIETRICH), PAUL DIETRICH ) |
| 10 | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| | THE CHILD'S TRUST FBO PAUL S. ) |
| 11 | DIETRICH, A SUBTRUST UNDER THE ) |
| | TRUST OF WILLIAM C. DIETRICH AND ) |
| 12 | IVANNA S. DIETRICH), JOHN ALSOP ) |
| | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| 13 | THE JOHN G. ALSOP LIVING TRUST), ) |
| | NANCY ROBERTS (INDIVIDUALLY ) |
| 14 | AND AS TRUSTEE OF THE NANCY C. ) |
| | ROBERTS LIVING TRUST), JANET ) |
| 15 | ZANARDI (INDIVIDUALLY AND AS ) |
| | TRUSTEE OF TRUST A UNDER THE ) |
| 16 | ZANARDI REVOCABLE TRUST), ) |
| | RONALD GURULE (INDIVIDUALLY ) |
| 17 | AND AS TRUSTEE OF THE RONALD ) |
| | GURULE 2013 FAMILY TRUST), ) |
| 18 | RICHARD ANDERSON (INDIVIDUALLY ) |
| | AND AS TRUSTEE OF THE REA ) |
| 19 | PROPERTIES TRUST), DAVID ) |
| | ANDERSON (INDIVIDUALLY AND AS ) |
| 20 | TRUSTEE OF THE IRWIN E. ANDERSON ) |
| | SURVIVOR'S TRUST), DEBORAH ) |
| 21 | WORKMAN (INDIVIDUALLY AND AS ) |
| | TRUSTEE OF THE IRWIN E. ANDERSON ) |
| 22 | SURVIVOR'S TRUST), CAROL ) |
| | HOFFMAN (INDIVIDUALLY AND AS ) |
| 23 | TRUSTEE OF THE IRWIN E. ANDERSON ) |
| | SURVIVOR'S TRUST), NED ANDERSON ) |
| 24 | (INDIVIDUALLY AND AS TRUSTEE OF ) |
| | THE NED KIRBY ANDERSON TRUST), ) |
| 25 | NEIL ANDERSON, GLENN ANDERSON, ) |
| | JANET BLEGEN (INDIVIDUALLY AND ) |
| 26 | AS TRUSTEE OF THE JANET ) |
| | ELIZABETH BLEGEN SEPARATE ) |
| 27 | PROPERTY TRUST), ROBERT ) |
| | ANDERSON (INDIVIDUALLY AND AS ) |
| 28 | TRUSTEE OF THE ROBERT TODD ) |

1  ANDERSON LIVING TRUST), STAN                    )
   ANDERSON, LYNNE MAHRE, SHARON                    )
2  TOTMAN, AMBER BAUMAN,                            )
   CHRISTOPHER WYCOFF; AND JOHN                     )
3  DOES 1-50,                                       )
                                                    )
4                          Defendant.               )
                                                    )
5  _____ )

6  TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

7          PLEASE TAKE NOTICE THAT on August 24, 2023, at 2:00 p.m., or as soon thereafter

8  as the matter may be heard by the Honorable Troy L. Nunley, in Courtroom 2 on the 15th floor

9  of the U.S. District Court for the Eastern District of California, Sacramento Division, 501 I

10 Street, Sacramento, California 95814, defendants Christine Mahoney Limited Partnership,

11 Christine Mahoney Limited Partnership Management Company, Emigh Land LP, El General

12 Partner, LLC, Christine Mahoney (individually and as trustee of the Mahoney 2005 Family

13 Trust), Daniel Mahoney (individually and as trustee of the Mahoney 2005 Family Trust), Ian

14 Anderson (individually and as trustee of the Ian and Margaret Anderson Family Trust); Margaret

15 Anderson (individually and as trustee of the Ian and Margaret Anderson Family Trust), Neil

16 Anderson, Maryn Anderson, William Dietrich (individually and as trustee of the Child's Trust

17 FBO William C. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S.

18 Dietrich), Paul Dietrich (individually and as trustee of the Child's Trust FBO Paul S. Dietrich, a

19 subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich), John Alsop (individually

20 and as trustee of the John G. Alsop Living Trust), Nancy Roberts (individually and as trustee of

21 the Nancy C. Roberts Living Trust), Janet Zanardi (individually and as trustee of Trust A under

22 the Zanardi Revocable Trust), Ronald Gurule (individually and as trustee of the Ronald Gurule

23 2013 Family Trust), Ned Anderson (individually and as trustee of the Ned Kirby Anderson

24 Trust), Neil Anderson, Glenn Anderson, Janet Blegen (individually and as trustee of the Janet

25 Elizabeth Blegen Separate Property Trust), Robert Anderson (individually and as trustee of the

26 Robert Todd Anderson Living Trust), Stan Anderson, Lynne Mahre, Sharon Totman, Amber

27 Bauman, and Christopher Wycoff ("Defendants") will bring on for hearing this Motion to

28 Dismiss (the "Motion").

1    The Motion seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) of the

2    Complaint for Damages and Injunctive Relief brought by Flannery Associates LLC on the

3    grounds that the Complaint fails to state a claim upon which relief may be granted.  Specifically:

4    (1) the Complaint fails to plausibly allege an agreement among the Defendants to conspire

5    against Flannery to violate the antitrust laws; (2) Defendants are not plausibly alleged to be

6    competitors with one another, nor could they be as a matter of law because each individual

7    parcel of land owned by Defendants is unique; (3) Flannery cannot establish antitrust standing;

8    (4) the Complaint fails to plausibly plead claims against the individual Defendants who allegedly

9    acted on behalf of LLCs or trusts; (5) with respect to defendants William C. Dietrich, Ned

10   Anderson, either Neil Anderson (there are two), Maryn Anderson, Glenn Anderson, Janet

11   Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman,

12   Christopher Wycoff, and Janet Zanardi, the Complaint fails to plead allegations sufficient to

13   explain their alleged role in the purported conspiracy; (6) the derivative Cartwright Act claim

14   fails for the same reasons as its Sherman Act claim, and (7) the derivative UCL claim fails for

15   the same reasons as the Sherman Act claim and the Cartwright Act claim.

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1    The Motion is based upon this Notice of Motion to Dismiss, the attached Memorandum

2   of Points and Authorities in support thereof, all pleadings and papers filed in this action, and

3   such other matter as may be presented in reply or at the hearing.

4       Dated:  July 11, 2023

5                                                    GLYNN, FINLEY, MORTL,
                                                     HANLON & FRIEDENBERG, LLP
                                                     CLEMENT L. GLYNN
6                                                    ADAM FRIEDENBERG
                                                     ROBERT C. PHELPS
7                                                    MORGAN K. LOPEZ
                                                     One Walnut Creek Center
8                                                    100 Pringle Avenue, Suite 500
                                                     Walnut Creek, CA  94596
9
                                                     By    /s/ *Morgan K. Lopez*
10                                                       Attorneys for Defendants Ian Anderson
                                                        (Individually and as Trustee of the Ian
11                                                      and Margaret Anderson Family Trust),
                                                        Margaret Anderson (Individually and as
12                                                      Trustee of the Ian and Margaret
                                                        Anderson Family Trust), Neil Anderson,
13                                                      and Maryn Anderson

14

15              **[See Signatures below for all defendants and counsel]**

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION .................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................3

        A.      Flannery Has Rapidly Become the Largest Private Landowner in Solano Co. .......3

        B.      Flannery Intentionally Paid Premium Prices ..............................................3

        C.      Flannery Negotiated Unique Deals for Each Parcel It Purchased ...........................4

        D.      Flannery Unsuccessfully Attempted to Purchase property from Certain
                Defendants ...................................................................................5

        E.      Flannery's Agreement Allegations Fail to Show Collusion ..................................5

III.    LEGAL STANDARD ..........................................................................................6

        A.      Standard for Motion to Dismiss .......................................................6

        B.      Pleading Standards in an Antitrust Action ...........................................7

IV.     ARGUMENT ....................................................................................................8

        A.      The Complaint Fails to Allege Sufficient Facts to Establish a Horizontal
                Price-Fixing Agreement Among Defendants .........................................8

                1.      Flannery fails to allege a horizontal price-fixing agreement .....................8

                2.      Flannery fails to allege that Defendants are competitors.........................10

        B.      Flannery Cannot Establish Antitrust Standing.......................................13

                1.      Flannery's alleged injuries are not the type antitrust laws are intended to
                        forestall ...........................................................................13

                2.      The alleged injuries are not direct............................................15

                3.      The alleged harm is too speculative.........................................16

        C.      Flannery Cannot Maintain Its Claims Against Individual Defendants Who Acted
                on Behalf of LLCs or Trusts .........................................................17

        D.      The Complaint Makes Insufficient Allegations Against Certain Defendants .......18

        E.      Flannery's Cartwright Act Claim Fails for the Same Reasons as Its Sherman Act
                Claim ................................................................................19

        F.      Flannery's UCL Cause of Action Must be Dismissed Because It is Dependent
                Upon Its Failed Antitrust Claims ....................................................19

V.      CONCLUSION.................................................................................................20

TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*
190 F.3d 1051 (9th Cir. 1999) ................................................................. 13

*Apex Hosiery Co. v. Leader*
310 U.S. 469, fn. 15 (1940) ..................................................................... 14

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ................................................................................... 6

*AT & T Mobility LLC v. AU Optronics Corp.*
707 F.3d 1106 ......................................................................................... 19

*Atl. Richfield Co. v. USA Petroleum Co.*
495 U.S. 328 (1990) ................................................................................. 14

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ......................................................................... passim

*Bounds v. Superior Ct.*
229 Cal. App. 4th 468 (2014) .................................................................. 10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*
20 Cal. 4th 163 (1999) ............................................................................ 19

