MATTHEW M. MARTINO (*pro hac vice*)
matthew.martino@skadden.com
MICHAEL H. MENITOVE (*pro hac vice*)
michael.menitove@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

LANCE A. ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Attorneys for Plaintiff*
*FLANNERY ASSOCIATES LLC*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Flannery Associates LLC, | Case No.: 2:23-cv-00927-TLN-AC |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| v. | |
| Barnes Family Ranch Associates, LLC, *et al.*, | **Date:** **August 24, 2023** |
| Defendants. | **Time:** **2:00 P.M.** |
| | **Dept.:** **Courtroom 2, 15th Floor** |
| | **Before:** **Hon. Troy L. Nunley** |

1

## **TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ..................................................................................... ii

3  PRELIMINARY STATEMENT ................................................................................. 1

4  FACTUAL BACKGROUND ...................................................................................... 3

5  ARGUMENT ................................................................................................................. 5

6      I.      FLANNERY'S SHERMAN ACT CLAIM IS ADEQUATELY PLED ............... 5

7            A.     Flannery Plausibly Alleges That Defendants Conspired To Fix Prices ..... 6

8                  1.    Flannery Directly Alleges An Agreement To Fix Prices ............. 7

9                  2.    Flannery Alleges Circumstantial Evidence of An Agreement

10                       To Fix Prices ..................................................................................... 9

11            B.     The Sherman Act Applies To Conspiracies Involving Real Property .......12

12      II.      FLANNERY HAS ANTITRUST STANDING....................................................14

13            A.     Overcharges and Lost Profits Are Quintessential Antitrust Injuries .........14

14            B.     The Price-Fixing Conspiracy Directly Harmed Flannery .........................15

15            C.     Flannery's Injuries Are Concrete, Not Speculative..................................17

16      III.     INDIVIDUAL CONSPIRATORS CANNOT ESCAPE LIABILITY.................18

17      IV.     FLANNERY'S STATE LAW CLAIMS ARE ADEQUATELY PLED .............20

18      V.     IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND .......20

19  CONCLUSION ..............................................................................................................20

20

21

22

23

24

25

26

27

28

PL.'S OPPOSITION TO DEFS.' MOT. TO DISMISS         CASE NO. 2:23-CV-00927-TLN-AC

## <u>TABLE OF AUTHORITIES</u>

**CASES** **Page(s)**

*1-800 Contacts, Inc.*, No. 2:16-cv-1183-TC,
    2018 WL 2271024 (D. Utah May 17, 2018) ........................................................................ 18

*American Ad Management, Inc. v. General Telephone Co. of California*,
    190 F.3d 1051 (9th Cir. 1999) ........................................................................................... 14

*American Proteins, Inc. v. River Valley Ingredients, LLC*,
    No. 2:22-cv-91-RWS, 2022 WL 16827602 (N.D. Ga. Nov. 8, 2022) .................................. 17

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .............................................................................................. 11

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982).......................................................................................................... 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................................... 5

*B & R Supermarket, Inc. v. Visa, Inc.*,
    No. 16-cv-01150 WHA, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ................... passim

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................... 5, 6, 8, 19

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988).......................................................................................................... 12

*In re California Bail Bond Antitrust Litigation*,
    No. 19-cv-00717-JST, 2022 WL 19975276 (N.D. Cal. Nov. 7, 2022) .............................. 13

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    MDL No. 1917, 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ......................................... 16

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ............................................................................ 19

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021)......................................................................................... 15, 17

*Contract Buyers League v. F & F Investment*,
    300 F. Supp. 210 (N.D. Ill. 1969) ..................................................................................... 13

*Cottonwood Christian Center v. Cypress Redevelopment Agency*,
    218 F. Supp. 2d 1203 (C.D. Cal. 2002) ............................................................................ 12

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
    724 F.2d 290 (2d Cir. 1983) ..................................................................... 17

*Dairy, LLC v. Milk Moovement, Inc.*,
    No. 2:21-cv-02233-WBS AC, 2023 WL 3437426 (E.D. Cal. May 12, 2023) .................... 14

*Davis v. Southern Bell Telephone & Telegraph Co.*,
    755 F. Supp. 1532 (S.D. Fla. 1991) ............................................................ 18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
    546 F.3d 981 (9th Cir. 2008) ..................................................................... 8

*Fisher v. City of Berkeley, Caifornia*,
    475 U.S. 260 (1986) ............................................................................... 13

*Flextronics v. Panasonic Holdings Corporation*,
    No. 22-cv-15231, 2023 WL 4677017 (9th Cir. July 21, 2023) ........................... 10,11

*Flores v. EMC Mortgage Co.*,
    997 F. Supp. 2d 1088 (E.D. Cal. 2014) ......................................................... 19

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) .................................................................... 12

*In re Gilead Sciences Securities Litigation*,
    536 F.3d 1049 (9th Cir. 2008) ................................................................ 5, 14

*Glen Holly Entertainment Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) ..................................................................... 15

*Glynn v. Marquette*,
    152 Cal. App. 3d 277 (Cal. Ct. App. 1984) ..................................................... 12

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    No. 2:09-cv-05334-MRP-RNB, 2010 WL 11520539 (C.D. Cal. Feb. 23, 2010) .......... 15, 17

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651 (7th Cir. 2002) ..................................................................... 13

*In re High-Tech Employee Antitrust Litigation*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................... 8, 14

*Jacques v. Bank of America Corp.*,
    No. 1:12-cv-00821-SAB, 2013 WL 3199027 (E.D. Cal. June 21, 2013) ..................... 20

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..................................................................... 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ............................................................ 14, 17, 18

iii

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ................................................................. 5

*In re Lithium Ion Batteries Antitrust Litig.*,
    13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ...................... 19

*Markson v. CRST International, Inc.*,
    No. 5:17-cv-01261-SB-SP, 2022 WL 790960 (C.D. Cal. Feb. 24, 2022) ........... 16

*Markson v. CRST International, Inc.*,
    No. 5:17-cv-01261-VAP-SPx, 2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) ......... 6, 9, 10, 16

*McLain v. Real Estate Board of New Orleans, Inc.*,
    444 U.S. 232 (1980) ........................................................................... 13

*Moore v. James H. Matthews & Co.*,
    550 F.2d 1207 (9th Cir. 1977) ............................................................... 13

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................... 8

*In re National Football League's Sunday Ticket Antitrust Litigation*,
    933 F.3d 1136 (9th Cir. 2019) ............................................................... 6

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ............................................................................. 7, 8

*People v. Pacific Landmark, LLC*,
    129 Cal. App. 4th 1203 (2005) .............................................................. 18

*Persian Gulf Inc. v. BP West Coast Products LLC*,
    324 F. Supp. 3d 1142 (S.D. Cal. 2018) ................................................. 9, 10, 20

*Real Estate Analytics, LLC v. Vallas*,
    160 Cal. App. 4th 463 (Cal. Ct. App. 2008) ............................................ 12

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................. 15

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) ................................................................. 19

*Souza v. Estate of Bishop*,
    594 F. Supp. 1480 (D. Haw. 1984) ......................................................... 12

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................... 5, 11

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................... 9, 11, 19, 20

iv

*Stine v. Dell'Osso*,
    230 Cal. App. 4th 834 (2014) ................................................................................. 18

*In re Text Messaging Antitrust Litigation*,
    630 F.3d 622 (7th Cir. 2010) ................................................................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................ 19

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ................................................................ 19

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................................................................ 18

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ................................................................................. 19

*United States v. A. Lanoy Alston, D.M.D., P.C.*,
    974 F.2d 1206 (9th Cir. 1992) ............................................................................... 13

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .................................................................................. 15

*United States v. Joyce*,
    895 F.3d 673 (9th Cir. 2018) ................................................................................. 13

*Walsh v. Kindred Healthcare*,
    798 F. Supp 2d 1073 (N.D. Cal. 2011) ................................................................. 18

