MATTHEW M. MARTINO (*pro hac vice*)
matthew.martino@skadden.com
MICHAEL H. MENITOVE (*pro hac vice*)
michael.menitove@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

LANCE A. ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Attorneys for Plaintiff*
*FLANNERY ASSOCIATES LLC*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Flannery Associates LLC,<br><br>Plaintiff,<br><br>v.<br><br>Barnes Family Ranch Associates, LLC, *et al.*,<br><br>Defendants. | Case No.: 2:23-cv-00927-TLN-AC<br><br>**JOINT REPORT FROM 26(f) CONFERENCE** |

Pursuant to Federal Rule of Civil Procedure 26(f), Plaintiff Flannery Associates LLC ("Flannery") and Defendants Christine Mahoney Limited Partnership, Christine Mahoney Limited Partnership Management Company, Emigh Land LP, El General Partner, LLC, Christine Mahoney (individually and as trustee of the Mahoney 2005 Family Trust), Daniel Mahoney (individually and as trustee of the Mahoney 2005 Family Trust), Ian Anderson (individually and as trustee of the Ian and Margaret Anderson Family Trust), Margaret Anderson (individually and as trustee of the Ian and Margaret Anderson Family Trust), Neil Anderson, Maryn Anderson, William Dietrich (individually and as trustee of the Child's Trust FBO William C. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich), Paul Dietrich (individually and as trustee of the Child's Trust FBO Paul S. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich), John Alsop (individually and as trustee of the John G. Alsop Living Trust), Nancy Roberts (individually and as trustee of the Nancy C. Roberts Living Trust), Janet Zanardi (individually and as trustee of Trust A under the Zanardi Revocable Trust), Ronald Gurule (individually and as trustee of the Ronald Gurule 2013 Family Trust), Ned Anderson (individually and as trustee of the Ned Kirby Anderson Trust), Neil Anderson, Glenn Anderson, Janet Blegen (individually and as trustee of the Janet Elizabeth Blegen Separate Property Trust), Robert Anderson (individually and as trustee of the Robert Todd Anderson Living Trust), Stan Anderson, Lynne Mahre, Sharon Totman, Amber Bauman, Christopher Wycoff, and Richard Anderson ("Defendants" and, collectively with Flannery, "the Parties") hereby submit the following Joint Report from 26(f) Conference.

## INTRODUCTION

The Parties hereby report from their 26(f) conference, which they held by telephone on Tuesday, September 12, 2023, and by videoconference on Tuesday, September 19, 2023.

## RULE 26(F) REPORT

### I.    Nature and Basis of Claims and Defenses

#### A.    Flannery

Flannery is a Delaware LLC that began purchasing rangeland in Solano County, California, in 2018 in furtherance of an initiative to: (i) create a new community that attracts employers,

creates good paying local jobs, builds homes in walkable neighborhoods, leads in environment

stewardship, and fuels a growing tax base to serve the county at large, including by providing tax

revenue to combat crime and homelessness and improve local schools; (ii) build large-scale

renewable energy projects that deliver clean power so that Solano County can retain and attract

major employers rather than losing them due to high energy prices and unavailable power capacity;

and (iii) create a greenbelt of open space, agriculture, and habitat.

Flannery alleges that Conspirators, a group of wealthy landowners consisting of Defendants

and their co-conspirators (many of whom have entered into settlement agreements with Flannery),

unlawfully conspired to fix prices, suppress competition, and overcharge Flannery for rangeland in

Solano County in violation of the Sherman Act, the Cartwright Act, and California's Unfair

Competition Law.  Beginning in 2018 and continuing to present, Flannery approached Conspirators

about their properties in good faith.  However, seeing an opportunity to extract hundreds of

millions of dollars in supracompetitive profits, Conspirators agreed to fix the price for their

properties at supracompetitive levels and eliminate the free-market competition for the sale of

property that would have otherwise existed.  In furtherance of their conspiracy, Conspirators

refused to sell to Flannery except at supracompetitive prices, repeatedly deferred negotiation under

various pretenses, shared nonpublic information about their price negotiations with Flannery, and

coordinated with one another to counter Flannery's offers at similar, supracompetitive levels.

Flannery learned of the conspiracy in 2023, through discovery in separate state court

litigation that revealed Conspirators' own text and email messages discussing the conspiracy.  For

example, Conspirator Richard Hamilton wrote to Kirk Beebe (one of the BLK Defendants (as

defined in the complaint) who was voluntarily dismissed on October 18, 2023 pursuant to a

settlement with Flannery): "In talking with [Defendant] Ian Anderson, *he agrees* that the

*remaining property owners should be in agreement on what we would want to sell our*

*properties*.  So [Flannery's attorney] cannot play owners against owners."  (Compl. Ex. A

(emphases added).)  Mr. Beebe responded: "*Agree.*"  (*Id.* (emphasis added).)  And in a

contemporaneous email message, Defendant Christine Mahoney wrote to Mr. Beebe: "I heard you

talked with Hamiltons[.]  That's great that *we can support each other*!"  (*Id.* Ex. B (emphasis

1  added).)  In addition to this direct evidence, a variety of "plus factors" further raise the inference

2  that Conspirators acted pursuant to an agreement, including suspicious communications between

3  Conspirators, a common motive to conspire, actions against Conspirators' economic self-interests,

4  and opportunities to collude.