*City of Oakland v. Oakland Raiders*
20 F.4th 441 (9th Cir. 2021) ............................................ 13, 15, 16, 17

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*
236 F.3d 1148 (9th Cir. 2001) ................................................................ 19

*Cottonwood Christian Center v. Cypress Redevelopment Agency*
218 F. Supp. 2d 1203 (C.D. Cal. 2002) .................................................. 11

*Cousins v. Lockyer*
568 F.3d 1063 (9th Cir. 2009) .................................................................. 6

*Davis v. HSBC Bank Nevada, N.A.*
691 F.3d 1152 (9th Cir. 2012) ................................................................ 20

*Dimidowich v. Bell & Howell*
803 F.2d 1473 (9th Cir. 1986) ................................................................ 19

*Est. of Sigourney*
93 Cal. App. 4th 593 (2001) .................................................................... 10

*Flores v. EMC Mortg. Co.*
997 F. Supp. 2d 1088 (E.D. Cal. 2014) .............................................. 7, 19

TABLE OF AUTHORITIES (Continued

Page(s)

*Glynn v. Marquette*
  52 Cal. App. 3d 277 (1984) ........................................................................... 11

*In re California Bail Bond Antitrust Litig.*
  No. 19-CV-00717-JST, 2022 WL 19975276 (N.D. Cal. Nov. 7, 2022)................... 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
  546 F.3d 981 (9th Cir. 2008) ........................................................................... 8

*In re Gilead Scis. Sec. Litig.*
  536 F.3d 1049 (9th Cir. 2008) ......................................................................... 6

*In re High Fructose Corn Syrup Antitrust Litig.*
  295 F.3d 651 (7th Cir. 2002) ..................................................................... 11, 12

*In re Lithium Ion Batteries Antitrust Litig.*
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. 2014)................................. 19

*In re Musical Instruments & Equip. Antitrust Litig.*
  798 F.3d 1186 (9th Cir. 2015) ...................................................................... 8, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) .............................................................. 7

*Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*
  386 F. Supp. 3d 1308 (E.D. Cal. 2019)............................................................ 8, 19

*Kelsey K. v. NFL Enterprises, LLC*
  757 F. App'x 524 (9th Cir. 2018).................................................................... 19

*Kendall v. Visa U.S.A.*
  518 F.3d 1042 (9th Cir. 2008) ...................................................................... 7, 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*
  232 F.3d 979 (9th Cir. 2000) ......................................................................... 13

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*
  729 F. App'x 528 (9th Cir. 2018).................................................................... 20

*Linde, LLC v. Valley Protein, LLC*
  No. 116CV00527DADEPG, 2019 WL 3035551 (E.D. Cal. July 11, 2019) ............ 20

*Lozano v. AT & T Wireless Servs., Inc.*
  504 F.3d 718 (9th Cir. 2007) ......................................................................... 20

*Moore v. James H. Matthews & Co.*
  550 F.2d 1207 (9th Cir. 1977) ....................................................................... 11

1

TABLE OF AUTHORITIES (Continued)

2

Page(s)

3

*People v. Pac. Landmark, LLC*
    129 Cal. App. 4th 1203 (2005) ................................................. 17

4

*Real Estate Analytics, LLC v. Vallas*
    160 Cal. App. 4th 463 (2008) ................................................. 11

5

*Souza v. Estate of Bishop*
    594 F. Supp. 1480 (D. Haw. 1984) ................................................. 11

6

7

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*
    782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................. 7

8

*Stine v. Dell'Osso*
    230 Cal. App. 4th 834 (2014) ................................................. 17

9

10

*Theme Promotions, Inc. v. News Am. Mktg. FSI*
    546 F.3d 991 (9th Cir. 2008) ................................................. 14

11

*Toscano v. PGA Tour, Inc.*
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................................................. 17

12

13

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*
    552 F.3d 430 (6th Cir. 2008) ................................................. 7, 18

14

*United States v. Ashland-Warren, Inc.*
    537 F. Supp. 433 (M.D. Tenn. 1982) ................................................. 11, 12

15

16

*United States v. Sargent Elec. Co.*
    785 F.2d 1123 (3d Cir. 1986) ................................................. 11

17

*Walsh v. Kindred Healthcare*
    798 F. Supp. 2d 1073 (N.D. Cal. 2011) ................................................. 17

18

19

*Western Sunview Properties, LLC v. Federman*
    338 F. Supp. 2d 1106 (D. Haw. 2004) ................................................. 11

20

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*
    588 F.3d 659 (9th Cir. 2009) ................................................. 20

21

22

**Statutes**

23

California Corporations Code

24

    Section 17703.04(a)(2) ................................................. 17

25

California Probate Code

26

    Section 18001 ................................................. 17

27

28

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.      INTRODUCTION**

3          In 2017, Plaintiff Flannery Associates LLC ("Flannery") commenced a campaign to

4    become the dominant landowner in Solano County.  (Dkt. 1 ¶ 162.)  Flannery admits it is the "de

5    facto only" buyer of properties in the area.  (*Id.* ¶ 274.)  Its goal is to establish a "large holding of

6    contiguous assembled property under common ownership" that would be "more valuable than if

7    such assemblage is missing properties."  (*Id.* ¶ 294.)  Anyone familiar with the Monopoly board

8    game will recognize what Flannery is trying to accomplish.  And this is not conjecture by

9    Defendants, it is precisely what Flannery itself alleges throughout the Complaint.

10         Flannery also makes clear how it acquired, and has perpetuated, its dominant position in

11   Solano County.  Starting in 2018, Flannery overwhelmed local families and farmers with

12   unprecedented cash and non-cash consideration, paying in its words "multiples of fair market

13   value."  (*Id.* ¶ 13.)  Flannery states that since 2018, "not a single other buyer has emerged who

14   would offer even a fraction of the prices and terms that Flannery was offering."  (*Id.* ¶¶ 12, 13.)

15   As a result, "the vast majority of the landowners in the area" sold their properties to Flannery

16   because its "offers were simply too good to pass up."  (*Id.* ¶ 165.)  In fact, Flannery offered such

17   exorbitant "cash prices and non-cash concessions" that it was able "[t]o purchase properties that

18   were not listed for sale."  (*Id.* ¶ 163.)

19         Why has Flannery acted so aggressively to re-make the Solano County real estate

20   market?  What is its business objective?  What legitimate commercial purpose requires such

21   massive, concentrated property ownership within Solano County?  Flannery will not say.

22   Flannery's ownership and objectives have remained shrouded throughout its interaction with the

23   Solano County community.  The Complaint is similarly mysterious.  It does not explain what

24   Flannery does, who or what owns it, or how it envisions using the "large holding of contiguous

25   assembled property" it deems so essential.[1]

26   _____

27   [1] This has been the subject of considerable public and governmental concern, particularly given
     the proximity of Flannery's large and growing holdings near Travis Air Force Base, as reflected

28   in various media accounts.  (*See, e.g., Investors Bought Nearly $1 Billion in Land Near a*

1    So, what does any of this have to do with the Defendants?  Defendants are long-time

2  Solano County farmers or landowners who have either engaged in good-faith, arms-length

3  transactions for the sale of land, or were not tempted by Flannery's prices, because they had no

4  desire (or ability) to sell.  Certain of Defendants' families have farmed in Solano County for

5  more than 100 years.  Because some of these deeply-rooted defendants preferred farming or

6  owning their land to selling it, they told Flannery "no thanks."  But that was unacceptable to

7  Flannery, which apparently believes greater concentration of ownership will result in greater

8  economic reward to Flannery.

9    The crux of Flannery's antitrust claims is that it overpaid for land as a result of a

10  horizontal price-fixing agreement by Defendants.  This is completely illogical given Flannery's

11  own allegations that its overpayments were voluntary and by design, to overwhelm sellers (both

12  willing and unwilling) with offers they could not refuse.  Indeed, Flannery has completely failed

13  to allege sufficient facts to state its claims under Section 1 of the Sherman Act (or its derivative

14  claims under the California Cartwright Act and Unfair Competition Law).  The claims fail as a

15  matter of law on the following grounds.

16   • *First,* Flannery has not alleged any agreement at all.  It points to various
17     communications among some Defendants about Flannery's activities, but none
      evidences an agreement.  Moreover, the communications alleged all occurred well
18     *after* Flannery alleges the conspiracy commenced.

19   • *Second*, Flannery's allegations make clear that Defendants are not competitors
      under antitrust law, and thus could not make a horizontal price-fixing agreement
20     concerning their individual land.  The Ninth Circuit has never recognized real
      property as the proper subject of a horizontal price-fixing claim.  That is because
21     each parcel of land is by definition unique, and not the sort of uniform,
      commoditized product that is susceptible to conspiratorial price fixing.

22   • *Third,* Flannery cannot establish antitrust standing.  Flannery does not allege any
      facts showing harm to competition generally (as opposed to harm only to
23     Flannery itself); it fails to allege any direct injury, and it fails to identify any non-
      speculative harm.  A cognizable injury would require that Flannery be able to
24     prove the but-for fair market value of the land it purchased.  Flannery does not
      allege facts to establish the fair market value benchmark, nor could it, given its
25     allegations that it remade the market through its massive, voluntary, above-market
      offers (most of which preceded by years the alleged price-fixing agreement).

26

27   _____

*California Air Force Base. Officials Want to Know Who Exactly They Are*, Wall St. J., July 7,
28  2023, at 2, a copy of which is attached as Exhibit A.)