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .................................................................. 6

*Western Sunview Properties, LLC v. Federman*,
    338 F. Supp. 2d 1106 (D. Haw. 2004) .................................................................. 12

*In re Xyrem (Sodium Oxybate) Antitrust Litigation*,
    555 F. Supp. 3d 829 (N.D. Cal. 2021) .................................................................. 19

**STATUTES**

15 U.S.C. § 1 ............................................................................................................... 5, 6, 12

*Haw. Rev. Stat. Ann.* § 480-4(b)(1)-(3) ........................................................................ 12

v

1   Plaintiff Flannery Associates LLC ("Flannery") respectfully submits this memorandum in

2   opposition to Defendants' Joint Motion to Dismiss Flannery's Complaint (ECF No. 78 ("Mem.")).[1]

3   **PRELIMINARY STATEMENT**

4   Flannery's complaint alleges that Conspirators, a group of wealthy landowners, illegally

5   agreed to fix prices, suppress competition, and overcharge Flannery for rangeland in Solano

6   County.  Flannery approached Conspirators in good faith with generous offers that would provide

7   them with tens of millions of dollars in profits.  But seeing an opportunity to extract hundreds of

8   millions of dollars, Conspirators illegally agreed, in their own words, "on what [they] would want

9   to sell [their] properties . . . [s]o [Flannery] cannot play owners against owners."  (Compl. Ex. A.)

10   Section 1 of the Sherman Act, the Cartwright Act, and California's Unfair Competition

11   Law ("UCL") condemn such collusion between competitors.  Seeking to obfuscate this illegal

12   conduct, Defendants resort to rumor, innuendo, and conjecture about Flannery and its motives.

13   (Mem. at 1-2 & n.1, 3, 6, 14.)  None of it is relevant as to whether Defendants broke the law by

14   conspiring to fix prices and eliminate free-market competition that would have otherwise existed.

15   Instead, Defendants' tactics—including their absurd suggestion that a buyer's offer to pay *some*

16   premium entitles sellers to collude to extract an even higher one—only betray the weakness of their

17   motion, which should be denied in its entirety for the reasons discussed below.

18   *First*, contrary to Defendants' argument that the complaint fails to allege a horizontal price-

19   fixing conspiracy, Flannery has met its burden through each of the alternative ways to plead a

20   conspiracy: direct and circumstantial evidence.  Flannery has identified direct evidence in the form

21   of Conspirators' own texts and emails discussing their agreement to extract inflated prices from

22   Flannery.  As for circumstantial evidence, Flannery has alleged: (i) that Conspirators engaged in

23   parallel conduct, such as refusing to sell to Flannery except at supracompetitive prices, deferring

24   negotiations under false pretenses, and contemporaneously deciding to break off discussions with

25   Flannery; and (ii) "plus factors" suggesting that this conduct was conspiratorial, including

26
27   [1] Certain Conspirators (as defined in the complaint) have entered into contingent or final settlement agreements with Flannery, including BLK Defendants, Hamilton Conspirators, and some Anderson Defendants (David Anderson, Carol Hoffman, and Deborah Workman).  Another Anderson Defendant—Richard Anderson—answered the complaint.  The motion to dismiss was filed by Mahoney Defendants and the remaining Anderson Defendants (collectively, "Defendants").

28

1

suspicious communications between Conspirators, a common motive to conspire, actions against Conspirators' economic self-interests, opportunities to collude, and information exchanges. Defendants attempt to rewrite the Sherman Act, arguing it applies only to "commodities"—and not to real property—despite the statute's plain terms condemning *every* conspiracy in restraint of trade and decades of contrary precedent, including case law applying the Sherman Act to real property. Tellingly, to support their untenable position, Defendants misleadingly cite cases interpreting *Hawaii's antitrust statute*, which—unlike the Sherman Act—is limited to "commodities."

*Second*, Flannery clearly has antitrust standing, despite Defendants' puzzling claim to the contrary. Defendants wrongly contend that Flannery has failed to plead antitrust injury. Flannery alleges that as a result of the conspiracy, it paid overcharges, a quintessential antitrust injury. Those overcharges, as well as Flannery's lost profits from its inability to buy other parcels due to the conspiracy, are direct, non-speculative injuries that plainly establish standing. And while Defendants assert that Flannery's injury is too speculative because it did not plead prices it would have paid absent the conspiracy, Flannery is not required to plead such facts, which will be established in discovery and through expert testimony. If anything, Flannery has gone beyond what is required of a well-pled complaint and provided concrete estimates of the $170 million of overcharges it has suffered thus far.

*Third*, individual Defendants cannot escape liability by hiding behind LLCs and trusts, or distorting pleading standards. While certain Anderson Defendants label the allegations against them insufficient, Flannery plausibly alleges each individual Defendant's involvement in the conspiracy. Notably, eight Defendants—all Mahoney Defendants, Ian Anderson, and Margaret Anderson—concede that Flannery sufficiently implicates them in the price-fixing conspiracy.

*Fourth*, Flannery's Cartwright Act and UCL claims, which are not meaningfully addressed in Defendants' motion, survive for the same reasons as Flannery's Sherman Act claim.

*Finally*, while Defendants' motion should be denied in its entirety, Flannery stands ready, if necessary, to allege additional facts to support its already detailed claims and could do so based on evidence it has been gathering from the numerous Conspirators who have already entered into settlement agreements with Flannery.

2

**FACTUAL BACKGROUND**

Conspirators are a group of wealthy owners of rangeland properties in the Jepson Prairie and Montezuma Hills area of Solano County, California.  (Compl. ¶¶ 35-79, 94-131.)  Conspirators consist of four groups: BLK Defendants (*id.* ¶¶ 35-47), Mahoney Defendants (*id.* ¶¶ 48-54), Anderson Defendants (*id.* ¶¶ 55-79), and Hamilton Conspirators (*id.* ¶¶ 80-91).  Conspirators attempt to gather sympathy and obfuscate their illegal conduct by calling themselves "farmers."  (Mem. at 3, 5.)  This characterization is not only irrelevant, but also largely false and intentionally misleading.[2]  In transactions preceding their price-fixing conspiracy, Conspirators paid between $470/acre and $2800/acre for their land.  (Compl. ¶¶ 147-51.)  From 2017 to 2021, Conspirators represented to tax authorities that their properties were worth about $4,000/acre or between $1,100/acre and $2,500/acre with wind lease income excluded.  (*Id.* ¶¶ 152-60.)

Flannery is a Delaware LLC that began buying properties in the Jepson Prairie and Montezuma Hills area in 2018.  (*Id.* ¶¶ 34, 161.)  At the time the complaint was filed, Flannery had bought or was under contract to buy approximately 140 properties, with an aggregate investment exceeding $800 million.  (*Id.* ¶¶ 12, 165, 167.)  Flannery has been willing to make attractive offers at premiums above market value, for example, at about $8,400/acre.  (*Id.* ¶¶ 15, 163-67.)  Contrary to Defendants' representations, Flannery does not allege that it seeks "to purchase *all* of the real property in the area" or that it is willing to pay limitless premiums.  (Mem. at 10 & n.3.)

Beginning in 2018 and continuing to the present, Conspirators agreed to fix prices for their properties at supracompetitive levels.  (Compl. ¶¶ 7, 28, 257, 317.)  This conspiracy is revealed by Conspirators' text and email exchanges, which Flannery obtained in 2023 through discovery in separate litigation.  (*Id.* ¶¶ 21, 256.)  For example, Conspirator Richard Hamilton wrote to Kirk Beebe (one of the BLK Defendants who entered into a contingent settlement with Flannery on

---

[2] To take a few examples: Ned Anderson told Flannery's counsel that he was one of the founders of Prologis, the largest publicly traded real estate investment trust in the United States, with a market capitalization of over $115 billion; Kirk Beebe is a commercial real estate broker at CBRE where, according to CBRE's website, "he has leased or sold more than 26,000,000 square feet of office space with a consideration of 3 billion dollars"; Daniel Mahoney is the former Planning Commissioner for Solano County; Michael Rice is a developer and president of Miller-Sorg Group, a construction company; and William Dietrich is Managing Director of Rubicon Valuation, which provides financial valuation of equity and intangible assets of private and public corporations.