5      Because of the conspiracy, Flannery has paid at least $170 million in overcharges to

6  Conspirators, as well as third parties who demanded higher prices for their properties due to the

7  conspiracy's effect on the market.  Flannery also has suffered damages in the form of lost profits

8  because of its inability to purchase certain properties from Conspirators and third parties influenced

9  by the conspiracy's effects.  To remedy the harm caused by the unlawful conspiracy, Flannery

10  seeks treble damages for overcharges paid to Conspirators and third parties, treble damages for lost

11  profits resulting from Flannery's inability to acquire property as a result of the conspiracy,

12  injunctive relief enjoining Defendants from continuing their price fixing, and Flannery's costs of

13  bringing suit—including reasonable attorneys' fees.

14      In their sections below, Defendants improperly attempt to supplement the arguments in the

15  pending motion to dismiss (ECF No. 78), in an apparent end-run around the Court's rules regarding

16  page limits, and insert baseless attacks on Flannery and its motives.  Flannery prefers to limit its

17  portions of this report to addressing the issues called for under Rule 26(f), and it will not respond to

18  each and every single one of Defendants' improper assertions.  However, to address just the most

19  egregious examples: First, Defendants wrongly contend that the Sherman Act only applies to

20  "commodity" products and, therefore, does not apply to conspiracies involving land because land is

21  not a commodity.  But unlike certain antitrust statutes that only apply to "commodities"—like

22  Hawaii's antitrust statute or Section 3 of the Clayton Act, which are the subject of cases cited in

23  Defendants' motion to dismiss—Section 1 of the Sherman Act applies to "*[e]very . . . conspiracy[]*

24  *in restraint of trade*," including those involving the sale of land.  (*See* ECF No. 80, Opp. to Mot. to

25  Dismiss at 12-14.)  Indeed, the Department of Justice's Antitrust Division regularly secures

26  criminal convictions in connection with conspiracies involving the sale of land.  (*See* ECF No. 1,

27  Compl. ¶ 9.)  Second, Defendants make the illogical claim that Flannery's willingness to pay *some*

28  premium for property somehow gives Defendants free rein to conspire to fix prices at *any* premium

3

1   and therefore at supracompetitive levels.  Finally, while Defendants now disclaim any interest in

2   selling their properties, that assertion is flatly inconsistent with the evidence Flannery has seen to

3   date, as alleged in the complaint.  For example, Defendant Ian Anderson communicated

4   extensively with a real estate broker, told his broker in May 2022 that $12,000 per acre is "fine,"

5   retained real estate counsel, and then had that real estate counsel deliver a written offer to Flannery

6   to sell the majority of his land holdings.  (*See, e.g.*, *id.* ¶¶ 27, 204-18.)

7           **B.    Defendants**

8           The Defendants consider the case meritless as a matter of law, and have filed a Motion to

9   Dismiss the case.  The motion is under submission.

10          Solano County is primarily an agricultural county.  Many of the defendants are farm

11  families, some of whom have farmed the land for more than a century.  It is how they make their

12  livelihood, and it is who they are.  The importance of agriculture to them and to Solano County is

13  beyond dispute.

14          In 2017, Flannery began buying up farmland in the County.  (Dkt. 1 ¶ 162.)  By its own

15  admission, Flannery chose to pay massive premiums to acquire thousands of acres of Solano

16  County farmland.  (*Id.* ¶¶ 12, 162.)[1]  If a farmer chose not to sell, Flannery would sweeten the

17  offer—in some cases multiple times.  (*See, e.g., id.* ¶¶ 169-174.)  Given Flannery's willingness to

18  pay premiums, many farmers and landowners eventually relented and agreed to sell.  (*Id.* ¶ 165.)

19  To date, Flannery has purchased more than 62,000 acres from more than 500 owners in the County.

20  It reportedly has paid more than $800,000,000 to acquire the land.  (*Id.* ¶ 167.)  In a few years

21  Flannery has become the largest private landowner in the County.

22          But some farmers did not want to sell.  Unable to lure them with premium payments,

23  Flannery resorted to pressure tactics—what United States Representative John Garamendi has

24  publicly described as "mobster tactics."[2]  Many farmers farm land they own, plus land they lease

25

26  [1]  Plaintiff incorrectly refers to this land as "rangeland." (*See* Sec. I.A *supra*.)  In fact, it is
    productive cropland subject to dry farming techniques, which are agriculturally valuable given the
27  scarcity of water in California.

28  [2]  *See* CBS Bay Area *Silicon Valley billionaires identified as mystery group buying Solano County*

from others.  As Flannery acquired more and more land it was able to squeeze the farmers who wished to continue farming by terminating leases and evicting the holdout farmers from the land. Another of Flannery's favored tactics was to play one family against another by misrepresenting the families' intentions regarding Flannery's offers, in hopes that families otherwise unwilling to sell would feel pressure not to disappoint their friend and neighbor.