1    Thus, none of Flannery's claims meets the applicable plausibility standard.  The

2  Complaint is a ham-fisted intimidation tactic designed to impose massively expensive and

3  invasive litigation to punish those farmers that already sold to Flannery and/or to force those

4  farmers who prefer to continue to farm to sell to Flannery.  None of the transactions to date are

5  suspect, and there is certainly nothing unlawful about a farmer refusing to sell his property at any

6  price, no matter how voracious the purchaser.  The idea that the Court should apply antitrust law

7  to punish non-selling landowners, paving the way for Flannery to further monopolize that

8  market, turns the law and logic on its head.  Accordingly, the Court should grant this motion and

9  dismiss the Complaint with prejudice.

10  **II.    FACTUAL BACKGROUND**

11    **A.    Flannery Has Rapidly Become the Largest Private Landowner in Solano Co.**

12    Flannery first began purchasing properties in Solano County in 2017.  (Dkt. 1 ¶ 162.)  At

13  the time of filing, its real estate portfolio included 140 properties in this area, for which it

14  purportedly paid $800 million.  (*Id.*)  It purchased these properties predominantly from local

15  families and their affiliated entities, many of which were generational farmers and ranchers.  (*Id.*

16  ¶ 5.)  Who owns Flannery, and the reasons for its massive investment, remain a mystery.

17    Flannery claims that Defendants made an illegal agreement to charge Flannery top dollar,

18  which led it to overpay for some unspecified percentage of its real property purchases.  (*Id.* ¶¶ 7,

19  15, 20.)  It does not allege the time, place or terms of any such "agreement."  Flannery also does

20  not identify every purchase allegedly influenced by Defendants' alleged agreement.  Rather, it

21  provides a handful of property purchases for which it allegedly overpaid.  (*Id.* ¶¶ 277-281.)

22    In total, Flannery identifies nine specific sales transactions (including land swaps)

23  allegedly influenced by Defendants' agreement.  A chart identifying these transactions is

24  attached hereto as Exhibit B.  As discussed below, Flannery concedes that each transaction was

25  subject to lengthy negotiations and a unique structure.  (*E.g.*, *id.* ¶¶ 185-202.)

26    **B.    Flannery Intentionally Paid Premium Prices.**

27    Flannery concedes that upon commencing its acquisition spree it intentionally offered to

28  pay a premium above the pre-existing fair market value of these properties.  (*Id.* ¶¶ 12, 162.)  It

paid these premiums not only to ensure that it would be the "de facto only purchaser of properties in this area during the period" (*id.* ¶ 274), but also to entice landowners who were not otherwise inclined to sell their property (*id.* ¶ 14). Indeed, Flannery admits that "[t]o purchase properties that were not listed for sale, Flannery offered both higher cash prices and non-cash concessions to sellers. . . ." (*Id.* ¶ 163.)

Flannery does not say that any conduct by Defendants compelled it to pay these market-setting premium prices. Rather, Flannery admits that it made this choice deliberately and freely in order to become the dominant purchaser in Solano County, and that its strategy was successful. (*Id.* ¶¶ 12, 162-166.) As a result, "[d]uring the five years that Flannery has been investing in this area, not a single other buyer has emerged who would offer even a fraction of the prices and terms that Flannery was offering." (*Id.* ¶ 13.) It also admits that "the vast majority of the landowners in the area" sold their properties to Flannery because its "offers were simply too good to pass up" (*id.* ¶ 165), as opposed to because Defendants acted conspiratorially.

**C.  Flannery Negotiated Unique Deals for Each Parcel It Purchased.**

The Complaint includes detailed discussions of many of Flannery's negotiations. (*See, e.g.*, *id.* ¶¶ 166, 169, 170, 179, 203.) This includes properties Flannery purchased from third parties (*id.* ¶ 166), properties Flannery purchased from Defendants (*id.* ¶¶ 185-202 (Emigh 45 Property), ¶¶ 222-226 (Ila Property and McKinnon 18 Property)), and properties Flannery has been unable to purchase (*id.* ¶¶ 169, 170, 179, 203). Indeed, Flannery spends 20 paragraphs describing the lengthy negotiation history and unique structure—including multiple property swaps—of its purchase of the Emigh Industrial Property. (*Id.* ¶¶ 182-202.) These allegations show that Flannery's negotiation of each sale is unique, not only in terms of the specific land being acquired and agreed-upon price, but also the ancillary terms governing the sale. (*Id.*)

Flannery does not allege that Defendants' conduct influenced any of its purchase offers. To the contrary, Flannery admits that it prepared offers based on its own property appraisals, and thus without regard to any conduct by Defendants. (*Id.* ¶ 164 ("the premiums Flannery offered fluctuated depending on both the general macroeconomic situation [] and on the details of each

///

1  specific transaction"), ¶ 177 (discussing independent appraisals Flannery obtained).)  Flannery

2  does not plead that any of the purchases were tied to the sale of other goods or services.

3      **D.      Flannery Unsuccessfully Attempted to Purchase Property from Certain Defendants.**

4

5      In addition to the 140 properties Flannery successfully purchased in the region, Flannery

6  pleads 29 properties that it unsuccessfully attempted to purchase.  A chart identifying these

7  properties is attached as Exhibit C.

8      Flannery does not allege that any of these properties were publicly listed for sale.  It does

9  not allege that Defendants were marketing these properties or had any desire to sell them.

10  Rather, Flannery alleges only that it desired to purchase them (regardless of Defendants'

11  desire—or lack of desire—to sell them).  Flannery nonetheless alleges conclusionally that

12  Defendants' unwillingness to sell to Flannery is due to their alleged price-fixing agreement (*id.* ¶

13  289), as opposed to an independent business reason, or Defendants' desire to continue owning

14  and farming their land.  But Flannery alleges no facts to support the conclusion.

15      **E.      Flannery's Agreement Allegations Fail to Show Collusion.**

16      Flannery alleges that, in the spring of 2023, it became aware that Defendants agreed to

17  collude against it in connection with their sales negotiations.  (*Id.* ¶ 256.)  But, it does not allege

18  the terms of any such agreement, or provide any plausible factual basis to establish the existence

19  of any such agreement.  Instead, Flannery refers to (1) a text message suggesting that certain

20  landowners should meet to discuss Flannery's impact on the market (*id.*, Ex. A), (2) an email

21  concerning a map of Flannery's purchases (*id.*, Ex. B), (3) an email discussing one family's

22  strategy for negotiating with Flannery (*id.*, Ex. C), (4) an email to Flannery's lawyer advising

23  that certain of the Anderson defendants were not interested in selling to Flannery (*id.*, Ex. D),

24  and (5) an email regarding one family's proceeds from a "gas through-put payment" (*id.*, Ex. E).

25   These communications represent the totality of the alleged direct evidence establishing the

26  supposed anti-competitive conspiracy, and none of the evidence remotely demonstrates any

27  agreement at all (much less one to fix prices).  (Dkt. 1 ¶¶ 258-263.)

28  ///

1       Although Flannery claims that this supposed 2022 agreement influenced sales beginning

2  in 2018 (*id.* ¶ 257), it presents no direct evidence of such influence.  (*See id.* ¶¶ 249-251

3  (alleging undocumented conversations regarding Flannery's identity); ¶¶ 252-255 (conjecturing

4  that Defendants must have conspired because they are family members and neighbors).  Nor

5  does Flannery plead facts demonstrating that the alleged agreement harmed competition

6  generally (as opposed to harming only Flannery itself).  This is unsurprising; Flannery admits

7  that the supposed agreement was directed solely to Flannery.  (*Id.* ¶ 273.)  Finally, Flannery

8  wholly fails to define the market it alleges was influenced by Defendants' alleged agreement;

9  rather, the market appears to comprise those parcels Flannery was intent on purchasing for its

10  undisclosed purposes.  (*Id.* ¶¶ 14, 294.)

11  **III.    LEGAL STANDARD**

12        **A.      Standard for Motion to Dismiss**

13       To defeat a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to

14  relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

15  court must take all allegations of material fact as true and construe them in the light most

16  favorable to the nonmoving party, but "conclusory allegations of law and unwarranted inferences

17  are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067

18  (9th Cir. 2009) (citation and internal quotations omitted); *see also In re Gilead Scis. Sec. Litig.*,

19  536 F.3d 1049, 1055 (9th Cir. 2008) (the court need not accept as true "allegations that are

20  merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

21       Thus, a complaint must set forth "more than labels and conclusions, and a formulaic

22  recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation

23  omitted).  The "[f]actual allegations must be enough to raise a right to relief above the

24  speculative level."  *Id.*  When the allegations do not allow the court to infer more than the mere

25  possibility of wrongdoing, they fall short.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)

26  ("plausibility standard" requires "more than a sheer possibility that a defendant has acted

27  unlawfully" where a claim pleads facts that are "merely consistent with a defendant's liability,"

28  it "stops short of the line between possibility and plausibility") (internal quotations omitted).

**B.      Pleading Standards in an Antitrust Action**

"A [Sherman Act] Section 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  Thus, plaintiff must plead evidentiary facts which, if true, will prove (1) a contract, combination, or conspiracy between two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States or with foreign nations; and (3) which actually injures competition.  *Kendall v. Visa U.S.A*., 518 F.3d 1042, 1047 (9th Cir. 2008); *Stanislaus Food Prod. Co. v. USS-POSCO Indus*., 782 F. Supp. 2d 1059, 1072 (E.D. Cal. 2011) (granting motion to dismiss where plaintiff failed to include allegations suggesting an illegal agreement was made).  In pleading the conspiracy, "[a]llegations of facts that could just as easily suggest rational, legal business behavior . . . as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws."  *Kendall*, 518 F.3d at 1049.  In other words, a merely possible agreement is not sufficient.  *Twombly*, 550 U.S. at 557.