July 3, 2023): "In talking with [Defendant] Ian Anderson, **he agrees** that the **remaining property owners should be in agreement** on what we would want to sell our properties.  So [Flannery's attorney] **cannot play owners against owners**."  (*Id.* ¶ 22, Ex. A (emphases added).)  Mr. Beebe responded: "**Agree**."  (*Id.* ¶ 23, Ex. A (emphasis added).)  And in a contemporaneous email message, Defendant Christine Mahoney wrote to Mr. Beebe: "I heard you talked with Hamiltons[.] That's great that we can **support each other**!"  (*Id.* ¶ 25, Ex. B (emphasis added).)  Conspirators have coordinated their approach to Flannery since at least 2018 when Mahoney Defendants and BLK Defendants discussed selling to Flannery.  (*Id.* ¶¶ 250-51.)

In furtherance of their conspiracy, Conspirators refused to sell to Flannery except at supracompetitive prices and repeatedly deferred negotiation under various pretenses.  (*E.g.*, *id.* ¶¶ 15, 27, 173, 189, 192, 208, 225, 263.)  For example, while Mahoney Defendants were willing to engage in transactions with Flannery in October 2018 at valuations of $5,700/acre, only two weeks later, after colluding with BLK Defendants, they refused to accept offers at $8,500/acre.  (*Id.* ¶¶ 179-81.)  And BLK Defendants and Ian and Margaret Anderson decided to break off negotiations with Flannery on the same day (August 8, 2022), with BLK Defendants explaining that they did so because "[s]everal of the other major land owners in the area are basically taking their time as well and not engaging with Flannery."  (*Id.* ¶¶ 26-27, Exs. C-D.)

Conspirators also coordinated to counter Flannery's offers at similar, supracompetitive levels (*id.* ¶¶ 196, 211-12), and shared information about price negotiations with Flannery (*id.* ¶ 267).  For example, when negotiating with Flannery in early 2023, BLK Defendants repeatedly referenced that Flannery was under contract to purchase a property from Mahoney Defendants for $43,560/acre, even though that purchase had not yet been disclosed in public records.  (*Id.*)

Conspirators had ample opportunities to collude because of their economic and personal connections.  Mahoney Defendants have leased property from BLK Defendants for years, and "[t]he Mahoney Defendants, the Hamilton Conspirators, and many of the Anderson Defendants all live near each other, know each other well, and communicate frequently."  (*Id.* ¶¶ 252-53.)  Anderson Defendants share familial connections, all own mineral rights under each other's properties, and all lease property to Ian, Margaret, Neil, or Stan Anderson.  (*Id.* ¶ 254.)

4

1    Even when Flannery made offers that acquiesced to Conspirators' demands, Conspirators

2    acted against their economic self-interest by refusing.  (*Id.* ¶¶ 174-75, 186, 207-10.)  This pattern of

3    behavior occurred despite Conspirators' demonstrated willingness to sell to Flannery.  (*Id.* ¶¶ 16,

4    26, 172, 185, 212, 217, 223, 229, 231-32, 241; Ex. C.)

5    The conspiracy has injured Flannery, including because it has paid overcharges in excess of

6    $170 million.  (*Id.* ¶ 11.)  Flannery has paid overcharges to Conspirators (*id.* ¶¶ 276-81), their co-

7    owners (*id.* ¶¶ 282-88), and third parties who demanded higher prices due to the conspiracy's effect

8    on the market (*id.* ¶¶ 295-305).  Flannery also has lost profits because of its inability to purchase

9    certain parcels of real property from Conspirators (*id.* ¶¶ 289-94) and third parties influenced by

10   the conspiracy's effects (*id.* ¶¶ 306-13).  The conspiracy's impact on third parties is revealed by a

11   landowner who refused to sell stating: "If you want to know why, you can go ask the Andersons,

12   the Emighs [i.e., a reference to the Mahoney Defendants, via Christine Emigh Mahoney], the

13   Hamiltons, and the Beebes."  (*Id.* ¶ 29 & n.6.)

14                                                **ARGUMENT**

15   In assessing a motion to dismiss, courts are "limited to the allegations in the complaint,

16   which are accepted as true and construed in the light most favorable to the plaintiff."  *Lazy Y Ranch*

17   *Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  A plaintiff need only allege "enough facts to

18   state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

19   (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

20   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

21   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "If there are two alternative explanations [of facts

22   alleged], one advanced by defendant and the other advanced by plaintiff, both of which are

23   plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*,

24   652 F.3d 1202, 1216 (9th Cir. 2011).  Indeed, "so long as the plaintiff alleges facts to support a

25   theory that is not facially implausible," any "skepticism is best reserved for later stages of the

26   proceeding."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

27   **I.      FLANNERY'S SHERMAN ACT CLAIM IS ADEQUATELY PLED**

28   Flannery states a claim under Section 1 of the Sherman Act, which prohibits "[e]very

                                                    5

contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1.  In seeking dismissal of this claim, Defendants contend that the complaint fails to plausibly suggest that Conspirators agreed to fix prices and that the Sherman Act does not apply to the sale of real property.  (Mem. at 8-13.)  These contentions ignore Flannery's well-pled allegations—which easily satisfy the standards for alleging a price-fixing conspiracy—and are at odds with long-standing case law applying the Sherman Act to *any* agreement, including with regard to the sale of real property.

### A. <u>Flannery Plausibly Alleges That Defendants Conspired To Fix Prices</u>

To state a Sherman Act § 1 claim, Defendants concede (Mem. at 8) that a plaintiff need only allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  The allegations must be viewed "as a whole," not by "dismembering" them and "wiping the slate clean after scrutiny of each" in isolation.  *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152-53 (9th Cir. 2019) (citations omitted).  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.

A plaintiff may allege an agreement in two ways.  First, a plaintiff may do so directly, i.e., through "'evidentiary facts'" showing that the defendants "agreed to restrain competition." *Markson v. CRST Int'l, Inc.*, No. 5:17-cv-01261-VAP-SPx, 2019 WL 6354400, at *3 (C.D. Cal. Mar. 7, 2019) (citation omitted).  Second, a plaintiff may do so circumstantially, i.e., by alleging that the defendants engaged in "parallel conduct" coupled with "plus factors" supporting a plausible inference that the defendants conspired.  *Id.* at *4.

Here, Flannery has done both in spades.[3]  Flannery provides numerous allegations detailing Conspirators' agreement "with one another to only sell their properties at artificially high and supracompetitive levels."  (Compl. ¶ 317; *see also id.* ¶¶ 7, 15, 21, 28, 29, 316.)  Contrary to Defendants' baseless assertion (Mem. at 8), Flannery amply alleges: (i) "who" participated in the

---

[3] Despite Defendants' suggestion (Mem. at 8 n.2), they "do not offer any authority to suggest that allegations of [an] agreement are subject to more scrutiny in per se cases than in typical rule of reasons cases."  *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1027 (C.D. Cal. 2011).

1  conspiracy (Compl. ¶¶ 35-91 (identifying all 51 known Conspirators)); (ii) "what" Conspirators did

2  to further the conspiracy (*see, e.g.*, *id.* ¶¶ 22, 217, 258, 317 (agree only to sell their properties at

3  artificially high levels so Flannery could not play owners against owners); *id.* ¶ 15 ("Conspirators

4  [] repeatedly engaged with Flannery to discuss possible sales, only to defer further negotiations

5  under various pretenses."); *id.* ¶ 267 (exchange prices negotiated with Flannery); *id.* ¶ 309

6  (dissuade others from selling to reduce the supply of real property on the market)); (iii) "where" the

7  conspiracy operated (*id.* ¶¶ 94-140 (identifying properties subject to the conspiracy)); and (iv)

8  "when" the conspiracy formed and operated (*id.* ¶ 257 (late 2018 and continuing to present)).