In some instances, Flannery resorted to litigation.  For example, in *Gassy Lassy L.P. v. Barnes Family Ranch Corp., et al*, Case No.  34-2022-00329651, filed in Sacramento County Superior Court, Flannery sued the Barnes family for causes of action stemming from the family's unwillingness to sell to Flannery.[3]  There, eight branches of descendants owned that land.  Seven of the eight wished to continue to farm and the eighth wished to sell.  So, Flannery decided to divide-and-conquer, acquiring the one-eighth share and then suing the other seven.  Once litigation was filed, the tactics were clear:  Flannery would use the expense of litigation to drive the farmers to surrender.  The farmers' only offense was their desire *not to sell* land their families had, in some cases, owned for generations.

Flannery used similar strong-arm tactics in its cases against the Hamilton family filed in Solano County Superior Court.  *See, e.g.*, *Arran LLC et al. v. Richard Hamilton, et al.*, Case No. FCS059348.[4]  In that litigation, Flannery acquired a membership interest in the Hamilton's family land-holding entity and filed suit against the remaining family members.  The impetus of the suit was that the Hamiltons had sought to lease some of their holdings for agriculture and sell others for conservation easements, rather than sell to Flannery.  In that suit, Flannery's lawyers recognized that the conservation easements appealed to the Hamiltons because they desired to continue farming the land, as they had for more than fifty years.  Nonetheless, Flannery alleged that the Hamiltons should have accepted Flannery's offer instead, because it was too good to refuse.  Not surprisingly, Flannery has reportedly settled its litigation against Solano County families not for

---

*land for new city* (Sept. 1, 2023) https://www.cbsnews.com/sanfrancisco/news/solano-county-land-purchase-mystery-flannery-associates-silicon-valley-billionaires.

[3]  Certain of those defendants were also named as defendants in this case.  A copy of this complaint is attached hereto as Exhibit A.

[4]  A copy of this complaint is attached hereto as Exhibit B.

5

1   money damages, but by negotiating deals that allowed Flannery to purchase the land it had

2   otherwise been unable to acquire.

3        The current case takes Flannery's pressure tactics to a new level.  Even though land is not a

4   commodity subject to the antitrust laws, Flannery alleges that the defendants (and others) conspired

5   to fix prices on their land, and that this has caused Flannery to overpay for land it has acquired.  As

6   Flannery itself proclaims that it was intentionally paying premium prices to amass its huge acreage,

7   the assertion is pure fiction, and Flannery knows it is.  Indeed, its CEO, Jan Sramek, recently told

8   KGO: "I don't think [speculation is] what happened. I think what happened is we went to a lot of

9   landowners and we offered them a premium, a significant premium several times over market

10  values. And many of those landowners looked at that and said, this is a great deal and I would like

11  to take it."[5]  Flannery alleges it has "smoking gun" evidence of price-fixing, but that is pure

12  hyperbole, meant to intimidate.

13       All of Flannery's tactics were conducted under a veil of secrecy.  None of the information

14  described above by Flannery was known publicly until the New York Times revealed the Flannery

15  motives on August 25, 2023.[6]  Indeed, none of Plaintiff's allegations in this statement regarding

16  Flannery's motivation for purchasing land in Solano County appear anywhere in its Complaint.

17  (Dkt. 1.)  And certainly none of it was disclosed to the landowners solicited by Flannery.  To the

18  contrary, County officials, the Federal Government, and regular citizens were concerned that this

19  massive land acquisition might be part of efforts by a foreign power such as China to acquire land

20  near Travis AFB, a critical military base.

21       As reported in the press, Flannery is owned by billionaire tech investors who have decided

22  to build a new city in Solano County.  The purchases ignore the County's general plan, which

23  protects agriculture by limiting urban development to city limits.  Its gambit revealed, Flannery has

24  

25  [5]  Stephanie Sierra, *EXCLUSIVE:  CEO behind massive Solano Co. land grab shares vision for
    new 'most walkable' city*, Real Estate (Sept. 21, 2023) https://abc7news.com/flannery-associates-
26  ceo-jan-sramek-new-solano-county-city-travis-airforce-base-farmland/13812726.

27  [6]  Conor Dougherty and Erin Griffith, *The Silicon Valley Elite Who Want to Build a City from
    Scratch*, N. Y. Times, Aug. 25, 2023.

28

1  begun a multi-front PR campaign in which Flannery declares that this is their effort to solve the

2  California housing crisis.  Meanwhile, Flannery has told its investors that they stand to make

3  billions from the project.[7]

4        Defendants request that this Court grant the motion to dismiss.   Massive damage to

5  farming and farmers in Solano County already has been done.  Flannery's efforts to litigate this

6  case while the motion to dismiss is pending will only increase that damage, by imposing an undue

7  financial and other burdens on defendants, none of whom can afford to individually defend an

8  antitrust case.

9        **Position of "DANZ" Defendants**:[8]

10        The DANZ defendants are four individuals who hold certain farmland in Solano County in

11  trusts. The farmland has been in their respective families for many years with no thought of

12  development. Most of the farmland has been leased to other local farmers for grazing and crops

13  and there are turbine wind farms that operate on the properties.