A plaintiff's allegations must be evaluated as to each individual defendant.  *See In re TFT-LCD (Flat Panel) Antitrust Litig*., 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (granting individual motions to dismiss where allegations were "insufficient to put specific defendants on notice of the claims against them").  An antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it."  *Id.*; *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) ("Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."); *cf. Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1103 (E.D. Cal. 2014) (to satisfy Rule 8, a complaint must "distinguish adequately claims and alleged wrongs among defendants and others" and state facts of "defendants' specific wrongdoing").

///

///

///

IV.     **ARGUMENT**

A.     **The Complaint Fails to Allege Sufficient Facts to Establish a Horizontal Price-Fixing Agreement Among Defendants.**

1.     **Flannery fails to allege a horizontal price-fixing agreement.**

Flannery's theory of liability rests solely on the assertion Defendants entered into a price-fixing agreement, which is *per se* illegal under the Sherman Act.  (Dkt. 1 ¶¶ 21, 319.[2])  Thus, the Complaint must include adequate allegations of the terms of an actual agreement to fix prices.  *See, e.g.*, *Twombly*, 550 U.S. at 547 (plaintiff must allege sufficient "factual matter (taken as true) to suggest that an agreement was made"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (plaintiff must allege "who, did what, to whom (or with whom), where, and when?"); *see also Kendall,* 518 F.3d at 1047-48 (dismissing claim due to failure to plausibly plead agreement).  Allegations that are merely "consistent" with an illegal agreement are not enough.  *Twombly*, 550 U.S. at 547.

Flannery's Complaint fails to provide even a generalized description of any such price-fixing agreement.  For example, Flannery makes no allegation that Defendants mutually agreed not to sell below a particular price per acre (the mark of a traditional price-fixing agreement in which defendants agree not to sell widgets for less than "x dollars per widget").  *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008).  Flannery likewise fails to allege that Defendants mutually agreed to sell less land than they otherwise would have sold if other Defendants also agreed (the mark of an OPEC-like "restriction of production" agreement).  *See, e.g., In re Musical Instruments & Equip.*, 798 F.3d at 1191.  Rather, the Complaint includes absolutely no description of what the supposed *per se* illegal agreement actually was between the Defendants.  Thus, the Complaint falls well short of the pleading requirement to allege "who, did what. . . where, and when."  *Id.* at 1194.

---

[2] Flannery's choice to limit Defendants' alleged Sherman Act liability to a "*per se*" price-fixing theory constrains this Court to analyze the Complaint under the applicable strict pleading standards set forth in this Motion, as opposed to alternative pleading standards applicable to the more common "rule of reason" Sherman Act inquiry.  *See Jain Irrigation, Inc. v. Netafim Irrigation, Inc*., 386 F. Supp. 3d 1308, 1314 (E.D. Cal. 2019) ("The court will respect plaintiffs'

1    Instead, Flannery claims "'smoking gun' evidence of a price-fixing conspiracy" can be

2    found in various documents it allegedly obtained through discovery in a separate case it brought

3    against another local landowner.  (Dkt. 1 ¶ 10; ¶¶ 22-27 & Exhs. A-E.)  But none of those

4    exhibits establishes any cognizable agreement.  For example, Exhibit A is a text message in

5    which one Defendant suggests that "the remaining property owners should be in agreement on

6    what we would want to sell our properties."  This message, which (at most) refers only to a

7    potential future agreement, shows no cognizable agreement, and the Complaint alleges no other

8    facts establishing that any agreement was made, let alone any suggestion as to what that

9    agreement might be, who made it, where or when.

10    Flannery's other exhibits likewise fall far short of the plausibility standard.  In Exhibit B,

11    a Defendant writes "[t]hat's great we can support each other."  This establishes nothing, and as

12    shown above, the fact that it could potentially be "consistent with" an unlawful agreement is

13    insufficient.  *Twombly*, 550 U.S. at 547.  Exhibit C notes that Flannery seems motivated to

14    purchase land and may be willing to pay even higher prices—obvious facts that Flannery itself

15    alleges throughout the Complaint (Dkt. 1 ¶¶ 18, 171, 174, 207, 231).  Exhibit D simply confirms

16    that some Defendants are not interested in selling their land at any price, a choice they had every

17    right to make.  And Exhibit E concerns an intrafamily discussion regarding irrelevant matters.

18    Finally, each of these Exhibits was created in the summer of 2022, almost four years after the

19    conspiracy allegedly commenced.  (*Id.* ¶ 257.)  None of these communications provides the

20    terms of an agreement, and thus they are insufficient to meet Flannery's pleading burden.

21    Flannery says it has a "smoking gun," but its pleading is all smoke and mirrors.

22    Flannery tries to obscure its complete failure to allege a cognizable conspiracy with a

23    conclusory statement that because Defendants could have made significant profits by selling

24    their properties at prices originally offered by Flannery, their choice not to sell at those prices

25    must evidence an illegal conspiracy.  (Dkt. 1 ¶ 6.)  This makes no sense for multiple reasons.

26    ///

27    _____

28    decision and therefore confines its analysis to the question of whether the FAC adequately
alleges a per se violation of the Sherman Act.").

1    First, as shown above, Flannery's surmise that certain facts are "consistent with"

2    concerted action is not sufficient.  *Twombly*, 550 U.S. at 547.

3    Second, as explained *infra*, land is not a commodity to be bought and sold solely for

4    economic benefit, especially land on which families have lived and worked for generations.

5    Rather, property rights include the right not to sell at any price, for any reason, as part of an

6    owner's complex "bundle of rights."  *Est. of Sigourney*, 93 Cal. App. 4th 593, 604 (2001).  That

7    bundle includes the "rights to possess the property, to use the property, to exclude others from

8    the property, and to dispose of the property by sale or by gift."  *Id.* at 603; *see also Bounds v.*

9    *Superior Ct.*, 229 Cal. App. 4th 468, 479 (2014) (same).  Defendants may have had any number

10   of non-collusive reasons to decline to sell, which is precisely why Flannery must allege more

11   than conduct merely "consistent with" an unlawful agreement.

12   Third, even were Defendants demonstrably willing to sell land to Flannery, Flannery

13   alleges no facts from which to infer Defendants' refusal to sell at the first available opportunity is

14   evidence of a conspiracy.  Flannery admits that it anxiously desires to purchase land in Solano

15   County, no matter the price.  (Dkt. 1 ¶ 19 (Flannery offered "2-3 times more than what these

16   properties are worth in the open market"); ¶ 144 ("in addition to paying premium prices,

17   [Flannery] would let sellers or property keep their income from wind leases"); ¶ 164 ("the

18   premiums Flannery offered fluctuated. . . .").  Under the pled facts, it is entirely rational for any

19   land-owning Defendants to hold out for higher offers for their properties.  In sum, the Complaint

20   is wholly consistent with expected individual action, and fail to nudge the bald assertions of

21   conspiratorial agreement beyond "consistent" to "plausible."  *Twombly*, 550 U.S. at 547.

22          **2.      Flannery fails to allege that Defendants are competitors.**

23   Flannery not only fails to allege a plausible price-fixing agreement among Defendants,

24   but also fails to allege facts to establish that Defendants were market competitors in the first

25   place.[3]  An agreement among persons who are not actual or potential competitors in a relevant

26   _____

27   [3] To the contrary, as shown above, Flannery alleges that it desired to purchase *all* of the real
property in the area, as opposed to a traditional scenario in which it would purchase one
supplier's commodity over another's.

28

1  market is for Sherman Act purposes *brutum fulmen*."  *United States v. Sargent Elec. Co*., 785

2  F.2d 1123, 1127 (3d Cir. 1986).  A "horizontal price-fixing conspiracy cannot realistically bear

3  the name unless made among entities that should be competing, for otherwise it has no reason for

4  coming into existence."  *United States v. Ashland-Warren, Inc*., 537 F. Supp. 433, 443 (M.D.

5  Tenn. 1982).  Thus, the typical price-fixing conspiracy is among competitors selling uniform or

6  commoditized products.  *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d

7  651, 658 (7th Cir. 2002); *In re California Bail Bond Antitrust Litig*., No. 19-CV-00717-JST,

8  2022 WL 19975276, at *11 (N.D. Cal. Nov. 7, 2022) (noting that "standardized, commodity-like

9  products" may make a "market susceptible to conspiratorial price-fixing") (citations omitted).

10  But land is unique as a matter of law, and therefore not interchangeable.  *Glynn v.

11  Marquette*, 52 Cal. App. 3d 277, 308 (1984) (cited with approval in *Cottonwood Christian

12  Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1230 (C.D. Cal. 2002) ("Every

13  piece of property is unique. . ."); *accord Real Estate Analytics, LLC v. Vallas*, 160 Cal. App. 4th

14  463, 466 (2008) ("The law generally presumes real property is unique and that the breach of an

15  agreement to transfer property cannot be adequately relieved by pecuniary compensation.")

16  Thus, in *Souza v. Estate of Bishop*, the court recognized that land could be subject to the antitrust

17  statutes "only if there is considerable judicial stretching of the words used in those statutes." 594

18  F. Supp. 1480, 1483, n.2 (D. Haw. 1984), *aff'd*, 821 F.2d 1332 (9th Cir. 1987); *see also Western

19  Sunview Properties, LLC v. Federman*, 338 F. Supp. 2d 1106, 1124 (D. Haw. 2004) (citing

20  *Souza*).  "In common parlance the word 'commodity' is not used to describe real estate, and the

21  dictionaries, both general and legal, defining 'commodity' use the words 'personal' and

22  'movable' and do not use the term 'real estate.'"[4]  *Souza*, 594 F. Supp. at 1483.