9               1.    <u>Flannery Directly Alleges An Agreement To Fix Prices</u>

10        Direct evidence of an agreement "usually take[s] the form of an admission by . . . one of the

11  conspirators"—i.e., a "smoking gun"—that "the defendants had met and agreed explicitly on the

12  terms of a conspiracy to raise price." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th

13  Cir. 2010).  For instance, in *B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-cv-01150 WHA, 2016

14  WL 5725010 (N.D. Cal. Sept. 30, 2016), the court denied a motion to dismiss, finding that the

15  plaintiff adequately alleged a conspiracy based on CEO statements from which "a jury could find

16  that defendants 'got in a room' and fixed" prices.  *Id.* at *7.

17        The same is true here, where Flannery attaches to the complaint the text exchange between

18  Richard Hamilton and Kirk Beebe, in which Mr. Hamilton wrote: "In talking with [Defendant] Ian

19  Anderson, ***he agrees*** that the ***remaining property owners should be in agreement*** on what we

20  would want to sell our properties.  So [Flannery's attorney] ***cannot play owners against owners***."

21  (Compl. ¶¶ 22, 217, 258, Ex. A (emphases added).)  Mr. Beebe replied: "***Agree***."  (*Id.* ¶¶ 23, 259,

22  Ex. A (emphasis added).)  Contemporaneously, Defendant Christine Mahoney emailed Mr. Beebe:

23  "I heard you talked with Hamiltons[.]  That's great that we can ***support each other***!"  (*Id.* ¶¶ 25,

24  261, Ex. B (emphasis added).)

25        Viewed in the light most favorable to Flannery (as the law requires), these exhibits show—

26  without any inferences—that Hamilton Conspirators, BLK Defendants, Mahoney Defendants, and

27  Anderson Defendants agreed to coordinate the prices at which they would sell their real property to

28  Flannery.  While Defendants contend that the exhibits omit reference to "a particular price per

7

1   acre" at which they agreed to sell (Mem. at 8), the Supreme Court has long held it "plainly

2   incorrect" to argue "that *per se* unlawful horizontal price fixing require[s] an explicit agreement on

3   prices to be charged." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48-49 (1990).  All that is

4   required is an agreement "formed for the purpose and with the effect of raising" prices.  *Id.* at 49.[4]

5   Flannery alleges exactly that, providing Conspirators' communications evidencing their agreement

6   "to drive up prices to supracompetitive levels by eliminating the free market competition in the sale

7   of properties that would have otherwise occurred."  (Compl. ¶ 7, Exs. A-E.)[5]

8       Nor is Defendants' temporal argument persuasive.  Defendants assert that the complaint's

9   exhibits do not show a conspiracy because they were "created in the summer of 2022, almost four

10   years after the conspiracy allegedly commenced."  (Mem. at 9.)  Such a "timing argument" "hardly

11   rescues defendants" because it "ignores the value of the statement[s] as to establishing, at the very

12   least, a ***continuing*** conspiracy," and "all after-the-fact admissions involve such timing

13   differences."  *B & R Supermarket*, 2016 WL 5725010, at *7.  It also rests on the false premise that

14   a conspiracy cannot be plausible unless all parties join at the same time.  *See In re High-Tech Emp.*

15   *Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120 (N.D. Cal. 2012) (finding plausible conspiracy based

16   on agreements reached among defendants "in a span of two years").  In any event, Defendants

17   ignore the complaint's allegations detailing conspiratorial communications between Mahoney

18   Defendants and BLK Defendants in 2018 and 2020.  (Compl. ¶¶ 250-51.)  And Defendants do not

19   challenge the allegations that they fraudulently concealed the conspiracy.  (*See id.* ¶ 28.)

20       Thus, Flannery plausibly alleges direct evidence of the unlawful conspiracy that, standing

21   alone, requires the denial of Defendants' motion.

22

_____

23   [4] Regardless, it is clear that the reference in Exhibit A to an "agreement on what [Conspirators]
    would want to sell their properties" means an agreement on sale price, even if the exact price is not
24   enumerated in this particular text message.

25   [5] Defendants cannot brush aside Flannery's direct factual allegations with cases (*see* Mem. at 8) in
    which plaintiffs pled no direct evidence.  *See, e.g., Twombly*, 550 U.S. at 564 ("complaint le[ft] no
26   doubt" it lacked "any independent allegation[s] of [an] actual agreement"); *Kendall v. Visa U.S.A.,*
    *Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (plaintiff "failed to plead any evidentiary facts beyond
    parallel conduct"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th
27   Cir. 2015) (plaintiffs "lack[ed] direct evidence of horizontal agreements"); *In re Dynamic Random*
    *Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008) (analyzing Foreign
28   Trade Antitrust Improvement Act on 12(b)(1) motion, not standards for pleading an agreement).

2.    <u>Flannery Alleges Circumstantial Evidence of An Agreement To Fix Prices</u>

Flannery also plausibly alleges the conspiracy through circumstantial evidence, including that Defendants engaged in "parallel conduct" coupled with "plus factors" that "place [the] parallel conduct in a context that raises a reasonable inference of conspiracy." *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142, 1148 (S.D. Cal. 2018). ***First***, Flannery alleges ample parallel conduct, which includes "competitors adopting similar policies around the same time." *Markson*, 2019 WL 6354400, at *4 (citation omitted). Here, Flannery alleges that Defendants adopted a policy of refusing to sell real property to Flannery except at supracompetitive prices. (Compl. ¶ 317; *see also, e.g., id.* ¶¶ 276-82 (detailing Conspirators' sales at supracompetitive prices).) Flannery also alleges parallel conduct in "repeatedly engag[ing] with Flannery to discuss possible sales, only to defer further negotiations under various pretenses." (*See, e.g., id.* ¶¶ 15, 173 (BLK Defendants), ¶ 192 (Mahoney Defendants), ¶ 208 (Anderson Defendants).) For example, Flannery alleges that BLK Defendants and Ian and Margaret Anderson decided to back away from negotiations with Flannery on ***the very same day***. (*Id.* ¶¶ 26-27, Exs. C-D.) And BLK Defendants' email makes clear that they chose not to engage because "[s]everal of the other major land owners" were taking a similar approach. (*Id.* Ex. C.) Conspirators also countered Flannery's offers with similar pricing. (*See, e.g., id.* ¶ 196 (Mahoney counteroffer at supracompetitive $43,650/acre price); ¶¶ 211-12 (Anderson counteroffer at supracompetitive ~$45,000/acre price).)

***Second***, contrary to Defendants' suggestion that the complaint merely alleges parallel conduct (*see* Mem. at 15), Flannery alleges numerous "plus factors" bolstering the inference of a conspiracy. "Plus factors" include: "suspicious communications between the defendants"; a "common motive to conspire"; actions taken "against self-interest"; opportunities to collude; and exchanging competitively sensitive information. *Markson*, 2019 WL 6354400, at *4-5; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008). Plus factors are "viewed cumulatively, and in tandem with the direct evidence of a conspiracy" to assess whether the inference of a conspiracy is plausible. *B & R Supermarket*, 2016 WL 5725010, at *9.