14        The DANZ defendants were approached by Flannery representatives through unsolicited

15  purchase offers delivered by Federal Express.  The DANZ defendants did not respond to the

16  unsolicited offers as they had no interest in selling their properties.  Flannery's only subsequent

17  contact with the DANZ defendants was a phone call with Nancy Roberts.  The DANZ defendants

18  did not have any further contact with Flannery as they did not wish to sell their properties.  The

19  DANZ defendants did not have any discussions with any of the owners of the neighboring

20  properties regarding sales to Flannery and there is no evidence of any conspiracy theory as created

21

22

---

23  [7] *The Silicon Valley Elite Who Want to Build a City from Scratch*, at 2 ("The financial gains could
be huge, Mr. Moritz said in the 2017 pitch.  He estimated the return could be many times the initial
24  investment just from the rezoning, and far more if and when they started building.  'If the plans
materialize anywhere close to what is being contemplated, this should be a spectacular investment,'
25  Mr. Moritz wrote.")

26  [8]  The "DANZ Defendants" are Paul Dietrich (individually and as trustee of the Child's Trust FBO
Paul S. Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich), John
27  Alsop (individually and as trustee of the John G. Alsop Living Trust), Nancy Roberts (individually
and as trustee of the Nancy C. Roberts Living Trust), Janet Zanardi (individually and as trustee of
28  Trust A under the Zanardi Revocable Trust).

---

1   by Flannery.  Flannery has no evidence to support its claims in the complaint against the DANZ

2   defendants.

3           **Position of Defendant William Dietrich**:[9]

4           William Dietrich is an elderly individual that has never attempted (or desired) to sell any

5   property to Flannery.  He was shocked when he was named as a Defendant in this litigation (which

6   appears to be an outgrowth of past and potential transactions involving Flannery and others).  As

7   discussed more fully in the pending motion to dismiss, William Dietrich denies any wrongdoing

8   and urges the Court to dismiss him because he has been unfairly swept up in this lawsuit.  In simple

9   terms, Flannery does not (and cannot) allege specific facts about William Dietrich's connection to

10  the alleged conspiracy.  (*See* Dkt. No. 78 at p. 28-29 (motion to dismiss) and Dkt. No. 82 at p. 11-

11  13 (reply brief).)

12          **Position of Blegen/Anderson Defendants**:[10]

13          The Blegen/Anderson Defendants hold undivided interests in farmland that Flannery seeks

14  to purchase in Solano County. Like other "non-seller" defendants, the Blegen/Anderson

15  Defendants were not interested in selling, but were hounded with solicitations by Flannery and its

16  agents. Given the Blegen/Anderson Defendants' lack of interest in selling, and Flannery's

17  aggressive tactics and lack of transparency, the Blegen/Anderson Defendants ultimately stopped

18  responding to Flannery. Because the Blegen/Anderson Defendants did not consider their land for

19  sale and did not wish to negotiate, Flannery resorted to the present action in order to force the sale

20  of their land. As set forth in the pending motion to dismiss, Flannery lacks any viable legal or

21  factual basis for the inclusion of the Blegen/Anderson Defendants in the present action.

22

23  _____

24  [9]  William Dietrich is named individually and as trustee of the Child's Trust FBO William C.
25  Dietrich, a subtrust under the Trust of William C. Dietrich and Ivanna S. Dietrich.

26  [10]  This group includes Ned Anderson (Individually and as Trustee of the Ned Kirby Anderson
    Trust), Neil Anderson, Glenn Anderson, Janet Blegen (Individually and as Trustee of the Janet
    Elizabeth Blegen Separate Property Trust), Robert Anderson (Individually and as Trustee of the
27  Robert Todd Anderson Living Trust), Stan Anderson, Lynne Mahre, Sharon Totman, Amber
28  Bauman, and Christopher Wycoff.

1    **Position of the Mahoney Defendants**:[11]

2    The Mahoney Defendants trace their roots back to 1877 when the Emigh family first settled

3    in Solano County.  The related families have been farming and raising sheep on these lands for

4    nearly 140 years.  Selling property was never the preference of the Mahoney Defendants, who

5    consider these lands to be their home and family legacy.

6    The Mahoney Defendants first became involved with Flannery in 2018, when Flannery

7    made an offer to purchase a smaller piece of property known as the "Emigh 279 Property" (Dkt. 1,

8    Page 16, Line 23.)  The Mahoneys sold that property to Flannery at a market price of $5,700/acre,

9    far below the price of subsequent land sales in the area.

10   In 2021, Flannery again approached the Mahoney Defendants and offered to buy the

11   "Emigh 45 Property," a 45-acre parcel, for $560,000 (*id.*, Page 16, Line 25).  The Mahoneys had

12   purchased that property from the State of California only a year or so earlier for $650,000. They

13   sold it to Flannery for less than what they paid for it.