23  Moreover, the implausibility of a conspiracy to fix the price of land is even greater here

24  than in a typical situation for at least two reasons.  First, the various parcels of land at issue are

25  ────────────

26  [4] Courts have also determined that land is not a commodity in other contexts.  *See Western
Sunview Properties*, 338 F. Supp. 2d at 1124 (holding that the term "commodity" in Hawaii
27  monopolization statute did not include the purchase of real estate by an individual owner);
*Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir. 1977) (holding that the word
28  "commodity" in Section 3 of the Clayton Act did not include cemetery lots).

1   not simply unique (as all parcels are), they are strikingly different.  Some are zoned for industrial

2   use while others are zoned for agricultural use.  (Dkt. 1 ¶ 183.)  The agricultural parcels are used

3   for different types of livestock and different types of crops.  Some parcels have significant

4   improvements (houses, other buildings) and some do not.  Some have substantial numbers of

5   wind turbines and some do not.  Second, many of the transactions at issue were not sales for cash

6   but swaps for different land.  (*See* Exhibit B hereto.)  As difficult as it is to conceive a price-

7   fixing agreement regarding the sale of disparate land plots, it is near-impossible to imagine such

8   an agreement that also incorporated swaps for land alongside cash sales.  Because all Flannery's

9   allegations concern Defendants' unwillingness to sell land (or to sell at a price dictated by

10  Flannery), Flannery does not plausibly allege that Defendants are competitors.

11        Flannery's specific factual allegations belie the conclusion that Defendants are

12  competitors.  *See Twombly*, 550 U.S. at 555.  For example, the allegation that a "large holding of

13  contiguous assembled property under common ownership is more valuable than if such

14  assemblage is missing properties," (Dkt. 1 ¶ 294) demonstrates that Flannery views each parcel

15  as uniquely significant.  (*See also id.* (alleging that "[i]f Flannery had been able to purchase the

16  above-referenced properties, Flannery's overall portfolio would be significantly more

17  valuable").)  Moreover, Flannery pleads that its negotiations surrounding each property were

18  unique.  (*E.g., id.* ¶ 164 ("the premiums Flannery offered fluctuated depending on both the

19  general macroeconomic situation [] and on the details of each specific transaction").)

20        Because the properties are not substitutable, Defendants are "not, in any meaningful

21  sense, competitors with one another," and thus lack any incentive (or practical ability) to agree

22  on prices for like goods.  *Ashland-Warren, Inc.*, 537 F. Supp. at 442-43 (an "'understanding'

23  requires reciprocal benefits and burdens to its participants before they may be found to have

24  engaged in an unlawful agreement"); *see also High Fructose Corn Syrup,* 295 F.3d at 658 ("If

25  the product is differentiated and as a result each seller has a little pocket of monopoly power . . .

26  no inference of collusion can be drawn from the fact that the sellers are all discriminating.").

27

28

- 12 -

1   Tellingly, there is no allegation Defendants were competing with each other–or anyone else for

2   that matter–before Flannery began its aggressive acquisition tactics.[5]

3          Thus, Flannery has failed to plausibly plead that Defendants are competitors engaged in

4   the sale of like products.  For this further reason, Flannery has not alleged an actionable

5   agreement and its claim fails as a matter of law.

6          **B.      Flannery Cannot Establish Antitrust Standing.**

7          The Sherman Act does not provide a remedy to anyone injured by an antitrust violation

8   simply on a showing of causation; plaintiff must have "antitrust standing."  *Knevelbaard Dairies*

9   *v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).  In assessing whether a plaintiff meets

10  this threshold standing requirement, courts will analyze the following factors: "(1) the nature of

11  the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to

12  forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of

13  duplicative recovery; and (5) the complexity in apportioning damages." *City of Oakland v.*

14  *Oakland Raiders,* 20 F.4th 441, 455 (9th Cir. 2021), *cert. denied sub nom. City of Oakland,*

15  *California v. Oakland Raiders*, 214 L. Ed. 2d 13 (2022) (citing *Am. Ad Mgmt., Inc. v. Gen. Tel.*

16  *Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999)).  At least three of these factors weigh in

17  favor of finding that Flannery lacks standing to bring its antitrust claims.

18                 **1.      Flannery's alleged injuries are not the type antitrust laws are**
19                 **intended to forestall.**

20         Antitrust standing does not exist if a plaintiff fails to establish the first factor of "antitrust

21  injury."  *City of Oakland*, 20 F.4th at 456 (cleaned up) (compiling cases and explaining that a

22  showing of antitrust injury is necessary, but not always sufficient to establish standing).[6]

23

24         [5] Flannery claims that the Department of Justice has prosecuted conspiracies involving the
    purchase and sale of real property, but those cases involved bid-rigging, not price-fixing.  (Dkt. 1
25  ¶ 9, n.4.)  Moreover, those cases did not involve an agreement among *landowners*.  Rather,
    potential purchasers agreed not to compete at public auctions to suppress the price of individual
26  properties.  The alleged conspiracy had nothing to do with the sale of the properties at issue.

27         [6] As discussed *infra*, even if antitrust injury is plausibly alleged, the Court must balance the
    remaining factors to determine whether antitrust standing has been established.  *City of Oakland*,
28  20 F.4th at 455-56.

1   Flannery's alleged injuries—overpayment for land or inability to force the sale of land—are not

2   the type of injury antitrust laws were intended to forestall.

3        As an initial matter, "[t]he history of the Sherman Act as contained in the legislative

4   proceedings is emphatic in its support for the conclusion that 'business competition' was the

5   problem considered and that the act was designed to prevent restraints of trade which had a

6   significant effect on such competition." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, fn. 15

7   (1940).  As explained above, Defendants are not competitors within the meaning of antitrust

8   laws.  Moreover, Flannery acknowledges that Defendants were not actively seeking to sell;

9   accordingly, it employed a variety of tactics just to bring Defendants to the negotiating table.

10  (Dkt. 1 ¶¶ 163-165 (unsolicited supracompetitive offers for unlisted properties), ¶¶ 205, 235, 291

11  (buying land impacting Defendants' interest out from under them), ¶ 296, fn. 17 (purchasing

12  properties surrounding a target property to add pressure to sell).)

13       Additionally, the Supreme Court has made clear that "[t]he antitrust injury requirement

14  ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or

15  effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344

16  (1990) (explaining that "[t]he need for this showing is at least as great under the per se rule as

17  under the rule of reason.").  Thus, "[i]f the injury flows from aspects of a defendant's conduct

18  that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's

19  conduct is illegal." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th

20  Cir. 2008).  Flannery's admission that it is the "de facto only" buyer of properties in the area

21  with a goal of assembling a "large holding of contiguous assembled property under common

22  ownership" to maximize its portfolio makes abundantly clear that Flannery does not seek to

23  promote competition in any way.  (Dkt. 1 ¶¶ 274, 294.)

24       To the contrary, Flannery admits that its objective was and is to establish a monopolistic

25  ownership of Solano County land (for reasons that remain a mystery).  Under such facts, an

26  agreement by Defendants *not* to sell to Flannery would have *prevented* precisely the type of

27  harm to competition the antitrust laws are intended to prevent.  If anything, the Complaint

28  ///

1    establishes that Flannery brought more potential sellers to market through its aggressive tactics.

2    For this further reason, the claim fails as a matter of law and the Court should dismiss it.

3              **2.      The alleged injuries are not direct.**

4              This factor focuses on "the chain of causation between [the plaintiff's] injury and the

5    alleged restraint" of trade. . . .   The harm may not be 'derivative and indirect' or 'secondary,

6    consequential, or remote.'"   *City of Oakland*, 20 F.4th at 458 (citations omitted).  Here, Flannery

7    asserts four categories of injuries: (1) overpayment to conspirators; (2) overpayment to non-

8    conspirators; (3) lost profits for land conspirators refused to sell; and (4) lost profits for land non-

9    conspirators refused to sell.  (Dkt. 1 ¶¶ 272-313.)

10             Flannery's claim it was injured by overpaying (to both conspirators and third parties) is

11   not plausible because Flannery concedes that these overpayments were independent of any

12   alleged acts by Defendants.  Specifically, Flannery admits it set the market price for properties in

13   the area through aggressive unsolicited above-market offers and by paying well-above market

14   value.  (Dkt. 1 ¶¶ 161-167, 274.)  Flannery cannot now allege that any Defendant is directly

15   responsible for other Defendants and non-parties attempting to negotiate, and expecting to

16   receive, supracompetitive purchase prices.

17             That Flannery seeks damages for overpayment to non-conspirators is telling, in and of

18   itself.  The Complaint tacitly acknowledges that it is normal for landowners to consider impacts

19   on neighbors, market conditions, and recent sales within their area when negotiating with a

20   prospective purchaser, without any presumed elaborate price-fixing conspiracy.  (Dkt. 1 ¶ 296,

21   n.17.)  The inclusion of damages for overpayment to non-conspirators undermines the

22   plausibility of any purported agreement among Defendants in the first instance, because it

23   evidences that Defendants' conduct may be parallel without necessarily evidencing an unlawful

24   conspiracy.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1193 ("mere

25   allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a

26   claim under § 1.")  The Complaint also fails to offer any basis for Flannery's assumption that

27   non-conspirators changed their negotiation strategies with Flannery based on any of the

28   ///

1   Defendants' alleged reputation as "shrewd operators" (Dkt. 1 ¶ 297), particularly when Flannery

2   acknowledges that other reputable sophisticated landowners sold early and for less (*id.* ¶ 14).