**Suspicious Communications**. The exhibits to the complaint reflect—at minimum— "'suspicious communications between the defendants' . . . that can bolster the inference of a

9

1    conspiracy." *Markson*, 2019 WL 6354400, at *4; *see also Flextronics v. Panasonic Holdings*

2    *Corp.*, No. 22-cv-15231, 2023 WL 4677017, at *2 (9th Cir. July 21, 2023) (communications

3    regarding price "plausibly understood as invitations to collude in a price-fixing conspiracy" support

4    "finding [a] conspiracy" at the pleading stage).  Defendants concede as much, as they attempt to

5    spin them as "refer[ring] . . . to a potential future agreement" that "could potentially be 'consistent

6    with' an unlawful agreement." (Mem. at 9.)  Flannery alleges other suspicious communications as

7    well, including between Mahoney Defendants and BLK Defendants in 2018 and 2020 discussing

8    potential sales to Flannery.  (*See, e.g.*, Compl. ¶¶ 250-51.)  Defendants do nothing to dispel the

9    inference of a conspiracy arising from these suspect communications.

10         **Common Motive**.  The complaint alleges a common motive to conspire—"to drive up

11   prices to supracompetitive levels" in order to make "hundreds of millions" rather than the tens of

12   millions that Conspirators' properties would warrant in a competitive market.  (*Id.* ¶ 7.)  Such a

13   "common motive to manipulate the market to increase" profits "further support[s] the inference" of

14   a conspiracy.  *Persian Gulf*, 324 F. Supp. 3d at 1156.  Defendants say nothing on this score.

15         **Actions Against Self-Interest**.  Actions against defendants' economic interests further

16   bolster the inference of a conspiracy.  *See Markson*, 2019 WL 6354400, at *4.  Flannery alleges

17   that Conspirators desired to sell as evidenced by, for example, Defendants Ian and Margaret

18   Anderson's offer to sell to Flannery at $32,000/acre (Compl. ¶¶ 211-212), and Conspirators' own

19   communications (*id.* Ex. C ("No one is suggesting we don't sell . . ."); *see also, e.g.*, *id.* ¶¶ 16, 31,

20   172, 185, 217, 223, 229, 232, 241).  Flannery further alleges that despite this willingness,

21   Conspirators acted against their economic interests, declining offers well above their own property

22   valuations even after Flannery acquiesced to various requests.  (*See, e.g.*, *id*. ¶¶ 174-75 (BLK

23   Defendants), ¶ 186 (Mahoney Defendants), ¶¶ 207-10 (Anderson Defendants).)  Defendants posit

24   "non-collusive reasons to decline to sell" (Mem. at 10), but Flannery is "not required to disprove

25   all possible alternative explanations to survive a motion to dismiss."  *Markson*, 2019 WL 6354400,

26   at *4; *Flextronics*, 2023 WL 4677017, at *2 ("district court erred by requiring [plaintiff] to plead

27   facts 'tending to exclude the possibility that defendants acted independently,'" which is

28   "appropriate at summary judgment," not "a motion to dismiss" (citation omitted)).  In other words,

10

1   Defendants' claim that "more benign reasons motivated" their conduct "do[es] not undo the

2   plausibility of" allegations that their conduct stemmed from a conspiracy.  *B & R Supermarket*,

3   2016 WL 5725010, at \*8; *Starr*, 652 F.3d at 1216.  And Flannery—not Defendants—receives

4   inferences in its favor.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d

5   Cir. 2012) ("innocuous interpretation" of conduct "does not mean that the plaintiff's allegation that

6   [the] conduct was culpable is not also plausible," and is "not a proper basis" to dismiss).

7   **Opportunities To Collude**.  The complaint "demonstrates how and when Defendants had

8   opportunities to exchange information or make agreements," strengthening the inference of a

9   conspiracy.  *SRAM*, 580 F. Supp. 2d at 903.  For example, Flannery alleges that Conspirators have

10   opportunities to collude through their economic connections as leaseholders or holders of mineral

11   rights to each other's properties (Compl. ¶¶ 252, 254), personal relationships and geographic

12   proximity (*id.* ¶ 253), and familial relationships (*id.* ¶¶ 48-91, 254), to say nothing of Conspirators'

13   own communications discussing a "meeting . . . to talk about Flannery" and their "agreement" on

14   the price at which they "would want to sell [their] properties" (*id.* Ex. A).  Defendants do not—and

15   cannot—deny these well-pled facts that support the inference of a conspiracy.

16   **Information Exchanges**.  An "exchange of information," such as competitively sensitive

17   information, "may be considered a plus factor that supports a finding of conspiracy." *Flextronics*,

18   2023 WL 4677017, at \*3.  Here, Flannery alleges Conspirators exchanged competitively sensitive

19   information about interactions with Flannery, including non-public prices and negotiation tactics.

20   (*See, e.g.*, Compl. ¶ 267 (Mahoney Defendants informed BLK Defendants of a non-public price

21   term), Ex. C (illustrating Conspirators' knowledge of each other's negotiating tactics).)

22   Defendants ignore these facts, even though "the exchange of price information alone can be

23   'sufficient to establish the . . . conspiracy.'"  *SRAM*, 580 F. Supp. 2d at 902 (citation omitted).

24   **Cumulative Consideration**.  Viewed cumulatively, Flannery's "factual allegations of

25   parallel [conduct] and plus factors" are more than "sufficient to nudge its claim of a price-fixing

26   conspiracy 'across the line from conceivable to plausible.'"  *Flextronics*, 2023 WL 4677017, at \*4

27   (citation omitted); *see also id.* at \*2 (district court "erred" by "failing to consider the [complaint]

28   holistically").  These allegations, standing alone, also require denial of Defendants' motion.

11

**B.**     <u>**The Sherman Act Applies To Conspiracies Involving Real Property**</u>

In a desperate attempt to avoid the damning evidence of their conspiracy, Defendants assert that landowners cannot compete—and thus, are exempt from the Sherman Act—because land is not the type of "commoditized" product the Sherman Act regulates.  (Mem. at 11.)  That is false.

Defendants' absurd suggestion that the Sherman Act applies only to commodities is predicated on misleading citations to non-Sherman Act cases.[6]  Most notably, Defendants cite two cases interpreting ***Hawaii's antitrust statute*** to support their argument that "land is not subject to antitrust statutes" because "the word 'commodity' is not used to describe real estate."  (*Id.* & n.4.)  But Defendants conspicuously fail to mention that Hawaii's statute, unlike the Sherman Act, limits the law to "commodities" as defined in the statute.  *See Haw. Rev. Stat. Ann.* § 480-4(b)(1)-(3) (prohibiting actions to fix the price "of any commodity"); *id.* § 480-1 (defining "commodity").[7]

In contrast, the Sherman Act governs "***[e]very*** . . . conspiracy, in restraint of trade," 15 U.S.C. § 1 (emphasis added), not merely those involving "commodities."  As the Supreme Court has recognized, "[t]he Sherman Act adopted the term 'restraint of trade'" for "its dynamic potential," referring "not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988).  Thus, courts have deemed Sherman Act claims viable in connection with myriad "non-commodities."[8]

---

[6] For example, Defendants cite (Mem. at 11) irrelevant cases concerning property law, not antitrust law.  *See, e.g.*, *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1209 (C.D. Cal. 2002) (non-antitrust dispute between city and property owner "over an 18 acre parcel" to enjoin "eminent domain proceedings"); *Glynn v. Marquette*, 152 Cal. App. 3d 277, 279 (Cal. Ct. App. 1984) (non-antitrust dispute involving a request for "specific performance" over "a parcel of land"); *Real Est.  Analytics, LLC v. Vallas*, 160 Cal. App. 4th 463, 466 (Cal. Ct. App. 2008) (non-antitrust case involving "breach[] [of] contract to sell a large parcel" of property).

[7] *See, e.g.*, *W. Sunview Props., LLC v. Federman*, 338 F. Supp. 2d 1106, 1124 (D. Haw. 2004) (holding, where no Sherman Act claim was asserted, that real estate was not subject to the "Hawaii Antitrust statute," which applies to "monopolization of trade or commerce in any 'commodity'" as "the word 'commodity'" is "defined" by statute); *Souza v. Est. of Bishop*, 594 F. Supp. 1480, 1482-83 & n.2 (D. Haw. 1984) (applying same statute, in which "the Hawaii Legislature defines the word 'commodity'").  Contrary to Defendants' suggestion, *Souza* "assum[ed]" that the Sherman Act would "apply to land," while questioning in dictum the Sherman Act's applicability in that case on a basis unrelated to whether it is a "commodity."  *Souza*, 594 F. Supp. at 1482 & n.2.