14   The Mahoney Defendants became involved with Flannery a third time when Flannery

15   offered to purchase an industrial property in neighboring Rio Vista owned by Emigh Land LP (the

16   "Emigh Industrial Property") (*id.*, Page 17, Line 1).  Flannery entered into a contract with Emigh

17   Land LP for the purchase of the Emigh Industrial Property and began a lengthy due diligence

18   period.  After months of due diligence, Flannery representatives contacted the Mahoney

19   Defendants and told them that if the Mahoney Defendants did not sell or swap a large portion of

20   the Mahoney farmland, that Flannery would back out of the industrial purchase.  The Mahoneys

21   refused.  Flannery continued to use the threat of cancellation of the industrial purchase to pressure

22   the Mahoneys, asserting various land swap proposals over several weeks until a deal became

23   palatable to the Mahoneys that would save the industrial deal.  As a result, Flannery and the

24   Mahoneys entered into four land swap transactions, whereby the Mahoneys swapped 1,989 acres of

25

26   [11]  As alleged and defined in the Complaint, the "Mahoney Defendants" are Christine Mahoney
     Limited Partnership, Christine Mahoney Limited Partnership Management Company, Emigh Land
27   LP, El General Partner, LLC, Christine Mahoney (individually and as trustee of the Mahoney 2005
     Family Trust), and Daniel Mahoney (individually and as trustee of the Mahoney 2005 Family
28   Trust).

their land for 1,588 acres of Flannery's land.  Three of the transactions have closed, and one remains outstanding. These swaps would not have occurred but for Flannery's aggressive tactics.

Unimaginably, Flannery is now suing the Mahoney Defendants under an antitrust theory that the Mahoneys illegally drove up the price of these transactions, when in fact the actual transactions were at or below market price, or were sold as part of a swap (price is plainly irrelevant in a land swap deal, because the exchange is land for land).  The Mahoney Defendants believe that Flannery's motive has not changed – its representatives appear to favor any method to coerce land sales, and now they are using the litigation system.

**Position of the Ian Anderson Defendants**:[12]

The Ian Anderson Defendants have farmed in Solano County for more than 100 years.  Ian Anderson's family is a fifth-generation farm family and Margaret Anderson's family is a sixth-generation farm family.  Neil Anderson continues the family tradition of farming.  Maryn Anderson is a schoolteacher in Solano County.

As alleged in the Complaint, in November 2018 Flannery first approached the Ian Anderson defendants about purchasing certain of the parcels they owned.  (Dkt. 1 ¶ 203.)  The Ian Anderson defendants, however, have no interest in selling their land because they wish to continue farming it. Flannery knows this and has attempted to constrain their ability to farm by cancelling leases the Ian Anderson defendants have held for generations in an attempt to coerce them to sell their land to Flannery.

The Ian Anderson defendants categorically deny engaging in an unlawful conspiracy.

**II.**   **Discovery Plan**

**A.**   **Changes to Timing, Form, or Requirement of FRCP 26(a) Disclosures**

Pursuant to the Parties' agreement, they exchanged initial disclosures on October 17, 2023.

**B.**   **Subjects on Which Discovery May Be Needed**

---

[12]  This group of defendants comprises Ian Anderson, individually and as trustee of the Ian and Margaret Anderson Family Trust, Margaret Anderson, individually and as trustee of the Ian and Margaret Anderson Family Trust, their son Neil Anderson, and his wife Maryn Anderson.  (Dkt. 1 ¶¶ 55-58.)

1    <u>Flannery's Position</u>.  Flannery anticipates seeking discovery on topics including the

2    conspiracy among Defendants and the prices at which real property would have been sold but for

3    the conspiracy.  Flannery will seek discovery regarding communications between Conspirators,

4    meetings between Conspirators, communications regarding Flannery, selling or not selling interests

5    in real property in Solano County, and the valuation of real property in Solano County, among

6    other topics.

7    Flannery propounded its first set of requests for production on Defendants on September 7,

8    2023.  Contrary to Defendants' contentions below that these requests for production were

9    "premature," they were expressly authorized under Federal Rule of Civil Procedure 26(d)(2)(A)

10   because they were served more than 21 days after Defendants had been served with the summons

11   and complaint.  Pursuant to Federal Rule of Civil Procedure 26(d)(2)(B), those requests for

12   production are considered served as of September 19—when the Parties completed their 26(f)

13   conference.  At no point has Flannery stated (as Defendants wrongly contend) that it would re-

14   serve or modify its requests for production.  It does not intend to do so, nor is it required to do so

15   under the applicable Federal Rules of Civil Procedure.  Flannery also intends to serve subpoenas

16   requesting discovery from third parties likely to possess relevant information.

17   Defendants misrepresent a litany of matters related to the Parties' discussions concerning

18   discovery.  For example, in its email accompanying the requests for production, Flannery offered a

19   compromise in which Defendants would produce documents responsive to the first three requests

20   for production.  In exchange, Flannery would agree that Defendants' deadlines to respond to the

21   remaining requests for production would be stayed until the Court rules on the pending motion to

22   dismiss.  Flannery did not, as Defendants erroneously assert, offer a general stay of discovery.

23   Similarly, Defendants misrepresent Flannery's position as to its requests for production.

24   During the Parties' first conference on September 12, Defendants represented that they were

25   inclined to accept Flannery's proposed compromise but raised certain concerns.  Defense counsel

26   stated that they did not believe that the request seeking all communications with conspirators

27   should encompass intra-family communications that did not pertain to Flannery or the sale of land.