3          Additionally, Flannery's claim that it lost profits when it was unable to acquire land from

4   Defendants and third parties fails as a matter of law.  Absent exceptions not applicable here,

5   "nonpurchaser" damages are not available in this Circuit.  *City of Oakland*, 20 F.4th at 460.  That

6   is because there "are too many speculative links in the chain of causation between Defendants'

7   alleged restrictions on output and [nonpurchaser's] alleged injuries."  *Id.*  That concern is

8   particularly applicable here.  Although the Complaint makes a conclusory assertion that

9   unspecified third parties wanted to sell but were dissuaded by Defendants' decisions not to sell

10  (Dkt. 1 ¶ 297), it fails to allege any facts to support this conclusion, or to establish what price (if

11  any) these unnamed third parties would have ultimately agreed to, or that the (unspecified) price

12  the (unnamed) third parties purportedly would have sold for was determined through a specific

13  agreement rather than based on Flannery's notorious willingness to pay above market.

14          **3.      The alleged harm is too speculative.**

15          Flannery alleges Defendants and non-conspirator third parties all would have sold at

16  some unspecified price, but for the alleged conspiracy.  But, as noted above, nonpurchaser

17  damages are considered inherently indirect and speculative.  *City of Oakland*, 20 F.4th at 460

18  ("Nonpurchasers who are priced out of the market, however, present a special problem, due to

19  the speculative nature of the harm").  Nor does Flannery allege facts to establish that Defendants

20  would have sold; it is pure conclusion.

21          For those Defendants or non-conspirators that did sell, Flannery's "overpayment"

22  damages are likewise too speculative.  First, there is no benchmark, just a naked allegation of

23  $170 million in overpayment.  (Dkt. 1 ¶ 11.)  Second, Flannery admits that it intentionally and

24  voluntarily paid above-market premiums, and provided valuable non-monetary consideration.

25  (*Id.* ¶¶ 12, 13, 163.)  Third, Flannery did all of this years before the various communications it

26  contends formed Defendants' "agreement."  (*See* section IV.A. *supra*.)  Thus, Flannery's own

27  allegations preclude any plausible and non-speculative measure of harm as a matter of law.

28  ///

1  *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002) (damages claim cannot

2  be based on "speculation or guesswork").

3      As confirmed by *City of Oakland*, the lack of direct injury and speculative nature of the

4  harm, standing alone, is enough to warrant dismissal of the entire action.  20 F.4th at 460.

5      **C.  Flannery Cannot Maintain Its Claims Against Individual Defendants Who
         Acted on Behalf of LLCs or Trusts.**

6

7      For members and managers of LLCs, and trustees acting on behalf of their trust, personal

8  liability is expressly limited by statute.  Cal. Corp. Code § 17703.04(a)(2) (LLC liabilities do not

9  become liabilities of a "member or manager solely by reason of the member acting as a member

10  or manager acting as a manager for the limited liability company."); Cal. Prob. Code § 18001

11  ("A trustee is personally liable for obligations arising from ownership or control of trust property

12  only if the trustee is personally at fault.")  Thus, for any manager or member of a Defendant LLC

13  to be sued in their individual capacity, Flannery must specifically plead that the individual

14  manager or member personally participated in tortious or criminal conduct, or that the LLC is a

15  mere alter ego of the members.  *People v. Pac. Landmark, LLC*, 129 Cal. App. 4th 1203, 1212

16  (2005); *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011).  Likewise,

17  for Flannery to maintain claims against any trustee in his or her individual capacity, the

18  Complaint must plead that the individuals are "personally at fault"; *i.e.,* that they personally

19  engaged in unlawful conduct.  *Stine v. Dell'Osso*, 230 Cal. App. 4th 834, 845 (2014), *as modified*

20  *on denial of reh'g* (Nov. 14, 2014).  Flannery has not done so and cannot do so.

21      First, the Complaint fails to include any non-conclusory conspiracy allegations against

22  the majority of the individually-named Defendants.  Hence, these individuals cannot be held

23  personally liable solely because of their affiliation with an LLC or trust holding title to

24  Flannery's target properties.  For those individually-named Defendants who opted not to sell to

25  Flannery, allegedly in both their individual capacity and their capacity as a trustee or LLC

26  member, the Complaint merely alleges that Flannery was informed (typically through second-

27  hand accounts) that these Defendants had a generalized interest in selling.  (*E.g.*, Dkt. 1 ¶¶ 229-

28  237.)  The Complaint's conclusory allegations that the trustees' and LLC members' decision not

1    to sell, despite purported interest[7] from other members or beneficiaries, because of an

2    unspecified price-fixing agreement, are insufficient to establish a price-fixing agreement, and

3    cannot pierce the trusts and LLCs and impose individual liability. *Twombly*, 550 U.S. at 556.

4           Similarly, for those entities that did sell, their members and trustees are not individually

5    liable simply because the LLC or trusts sought and received an above-market purchase price. By

6    its own admission, Flannery eagerly offered several times more than any buyer in the area. (Dkt.

7    1 ¶¶ 13, 14.) As such, the allegation that a trustee or LLC may have expected and negotiated a

8    supracompetitive price for its property after learning of Flannery's offers does not provide any

9    evidence that a trustee or member directly participated in, or was even aware of, the supposed

10   price-fixing agreement.

11          Hence, even were the properties subject to antitrust laws (they are not), Flannery failed to

12   allege that the individual Defendants personally engaged in tortious conduct in their sales—or

13   decisions not to sell—on behalf of the LLCs or trusts. The claims against individual Defendants

14   thus fail as a matter of law, and the Court should dismiss them, for this independent reason.

15          **D.     The Complaint Makes Insufficient Allegations Against Certain Defendants.**

16          To withstand *Twombly*, a complaint must present sufficient allegations against each

17   individual defendant. *See Total Benefits*, 552 F.3d at 436. Here, the Complaint fails to plead

18   factual allegations to establish that the following defendants had a role in the alleged conspiracy:

19   William C. Dietrich, Paul Dietrich, John Alsop, Nancy Roberts, Ronald Gurule, Ned Anderson,

20   either Neil Anderson (there are two), Maryn Anderson, Glenn Anderson, Janet Blegen, Robert

21   Anderson, Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman, Christopher Wycoff,

22   and Janet Zanardi. With respect to each of these defendants Flannery fails to allege facts about

23   any specific wrongdoing. (Dkt. 1 ¶¶ 22-31 (alleging communications among other defendants).)

24   Further, there is nothing in the Complaint that, even if taken as true, would indicate they had

25   knowledge of the alleged conspiracy, much less participated in it. (*Id.* ¶ 10.) For instance, the

26   Complaint identifies William Dietrich under "Anderson Defendants" and "Anderson Properties"

27   _____

28   [7] Again, it must be noted that Flannery aggressively manufactured "interest" through its own
     deliberate acts, such as unsolicited supracompetitive offers. (*E.g.*, Dkt. 1 ¶¶ 163-165.)

1    respectively.  (Dkt. 1 ¶¶ 60, 121.)  The Complaint makes no specific allegations about him.  The

2    lack of any factual allegations distinguishing between defendants requires dismissal under

3    *Twombly*.  *Flores*, 997 F. Supp. 2d at 1103 (a complaint lumping defendants together should

4    "distinguish adequately claims and alleged wrongs among defendants and others" and state facts

5    of "defendants' specific wrongdoing"); *In re Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-

6    2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. 2014) (holding that plaintiff must "allege that

7    each individual defendant joined the conspiracy and played some role in it because, at the heart

8    of an antitrust conspiracy is an agreement and conscious decision by each defendant to join it").

9    **E.    Flannery's Cartwright Act Claim Fails for the Same Reasons as Its Sherman**
10   **Act Claim.**

11        "The requirements to plead a claim under California's Cartwright Act are 'patterned after

12   section 1 of the Sherman Act.'" *Kelsey K. v. NFL Enterprises, LLC*, 757 F. App'x 524, 527 (9th

13   Cir. 2018) (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476–77 (9th Cir. 1986));

14   *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (because

15   Cartwright Act, is "modeled after the Sherman Act," the analysis of California's antitrust law

16   "mirrors the analysis under federal law.").  Hence, Flannery's derivative Cartwright Act claim

17   fails for the same reasons as its Sherman Act claim.  *Id.*; *see also Jain Irrigation,* 386 F. Supp. 3d

18   at 1316 (dismissing Cartwright Act claim that rose and fell with deficient Sherman Act claim).

19   **F.    Flannery's UCL Cause of Action Must be Dismissed Because It is Dependent**
20   **Upon Its Failed Antitrust Claims.**

21        Flannery's UCL claim is premised on allegations that Defendants' conduct is prohibited

22   under the UCL's "unlawful" and "unfair" prongs.  (Dkt. 1 ¶¶ 334, 335.)

23        To be "unlawful," Defendants' conduct must violate another "borrowed" law.  *Cel-Tech*

24   *Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); *AT & T Mobility*

25   *LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1107, n. 1 (9th Cir. 2013).  Where, as here, "a

26   complaint alleges the same conduct as both a violation of the Sherman Act and a violation of

27   California's Cartwright Act and UCL, the determination that the alleged conduct is not an

28   unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not

1  unlawful under the Cartwright Act or the 'unlawful' prong of the UCL." *Lenhoff Enters., Inc. v.*

2  *United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018) (internal citations omitted);

3  *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 669 (9th Cir. 2009).

4         In determining whether an act or practice is properly alleged to violate UCL's "unfair"

5  prong, California courts remain unsettled as to what test should be applied. *Davis v. HSBC Bank*

6  *Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) citing *Lozano v. AT & T Wireless Servs., Inc.*,

7  504 F.3d 718, 735–36 (9th Cir. 2007). Regardless of the test applied, this Court adopted the rule

8  that where the unfair business practices alleged under the "unfair" prong of the UCL overlap

9  entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL,

10 the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL

11 do not survive. *Linde, LLC v. Valley Protein, LLC*, No. 116CV00527DADEPG, 2019 WL

12 3035551, at *21 (E.D. Cal. July 11, 2019) (citations omitted). Flannery's claims of unfairness

13 are solely dependent on the alleged incipient violation of state and federal antitrust laws (Dkt. 1

14 ¶¶ 333-339); its cause of action under the UCL's "unlawful" and "unfair" prongs thus fails for

15 the same reasons its Sherman Act and Cartwright Act claims fail.