[8] *See, e.g.*, *Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 335-36 (1982) (payment for health services); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1140 (9th Cir. 2003) (fees for

*(cont'd)*

12

Moreover, numerous decisions—including Supreme Court precedent—confirm that the Sherman Act applies to conspiracies to fix the price of real property. *See, e.g.*, *Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 266 (1986) ("[h]ad the owners of residential rental property in Berkeley voluntarily banded together to stabilize rents in the city, their activities would not be saved from antitrust attack"); *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 235 (1980) (vacating dismissal of Sherman Act claim involving a "conspiracy among [real estate brokers] to fix, control, raise, and stabilize prices for the purchase and sale of residential real estate"); *Cont. Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216-17 (N.D. Ill. 1969) ("no question" that it "violate[s] the antitrust laws" to "fix the prices on the sale of real estate . . . above the fair market value" by "eliminat[ing] . . . price competition in the sale" of real properties).

Similarly, in *United States v. Joyce*, 895 F.3d 673 (9th Cir. 2018), the Ninth Circuit held that rigging bids in foreclosure auctions violates Section 1 as a "form of horizontal price fixing." *Id.* at 677.[9]  In doing so, the Ninth Circuit made clear that, contrary to Defendants' argument here, "the Sherman Act, so far as price-fixing agreements are concerned, establishes ***one uniform rule applicable to all industries alike***." *Id.* at 678 (citation omitted) (emphasis added); (Compl. ¶ 9 (discussing criminal prosecution of antitrust conspiracy involving real property sales)).[10]

Finally, Defendants cannot escape the Sherman Act with their self-serving contention that "properties are not substitutable," so that Defendants are "not . . . competitors."  (Mem. at 12.)

---

realtor listing services); *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1207-08 (9th Cir. 1992) (prices of dental services).  The cases Defendants cite to argue that "the ***typical*** price-fixing conspiracy" involves "commoditized products" do not state that the Sherman Act applies only to commodities.  (Mem. at 11 (emphasis added) (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 658 (7th Cir. 2002); *In re Cal. Bail Bond Antitrust Litig.*, No. 19-cv-00717-JST, 2022 WL 19975276, at *11 (N.D. Cal. Nov. 7, 2022)).)

[9] Thus, the Ninth Circuit disagrees with Defendants' erroneous contention that "bid rigging" precedent is not instructive because "bid rigging" is "not price-fixing."  (Mem. at 13 n.5.)

[10] Contrary to Defendants' suggestion (Mem. at 11 n.4), *Moore v. James H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977), actually illustrates that the Sherman Act applies to real property.  The Ninth Circuit held that the plaintiff could not maintain a viable tying claim ***under Section 3 of the Clayton Act***—which, unlike the Sherman Act, requires that the defendants' misconduct involve "goods, wares, merchandise, machinery, supplies or other commodities"—because the "cemetery lots" involved in the tying arrangement did not "fit" within these categories.  *Id.* at 1214.  But as Defendants ignore, the Ninth Circuit ***proceeded to apply Section 1 of the Sherman Act*** to the real property at issue.  *See id.* ("[O]ur analysis proceeds on the basis of the [Section] 1 test.").

13

1  Flannery alleges competition among Conspirators, including in ***their own words***.  For example, in

2  Richard Hamilton's text to Kirk Beebe, he described the conspiracy's goal as preventing Flannery

3  from "***play[ing] owners against owners***."  (Compl. Ex. A (emphasis added).)  In other words,

4  Conspirators understood and agreed that they compete for property sales and agreed to limit that

5  competition, which would result in lower prices.  Given that admission, Flannery's claim cannot be

6  "facially implausible."  *Gilead Scis.*, 536 F.3d at 1057.  Defendants' argument about ***the degree*** to

7  which they believe parcels are "interchangeable" wrongly invites a market definition analysis, even

8  though in cases of *per se* illegality, "no market analysis is required at this time."  *High-Tech Emp.*,

9  856 F. Supp. 2d at 1122.  At most, Defendants' argument creates a factual issue that cannot be

10 resolved on the pleadings.  *See Dairy, LLC v. Milk Moovement, Inc.*, No. 2:21-cv-02233-WBS AC,

11 2023 WL 3437426, at *12 (E.D. Cal. May 12, 2023) (arguments that firms were not "competitors"

12 "involve[d] factual determinations . . . not appropriate at the motion to dismiss stage").

13 **II.    FLANNERY HAS ANTITRUST STANDING**

14 Defendants fare no better with their puzzling claim that Flannery lacks "antitrust standing"

15 (Mem. at 13-16), which courts evaluate by analyzing several factors, including:  "(1) the nature of

16 the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to

17 forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of

18 duplicative recovery; and (5) the complexity in apportioning damages."  *Knevelbaard Dairies v.*

19 *Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (citation omitted).  "[A] court need not find in

20 favor of the plaintiff on each factor."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051,

21 1055 (9th Cir. 1999).  Here, Defendants do not (and cannot) challenge the fourth and fifth factors,

22 and the three factors they challenge tip decidedly for Flannery.

23 **A.    Overcharges and Lost Profits Are Quintessential Antitrust Injuries**

24 The first factor—whether Flannery suffered "antitrust injury" (Mem. at 13-14)—is easily

25 satisfied.  The Ninth Circuit has held that "antitrust injury occurs" when "horizontal price fixing

26 causes buyers to pay more . . . than the prices that would prevail in a market free of the unlawful

27 trade restraint" and "is seen most often in claims by overcharged buyers."  *Knevelbaard*, 232 F.3d

28 at 988.  "[A]n increase in price resulting from a dampening of competitive market forces is

14

1   assuredly one type of injury" the antitrust laws redress.  *Glen Holly Ent. Inc. v. Tektronix Inc.*, 352

2   F.3d 367, 375 (9th Cir. 2003).  Flannery alleges just that: an illegal agreement "to only sell

3   [Conspirators'] properties at artificially high" prices, causing Flannery to "overpay[] for property

4   purchased from the Conspirators and their co-owners."  (Compl. ¶¶ 317-20.)

5          Defendants' contrary arguments misconstrue antitrust injury.  After repeating the erroneous

6   contention that they do not compete, Defendants argue that Flannery suffered no antitrust injury

7   because "Flannery does not seek to promote competition" in adding to its property portfolio.

8   (Mem. at 14.)  This disparagement has no bearing on whether Flannery suffered antitrust injury.

9   As Defendants recognize, assessing antitrust injury requires analysis of whether "a ***defendant's***

10  conduct [is] beneficial or neutral to competition" (*id.* (emphasis added)), not the plaintiff's conduct.

11  And because *per se* illegal agreements like Conspirators' inherently destroy competition, plaintiffs

12  are "relieve[d] . . . of the burden of proving anticompetitive effects, which are assumed."  *Rebel Oil*

13  *Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995).  Thus, Defendants get nowhere by

14  suggesting they "*prevented* precisely the type of harm to competition the antitrust laws are intended

15  to prevent" through their illegal "agreement . . . *not* to sell to Flannery."  (Mem. at 14.)  Similar

16  arguments have been flatly rejected.  *See United States v. Apple, Inc.*, 791 F.3d 290, 340 (2d Cir.

17  2015) (Lohier, J., concurring) ("[i]t cannot have been lawful for [defendant]" to "help[] rival[s] fix

18  prices," notwithstanding belief that a competitor was engaged in "corporate bullying").

19          **B.      The Price-Fixing Conspiracy Directly Harmed Flannery**

20          The second factor—the "directness" of Flannery's injury—is also satisfied.  As Defendants'

21  own cases hold, "direct purchasers plainly have 'standing to recover any collusive overcharges.'"