28   Flannery responded that this request to each Defendant was drafted in a way that was not intended

11

to capture all intra-family communications, through carveouts in the definition of "Conspirator."
Contrary to Defendants' contention below, Flannery stated that if it inadvertently drafted any
request to include all intra-family communications, any affected defense group should discuss the
issue with Flannery via a meet-and-confer.  Similarly, Defendants wrongly assert that Flannery
agreed to strike the word "Conspirator" from its requests for production or to issue new requests
omitting that word.  To the contrary, when counsel for Richard Anderson objected during the
conference to the use of the word "Conspirator" because it supposedly has criminal connotations,
counsel for Flannery explained that its use of that term is merely consistent with the text of Section
1 of the Sherman Act, which applies to "conspiracies" in restraint of trade and renders those who
engage in such misconduct "conspirators."

Further, Defendants selectively and inaccurately report the parties' efforts to reach a
compromise as to limited discovery.  At the first conference, Defendants' counsel proposed that
Defendants be permitted to jointly serve three document requests as part of the limited discovery
compromise.  Flannery's counsel requested to see the three contemplated requests in advance of
the next conference, which was scheduled for September 19, so that Flannery would be able to
review the requests with its counsel.  Defendants' counsel represented that they would endeavor to
deliver proposed requests for production before the end of the week.  In actuality, Defendants'
counsel then emailed draft requests for production only one hour before the second conference.
During the second conference, counsel for Flannery noted that Flannery did not have the
opportunity to review the requests in advance of the conference and would need to consult with
their client prior to entering into any agreement with Defendants' counsel.

After the conference concluded on September 19, Flannery decided to reject the proposed
compromise for two reasons, which Defendants again fail to accurately describe below.  First,
Flannery determined that the overbreadth of the requests proposed by Defendants contravened the
spirit of the contemplated limited initial discovery.  Second, counsel for the Ian Anderson
Defendants called counsel for Flannery to attack Flannery's motives and threaten to go after
Flannery "with a f***ing vengeance."  As reflected in the full text of the September 29 email that
DANZ Defendants selectively quote below, Flannery's counsel wrote:

12

In addition, I had a call with Clem Glynn during which he leveled various attacks on Flannery, questioned Flannery's motives, and threatened to come after Flannery "with a f***ing vengeance."

In light of the above, our client will not enter into the proposed agreement.

<u>Defendants' Position</u>.

The Defendants submit that discovery should be stayed pending this Court's decision on the motion to dismiss. Before the Rule 26 conference, Flannery sent each defendant a set of 10 requests for production. These were obviously premature. Indeed, Plaintiff's counsel stated that the requests were being sent "in the hope of making the discussion more productive" because defense counsel had already told them that their position was that, to obviate unnecessary expense, all discovery should be stayed pending the Court's decision on the motion to dismiss. In recognition of this position, Flannery's pre-conference correspondence also offered a compromise: it would agree to stay discovery generally, provided the Defendants would agree to respond to the first three requests for production categories.

The parties met and conferred over two sessions. During the first session, Defendants told Flannery that they were inclined to recommend the proposed compromise to their clients but for a few specific concerns. First, because the requests were extremely broad and sought "all communications," this category would extend to intra-family communications, or communications with other so-called conspirators (there are many inter-family friendships across the farming community) that did not pertain to Flannery or the potential sale of land. Flannery agreed that the requests should not be interpreted so broadly.

Second, one defense counsel made clear that he would not agree to any discovery that defined the defendants as "CONSPIRATORS." Flannery agreed to revise this definition as well.

Third, defense counsel proposed that defendants be permitted to jointly serve three document requests. Flannery's counsel agreed to this in principle but asked to see the three defense requests prior to the next meet-and-confer session. Defense counsel complied with this request. On September 19, during their second meet and confer session, Flannery's counsel said it had reviewed the defense requests for production, which appeared "reasonable." Both sides agreed that they would retain the right to object to any request, as in the normal case.

13

1   On September 29, 2023, Flannery withdrew its proposed compromise regarding discovery

2   phasing, at which point Defendants deemed the Rule 26(f) conference complete.  The Plaintiff

3   failed, however, to re-serve its requests for production, or to modify the definitions in the manner

4   discussed above.  Because Plaintiff now contends it properly served its requests, on October 18,

5   2023 Defendants filed a motion for a protective order, which stayed its obligations to respond to

6   the requests.  Pursuant to this motion, Defendants will ask the Court to stay discovery until the

7   pending Motion to Dismiss is decided.  *See Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, No.

8   118CV01505LJOBAM, 2019 WL 9667685 (E.D. Cal. Dec. 20, 2019).

9        **Position of the DANZ defendants**:  Plaintiff served premature written requests for

10   documents on all Defendants on September 7, 2023 five days prior to the Rule 26(f) conference.

11   Prior to the 26(f) conference Plaintiff offered that Defendants only had to respond to the first three

12   premature requests and that responses to the remainder could wait. During the 26(f) conference the

13   parties discussed limited discovery where Defendants would respond to Plaintiff's first three

14   requests and Plaintiff would respond to three requests to be drafted by Defendants. The 26(f)

15   conference was continued to September 19, 2023. On September 19th Defendants provided Plaintiff

16   three document requests. Plaintiff's lawyer stated that the requests seemed reasonable and that he

17   would have to check with his clients. It should be noted that the Defendants requests cover the

18   means and methods of Plaintiff's damage calculations and claims as well as any evidence Plaintiff

19   has to prove its claims of conspiracy against the individual Defendants. All information to be made

20   in the respective initial disclosures. The parties agreed to put a hold on third party discovery and

21   the entire agreement was to be documented in this Discovery Plan. Plaintiff's attorneys agreed to

22   draft the Discovery Plan as well as a proposed protective order. The parties agreed that initial

23   disclosures would be made on October 17, 2023.