16 **V.    CONCLUSION**

17        For the reasons stated above, the Complaint fails to allege a claim upon which relief may

18 be granted and should be dismissed, with prejudice.

19      Dated:  July 11, 2023           GLYNN, FINLEY, MORTL,
                                            HANLON & FRIEDENBERG, LLP

20                                        CLEMENT L. GLYNN
                                       ADAM FRIEDENBERG

21                                        ROBERT C. PHELPS
                                       MORGAN K. LOPEZ

22                                        One Walnut Creek Center
                                       100 Pringle Avenue, Suite 500

23                                        Walnut Creek, CA  94596

24                                     By    /s/ *Morgan K. Lopez*

25                                     Attorneys for Defendants Ian Anderson
                                       (Individually and as Trustee of the Ian

26                                      and Margaret Anderson Family Trust),
                                       Margaret Anderson (Individually and as

27                                      Trustee of the Ian and Margaret
                                     Anderson Family Trust), Neil Anderson,

28                                      and Maryn Anderson

Dated: July 11, 2023

BUCHALTER
KEVIN T. COLLINS
PHILLIP CHAN
ADAM SMITH
NATALIYA SHTEVNINA
A Professional Corporation
500 Capitol Mall, Suite 1900
Sacramento, CA  95814

By _____/s/ *Kevin T. Collins*_____
    (*as authorized on July 11, 2023*)
Attorneys for Defendants
Ned Anderson (individually and as trustee of
the Ned Kirby Anderson Trust), Neil
Anderson, Glenn Anderson, Janet Blegen
(individually and as trustee of the Janet
Elizabeth Blegen Separate Property Trust),
Robert Anderson (individually and as trustee
of the Robert Todd Anderson Living Trust),
Stan Anderson, Lynne Mahre, Sharon
Totman, Amber Bauman and Christopher
Wycoff

Dated: July 11, 2023

HOGE FENTON JONES & APPEL INC.
STEVEN J. KAHN
ALEXANDER H. RAMON

By _____/s/ *Steven J. Kahn*_____
    (*as authorized on July 11, 2023*)
    Attorneys for Defendant Ronald Gurule
    (individually and as trustee of the
    Ronald Gurule 2013 Family Trust)

Dated: July 11, 2023

DAVIS WRIGHT TREMAINE LLP
ALLISON A. DAVIS
SANJAY M. NANGIA
50 California Street, 23rd Floor
San Francisco, CA 94111

By: *_/s/Allison A. Davis_____*
    (*as authorized on July 11, 2023*)
    Attorneys for Defendant
    WILLIAM DIETRICH
    (individually and as trustee of the
    Child's Trust FBO William C. Dietrich,
    a subtrust under the Trust of William C.
    Dietrich and Ivanna S. Dietrich)

- 21 -

1

Dated: July 11, 2023

RIMON, P.C.
GABRIEL G. GREGG
A Professional Corporation
800 Oak Grove Avenue, Suite 250
Menlo Park, California 94025

2

3

4

By    /s/ *Gabriel G. Gregg*
*(as authorized on July 11, 2023)*
Attorneys for the Mahoney Defendants

5

6

7

Dated: July 11, 2023

ROPERS MAJESKI PC
MICHAEL J. IOANNOU
DAVID B. DRAPER
KEVIN W. ISAACSON

8

9

10

By: /s/ *Michael J. Ioannou*
*(as authorized on July 11, 2023)*
Attorneys for Defendants
Paul Dietrich (individually and as trustee of
the Child's Trust FBO Paul S. Dietrich, a
subtrust under the Trust of William C.
Dietrich and Ivanna S. Dietrich; John
Alsop (individually and as trustee of the
John G. Alsop Living Trust), Nancy
Roberts (individually and as trustee of the
Nancy C. Roberts Living Trust), Janet
Zanardi (individually and as trustee of
Trust A under the Zanardi Revocable
Trust)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 -

EXHIBIT A

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/investors-bought-nearly-1-billion-in-land-near-a-california-air-force-base-officials-want-to-know-who-exactly-they-are-fd868e38

◆ **WSJ NEWS EXCLUSIVE** | **NATIONAL SECURITY**

# Investors Bought Nearly $1 Billion in Land Near a California Air Force Base. Officials Want to Know Who Exactly They Are.

Flannery Associates' purchases near Travis Air Force Base have alarmed local and federal officials

*By Kristina Peterson* Follow *, Jack Gillum* Follow *and Kate O'Keeffe* Follow

*July 7, 2023 9:00 am ET*



Flannery Associates, an investment group, has purchased at least 20 parcels of land near Travis Air Force Base in California. PHOTO: HEIDE COUCH/U.S. AIR FORCE

WASHINGTON—Government officials are investigating large land acquisitions near a major air force base northeast of San Francisco, concerned that foreign interests could be behind the investment group that purchased the land.

At the center of the probes is Flannery Associates, which has spent nearly $1 billion in the last five years to become the largest landowner in California's Solano County, according to county officials and public records.

An attorney representing Flannery said it is controlled by U.S. citizens and that 97% of its invested capital comes from U.S. investors, with the remaining 3% from British and Irish

Case 2:23-cv-00927-TLN-AG   Document 78   Filed 07/11/23   Page 35 of 46

investors. Flannery previously told Solano County the entity "is owned by a group of families looking to diversify their portfolio from equities into real assets, including agricultural land in the western United States."

"Any speculation that Flannery's purchases are motivated by the proximity to Travis Air Force Base" is unfounded, the attorney said.

The Air Force's Foreign Investment Risk Review Office has been investigating Flannery's purchases of roughly 52,000 acres, including around Travis Air Force Base, according to people familiar with the matter. But the office, which has been looking into the matter for about eight months, has yet to be able to determine who is backing the group, one of the people said.



Note: county data is as of June 6 from the Solano County assessor
Sources: Solano County property records; federal court filings
Brian McGill and Jack Gillum/THE WALL STREET JOURNAL

"We don't know who Flannery is, and their extensive purchases do not make sense to anybody in the area," said Rep. John Garamendi, (D., Calif.) the top Democrat on the House Armed Services Committee's readiness panel. "The fact that they're buying land purposefully right up to the fence at Travis raises significant questions."

Garamendi and Rep. Mike Thompson (D., Calif.), whose districts include the area where land has been bought, have asked for an investigation by the Committee on Foreign Investment in the U.S., a multiagency panel that can advise the president to block or unwind foreign acquisitions for security concerns.

The U.S. Agriculture Department also has inquired about Flannery's ownership, according to correspondence reviewed by The Wall Street Journal. Nearly all of the land is in unincorporated parts of Solano County, and most of it is zoned for agricultural use, records show. Several of the parcels include wind turbines.

The Journal found that at least 20 parcels surround Travis, known as the "Gateway to the Pacific" and home to the largest wing of the Air Force's Air Mobility Command, which provides planes to refuel other aircraft and those to transport military personnel and supplies, including munitions used in Ukraine following Russia's invasion.

The Flannery attorney declined to provide more details about Flannery's investors. Local and federal officials also say they have been unable to learn the identities of those in the Flannery group.



Rep. John Garamendi (D., Calif.) has asked the Committee on Foreign Investment in the U.S. to investigate Flannery Associates. PHOTO: MARIAM ZUHAIB/ASSOCIATED PRESS

Flannery's statement that it is U.S.-owned can't be confirmed or denied by federal agencies at this time, a congressional aide said. Cfius, which is led by the Treasury Department and includes the Departments of Defense, Justice, State and others, declined to comment.

If Cfius takes up the case, the Treasury Department could subpoena Flannery to get more information about its backers, but people familiar with the panel, whose operations are

Case 2:23-cv-00927-TLN-AC   Document 78   Filed 07/11/23   Page 37 of 46

confidential, have said they couldn't think of a time when the department had used that authority.

Acquisitions around Travis Air Force Base have raised security concerns among Solano County officials, who have been trying to determine the investors in Flannery and their plans for the land for years, said Bill Emlen, the county administrator.

County supervisor Mitch Mashburn said if Flannery intends to develop the land, it would make sense for the group to engage with local officials—but it hasn't.

"The majority of the land they're purchasing is dry farmland," he said. "I don't see where that land can turn a profit to make it worth almost a billion dollars in investment."

A spokesperson for Travis said that its officials and other Air Force offices "are aware of the multiple land purchases near the base and are actively working internally and externally with other agencies."

In a recent federal court filing, Flannery Associates said it is a wholly owned subsidiary of Flannery Holdings, a limited liability company registered in Delaware. LLCs registered in Delaware don't have to publicly disclose the identity of their owners.

Use of LLCs to purchase land is a common practice. Nearly one in five homes were purchased by investors in early 2023, including LLCs and other corporate entities, according to data compiled by real-estate firm Redfin of more than 40 of the largest U.S. metro areas.

"While I can see Cfius being interested in who owns real estate near a military base, the fact that a property's ownership is opaque does not mean anything nefarious is going on," said Rick Sofield, an attorney at Vinson & Elkins who used to run the Justice Department's Cfius team.

In May, Flannery filed a price-fixing lawsuit in federal court in California, alleging that landowners had colluded against it to drive up prices, in some instances overcharging Flannery and in others refusing to sell their properties.