22  *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021) (citation omitted).  Such

23  "injuries are direct and certain."  *Id.*; *Hexcel Corp. v. Ineos Polymers, Inc.*, No. 2:09-cv-05334-

24  MRP-RNB, 2010 WL 11520539, at *4 (C.D. Cal. Feb. 23, 2010) (denying motion to dismiss on

25  standing grounds because plaintiff "was a direct purchaser . . . and purchased . . . from [defendants]

26  directly" at "higher prices").  Flannery is a direct purchaser of real property from Conspirators and

27  has been "injured and will continue to [be] injure[d]" by the "supracompetitive prices and/or lost

28  profits" the conspiracy caused.  (Compl. ¶ 321.)  Flannery's injuries are as "direct" as they get.

15

1   To resist this conclusion, Defendants seek to sow confusion by distorting the complaint and

2   the doctrine of standing. ***First***, Defendants argue they did not cause Flannery's "overpayments" to

3   Conspirators and third parties, but rather that Flannery itself caused this harm because "it set the

4   market price for properties in the area" through "above-market offers and by paying well-above

5   market value." (Mem. at 15.) Defendants misconstrue Flannery's allegations. Flannery alleges

6   that despite its offering premiums above fair market value, Conspirators colluded to extract ***even***

7   ***higher prices***. (*See, e.g.*, Compl. ¶¶ 7, 212, 218.) Flannery's willingness to pay ***some*** premiums

8   does not entitle Defendants to conspire and artificially inflate prices to an even higher level.[11]

9   ***Second***, Defendants wrongly suggest that Flannery's harm is not direct because it "seeks

10   damages for overpayment to non-conspirators." (Mem. at 15.) Defendants ignore that "cartels

11   increase the ***market*** price for a price-fixed good, not just their own price," and thus, "injuries that

12   result from conspirators' impact ***on the market*** are ***directly caused*** by their collusive conduct

13   regardless of the supplier that sells the good." *In re Cathode Ray Tube (CRT) Antitrust Litig.*,

14   MDL No. 1917, 2016 WL 6246736, at *6 (N.D. Cal. Oct. 26, 2016) (third emphasis added)

15   (denying motion to exclude overcharges paid to non-conspirators). Flannery alleges how this same

16   market-wide effect caused it to pay overcharges to third parties (Compl. ¶¶ 295-313)—harm that

17   flows directly from the conspiracy. In any event, these contentions have no bearing on Flannery's

18   standing because it made direct purchases from Conspirators.[12]

19   ***Third***, Defendants misapply the law regarding Flannery's ability to recoup lost profits

20   relating to parcels it was prevented from buying. (Mem. at 16.) Defendants state that "[a]bsent

21   exceptions not applicable here, 'nonpurchaser' damages are not available in this Circuit." (*Id.*)

22   That presumption exists because those who purchase from conspirators suffer "injur[es] [that are]

23   _____

24   [11] To illustrate, consider an example concerning a current use of some of the properties—wind energy generation. If a renewable energy company attempting to establish a wind farm offered

25   wind turbine manufacturers a 25% premium to obtain the supply it required because there was a shortage of wind turbines, that would not entitle the turbine manufacturers to conspire among

26   themselves to sell only at a 1,000% premium. That would be illegal price fixing.

27   [12] Defendants are jointly and severally liable for all damage caused by Conspirators, including those who have settled already. *See Markson v. CRST Int'l, Inc.*, No. 5:17-cv-01261-SB-SP, 2022

28   WL 790960, at *11 (C.D. Cal. Feb. 24, 2022) (antitrust law "permit[s] plaintiffs to recover from any conspiring defendant under joint and several liability").

1   more direct and more proximately caused than those who are unable to purchase" from

2   conspirators.  *City of Oakland*, 20 F.4th at 458 (citation omitted).  But that concern does not apply

3   here, where there is no other purchaser to file an antitrust suit besides Flannery.  And Flannery is

4   nothing like the plaintiff in *City of Oakland*—on which Defendants rely—which lacked allegations

5   of "what would have occurred in a more competitive marketplace," making the link between its

6   injuries and the defendants' conduct speculative.  *Id*. at 459.  Flannery, by contrast, details

7   overcharges paid to Conspirators and third parties, as well as lost profits resulting from the inability

8   to complete prospective purchases.  (*See, e.g.*, Compl. ¶¶ 11, 20, 32.)  In sum, Defendants'

9   arguments are "mere[] denials" that Flannery was "damaged in fact," but "disputed claims of

10  causation and injury cannot be decided on a Rule 12(b)(6) motion."  *Knevelbaard*, 232 F.3d at 989.

11          **C.**     **Flannery's Injuries Are Concrete, Not Speculative**

12          The last factor—the measure of harm—also weighs in Flannery's favor, as it is satisfied by

13  allegations showing the harm "can be measured directly by the overcharge."  *Hexcel*, 2010 WL

14  11520539, at *4.  Here, Flannery likewise alleges concrete examples of overcharges.  (Compl.

15  ¶¶ 276-88, 295-305.)  It also alleges concrete examples of lost profits (*id.* ¶¶ 289-93, 306-13),

16  which are "provable under the liberal principles long recognized in antitrust cases," *Crimpers*

17  *Promotions Inc. v. Home Box Off., Inc.*, 724 F.2d 290, 297 (2d Cir. 1983) (on pleadings, finding

18  standing to pursue "expected profits from [boycotted product] and future [boycotted products]");

19  *Am. Proteins, Inc. v. River Valley Ingredients, LLC*, No. 2:22-cv-91-RWS, 2022 WL 16827602, at

20  *6 (N.D. Ga. Nov. 8, 2022) ( "lost profits" are "potentially ascertainable business losses").

21          Defendants' arguments do not alter this reality.  After repeating flawed premises debunked

22  above,[13] Defendants assert that Flannery's overpayment allegations are too speculative absent a

23  "benchmark" by which to calculate the precise overcharge.  (Mem. at 16.)  But at this stage, the

24  question is not, as Defendants imply, "[w]hether experts will be able to measure the difference

25  between the allegedly restrained price" and the "price that would have prevailed but for the

---

[13] (*See* Mem. at 16 (repeating erroneous view that nonpurchaser damages are unrecoverable; baseless and contradicted assertion that no facts show Conspirators wanted to sell; nonsensical argument that willingness to pay premiums entitles Conspirators to fix prices at any level; and irrelevant observation that Flannery made certain purchases pre-dating the complaint's exhibits).)

17

1  antitrust violation." *Knevelbaard*, 232 F.3d at 991.  Rather, economic analysis—including

2  "evidentiary facts" showing how competition would impact "the price of [a product] absent [the

3  defendant's] practices"—is not required to show antitrust standing on the pleadings because such

4  analysis is more appropriate after the benefits of discovery.  *Davis v. S. Bell Tel. & Tel. Co.*, 755 F.

5  Supp. 1532, 1536 & n.10 (S.D. Fla. 1991); *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-cv-1183-

6  TC, 2018 WL 2271024, at *4 (D. Utah May 17, 2018) (similar).  Tellingly, in arguing that

7  Flannery's damages are "speculative," Defendants cite a case decided at summary judgment

8  concerning "evidence" a plaintiff must adduce for "the jury."  *Toscano v. PGA Tour, Inc.*, 201 F.

9  Supp. 2d 1106, 1124 (E.D. Cal. 2002).  Such an evidentiary challenge is improper at this stage.

10  **III.      INDIVIDUAL CONSPIRATORS CANNOT ESCAPE LIABILITY**

11         Next, Defendants attack slivers of Flannery's Section 1 claim, directing two arguments

12  toward the sufficiency of allegations against certain individual Defendants.  (Mem. at 17-18.)