24        On September 29, 2023 Plaintiff's attorney emailed Defendants and stated:

25        "We've discussed your proposed requests for production internally and with the client.

26        Our conclusion is that your requests are inconsistent with the spirit of the proposed
          agreement regarding limited discovery.  Flannery served defendants with ten document
          requests, but agreed to explore limited initial discovery whereby Flannery would only seek

27        responses to three requests and would stay the deadline to respond to the others, and
          defendants would also only serve three requests.  But defendants' three draft requests are
28        significantly broader than Flannery's three priority requests.  Specifically, unlike Flannery's

                                                    14

---

three priority requests, which are narrowly focused on evidence of the alleged price-fixing conspiracy, defendants' requests are far broader and exceed the scope of Flannery's ten requests combined."

Flannery then declined to enter into the proposed agreement and provided a draft Discovery Plan.

If there is no stay on discovery, the DANZ defendants anticipate responding to Flannery's premature document requests and making their initial disclosures.  Further discovery where there is no evidence to support Plaintiff's claims is burdensome and oppressive.  The DANZ defendants believe that discovery should be stayed until the Court rules on Defendants' joint motion to dismiss.

**Position of Defendant William Dietrich**:  William Dietrich believes discovery should be stayed pending the motion to dismiss, as is customary in antitrust and alleged price-fixing cases. Because William Dietrich has raised arguments under *Twombly*, the stay is particularly appropriate. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.") (internal citations omitted).

### C.  Phasing of Discovery

Flannery's Position.  As explained above, during the 26(f) conference, the Parties discussed the possibility of a compromise in which the Parties would agree to proceed with limited discovery during the pendency of certain Defendants' motion to dismiss (ECF No. 78).[13]  The Parties were unable to come to an agreement about such a compromise.  Accordingly, Flannery considers discovery to be open as contemplated by the Federal Rules of Civil Procedure.

Defendants' Position. After reaching a number of agreements, Plaintiff abruptly reversed its position and refused any compromise.

### D.  Case Schedule

---

[13]  All defendants participating in the 26(f) conference joined in the motion to dismiss, except for Defendant Richard Anderson—who answered the complaint.

15

1    The Parties discussed the case schedule set forth in the Court's Initial Pretrial Scheduling

2  Order (ECF No. 3).  While the Parties do not request any modification to the schedule at this time,

3  they have agreed to meet and confer following the disposition of the motion to dismiss to discuss

4  whether to request any modification to the schedule.

5        **E.      Electronically Stored Information**

6        The Parties intend to confer in good faith regarding a protocol governing the production of

7  electronically stored information and to submit a proposed stipulated protocol to the Court

8  following those discussions.

9        **F.      Privileges and Claims of Protection**

10        The Parties anticipate that discovery will require disclosure of confidential information.

11  The Parties intend to confer in good faith regarding a protective order governing confidentiality

12  and will submit a proposed stipulated protocol to the Court following those discussions.  The

13  Parties' proposed order will comport with Local Civil Rule 141 regarding the filing of protected

14  information under seal.

15        At this time, the Parties do not propose any particular agreements or modifications to Rule

16  502 of the Federal Rules of Evidence.  The Parties will continue to meet and confer regarding

17  managing privilege and work product issues and will submit any disputes to Magistrate Judge

18  Claire as contemplated by the Local Civil Rules.

19        **G.      Changes to Limitations on Discovery**

20        The Parties discussed possible changes to limitations on discovery, including Flannery's

21  belief that an enlargement to the presumptive ten-deposition limit under Federal Rule of Civil

22  Procedure 30 is warranted, given that there are 23 individual named defendants who have not

23  entered into settlement agreements with Flannery and that Flannery also intends to take third-party

24  depositions.  Defendants also raised the potential for a limitation on total deposition hours per side,

25  rather than limiting the number of depositions.

26        The Parties agreed to meet and confer regarding limitations on depositions and other forms

27  of discovery following the disposition of the motion to dismiss.

28        Flannery's Position.  Defendants filed a motion for a protective order on October 18, 2023.

16

1  Flannery intends to oppose the motion.

2      <u>Defendants' Position</u>.  Defendants filed a motion for a protective order on October 18,

3  2023. Defendants believe all discovery should be stayed pending resolution of their motion to

4  dismiss.

5      **H.**    **<u>Other Orders Pursuant to FRCP 16(b)-(c), 26(c)</u>**

6      As noted above, the Parties intend to confer in good faith regarding a protective order

7  governing confidential information and will submit a stipulated protective order to the Court

8  following those discussions.

9  **III.**    **<u>Possibility of Settlement/Prompt Resolution</u>**

10      The Parties have discussed the possibility of settlement and prompt resolution of the case,

11  but they did not reach any such agreement during the conference.