Attorneys for the defendants didn't respond to requests for comment or declined to comment. Flannery settled with one group of defendants in late June and filed notice of a contingent settlement with another group of defendants Thursday.

The 52,000 acres Flannery now owns in Solano County is spread out over more than 300 parcels, a Journal analysis of property records shows. The company said in court filings that it

has invested more than $800 million in its acquisitions and acknowledged paying prices of "multiples of fair market value."



A plan by a Chinese-owned company to develop land near Grand Forks Air Force Base in North Dakota was halted after the Air Force said it posed a national security risk. PHOTO: LEWIS ABLEIDINGER FOR THE WALL STREET JOURNAL

Flannery has offered various explanations for its purchases over time. In 2019, Flannery attorney Richard Melnyk said in an email to a Solano County official that Flannery planned to work with local farmers and might explore "new types of crops or orchards," he said, ruling out any cannabis operations.

In its May price-fixing lawsuit, Flannery said it planned to use the land for renewable energy and related projects. The entity has allowed many sellers to continue farming or remain on the land and collect income from wind turbine leases for the remainder of the lease, according to court filings.

In a June 5 email to Emlen reviewed by the Journal, Melnyk said Flannery was considering leasing "a substantial portion" of its land to olive growers, including some near Travis Air Force Base.

"Nobody can figure out who they are," said Ronald Kott, mayor of Rio Vista, Calif., which is now largely surrounded by Flannery-owned land. "Whatever they're doing—this looks like a very long-term play."

Flannery's holdings near Travis raised concerns similar to those sparked by a Chinese-owned company's plan to develop land 12 miles from the Grand Forks Air Force Base in North Dakota. The plan was halted after the Air Force said it posed a national security risk, and lawmakers

have continued to introduce bipartisan legislation restricting foreign ownership of U.S. farmland or increasing transparency around these acquisitions.

The Chinese company's U.S. arm said at the time the planned facility wouldn't be used to spy on the U.S.

Flannery told USDA in June that it didn't need to register its holdings in Solano County because no foreign person "holds any significant interest or substantial control" of Flannery, according to a letter provided by the group's attorneys.

Write to Kristina Peterson at kristina.peterson@wsj.com, Jack Gillum at jack.gillum@wsj.com and Kate O'Keeffe at kathryn.okeeffe@wsj.com

EXHIBIT B

**Exhibit B**

| Paragraph(s) | Property APN and/or Name | Seller | Date of Sale | Price | Miscellaneous Allegations |
|---|---|---|---|---|---|
| 99, 185 | APN 0048-010-490 "Emigh 45 Property" | Emigh Land LP | June 4, 2021 | $560,000 (approximately $12,400/acre) | |
| 100, 183-202 | APNs 0042-110-440, 0042-110-450, 0042-100-290, 0042-110-430, 0042-110-420, 0048-020-560, 0048-020-550, 0048-020-580, 0048-020-590, 0048-010-430, 0048-010-470, 0048-010-460 "Emigh Industrial Property" | Emigh Land LP | April 20, 2023 | ~ $50 million ($43,560/acre) | |
| 102 | APN 0048-010-170 "Antenna Property" | Mahoney LP | May 11, 2023 | N/A | Alleged to be a swap in connection with Emigh Industrial Property sale (¶¶ 199-201) |
| 103 | APNs 0090-190-190 and 0090-190-200 "Marianno Property" | Mahoney LP | May 11, 2023 | N/A | Alleged to be a swap in connection with Emigh Industrial Property sale (¶¶ 199-201) |
| 105 | APNs 0048-020-070, 0048-020-080, 0048-020-300, 0048-020-370 "Denverton Property" | Mahoney LP | May 11, 2023 | N/A | Alleged to be a swap in connection with Emigh Industrial Property sale (¶¶ 199-201) |
| 106 | APNs 0048-010-290, 0048-010-300, 0048-010-440, 0048-010-450, 0048-050-040 "Souza Property | Mahoney Trust | May 11, 2023 | N/A | Alleged to be a swap in connection with Emigh Industrial Property sale (¶¶ 199-201) |

**Exhibit B**

| Paragraph(s) | Property APN and/or Name | Seller | Date of Sale | Price | Miscellaneous Allegations |
|---|---|---|---|---|---|
| 111, 278 | "Ila Property" | Richard Anderson, Carol Hoffman, Deborah Workman, and David Anderson | May 10, 2023 | $17,200/acre | Immediately sold to Mahoney Trust, via swap. (¶ 111) |
| 113, 127, 226, 279 | "McKinnon 18 Property" | Carol Hoffman, Deborah Workman, and David Anderson | Under contract | $17,200/acre | Will be swapped upon completion of sale. (¶ 112) |
| 303 | Orciuoli property | Non-conspirators Nick and Enina Orciuoli | December 5, 2022 | $7 million ($17,500/acre) | |
| 140 | Certain "Hamilton Properties" | Hamilton Conspirators | Unknown | Unknown | |
| 295 | Unknown | Dozens of unidentified, non-conspirator landowners who demanded higher prices to sell to Flannery than they would have otherwise | Unknown | Unknown | |

EXHIBIT C

**Exhibit C**

| Paragraph(s) | Property APN and Name | Owner | Miscellaneous Allegations |
|---|---|---|---|
| 94, 290 | APN 0042-100-160 "Barnes Property" | Barnes LLC | |
| 95, 290 | APNs 0048-010-110, 0048-010-220, 0048-010-240, 0048-020-430, 0048-020-510, 0048-020-520, 0048-020-530 "Lambie Property" | Lambie LLC | |
| 96, 290 | APNs 0046-180-070, 0046-180-080, 0048-070-20 "Kirby Property" | Kirby LLC | |
| 101, 291 | APNs 0042-110-210 and 0048-010-030 "Goosehaven Property" | Mahoney LP | |
| 107, 291 | APNs 0048-120-400, 0048-120-410, 0048-130-200 "Mahoney 607 Property" | Mahoney Trust | |
| 108, 291 | APNs 0048-160-210 and 0048-160-220 "Nielsen Property" | Mahoney LP | |
| 109, 291 | APN 0048-130-210 "Mahoney 370 Property" | Mahoney Trust | Flannery did purchase this property but then swapped it (¶ 109) |
| 110, 291 | APNs 0048-100-150, 0048-100-420, 0048-160-200 "Currie Property" | Mahoney LP | Flannery did purchase this property but then swapped it (¶ 110) |
| 111, 291 | APN 0090-190-050 "Ila Property" | Mahoney Trust | Flannery did purchase this property but then swapped it (¶ 111) |
| 112, 291 | APN 0090-190-240 "McKinnon 18 Property" | Anderson Defendants | Flannery is under contract to purchase this property and then swap it (¶ 112) |

**Exhibit C**

| Paragraph(s) | Property APN and Name | Owner | Miscellaneous Allegations |
|---|---|---|---|
| 116, 292 | APNs 0048-060-220, 0048-060-230, 0048-060-240, 0048-060-250, 0048-060-260, 0048-070-350, 0048-070-360 "Mason Property" | Ian and Margaret Anderson | |
| 117, 292 | APN 0048-070-440 "Zadwick Property | Ian and Margaret Anderson | |
| 118, 292 | APN 0090-070-310 "Neil Anderson Property" | Neil Anderson | |
| 119, 292 | APN 0090-090-350 "Maryn Anderson Property" | Ian, Margaret, and Maryn Anderson | |
| 120, 292 | APN 0090-090-230 "Russell Property" | Ian and Margaret Anderson | |
| 121, 292 | APNs 0048-130-220, 0048-160-350, 0048-160-360 "Dietrich Property" | William and Paul Dietrich | |
| 122, 292 | APNs 0048-100-200, 0048-160-240, 0048-160-370 "Alsop Property" | John Alsop, Nancy Roberts, Janet Zanardi | |
| 123, 292 | APNs 0048-160-230, 0048-160-250, 0048-160-290, 0090-190-020 "Gurule Property" | Ronald Gurule | |
| 124, 292 | APNs 0090-200-100 and 0048-130-203 "Richard Anderson Property" | Richard Anderson | |
| 125, 292 | APNs 0090-190-250 and 0048-130-240 "Irwin Anderson Property" | David Anderson Carol Hoffman, Deborah Workman | |

**Exhibit C**

| Paragraph(s) | Property APN and Name | Owner | Miscellaneous Allegations |
|---|---|---|---|
| 128, 292 | APNs 0090-090-170, 0090-110-080, 0090-090-100, 0090-090-110, 0090-100-140, 0090-100-150 "Anderson 1,005 Property" | Ned Anderson, Neil Anderson, Glenn Anderson, Janet Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman, Christopher Wycoff | |
| 129, 292 | APNs 0090-090-300, 0090-090-310, 0090-100-020 "Anderson 153 Property" | Janet Blegen, Robert Anderson, Stan Anderson | |
| 132, 293 | APN 0049-310-060 "Hamilton 235" | Hamilton Conspirators | Flannery did purchase this property but then swapped it |
| 133, 293 | APN 0049-310-050 "Hamilton 200" | Hamilton Conspirators | Flannery did purchase this property but then swapped it |
| 134, 293 | APNs 0049-320-040 and 0049-0360-010 "Hamilton 265" | Hamilton Conspirators | Flannery did purchase this property but then swapped it |
| 309 | Unknown | Jeanne McCormack and Albert Medvitz | Third parties allegedly influenced by conspirators, on information and belief |
| 310 | Unknown | Dexter Mayhood | Third party allegedly influenced by conspirator, on information and belief |
| 311 | Unknown | Cattey Ranch LLC | Third party allegedly influenced by conspirator, on information and belief |
| 312 | Unknown | Marilyn Riley | Third party allegedly influenced by conspirator, on information and belief |