13  Notably, Defendants ***concede*** the sufficiency of the specific allegations as to Christine Mahoney,

14  Daniel Mahoney, Ian Anderson, Margaret Anderson, Christine Mahoney Limited Partnership,

15  Christine Limited Partnership Management Company, Emigh Land LP, and El General Partner,

16  LLC.  As to those other individuals for whom Defendants do seek dismissal, their arguments fail.

17         ***First***, Defendants seek dismissal of those who acted "on [b]ehalf of LLCs or [t]rusts"

18  because Flannery purportedly did not plead that they "personally engaged" in the conspiracy.  (*Id.*

19  at 17.)  Not so.  Flannery alleges all individual Defendants individually participated in the

20  conspiracy (Compl. ¶¶ 52-53, 55-56, 59-69, 72-73) and alleges their personal actions, including the

21  parallel conduct and "plus factors" described above.  (*See supra* Section I.A.2.)  Thus, Flannery's

22  allegations suffice against those involved in trusts or LLCs, and Defendants' citations—which do

23  not analyze antitrust liability for such individuals (Mem. at 17-18)—do not suggest otherwise.[14]

24         ***Second***, Defendants misstate pleading burdens in arguing that Flannery lacks plausible

25  allegations regarding certain Anderson Defendants—namely, William Dietrich, Paul Dietrich, John

---

26  [14] *See People v. Pac. Landmark, LLC*, 129 Cal. App. 4th 1203 (2005) (LLC manager's liability for
27  permitting prostitution on property); *Walsh v. Kindred Healthcare*, 798 F. Supp 2d 1073 (N.D. Cal.
    2011) (involving parent entity's liability for state law claims); *Stine v. Dell'Osso*, 230 Cal. App.
28  4th 834 (2014) (regarding imputation of predecessor's wrongful acts to successor conservator).

18

1 | Alsop, Nancy Roberts, Ronald Gurule, Ned Anderson, Neil Anderson, Neil Anderson, Maryn

2 | Anderson, Glenn Anderson, Janet Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Sharon

3 | Totman, Amber Bauman, Christopher Wycoff, and Janet Zanardi.  (*Id.* at 18.)  Defendants ignore

4 | that antitrust cases do not require "detailed, defendant-by-defendant allegations."  *In re Cathode*

5 | *Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010); *see also Twombly*,

6 | 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics.").  A plaintiff need

7 | only "plausibly suggest that each Defendant participated in the alleged conspiracy" based on the

8 | "the context of the complaint taken as a whole."  *In re CRT*, 738 F. Supp. 2d at 1019 (citations

9 | omitted).  Indeed, where the "overall allegations are sufficient to survive a motion to dismiss,"

10 | arguments that plaintiffs "failed to allege how each individual Defendant participated in the alleged

11 | conspiracy" have failed as more apt for "summary judgment."  *SRAM*, 580 F. Supp. 2d at 903-04.

12 | Courts' rejection of "elaborate fact pleading" recognizes that in conspiracy cases, "proof is

13 | largely in the hands of the alleged conspirators," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599

14 | F. Supp. 2d 1179, 1184 (N.D. Cal. 2009), and accords with the Ninth Circuit's instruction to "relax

15 | pleading requirements where the relevant facts are known only to the defendant," *Soo Park v.*

16 | *Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (reversing dismissal of conspiracy claim in light of

17 | "the entire factual context" (citation omitted)); *see also In re Xyrem (Sodium Oxybate) Antitrust*

18 | *Litig.*, 555 F. Supp. 3d 829, 867 (N.D. Cal. 2021) (Koh, J.) (refusing to "overstate[] [p]laintiffs'

19 | burden at the motion to dismiss stage," as it would be "rare" for "all aspects of a conspiracy" to "be

20 | laid bare in court with the precision of a surgeon's scalpel" (citation omitted)).[15]

21 | Here, the complaint, taken as a whole, plausibly alleges each Defendant's participation in

22 | the conspiracy.  For the individual Defendants challenging the allegations against them, Flannery

---

[15] Defendants' citations (Mem. at 7, 19) do not further their request for heightened pleading rules. *See, e.g.*, *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (involving a deficient hub-and-spoke conspiracy); *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1103, 1128 (E.D. Cal. 2014) ("rambling" non-antitrust complaint "lack[ing] necessary cohesion and organization to decipher claims against defendants"); *In re Lithium Ion Batteries Antitrust Litig.*, 13-MD-2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014) ("Plaintiffs are not required to identify exactly how, when, and through whom each [d]efendant joined the conspiracy."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (complaints "need not contain detailed 'defendant by defendant' allegations," and granting leave to amend "general allegations" involving corporate groups).

1  alleges, *inter alia*: their property interests; parallel conduct such as refusing to sell, participating in

2  the pattern of delaying negotiations, and/or demanding supracompetitive prices for their property;

3  and plus factors, including opportunities to conspire, actions against self-interest, and information

4  exchanges.  (*See, e.g.*, Compl. ¶ 131 (mineral rights relationships among Anderson Defendants and

5  opportunities to conspire), ¶ 218 (Anderson Defendants brought into conspiracy by Ian Anderson),

6  ¶¶ 203-08 (negotiations of Maryn Anderson and Neil Anderson with Flannery), ¶¶ 219-20

7  (negotiations of William Dietrich, John Alsop, Janet Zanardi, Paul Dietrich, and Nancy Roberts

8  with Flannery through Paul Dietrich and Nancy Roberts as "speakers"), ¶ 221 (coordination and

9  communication between Ronald Gurule and Ian Anderson), ¶¶ 227-37 (negotiations over Anderson

10  1,005 and 153 properties, including allegations regarding Stan Anderson, Janet Blegen, Robert

11  Anderson, Glenn Anderson, Ned Anderson, Sharon Totman, and Lynn Mahre), ¶ 266

12  (communications between Paul Dietrich and Ian Anderson coordinating Flannery approach); *see*

13  *also supra* Section I.A.2.)  All Defendants are plausibly implicated in the conspiracy.

14  **IV.   FLANNERY'S STATE LAW CLAIMS ARE ADEQUATELY PLED**

15       Contrary to Defendants' claim (Mem. at 19-20), Flannery's Cartwright Act and UCL claims

16  survive for the same reasons as Flannery's Section 1 claim.  *See Persian Gulf*, 324 F. Supp. 3d at

17  1156-57 (denying motion to dismiss Section 1, Cartwright Act, and UCL claims for same reasons).

18  **V.   IF NECESSARY, THE COURT SHOULD GRANT LEAVE TO AMEND**

19       Defendants seek dismissal with prejudice (Mem. at 20), even though courts are "generally

20  required to grant a plaintiff leave to amend," *SRAM*, 580 F. Supp. 2d at 900, and do so "with

21  extreme liberality," *Jacques v. Bank of Am. Corp.*, No. 1:12-cv-00821-SAB, 2013 WL 3199027, at

22  *3 (E.D. Cal. June 21, 2013).  Here, Flannery has not previously amended its complaint, and it has

23  been gathering evidence from numerous Conspirators who have settled concerning additional

24  communications and exchanges of information between Conspirators.  Such information will

25  bolster Flannery's already well-pled claims, and leave to amend should be granted if necessary.

26                                 **CONCLUSION**

27       For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

28

DATED: July 25, 2023                    By: ___/s/ Matthew Martino_____

                                        Matthew Martino
                                        matthew.martino@skadden.com
                                        Michael H. Menitove
                                        michael.menitove@skadden.com
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        One Manhattan West
                                        New York, New York 10001
                                        Telephone: (212) 735-3000
                                        Facsimile: (917) 777-3000

                                        Lance A. Etcheverry (SBN 199916)
                                        lance.etcheverry@skadden.com
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        525 University Avenue
                                        Palo Alto, California 94301
                                        Telephone: (650) 470-4500
                                        Facsimile: (650) 470-4570

                                        *Attorneys for Plaintiff*
                                        *Flannery Associates LLC*

21