12      <u>Position of the DANZ Defendants</u>:  The possibility of settlement and prompt resolution of

13  the case was discussed.  It was one-sided with no discussion of the lack of evidence to support

14  Plaintiff's claims.

15  Dated: October 26, 2023         <u>/s/Michael H. Menitove</u>

16                              *(as authorized on October 26, 2023)*

17                            Matthew Martino
                          matthew.martino@skadden.com

18                            Michael H. Menitove
                          michael.menitove@skadden.com

19                            SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM LLP

20                            One Manhattan West
                          New York, New York 10001

21                            Telephone: (212) 735-3000
                          Facsimile: (917) 777-3000

22                            Lance A. Etcheverry (SBN 199916)

23                            lance.etcheverry@skadden.com
                          SKADDEN, ARPS, SLATE,

24                              MEAGHER & FLOM LLP
                          525 University Avenue

25                            Palo Alto, California 94301
                          Telephone: (650) 470-4500

26                            Facsimile: (650) 470-4570

27                            *Attorneys for Plaintiff*
                          *Flannery Associates LLC*

28                  **[See Signatures below for all defendants and counsel]**

                        17

1   Dated:  October 25, 2023                    GLYNN, FINLEY, MORTL,
                                                HANLON & FRIEDENBERG, LLP
2                                               CLEMENT L. GLYNN
                                                ADAM FRIEDENBERG
3                                               ROBERT C. PHELPS
                                                MORGAN K. LOPEZ
4                                               One Walnut Creek Center
                                                100 Pringle Avenue, Suite 500
5                                               Walnut Creek, CA  94596

6                                               By:  /s/ Morgan K. Lopez
                                                *(as authorized on October 25, 2023)*
7                                               Attorneys for Defendants Ian Anderson (Individually
                                                and as Trustee of the Ian and Margaret Anderson
8                                               Family Trust), Margaret Anderson (Individually and
                                                as Trustee of the Ian and Margaret Anderson Family
9                                               Trust), Neil Anderson, and Maryn Anderson

10
    Dated: October 25, 2023                     BUCHALTER
11                                              KEVIN T. COLLINS
                                                PHILLIP CHAN
12                                              ADAM SMITH
                                                NATALIYA SHTEVNINA
13                                              A Professional Corporation
                                                500 Capitol Mall, Suite 1900
14                                              Sacramento, CA  95814

15
                                                By:  /s/ Kevin T. Collins
16                                              *(as authorized on October 25, 2023)*
17                                              Attorneys for Defendants
                                                Ned Anderson (individually and as trustee of the Ned
18                                              Kirby Anderson Trust), Neil Anderson, Glenn
                                                Anderson, Janet Blegen (individually and as trustee of
19                                              the Janet Elizabeth Blegen Separate Property Trust),
                                                Robert Anderson (individually and as trustee of the
20                                              Robert Todd Anderson Living Trust), Stan Anderson,
                                                Lynne Mahre, Sharon Totman, Amber Bauman and
21                                              Christopher Wycoff

22
    Dated: October 25, 2023                     HOGE FENTON JONES & APPEL INC.
23                                              STEVEN J. KAHN
                                                ALEXANDER H. RAMON
24

25                                              By: /s/ Steven J. Kahn
26                                              *(as authorized on October 25, 2023)*
                                                Attorneys for Defendant Ronald Gurule (individually
27                                              and as trustee of the Ronald Gurule 2013 Family
                                                Trust)
28

                                                18

Dated: October 25, 2023

DAVIS WRIGHT TREMAINE LLP

ALLISON A. DAVIS
SANJAY M. NANGIA
50 California Street, 23rd Floor
San Francisco, CA 94111

By: /s/ *Sanjay M. Nangia*
*(as authorized on October 25, 2023)*
Attorneys for Defendant
WILLIAM DIETRICH
(individually and as trustee of the Child's Trust FBO
William C. Dietrich, a subtrust under the Trust of
William C. Dietrich and Ivanna S. Dietrich)

Dated: October 25, 2023

RIMON, P.C.
GABRIEL G. GREGG
A Professional Corporation
800 Oak Grove Avenue, Suite 250
Menlo Park, California 94025

By: /s/ Gabriel G. Gregg
*(as authorized on October 25, 2023)*
Attorneys for the Mahoney Defendants

Dated: October 25, 2023

ROPERS MAJESKI PC
MICHAEL J. IOANNOU
DAVID B. DRAPER
KEVIN W. ISAACSON
333 W. Santa Clara St., Suite 910
San Jose, CA  95113

By: /s/ David B. Draper
*(as authorized on October 25, 2023)*
Attorneys for Defendants Paul Dietrich (individually
and as trustee of the Child's Trust FBO Paul S.
Dietrich, a subtrust under the Trust of William C.
Dietrich and Ivanna S. Dietrich; John Alsop
(individually and as trustee of the John G. Alsop
Living Trust), Nancy Roberts (individually and as
trustee of the Nancy C. Roberts Living Trust), Janet
Zanardi (individually and as trustee of Trust A under
the Zanardi Revocable Trust)

19

1   Dated: October 25, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOUK & HORNBURG, INC.
WILLIAM N. HANNAH
C. MATTHEW GAEBE
206 S. Mooney Blvd.
Visalia, CA  93291

By ____/s/ William N. Hannah_____
*(as authorized October 25, 2023)*
Attorneys for Defendant Richard Anderson,
(Individually and as Trustee of the REA
Properties Trust

20