# EXHIBIT A

Superior Court Of California,
Sacramento
11/08/2022
Nathera
By........................................... , Deputy
Case Number:
34-2022-00329651

1 | LANCE A. ETCHEVERRY (SBN 199916)
Lance.Etcheverry@skadden.com
2 | ABRAHAM A. TABAIE (SBN 318397)
Abraham.Tabaie@skadden.com
3 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
4 | Palo Alto, CA 94301
Telephone:     (650) 470-4500
5 | Facsimile:     (650) 470-4570

6 | Attorneys for Plaintiff
Gassy Lassy L.P., Individually and
7 | Derivatively on behalf of LLCs

8 |

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

9 |
10 |
11 |

| | |
|---|---|
| Gassy Lassy L.P., Individually and Derivatively on behalf of LLCs, | CASE NO.: |
| Plaintiffs, | (1) BREACH OF CONTRACT (DERIVATIVELY AND INDIVIDUALLY); |
| v. | (2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (DERIVATIVELY); |
| Barnes Family Ranch Corporation, Lambie Ranch Corporation, Kirby Hill Corporation, Kirk Beebe, Susan Beebe Furay, Janet Beebe, Kenneth Beebe, | (3) BREACH OF FIDUCIARY DUTIES (DERIVATIVELY); |
| Defendants, | (4) FRAUD—INTENTIONAL MISREPRESENTATION (DERIVATIVELY); |
| -and- | (5) FRAUD—FRAUDULENT CONCEALMENT (DERIVATIVELY); |
| Barnes Family Ranch Associates, LLC, Lambie Ranch Associates, LLC, Kirby Hill Associates, LLC, | (6) CONSTRUCTIVE FRAUD (DERIVATIVELY); |
| Nominal Defendants. | (7) BREACH OF CONTRACT (INDIVIDUALLY); |
| | (8) VIOLATION OF SECTIONS 17704.10(B)(1) AND 17701.13 OF THE CALIFORNIA CORPORATIONS CODE (INDIVIDUALLY) |
| | (9) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (INDIVIDUALLY); |

COMPLAINT

BY FAX

|    |   |   |
|----|---|---|
| 1  | ) | (10)   BREACH OF FIDUCIARY DUTIES (INDIVIDUALLY); |
| 2  | ) |   |
| 3  | ) | (11)   INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (INDIVIDUALLY); |
| 4  | ) |   |

1   )
2   )         (10)   BREACH OF FIDUCIARY DUTIES
              (INDIVIDUALLY);
3   )
4   )         (11)   INTENTIONAL INTERFERENCE
              WITH PROSPECTIVE ECONOMIC
              RELATIONS (INDIVIDUALLY);
5   )
6   )         (12)   CIVIL CONSPIRACY AGAINST
              INDIVIDUAL DEFENDANTS
              (DERIVATIVELY AND
              INDIVIDUALLY);
7   )
8   )         (13)   CIVIL CONSPIRACY AGAINST
              CORPORATE DEFENDANTS
9   )         (DERIVATIVELY AND
              INDIVIDUALLY);
10  )
              (14)   CLAIM AGAINST KIRK BEEBE FOR
11  )         AIDING AND ABETTING BREACHES OF
              FIDUCIARY DUTIES (DERIVATIVELY
              AND INDIVIDUALLY);
12  )
13  )         (15)   CLAIM AGAINST KENNETH BEEBE
              FOR AIDING AND ABETTING
14  )         BREACHES OF FIDUCIARY DUTIES
              (DERIVATIVELY AND
              INDIVIDUALLY);
15  )
16  )         (16)   CLAIM AGAINST SUSAN BEEBE
              FURAY FOR AIDING AND ABETTING
17  )         BREACHES OF FIDUCIARY DUTIES
              (DERIVATIVELY AND
              INDIVIDUALLY); and
18  )
19  )         (17)   CLAIM AGAINST JANET BEEBE
              FOR AIDING AND ABETTING
20  )         BREACHES OF FIDUCIARY DUTIES
              (DERIVATIVELY AND
              INDIVIDUALLY).
21  )
22  )         JURY TRIAL DEMANDED

23

24

25

26

27

28

2

1        Plaintiff Gassy Lassy L.P., Individually and Derivatively on behalf of Barnes Family Ranch
2 Associates, LLC, Lambie Ranch Associates, LLC, and Kirby Hill Associates, LLC, for its Complaint
3 against Defendants Barnes Family Ranch Corporation, Lambie Ranch Corporation, Kirby Hill
4 Corporation, Kirk Beebe, Susan Beebe Furay, Janet Beebe, and Kenneth Beebe, and Nominal
5 Defendants Barnes Family Ranch Associates, LLC, Lambie Ranch Associates, LLC, and Kirby Hill
6 Associates, LLC, alleges based on its own personal knowledge and on information and belief as
7 follows:

8                          **INTRODUCTION**

9      1.      Defendants Barnes Family Ranch Corporation ("Barnes Corp"), Lambie Ranch
10 Corporation ("Lambie Corp"), and Kirby Hill Corporation ("Kirby Corp") are C Corps (the
11 "Corporate Defendants") that are the respective Managers of three LLCs: Barnes Family Ranch
12 Associates, LLC ("Barnes LLC"), Lambie Ranch Associates, LLC ("Lambie LLC"), and Kirby Hill
13 Associates, LLC ("Kirby LLC," and collectively the "LLCs"). The Corporate Defendants are owned
14 and controlled by Kirk Beebe, Susan Beebe, Janet Beebe, and Kenneth Beebe (collectively, the
15 "Individual Defendants," and with the Corporate Defendants, "Defendants"). The Corporate
16 Defendants are also members of each of the LLCs. The Individual Defendants therefore control the
17 LLCs.

18      2.      The LLCs were created in 2003 by conversion of Barnes Family Ranch Associates
19 ("Barnes LP"), Lambie Ranch Associates ("Lambie LP"), and Kirby Hill Associates ("Kirby LP,"
20 and collectively the "Limited Partnerships") into the LLCs. The Limited Partnerships were created
21 in 1988.

22      3.      The LLCs are governed by operating agreements dated May 15, 2001 that are
23 substantively the same to each other (collectively, the "Operating Agreements"). The Limited
24 Partnerships were previously governed by limited partnership agreements that were substantively the
25 same to each other (the "LP Agreements"). Further, the Operating Agreements mostly follow the
26 terms of the LP Agreements.

27

28

---

1    4.    The LLCs own real property located in Solano County (the "Land"). The Land
2 consists of Barnes Ranch (owned by Barnes LLC), Lambie Ranch (owned by Lambie LLC), and
3 Kirby Hill (owned by Kirby LLC).

4    5.    Prior to the formation of the Limited Partnerships in 1988, the Land was owned by a
5 group of eight extended families who each owned a roughly one-eighth tenancy-in-common
6 undivided interest in the Land. As a result, each family had similar rights. The Individual Defendants
7 constituted one of those eight families.

8    6.    Through 1986 and 1987, the Individual Defendants convinced the other families to
9 form the Limited Partnerships. The Individual Defendants claimed that the purpose of such efforts
10 was to simplify the management of the Land. However, the Individual Defendants' actual purpose
11 was to begin a multi-decade fraudulent scheme to enrich themselves at the expense of their families,
12 by usurping all control as the sole general partner, and by creating transfer restrictions that would
13 force everyone else to eventually sell their interests to Individual Defendants on the cheap.

14    7.    However, the scheme was taking too long. So, in the early 2000s, Defendants came
15 up with a new scheme to convince the other families to convert the Limited Partnerships into LLCs,
16 and as part of that, secretly change the governing documents to make it even harder to remove
17 Defendants as the Managers (the Corporate Defendants as the Managers in fact and the Individual
18 Defendants by virtue of their control of the Corporate Defendants), and at the same time secretly fail
19 to record certain real property conveyances that they had promised to record, which had the effect of
20 nearly doubling Defendants' record ownership from roughly 12.5% of the Land to almost 25% of
21 the Land.

22    8.    Defendants' scheme worked in that the reorganization was approved. Defendants had
23 on paper nearly doubled their ownership without spending a dollar. They had locked each member
24 of all three LLCs (each a "Member" and collectively the "Members") into Operating Agreements
25 that gave Defendants significant power and made them extremely difficult to remove, and that
26 imposed transfer restrictions that Defendants hoped would coerce the remaining Members to
27 eventually sell their interests in the Land to Defendants for cents on the dollar.

28

1    9.    Starting in 2018, a potential purchaser made a series of offers on the LLCs' Land at
2  multiples of fair market value. Had Defendants acted in the best interests of the LLCs and their
3  Members upon receiving the above-market offers, whether they personally wanted to sell or not, they
4  would have engaged with the would-be buyer, attempted to negotiate the best possible offer,
5  presented the best offer with a balanced analysis of pros and cons of selling to the Members, and
6  called a vote. However, any sale process threatened to reveal Defendants' underlying schemes, and
7  any sale of the Land, regardless of the sale price, would be less profitable to Defendants than if they
8  first bought out everyone else's interests on the cheap and then potentially sold the Land. Therefore,
9  Defendants instead sought to prevent a sale by disregarding their contractual obligations, fiduciary
10 duties, and applicable law. In particular, Defendants first concealed offers from the Members for
11 over two years. Then, when the potential purchaser discovered the offers were being concealed and
12 contacted the Members directly, Defendants induced the Members to ignore and/or reject the offers
13 by misrepresenting and/or concealing material facts about those offers and the LLCs' operations.

14    10.    The next threat to Defendants' plan came in 2022 when one Member of each of the
15 LLCs—plaintiff Gassy Lassy L.P. ("GLLP")—started demanding access to books and records of the
16 LLCs, and offering to buy the interests of other Members. To neutralize GLLP, Defendants falsely
17 told Members that such transfers would be invalid and that GLLP's Membership was suspended,
18 preventing Members from selling their interests to GLLP. Afterwards, in breach of their fiduciary
19 duties, they induced Members, through misrepresentation and concealment, to purportedly approve
20 Amended and Restated Operating Agreements (the "Purported Amended Operating Agreements"),
21 which were intended to attempt to expel GLLP as a Member, stripping GLLP of its voting rights and
22 ability to transact with other Members, and leaving it with only the ability to receive distributions.
23 With GLLP out of the way after the purported adoption of the Purported Amended Operating
24 Agreements, Defendants would once again become the only realistic purchaser of Members' interests
25 going forward. Defendants, therefore, forced through the Purported Amended Operating Agreements
26 to benefit themselves at the expense of GLLP, because they wanted GLLP out of the way. Without
27 having to compete with or even match any offer from GLLP or any other party, Defendants have no
28 incentive to pay Members a fair price for their interests. Members will have no choice but to sell to

1 the Individual Defendants, because under the Purported Amended Operating Agreements, Members
2 either cannot sell to third parties at all or at best any such sale results in the interests losing voting
3 rights. No third-party buyer will purchase such interests without a huge discount.

4     11.    In addition, despite telling Members that the changes to the Operating Agreements
5 related only to voting and family membership, Defendants made two unrelated and self-serving
6 modifications. First, they inserted vague and broad language purporting to retrospectively ratify a set
7 of unknown payments to Defendants going back to 2005, i.e., more than 17 years. Second,
8 Defendants inserted a provision that allows them to dissolve the LLCs if they are somehow removed
9 as Managers. This avoids Defendants being subjected to the one-sided Operating Agreements they
10 have imposed on the Members.

11     12.    In summary, Defendants have violated the trust that the Individual Defendants'
12 extended families placed in them by attempting to steal from them, lying to them, breaching their
13 fiduciary duties, violating the Operating Agreements, intentionally harming the Members' interests,
14 preventing the Members from examining the financial records of the LLCs, and committing
15 numerous other legal wrongs in connection with the foregoing.

16         **PARTIES**

17     13.    GLLP is a California limited partnership. GLLP was formed by one of the eight
18 founding families that owned the Land. GLLP has been a member of Barnes LLC, Lambie LLC, and
19 Kirby LLC since the LLCs were formed. As of formation of the LLCs, GLLP owned 15.625% of
20 Barnes LLC, 12.5% of Lambie LLC, and 12.5% of Kirby LLC. GLLP's ownership interests in each
21 of the LLCs have remained constant since the formation of the LLCs until June 2022, when they
22 increased because GLLP purchased the interest of another Member, Steven Holt. Following this
23 purchase, GLLP currently owns approximately 17.4% of Barnes LLC, 14.6% of Lambie LLC, and
24 14.6% of Kirby LLC, and is now the Member with the largest ownership interest in each LLC.

25     14.    Nominal Defendant Barnes LLC is a California limited liability company. Its sole
26 asset is real property it owns in Solano County. It is managed by Defendant Barnes Corp.

27     15.    Nominal Defendant Lambie LLC is a California limited liability company. Its sole
28 asset is real property it owns in Solano County. It is managed by Defendant Lambie Corp.

1      16.     Nominal Defendant Kirby LLC is a California limited liability company. Its sole asset
2 is real property it owns in Solano County. It is managed by Defendant Kirby Corp.

3      17.     Defendant Barnes Corp is a California corporation headquartered in Alamo,
4 California, that is wholly owned and controlled by the Individual Defendants. In addition to serving
5 as the Manager of Barnes LLC pursuant to Barnes LLC's operating agreement, Barnes Corp is a
6 Member of Barnes LLC. As of formation of the LLCs, Barnes Corp owned 13.5418% of Barnes
7 LLC. The ownership interest has remained constant since the formation of the LLCs.

8      18.     Defendant Lambie Corp is a California corporation headquartered in Alamo,
9 California, that is wholly owned and controlled by the Individual Defendants. In addition to serving
10 as the Manager of Lambie LLC pursuant to Lambie LLC's operating agreement, Lambie Corp is a
11 Member of Lambie LLC. As of formation of the LLCs, Lambie Corp owned 12.5% of Lambie LLC.
12 The ownership interest has remained constant since the formation of the LLCs.

13      19.     Defendant Kirby Corp is a California corporation headquartered in Alamo, California,
14 that is wholly owned and controlled by the Individual Defendants. In addition to serving as the
15 Manager of Kirby LLC pursuant to Kirby LLC's operating agreement, Kirby Corp is a Member of
16 Kirby LLC. As of formation of the LLCs, Kirby Corp owned 12.5% of Kirby LLC. The ownership
17 interest has remained constant since the formation of the LLCs.

18      20.     Defendant Kirk Beebe is an individual residing in Contra Costa County, California.
19 At all relevant times, Kirk has been the CEO of the LLCs. Kirk is, and has been since at least 2011,
20 a director and officer of the Corporate Defendants. Kirk has participated in or directed the wrongful
21 conduct described herein. Kirk is the son of Janet and Kenneth Beebe.

22      21.     Defendant Susan Beebe Furay is an individual residing in Contra Costa County,
23 California. At all relevant times, Susan has been an officer of the LLCs, including as secretary and
24 partner. Susan was a director of the Corporate Defendants since at least in 2011. She is, and has been
25 since at least 2011, an officer of the Corporate Defendants. Susan has participated in or directed the
26 wrongful conduct described herein. Susan is the daughter of Janet and Kenneth Beebe.

27      22.     Defendant Janet Beebe is an individual residing in Contra Costa County, California.
28 At all relevant times, Janet has been an officer of the LLCs, including as president. In her capacity

1  as president of the Corporate Defendants, Janet signed the Operating Agreements of Barnes LLC,
2  Lambie LLC, and Kirby LLC. Janet was a director of the Corporate Defendants since at least in 2011.
3  She is, and has been since at least 2011, an officer of the Corporate Defendants. Janet has participated
4  in or directed the wrongful conduct described herein. Janet is the wife of Kenneth Beebe, and the
5  mother of Kirk and Susan Beebe.

6      23.    Defendant Kenneth Beebe is an individual residing in Contra Costa County,
7  California. He is married to defendant Janet Beebe. At all relevant times, Kenneth has held himself
8  out as managing the LLCs, including sending communications to the Members purporting to act on
9  their behalf and on behalf of the Managers. Kenneth has participated in or directed the wrongful
10 conduct described herein. Kenneth is the husband of Janet Beebe, and the father of Kirk and Susan
11 Beebe.

12     24.    The Corporate Defendants are the alter egos of the Individual Defendants. There is a
13 complete unity of interest and ownership between the Corporate Defendants and Individual
14 Defendants such that separate personalities do not exist. The Corporate Defendants merely exist to
15 attempt to shield the Individual Defendants from personal liability for the wrongdoing that the
16 Individual Defendants have perpetrated through the Corporate Defendants, as alleged herein.

17     25.    Prior to bringing this action, GLLP did not make efforts to secure from the Managers
18 the actions, compensation, and restitution they hereby seek. Because the Managers, and their officers
19 and directors, are the parties that willfully, fraudulently, or grossly negligently committed the
20 harmful actions taken in bad faith in this complaint, GLLP is excused from the requirement to do so
21 pursuant to Section 17709.02(a)(2) of the California Corporations Code. GLLP has delivered to
22 Defendants, including the LLCs, a true copy of this complaint.

23     **JURISDICTION AND VENUE**

24     26.    Jurisdiction is proper in the Superior Court of the State of California, Sacramento
25 County, pursuant to Section 410.10 of the California Code of Civil Procedure, because such Court
26 has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist. The amount
27 in controversy exceeds the jurisdictional minimum of the Court.

28     27.    The Operating Agreements do not contain arbitration clauses.

28.     Instead, Section 17.9 of the Operating Agreements provides:

> Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Sacramento, California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not arbitrated pursuant to an agreement of all Members. Each Member further agrees that personal jurisdiction over it, him [sic] may be effected by service of process by registered or certified mail addressed as provided in Section 17.13 of this Agreement, and that when so made shall be as if served upon it, him personally within the State of California.

29.     This Court has personal jurisdiction over the Corporate Defendants because they are California corporations and have consented to jurisdiction herein via Section 17.9 of the Operating Agreements.

30.     This Court has personal jurisdiction over the Individual Defendants because they each have consented to jurisdiction herein via Section 17.9 of the Operating Agreements. Venue is proper in the County of Sacramento pursuant to agreement of the parties and Sections 395 and 395.5 of the California Code of Civil Procedure.

## FACTUAL ALLEGATIONS

**Formation of the LLCs**

31.     In the 1950s, one family owned the three ranches in Solano County that today are owned by the LLCs (each LLC owns one ranch). Over many years, the ownership of the Land was dispersed among distant relatives through inheritances. The heirs held the Land as tenants-in-common until 1988, when they formed the Limited Partnerships to hold the Land.

32.     In 1988, heirs and Defendants Janet Beebe, Kirk Beebe, Susan Beebe Furay, and Janet's husband, Defendant Kenneth Beebe, proposed creating the Limited Partnerships, purportedly to make management of the Land easier. However, the real reason was to allow Defendants to enrich themselves at the expense of the other families.

33.     Defendants' plan was straightforward—they would draft a set of one-sided partnership agreements for the Limited Partnerships (the "LP Agreements"), which replaced a structure of owners with equal rights proportional to their ownership with a structure that gave Defendants, who only owned roughly 12.5% of each ranch, massive control over the Land and over

1  the other families, while making it effectively impossible for the other families, as limited partners,
2  to sell the entirety of their stakes to anyone that was not already a Member, given (i) various consent
3  rights vested in the general partner, and (ii) a provision to force a selling limited partner to sell at a
4  price much lower than what a third-party buyer is offering them. To ensure that the LP Agreements
5  would be one-sided, Defendants engaged counsel who previously helped Individual Defendants form
6  the Corporate Defendants in 1986 to draft the LP Agreements, so that the counsel's primary loyalty
7  was inherently to Defendants, rather than the Limited Partnerships or the other families. The other
8  families trusted Defendants and believed that Defendants' counsel was looking out for their interests,
9  and thus did not obtain independent counsel.

10       34.     To ensure they retained even more power, Defendants convinced the other families
11  to convey their interests in the Land into the Limited Partnerships, but Defendants conveyed only a
12  de minimis 1% share of their interest as a general partnership interest and kept their other roughly
13  11.5% interest owned directly by the Corporate Defendants. After the formation of the Limited
14  Partnerships, the Land was therefore owned as ~88.5% by the Limited Partnerships and ~11.5% by
15  the Corporate Defendants, who also owned ~1% of the Limited Partnerships and served as their
16  general partners. Defendants did this for a sole purpose—so that if the other families ever attempted
17  to replace Defendants as the general partner, ~11.5% of Defendants' 12.5% total interest would not
18  be subject to the very same LP Agreements that they created and persuaded the other family members
19  to accept. If they were ever removed, Defendants would own almost their entire interest in the Land
20  directly, meaning that they could therefore exert incredible leverage over the Limited Partnerships.
21  Put differently, Defendants knew that the LP Agreements they drafted were so one-sided and unfair
22  that they would themselves never want to be limited partners under such LP Agreements.

23       35.     In addition, although Defendants (through the Corporate Defendants or otherwise)
24  never were limited partners in the Limited Partnerships, they repeatedly told the other families that
25  they were limited partners, including in communications to certain owners in 2002 from Janet Beebe,
26  on behalf of Defendants and with their approval, and around 2009 from Kenneth Beebe, on behalf
27  of Defendants and with their approval.

28

36.     The net result was that Defendants usurped the power to make almost all decisions regarding the Land and made it impossible for the other families to sell their interest to third parties if they disagreed. Defendants knew that once they put their scheme into motion, all they had to do was wait. Eventually, the other families would want or need to sell, and when they did, there would be nobody else to buy their interest other than Defendants, who had a privileged position and more buying power than any of the other families. This would put Defendants in the position to buy them out for cents on the dollar.

37.     Over time, as family members passed away, the Individual Defendants repeatedly made offers to the heirs of these families to buy them out, but none accepted, and they grew impatient at waiting. Accordingly, in the early 2000s, Defendants came up with a new scheme. They would convince the families to convert the Limited Partnerships into LLCs. As part of the conversion, they would attempt to steal almost 12.5% of each ranch from the other families and further solidify their control by sneaking an undisclosed change into the new Operating Agreements. Specifically, under the LP Agreements, the Corporate Defendants could be removed as general partners "with or without cause," whereas in the new Operating Agreements, Defendants removed the "without cause" removal, such that the Corporate Defendants could now be removed as Managers only "for cause."

38.     To imprint their scheme with a veneer of credibility, and to make it less likely that Members would review changes to the Operating Agreements and check the property records to make sure each Member's ownership remained the same, Defendants engaged a large Sacramento-based law firm to serve as both their and the LLCs' counsel. Abusing the trust that other families put in Defendants, Defendants again succeeded in having the other families approve the reorganization without retaining independent counsel.

39.     Defendants' scheme worked because after the conversion into LLCs, the record ownership showed that the Individual Defendants now owned almost 25% of each ranch, almost doubling their interest. And with the "without cause" removal standard gone from the Operating Agreements, the Managers thought they could control the Members indefinitely. The California Secretary of State Limited Liability Company Articles of Organization–Conversion forms by which

1 | the LLCs were registered to do business in California were signed by Janet as the President of Barnes
2 | Corp, Lambie Corp, and Kirby Corp.

3 |     40.     At least since 2001, Janet and Kenneth have made all decisions on behalf of the LLCs
4 | and have held themselves out publicly as the owners of the LLCs and of the Land. At least since
5 | 2011, Janet and Kenneth's children, Kirk Beebe and Susan Beebe Furay, have joined their parents
6 | in making the decisions on behalf of the LLCs and holding themselves out publicly as the owners of
7 | the LLCs and of the Land.

8 |     41.     The Corporate Defendants owe the LLCs, GLLP, and the other Members of the LLCs
9 | fiduciary duties as the managers of the LLCs pursuant to the California Revised Uniform Limited
10 | Liability Act (Cal. Corp. Code § 17704.09) and pursuant to the Operating Agreements (Operating
11 | Agreement for Barnes LLC, § 7.4 ("The Manager shall perform its managerial duties in good faith,
12 | in a manner it reasonably believes to be in the best interests of the Company and its Members, and
13 | with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would
14 | use under similar circumstances."); Operating Agreement for Lambie LLC, § 7.4 (same); Operating
15 | Agreement for Kirby LLC, § 7.4 (same)). Janet, Kirk, and Susan owe the LLCs, GLLP, and the other
16 | Members of the LLCs fiduciary duties as the officers and directors of the Corporate Defendants.
17 | Kenneth owes the LLCs, GLLP, and the other Members of the LLCs fiduciary duties because he has
18 | held himself out as managing the LLCs, including sending communications to the Members
19 | purporting to act on their behalf and of the Managers. The Individual Defendants also owe the LLCs,
20 | GLLP, and the other Members of the LLCs fiduciary duties as individuals who used control over the
21 | LLCs' property to the advantage of themselves at the expense of the LLCs, GLLP, and the other
22 | Members of the LLCs.

23 |     42.     The Individual Defendants also owed fiduciary duties to the LLCs, GLLP, and the
24 | other Members of the LLCs because their conduct in taking advantage of the latter's vulnerabilities
25 | established a confidential relationship under California law. The LLCs, GLLP, and the other
26 | Members of the LLCs are passive members who do not oversee the day-to-day operations of the
27 | Land and are dispersed throughout the country. Many Members are also of advanced age, suffer from
28 | ill health, and lack experience in managing real estate, including the Land. The Individual Defendants

1  have been managing the Land for the families for several decades and so had actual knowledge of
2  GLLP's and other Members' vulnerabilities. Because GLLP and other Members effectively
3  delegated control to the Individual Defendants, Defendants were able to and did in fact take
4  advantage of GLLP and other Members' vulnerabilities for their own benefit, including the
5  imposition of one-sided LP Agreements and, later, Operating Agreements. The Individual
6  Defendants solicited empowerment over GLLP by signing Operating Agreements, purported to act
7  on behalf of the LLCs and Members, and made reassurances that they were acting in the LLCs' and
8  Members' best interests. The Individual Defendants' conduct, coupled with the vulnerability of the
9  LLCs, GLLP, and the other Members of the LLCs, rendered the latter group effectively unable to
10 protect themselves.

11      43.     Given the Individual Defendants' fiduciary duties and managerial roles, GLLP and
12 other Members reasonably relied on the Individual Defendants' expertise and representations
13 concerning the management of the LLCs and purchase offers at issue.

14      44.     Defendants intentionally withheld and misrepresented information from GLLP and
15 other Members about operations, financial affairs, and management of the LLCs, and about offers
16 made on the Land.

17      45.     Because Defendants are fiduciaries of the LLCs, the delayed accrual rule applies,
18 limiting any duty of inquiry into Defendants' actions that comprise the causes of action. Defendants
19 used their positions of trust as fiduciaries, managers of the Land, and "family members" to make the
20 Members believe that they were acting in Members' best interests, often making statements
21 reassuring Members that they were acting in their best interests. As a result, when the Individual
22 Defendants promised Members in 2003 that they would record quitclaim deeds following the
23 conversion of the entities from LPs to LLCs, Members reasonably believed them. Members
24 continued to trust and rely on their relationship with Defendants when Defendants were engaged in
25 conversations with would-be purchasers starting in 2018 to the present and when Defendants made
26 repeated assurances about the arrangement regarding the Lodi Gas Storage ("LGS") lease. At the
27 same time, Defendants concealed and misrepresented material facts, as alleged herein. Defendants'
28 abuse of the Members' trust led to Members' delayed discovery of the true facts. GLLP began to

1 suspect that Defendants were not acting in their best interests with respect to the negotiations to
2 purchase the Land in mid-2021. Thereafter, GLLP reexamined the 2003 conversion and conducted
3 extensive research into the LGS lease to determine that the terms were below market, as alleged
4 herein.

5 **Defendants Breached Their Fiduciary Duties to Members by Their Choice of Attorneys for**
6 **the Limited Partnerships and the LLCs.**

7     46.   In the 35-year history of these entities, Defendants have never hired attorneys to
8 represent the Limited Partnerships or the LLCs that were not conflicted by having a prior relationship
9 with the Individual Defendants.

10     47.     In 1986, a law firm (referred to herein as "Counsel A") helped incorporate the
11 Corporate Defendants and convey the Individual Defendants' interests in the Land into the Corporate
12 Defendants (for example, Counsel A recorded and is named on a grant deed from the Individual
13 Defendants to the Corporate Defendants recorded on May 14, 1986, in Solano County). In 1987 and
14 1988, Counsel A drafted the one-sided LP Agreements, and the signing of the LP Agreements by
15 family members as limited partners took place in Counsel A's offices.

16     48.     The second counsel is an individual (referred to herein as "Counsel B") who has
17 acknowledged that he has worked with Kenneth Beebe for a long time. Additionally, Counsel B also
18 represents the Individual Defendants in their personal capacities. For example, Counsel B recorded
19 and is named on a quitclaim deed from Kenneth Beebe, Trustee of the Ken and Janet Beebe Family
20 Trust, to Kirk and Susan Beebe, for a vacation house, recorded in 2021 in Placer County. GLLP is
21 not aware of any other Members of the LLCs who were represented by Counsel B.

22     49.     The third counsel (referred to herein as "Counsel C") currently represents the
23 Individual Defendants in their personal affairs and has done that for many years. For example, in
24 2008, Counsel C recorded and is named on an estate planning grant deed on the personal residence
25 of Kirk Beebe, recorded in Contra Costa County. On June 1, 2021, Counsel C wrote to a potential
26 buyer of the Land stating, "*I have been asked to represent both the Managing Members of each of*
27 *the limited liability companies and those companies* with respect to all matters involving any
28 potential sale or lease transaction." (Emphasis added.) Further highlighting this conflict and that

1  Defendants had elevated their personal interests at the expense of the Members, the attorney wrote,
2  "*I will work with those entities and their managing members* to make certain that proper
3  consideration is given to any offers which might be proposed, that communications with members,
4  as appropriate, are made; and that a response, if authorized and appropriate, is furnished to you."
5  (Emphasis added.)

6      50.    Defendants breached their duties to Members by hiring attorneys who had conflicted
7  loyalties and were inherently unable to look out exclusively for the interests of the LLCs and their
8  Members.

9      51.    In addition, Defendants and their attorneys have concealed from the Members
10 material information when describing the roles of these attorneys. For example, Defendants never
11 disclosed to the Members the actual conflicts of counsel retained for the LLCs based on that same
12 counsel also representing Kirk Beebe, Susan Beebe, Janet Beebe, and Kenneth Beebe personally and
13 their three Corporations (the Managers). For example, Counsel C, who represents the Individual and
14 Corporate Defendants, is unsuitable to also represent the LLCs in situations where an existing
15 Member (here, GLLP) is openly alleging numerous breaches of fiduciary duties by Defendants, as
16 GLLP has done since mid-2021.

17     52.    Instead, Defendants have described Counsel C as "the LLCs' attorney." For example,
18 Susan Beebe Furay, acting on behalf of Defendants and with their approval, wrote in her email to the
19 Members from June 22, 2021: "This letter was addressed to [Counsel C]—the LLC attorney . . . ."
20 Ms. Furay, acting on behalf of Defendants and with their approval, omitted the fact that Counsel C
21 represents the Managing Members, and some subset of the Individual Defendants in their personal
22 capacities as well, and is conflicted based on these competing interests.

23 **Defendants Have Attempted To Steal GLLP Property.**

24     53.    When Defendants, along with the Members, converted the Limited Partnerships into
25 LLCs in 2003, Defendants and their attorneys represented to all Members that the reorganization of
26 the Limited Partnerships into LLCs would keep the ownership of each family the same as has
27 historically been the case. The other Members approved this reorganization relying on these
28

13

1 | representations. However, Defendants manipulated the reorganization to increase their effective
2 | ownership of the Land.

3 |     54.    As explained above, during the existence of the Limited Partnerships, Defendants
4 | owned the majority of their interest in their land directly, through the Corporate Defendants, and
5 | outside of the Limited Partnerships.

6 |     55.    With respect to the Lambie Ranch and Kirby Hill properties, between 1988 and 2003,
7 | the real property for Lambie Ranch and Kirby Hill was owned 11.61% by the Corporate Defendants
8 | and 88.39% by the Limited Partnerships. With respect to the Barnes Ranch property, the real property
9 | for Barnes Ranch was owned 12.67% by the Corporate Defendants and 87.33% by the Limited
10 | Partnerships.

11 |     56.    In 2003, when the Limited Partnerships were being restructured into LLCs,
12 | Defendants proposed that the Corporate Defendants convey their interests to the LLCs, such that the
13 | LLCs would own 100% of the real property, and that, in exchange, the Corporate Defendants' interest
14 | in each LLC would be increased from ~1% to 12.5% for Lambie LLC and Kirby LLC, and to 13.54%
15 | for Barnes LLC. Defendants and their counsel promised to Members that under this arrangement the
16 | beneficial ownership of the Land post-reorganization would be the same as the ownership of the
17 | Land under tenancy-in-common prior to 1988.

18 |     57.    To execute this change, Defendants agreed with, and represented to, the Members that
19 | the Corporate Defendants would quitclaim the 11.61% that they directly owned in Lambie Ranch
20 | and Kirby Ranch to those LLCs, and the 12.67% that they directly owned in Barnes Ranch to that
21 | LLC, such that the LLCs would own 100% of the Land.

22 |     58.    Defendants' agreement to quitclaim their interests in the Land to the LLCs is reflected
23 | in a memorandum from Counsel B to the Members dated February 24, 2003, regarding the Operating
24 | Agreements of the LLCs, at the specific direction of Kenneth and Janet Beebe (the "Counsel B
25 | Memo").

26 |     59.    The Counsel B Memo shows that the Members accepted Defendants' offer. The
27 | Counsel B Memo detailed this agreement and reflected this understanding, stating that "any property
28 | interests the corporate general partners held outside the partnerships were to be transferred to the

1 limited liability companies" and that "[t]he property records could have been more clear but
2 suggested that the corporate general partners still owned a small percentage of the properties of the
3 three companies. *We cured that problem by having the corporations quitclaim their interests in the*
4 *properties to the limited liability companies*." (Counsel B Memo at 1-2 (emphasis added).)

5      60.     The Counsel B Memo represented to the Members that Defendants did not retain any
6 ownership interests directly. However, despite this agreement and representation to the Members,
7 Defendants never intended to quitclaim the Corporate Defendants' interests and Defendants
8 intentionally failed to record any such quitclaims. Defendants executed this scheme so that in the
9 future, when none of the Members or their heirs recalled the agreement or the Counsel B Memo,
10 Defendants could claim that the interests that should have been quitclaimed were still owned by
11 Defendants.

12      61.     As a result, as late as July 2022, the real property records showed that the Beebe-
13 owned Lambie Ranch Corporation is the record owner of 11.61% of Lambie Ranch directly. That is
14 in addition to the Lambie Ranch Corporation owning 12.5% of the applicable LLC. That means that
15 instead of being record owner of 100% of the ranch, the LLC is only record owner of 88.39% of the
16 ranch. It also means that the Individual Defendants are now a record owner of a total of 22.7% of the
17 ranch (11.61% + 12.5%*88.39%), rather than the 12.5% they should own.

18      62.     The same is true for Barnes Ranch. The Individual Defendants should own
19 approximately 13.5% of the ranch through their interest in the applicable LLC. But the real property
20 records show that they are a record owner of 12.67% directly through the Barnes Family Ranch
21 Corporation, in addition to another 11.82% (13.54%*87.33%) through the Barnes LLC, for a total
22 of 24.49%.

23      63.     As a result, the of-record ownership of all other Members of Barnes LLC and Lambie
24 LLC was approximately 10% lower than it should have been.

25      64.     On July 18, 2022, GLLP delivered a letter to Defendants that among other things
26 identified this issue and demanded that Defendants immediately correct the record ownership. To
27 ensure that Defendants could not continue their scheme, GLLP also alerted other Members to these
28 facts. Once their scheme was exposed, Defendants had no choice other than to admit this had

1 | happened and agree to fix the issue, though Defendants claimed to the Members that this was nothing
2 | but a clerical error. As explained below, the facts show otherwise.

3 |     65.    The same scheme occurred on the Kirby Hill property, but it was uncovered in 2006
4 | by LGS, a new tenant of the Kirby Hill property. As part of its due diligence when signing and later
5 | amending its lease and securing financing for its gas storage facility, LGS discovered that the
6 | property records showed that Kirby LLC did not own 100% of the fee as it should have. It appears
7 | that LGS's discovery forced Defendants to fix this discrepancy in ownership by doing what they
8 | promised to do on all three ranches back in 2003, i.e., recording a quitclaim that conveyed the extra
9 | record ownership from Kirby Corp to Kirby LLC.

10 |     66.    Given that Defendants have always run all three ranches as a single operation, if the
11 | unrecorded quitclaims had been a mere clerical error, this would have led Defendants to check
12 | whether the same issue existed on Barnes Ranch and Lambie Ranch and, if so, to fix the issue on the
13 | other two ranches at that time as well. Instead, Defendants recorded the quitclaim on Kirby Hill on
14 | March 9, 2006, never told the Members about any of this, did nothing about Barnes Ranch and
15 | Lambie Ranch, and continued to maintain their scheme on those two properties.

16 |     67.    There is additional evidence that Defendants' failure to record the quitclaim deeds,
17 | which would thereby allow them to claim in the future that they own land that rightfully belonged to
18 | the LLCs (and their Members, indirectly) was willful. Since 2004 (well after the quitclaims should
19 | have been recorded), Defendants executed documents representing that Lambie Ranch is owned by
20 | both Lambie Corp and Lambie LLC. If Defendants believed they had recorded the quitclaims as they
21 | were supposed to, they would have signed only as if Lambie Ranch were owned by Lambie LLC.
22 | Defendants' conduct in this regard establishes that Defendants knew that the quitclaim deeds on
23 | Lambie Ranch were not recorded and evidences their intent to continue to claim in the future that
24 | they own part of Lambie Ranch directly through Lambie Corp.

25 |     68.    For example, in October 2004, a gas company entered into a lease between the gas
26 | company and both Lambie LLC *and* Lambie Corp, and Janet Beebe signed on behalf of both Lambie
27 | LLC *and* Lambie Corp, separately for each, using a separate signature block. If Defendants believed
28 |

1  they had properly quitclaimed Lambie Ranch to Lambie LLC in 2003, Defendants would only have
2  signed the lease between the gas company and Lambie LLC—not also Lambie Corp.

3      69.     Likewise, in March 2006, a gas company quitclaimed the rights to its lease to Lambie
4  LLC *and* to Lambie Corp. Similarly, in April 2006, another gas company quitclaimed the rights to
5  its lease to Lambie LLC *and* to Lambie Corp. The quitclaim deeds were prepared by and bear the
6  name of Counsel C, counsel to Defendants. If Defendants and their counsel believed that they had
7  properly quitclaimed Lambie Ranch to Lambie LLC in 2003, Defendants and their counsel would
8  have drafted the quitclaims as only being to Lambie LLC—*not* also Lambie Corp. Quitclaim deeds
9  are always drafted as being to the current record owner of the property—not to whoever originally
10  signed the lease that is being quitclaimed.

11      70.     Similarly, in 2009, the State of California filed an eminent domain lawsuit against the
12  parties it believed had interests in a portion of Lambie Ranch. In its complaint, the State listed two
13  entities as "Owners" of the fee interest—Lambie LLC and Lambie Corp. After litigation, including
14  expert testimony, the court entered a condemnation award in 2010 to *both* Lambie LLC and Lambie
15  Corp, and Kirk Beebe signed the stipulation for the judgment in his capacity as both the "Managing
16  Member" of the LLC and the VP of Lambie Corp, while Counsel C also signed the stipulation in his
17  capacity as both the attorney for the LLC and for Lambie Corp. The entire extensive eminent domain
18  proceeding was a recurring reminder to the Individual Defendants that the LLC was not the record
19  owner of 100% of the fee interest as it should have been, and that the Individual Defendants should
20  cause the Corporate Defendants to quitclaim the missing interest to the LLC, and notify the state that
21  following such a quitclaim, Lambie LLC owns 100% of the fee interest. Defendants never did so.

22      71.     The Members relied on Defendants' representations that the quitclaim deeds were
23  recorded, particularly given Defendants' fiduciary responsibilities, and had no reason to check
24  property records. Having relied on Defendants' representations, GLLP and Members proceeded to
25  believe that the beneficial ownership of the Land was in the same proportions as the prior tenancy-
26  in-common interests. GLLP and other Members had no reason to suspect that Defendants would not
27  record the quitclaim deeds and would conceal this information from GLLP and other Members.

28

1  72.  Defendants intentionally concealed the events described above so that the Members
2  had no reason to suspect that the quitclaim deeds were not recorded.

3  73.  This issue was discovered only in 2022, when Defendants' conduct caused GLLP to
4  grow suspicious of their management of the LLCs, conduct independent analysis of the situation,
5  and discover this fraud.

6  74.  On July 18, 2022, GLLP alerted other Members of the LLCs to these facts, and
7  confronted Defendants about them.

8  75.  On July 28, 2022, Counsel C, at the direction of and on behalf of the Manager
9  Defendants, assured GLLP that the "matter will be administratively corrected," but despite this
10  assurance, the Manager Defendants again failed to record the quitclaim deeds.

11  76.  As the issue was still not remedied several weeks later, GLLP again inquired about
12  the quitclaims, and, on September 14, 2022, Kirk and Susan Beebe, on behalf of all Defendants and
13  with their approval, again falsely assured the Members that Defendants would fix the recording issue.
14  Notably, Kirk and Susan Beebe, on behalf of all Defendants and with their approval, sent the
15  Members a letter attaching a September 13, 2022 letter from Counsel C, which attempted to
16  downplay the issue by framing the recording issue as a "mistake" that was not "substantive," and
17  attempted to further delay and avoid having to fix the recording issue by falsely assuring the
18  Members that the "record title mistakes as to Barnes Family Ranch and Lambie Ranch will be
19  corrected as part of this process of amendment and restatement" to the Operating Agreements—
20  despite the aforementioned "amendment and restatement" having nothing to do with the quitclaim
21  record deed issue at all. Rather, this was a delay tactic to avoid having to record the quitclaim deeds.

22  77.  As discussed in paragraph 216, on September 24, 2022, Kirk informed the Members
23  that the Amended Operation Agreements had been adopted.[1] However, contrary to the assurances
24  from Defendants that the quitclaim deeds would be recorded "as part of this process of amendment
25  and restatement," as of the filing of this complaint, more than a month later, Defendants have not
26  provided the Members with the recorded quitclaims and according to the Solano County Public

27

28  [1] Paragraph references throughout this Complaint are meant to be exemplary and not comprehensive.

1 Records Search website, which includes all documents recorded through and inclusive of
2 November 2, 2022, the quitclaims have not been recorded.

3 **Defendants Concealed Changes to the Operating Agreements.**

4       78.       When the Members converted the Limited Partnerships to the LLCs in 2003,
5 Defendants misrepresented and failed to disclose to the Members a significant change to the
6 Operating Agreements that improperly expanded the Managers' rights and further solidified
7 Defendants' domination of the other Members.

8       79.       Section 12.1 of the 1988 LP Agreements, which governs the removal of Defendants
9 as the general partner, provided that the general partner may be "removed as general partner with or
10 *without cause*" with the consent of a Majority in Interest of the Limited Partners. (Emphasis added.)
11 This provision was quietly changed in the 2003 Operating Agreements to read "Any Manager may
12 be removed at any time for cause by the affirmative vote of a Majority in Interest"—i.e., the "without
13 cause" removal was stripped out. Once "without cause" was removed, and with "cause" intentionally
14 undefined, Defendants further secured their control over the LLCs' affairs. By making this change,
15 Defendants have sought to make themselves extremely difficult to remove, even though they only
16 own approximately 12.5% of each LLC.

17       80.       The 2003 restructuring was framed to the Members as a change of corporate form
18 with corresponding procedural changes to the governing documents, but without any significant
19 changes to the rights of the limited partners/members and general partners/managers. Defendants
20 concealed from the Members that the new Operating Agreements would expand Defendants' control
21 of the LLCs. Defendants executed this plan by engaging counsel from a large law firm whose primary
22 loyalty is to the Individual Defendants, rather than the Limited Partnerships or the other families,
23 and having that counsel deliver new Operating Agreements to the members, expecting the other
24 families to assume the changes were appropriate and execute the agreements without asking
25 questions. Indeed, that is what happened.

26 **Defendants Failed To Direct LGS To Distribute Rents Directly To the Members.**

27       81.       Since 2005, the Kirby Hill property has been leased for gas storage purposes to LGS,
28 and LGS has been paying regular royalties to Kirby LLC.

82.    The Operating Agreements § 9.3.1 require that "[t]he Manager shall direct all operators of oil and gas operations on the Property to distribute Royalties directly to the Members in proportion to the Company Percentages."

83.    Defendants intentionally and willfully failed to do so. To preserve and enhance their domination over the Members, Defendants prevented the Members from receiving income frequently and directly from LGS. Instead, Defendants retained all income at Kirby LLC, without any oversight and corporate governance, and distributed such income only when they wanted. When the income was distributed, it would come at the direction of Defendants, through checks signed by the Individual Defendants. This rendered the Members dependent on Defendants for both money and information about LGS.

**Defendants Committed Gross Negligence in Negotiating Kirby LLC's Lease with Lodi Gas Storage.**

84.    In 2005, Kirby LLC signed a gas storage lease with LGS, which was later renegotiated and restated by the parties in 2007.

85.    At the time, LGS was operating one gas storage facility near Acampo in San Joaquin County. LGS offered the following terms to local landowners back in 2000: *"Lodi Gas Storage is offering the 65 owners of the land over the 1,450-acre underground field a $2,000 signing bonus and $317 per acre in the project's first year, with annual payments escalating up to $1,260 an acre in the eighth year, according to Vice President Scott Wilson. After that, annual payments go up to 4 percent per year. The contracts would be up for renewal in 50 years." See Lodi Gas Storage Plan Drives Wedge Between Neighbors*, Herum Crabtess Suntag (Mar. 25, 2000), https://herumcrabtree.com/2000/03/25/lodi-gas-storage-plan-drives-wedge-between-neighbors/ (emphasis added).

86.    GLLP does not know how much Kirby LLC receives from LGS under its lease because Defendants have unlawfully refused to provide the Members with any financial statements or books and records, as alleged *infra*. However, the K-1 Form received by GLLP from Defendants for Kirby LLC states that "[a]ggregate gross receipts for AMT exclusion" attributed to GLLP's 12.5% interest in Kirby LLC in 2021 were $151,066. This means that total gross annual receipts by

Kirby LLC should be approximately $1,210,000 ($151,066/0.125). GLLP believes that Kirby LLC receives roughly $25,000 in annual lease income from its agricultural tenant, which would mean that the maximum possible rent received from LGS is approximately $1,185,000 ($1,210,000 - $25,000).

87.     LGS's Kirby Hill facility commenced operations in 2007. Therefore, 2021 is the fifteenth year of LGS operations in Kirby Hill. If the information about LGS stated in paragraphs 85 and 86 is accurate, by year fifteen, LGS was meant to be paying the landowners at the Acampo facility at least $2,404,207 in rent (1,450 acres multiplied by $1,260/acre, increased by 4% per year between years 8 and 15). This number could be higher since some of the Acampo landowners may have negotiated rents higher than those stated in the article above.

88.     The Acampo facility and Kirby Hill facility have roughly equal capacity. However, despite this, Kirby LLC appears to be receiving at best 49% of the rents that Acampo landowners are receiving, and possibly an even smaller fraction (if the rents paid to Acampo landowners are higher than the $2,404,207 calculated in paragraph 87).

89.     Moreover, given the timing of the signing of the lease, and the negotiating leverage that Kirby LLC should have had when signing its lease, the opposite should have been the case. Kirby LLC should have been receiving much higher rents than the Acampo landowners.

90.     That is because Acampo leases were signed in 2000, when natural gas was trading about $2.50/MBTU (Million British Thermal Units), and following a period of two years of extremely low volatility in natural gas prices. In contrast, the restated Kirby LLC lease was signed in 2007, when natural gas was trading at about $7.50/MBTU, following one of the most volatile periods in the natural gas market in history.

91.     Gas storage facilities make money by buying gas when it is cheap (typically in the summer), storing it, and selling it back when it is expensive (typically in the winter). The profitability of such facilities is therefore a function of the difference between gas prices throughout a year. In the 24 months prior to signing the Acampo leases, natural gas prices ranged between $1.70/MBTU and $2.50/MBTU, a spread of $0.80/MBTU. In the 24 months prior to signing of the Kirby LLC lease, natural gas prices ranged between $4.50/MBTU and $13.50/MBTU, a spread of $9.00/MBTU,

1 | i.e., 11.25 times more. This means that natural gas storage became immensely more profitable by the
2 | time the Kirby LLC lease was signed.

3 |     92.    The profitability of natural gas was clearly evident from the fact that on July 27, 2007,
4 | Buckeye Partners, L.P., announced that it agreed to acquire LGS from its previous owners, for cash
5 | consideration of approximately $440,000,000.

6 |     93.    Furthermore, Kirby LLC owns 94% of the applicable reservoir (with the remaining
7 | 6% owned by a single other landowner). Thus, Kirby LLC should have had an immense amount of
8 | negotiating leverage to receive higher rents than the Acampo owners because the latter is a
9 | fragmented group of at least 56 landowners.

10 |     94.    Defendants have significant expertise in real estate and have used their expertise to
11 | dominate the other Members and control Kirby LLC. Kirk Beebe is a commercial real estate broker
12 | at CBRE. Susan Beebe Furay's husband is also a commercial real estate broker. Defendants as a
13 | group have repeatedly represented to the Members that they have expertise in real estate—in fact,
14 | this was one of the reasons why the Members trusted and placed their faith in Defendants. In addition,
15 | Defendants have represented that they have met with consultants and others knowledgeable in this
16 | field and area in connection with the LGS lease. Kirby LLC is paying Kirk Beebe a 4% annual
17 | commission on the income from the LGS Lease, which Defendants have stated to the Members is
18 | for Kirk's efforts in negotiating the lease.

19 |     95.    The facts stated above were available to Defendants upon exercise of reasonable
20 | diligence and effort consistent with their fiduciary duties when they were negotiating the lease.
21 | Defendants should have known those facts and used them to negotiate for Kirby LLC terms that were
22 | significantly better than those LGS appears to have agreed with Acampo landowners. Instead,
23 | Defendants accepted rent that was at best 49% of what LGS pays for Acampo. Given these facts,
24 | Defendants' conduct amounted to a breach of their fiduciary duties and gross negligence.

25 |     96.    As a result of Defendants' unlawful conduct as alleged above, Kirby LLC was
26 | significantly damaged because it lost out on higher rent payments during the most profitable period
27 | in the gas storage market, which was the period from 2004 through 2014. This period was signified
28 | by the sale of LGS for $440,000,000 to Buckeye in 2007, and then ended in 2014 with the sale of

1  LGS to a different entity (Brookfield) for $105,000,000. Since 2014, the gas storage industry has
2  been much less profitable due to the fracking revolution in the United States, which made gas cheaper
3  and less volatile. Thus, as a result of Defendants' gross negligence, Kirby LLC missed out on the
4  most profitable decade in history in the gas storage market.

5  **Defendants Intentionally Misled the Members Regarding Future Prospects for Rent**
6  **Payments Under the LGS Lease.**

7      97.     After negotiating the LGS Lease in violation of their duties to the LLCs, Defendants
8  further harmed the Members again around 2021 and 2022, when they misled the Members by
9  claiming that the rent under the lease may be increased by more than its scheduled 4% per year
10  increase, when they knew or should have reasonably known that the opposite was likely the case.

11     98.     In his December 16, 2021 letter to the Members, Kirk, on behalf of all Defendants,
12  and with their approval, wrote:

13          Enclosed please find a check for the Kirby Gas Storage Base rent.
            The check represents a 4% increase over the amount you received
14          last year. *We are hopeful that the increased volatility in gas prices
            will also result in an increase in the check we will be getting mid-*
15          *year as well. Regarding the Kirby facility we are presently in
            discussions with the operator on whether an increase in the rental*
16          *rate is warranted at this time.* The lease calls for such a discussion to
            occur at this point. The way the lease is structured we will either
17          obtain a negotiated increase based on the increase in the value of
            storage or the rental rate will continue to increase at 4% annually,
18          whichever is greater.

19  (Emphasis added.)

20     99.     Kirk's statement, on behalf of Defendants and with their approval, was false, and he
21  either knew it or acted recklessly in making the false representation. Defendants' duties to the
22  Members includes keeping themselves reasonably updated on LGS's business operations given that
23  the LGS lease constitutes 95% of the LLCs' income. In both its bondholder financial statements and
24  in its reports to regulatory agencies, both of which are publicly available, LGS has stated since at
25  least early 2021, that due to the fracking revolution and increasing regulatory costs in California, the
26  gas storage market has become much less profitable, and that LGS therefore *"has been actively
27  pursuing landowners to which they lease ground rights to renegotiate the leases. At the time the
28  leases were entered into, the market conditions were drastically different. Because of the cost*

1  *associated with the leases, LGS will continue to experience negative income. If the leases are not*
2  *renegotiated and the market continues in this direction, it is possible that LGS will not exist in the*
3  *near future.*" Put plainly, LGS has represented that it may go bankrupt.

4      100.    In addition, Defendants knew that LGS was sold for $440 million in 2007 and then
5  sold again for $105 million in 2014, given that they referred to the new owner in a letter to the
6  Members around 2016. Defendants therefore knew based on these sale prices alone that the
7  conditions in the gas storage market today are not anywhere near as favorable as when the LGS-
8  Kirby LLC lease was signed, and that it is extremely unlikely, if not impossible, that "*an increase in*
9  *the rental rate is warranted.*" (Emphasis added.)

10     101.    In addition, LGS has only two gas storage projects: Acampo and Kirby Hill, and they
11 are roughly the same size. However, the largest landowner on the Acampo project owns less than
12 20% of the Acampo acreage, whereas Kirby LLC owns 94% of the Kirby Hill acreage. Kirby LLC
13 is therefore almost certainly the largest rent expense item for LGS. Given that and the statements by
14 LGS alleged above, it is unlikely that LGS would not have spoken to Defendants about the need to
15 restructure and dramatically reduce the lease payments. Regardless, even if LGS never spoke to
16 Defendants about this, Defendants' failure to keep track of LGS's operations and realize that the
17 lease income is at risk is a clear violation of Defendants' duties to the Members, particularly given
18 that 95% of the LLCs' income comes from this single lease.

19     102.    The conduct of Defendants referenced in this section is particularly egregious because
20 many Members rely on income from the LLCs for their living expenses, and the LLCs' income
21 essentially depends solely on the LGS payments, as those produce roughly 95% of the total income
22 of all three LLCs. Further, Kirk's letter referenced in paragraph 98 is outright unconscionable, in that
23 not only did Kirk fail to inform the Members that the lease income might be cut, but he did the exact
24 opposite and suggested that the income may increase more than the scheduled 4% annual increase.

25     103.    This is similar to Defendants' other misrepresentations creating false hope regarding
26 the likely profitability of the Land, such as Defendants' statements to the Members about speculative
27 possibility of significant income from carbon sequestration or blue hydrogen, all of which are
28

1 intended to ensure that the Members will not change their mind and sell the Land, which would
2 expose and interrupt Defendants' scheme to eventually buy them out on the cheap.

3 **Defendants Failed to Comply with their Obligations to Provide Records to GLLP.**

4      104.    Since the formation of the Limited Partnerships in 1988, Defendants have withheld
5 from the other families financial and corporate records of the Limited Partnerships and of the
6 successor LLCs.

7      105.    The Operating Agreements require "[u]pon the request of any Member . . . for
8 purposes reasonably related to the interest of that Person as a Member or Transferee, the Manager
9 shall promptly deliver to the requesting Member or Transferee, at the expense of the Company, a
10 copy of the information required to be maintained hereunder." Operating Agreements § 15.2. Such
11 information includes copies of the LLCs' tax returns and copies of the LLCs' financial statements.
12 *Id.* §§ 15.1.4, 15.1.6. The Operating Agreements further require that "[t]he Manager shall provide
13 such financial and other information relating to the Company . . . as a Member may reasonably
14 request." *Id.* § 15.4.

15      106.    In addition, Sections 17704.10(b)(1) and 17701.13 of the California Corporations
16 Code provide the Members of the LLCs with statutory rights to examine the books and records of
17 the LLCs.

18      107.    On July 18, 2022, GLLP sent Defendants a demand to receive documents and
19 information pursuant to Sections 15.2 and 15.4 of the Operating Agreements and its statutory books
20 and records rights under the California Corporations Code, for purposes of assessing the financial
21 and legal status of the LLCs. The request also stated that GLLP could accept delivery of the requested
22 documents by either providing a data room link that enabled Defendants to upload these documents
23 or by inspecting and copying the documents in physical form at a pre-agreed time and location.

24      108.    Rather than making available to GLLP copies of the requested information as
25 required, Defendants refused to provide any books or records, and concocted unlawful excuses for
26 such behavior with their attorney.

27

28

1    109.    This has prevented GLLP from understanding the actions Defendants have taken with
2  respect to the LLCs, understanding the value of the LLCs, and making fully informed decisions about
3  its interests in the LLCs.

4    110.    Indeed, Defendants have been intentionally and wrongfully withholding LLC records
5  from Members for many years. One example was when one of the beneficial owners of GLLP passed
6  away in the 2000s, and GLLP therefore needed to review the LLCs' tax returns for the prior three
7  years for estate purposes. When GLLP asked for these documents, Defendants provided the tax
8  returns only to GLLP's attorneys, required the attorneys to destroy them within five days, and forbid
9  the attorneys from sharing them with GLLP, in clear breach of Defendants' duties under both the
10 Operating Agreements and the Law. GLLP was not even requesting any particularly confidential
11 information—just the LLCs' tax returns for the last three years.

12    111.    Another example was in 2009 when Defendants required a principal of GLLP to sign
13 an onerous non-disclosure agreement with a 46-year term to be permitted to review information
14 related to the gas storage lease with LGS, despite GLLP's right to review this information pursuant
15 to Section 15.4 of the Operating Agreements. Among other things, the non-disclosure agreement
16 included the following outrageous clause with respect to the documents reviewed: *"Neither*
17 *Principal, nor any of its advisors shall directly or indirectly communicate with any tenants, property*
18 *manager, leasing agents, service contracts, attorneys, lien holders or other parties with any interest*
19 *in or contractual relationship affecting the Property."*

20    112.    Defendants have hid the books and records of the LLCs from the Members, and have
21 violated the Operating Agreements and California law by refusing to provide books and records to
22 GLLP.

23 **Defendants Breached Their Fiduciary Duties, Lied, and Concealed Material Information**
24 **Regarding Offers To Purchase the Land.**

25    113.    Defendants breached their fiduciary duties, concealed material facts, and made
26 material misrepresentations regarding generous purchase offers for the Land that could have returned
27 significant profits to the LLCs and its Members. The Operating Agreements dictate that Defendants
28 "shall not take any action outside the ordinary course of business . . . without first giving the other

1  Members at least ten (10) days' written notice of the proposed action." Operating Agreements
2  § 7.3.4. Pursuant to this clause, and in accordance with their fiduciary duties, Defendants had an
3  obligation to present purchase offers to the Members, to provide accurate information to the
4  Members about the offers and value of the Land, and allow the Members to make informed decisions,
5  discuss them with other Members, provide input to the Managers, and vote on material transactions.

6      114.    In early 2018, Flannery Associates LLC ("Flannery"), another landowner in Solano
7  County, made an offer to Defendants to purchase the land held by Barnes LLC and Lambie LLC at
8  roughly 125% of fair market value. This offer was addressed to the Individual Defendants, because
9  in communications with Flannery's broker representative, Kirk Beebe suggested through
10  concealment that Defendants were the only owners of the LLCs. Defendants did not disclose
11  Flannery's offer to the Members, despite their duty to do so. Defendants never meaningfully engaged
12  with Flannery on this offer and by letting it expire, effectively declined it on behalf of the LLCs and
13  its Members.

14      115.    In late 2018, Flannery again offered to purchase the land held by all three of the LLCs,
15  this time at roughly 200% of fair market value. At this time, Flannery still assumed that the LLCs
16  were owned solely by Defendants, so the offer was made solely to Kirk Beebe. Defendants again did
17  not tell the Members that the LLCs had received this second offer from Flannery, despite a duty to
18  do so. Defendants again did not meaningfully engage with Flannery on this offer and by letting it
19  expire, effectively declined it on behalf of the LLCs and its Members.

20      116.    In receiving and considering the Flannery offers, Defendants were not looking out for
21  the LLCs' and Members' best interests because they were conflicted.

22      117.    First, Defendants would make less money from selling their 12.5% interest, even at
23  200% of fair market value, than they would if they first bought out the other Members for cents on
24  the dollar as they planned, even if they then had to later sell their 100% interest for only fair market
25  value.

26      118.    Second, because too many of the Members who were involved in the 2003
27  reorganization are still alive (though some have passed), Defendants could not take their larger share
28  of the sales proceeds on Barnes and Lambie, as outlined, for example, in paragraphs 45, 53-77, as

1  they hoped to be able to do in the future when Members' interests fracture further and the next
2  generation does not remember who owned how much and why.

3       119.    Third, any sale of the Land would likely lead to a full distribution of the proceeds and
4  winding down of the LLCs. The disclosure of the LLCs' books and any possible audit that the
5  winding down may require threatened to reveal Defendants' mismanagement, self-dealing, and
6  fraud.

7       120.    Although Defendants represented themselves as the sole owners of the LLCs,
8  Flannery investigated the title records of the Land held by the LLCs, and learned that at least as of
9  1988, Defendants owned only an approximately 12.5% interest. Based on its experience in
10  successfully purchasing other similar properties, particularly in situations where extended families
11  owned a ranch together through fragmented ownership, Flannery was surprised that the LLCs never
12  wanted to at least discuss the possible sale. Flannery identified the individuals who conveyed their
13  interests into the Limited Partnerships in 1988, presumed them or their heirs to be the Members of
14  the LLCs, and found their contact information.

15      121.    In February 2020, suspecting that Defendants were not communicating its purchase
16  offers to the other Members of the LLCs, Flannery prepared a new offer at 250% of fair market value
17  and started calling the presumed Members. The calls essentially included a statement to this effect:
18  *"My client would like to make another offer on the ranches owned by the LLCs. What is a good
19  address for you to send the offer to?"*

20      122.    In several of the initial phone calls, the Members immediately reacted with statements
21  to the effect of: "What do you mean another offer? Was there a previous offer?" The majority of the
22  Members that Flannery contacted provided Flannery with their contact information. Some of the
23  Members even volunteered contact information for other Members who they thought would want to
24  see the third Flannery offer, and asked Flannery to send them the offer as soon as possible.

25      123.    GLLP was one of the Members who received such phone calls. This was the first time
26  that GLLP heard about any offers on the Land.

27      124.    However, within hours, on February 5, 2020, Flannery received a call from Kirk
28  Beebe, acting on behalf of Defendants and with their approval, who was enraged that Flannery called

1  any of the Members.  Kirk Beebe, on behalf of Defendants and with their approval, insisted that

2  Flannery stop contacting the Members, and instead have any discussions regarding the potential

3  purchase only with him or the LLCs' counsel (who, as GLLP later learned, was also his personal

4  counsel). Kirk based this direction on the claim that because the LLCs were represented by Counsel

5  B, and Flannery's was represented by its attorney, Flannery's attorney could not ethically contact the

6  Members—even though the Members were unrepresented. Counsel B was copied on Kirk's email

7  below and later took positions consistent with this prohibition in the communications with Flannery's

8  attorney. Kirk, on behalf of Defendants and with their approval, followed up in an email on February

9  6, 2020, and stated (Counsel B was cc'd on this email):

> Per my phone conversation last night as the managing member of the LLC's please stop calling the other members of the LLC's for our various properties. Going forward all correspondence needs to be directed though our attorney [Counsel B] who is with [Counsel B's firm] in Sacramento Ca.

13  125.   Kirk Beebe's direction was unlawful and in violation of duties owed to the Members.

14  There is no prohibition on contacting the Members under the law or Operating Agreements,

15  especially given that the Members were not personally represented by Counsel B and Defendants

16  were not fully or accurately communicating Flannery's offers to Members.

17  126.   On February 5, 2020, the same day Kirk Beebe called Flannery and the day before he

18  wrote to Flannery, Susan Beebe, acting on behalf of Defendants and with their approval, wrote to the

19  Members:

> Today, two family members received a phone call about a purchase offer for the ranches – These are unsolicited phone calls by a man named Rich Melnick, an attorney representing the Flannery Associates. We have had prior contact from them but they will not supply any information about who the people are behind the inquiring company or if they are a foreign entity which could cause extensive legal problems for the family, and/or what their source of money or any other details are surrounding their interest in the ranches. The only information we have is that there is a P.O. box up in Folsom that is maintained by Flannery Associates. To no avail, we have even had a private investigator try to dig up some information on Flannery. Now it seems they are trying to contact various LLC members. Kirk is contacting our lawyer, [Counsel B] in the morning so that further contact must be directed through them and to cease the harassment of LLC members.
>
> If you too have received a call, please let us know.

> If anyone else receives a call, please don't respond and have him contact Kirk at the following number. 925-984-6138.
>
> We will keep you update to date [sic] on the situation.

127.    This false and misleading communication was intended to make it seem like there was something improper about Flannery and its offer and the fact that Flannery was reaching out directly to the Members with this offer, even characterizing the calls as "harassment," and mentioning that Kirk was contacting a law firm about directing Flannery to stop contacting the Members, even though there was nothing improper about that under the Operating Agreement or law, and Counsel B did not represent the Members in their personal capacities.

128.    Additionally, Susan, acting on behalf of Defendants and with their approval, falsely stated that Flannery refused to say whether its investors were "foreign," and made other misleading statements, intended to confuse and frighten the Members, such as mentioning that the buyer may be "a foreign entity which could cause extensive legal problems for the family." In fact, Flannery had previously told the Individual Defendants, including Kirk Beebe, that its investors were U.S. investors. Additionally, even if the buyer were foreign, there was no basis to believe that there would be "extensive legal problems for the family" by selling to foreign investors. Susan Beebe, acting on behalf of Defendants and with their approval, intentionally and without any basis invoked the "foreign entity" concept to frighten the Members.

129.    Further, Susan Beebe's email also references Flannery "not supply[ing] any information about who the people are behind the inquiring company . . . and/or what their source of money or any other details are surrounding their interest in the ranches." This was again false, as Defendants were aware that the venerable First Republic Bank had vouched for Flannery and represented that it had the cash on hand to fulfill its all-cash offer. All these statements by Susan were intended to discourage the Members from entertaining the offers for the benefit of Defendants.

130.    At the time, Flannery decided to respect Kirk's request to not contact the Members, and on February 6, 2020, Flannery delivered a written offer at 250% of fair market value only to Kirk and his legal counsel (Counsel B). The offer once again confirmed that Flannery's capital came

1  from U.S. investors. Importantly, the offer permitted Kirby LLC to retain the income from the LGS
2  gas storage lease on the property for the remainder of its term which goes through 2055.

3          131.    On February 7, 2020, Flannery followed up with an email to Counsel B, stating that
4  because Kirk had asked them to hold off on speaking with Members they only sent the offer to Kirk
5  and Counsel B, and asking Kirk's counsel to ensure that all Members received the offer within the
6  next few days. In response, Counsel B, acting on behalf of and at the direction of Defendants,
7  deflected, claiming that Kirk would communicate with the Members but the timing was unknown,
8  and that it would not be counsel's place to communicate directly with Members or authorize
9  correspondence (even though the same Counsel B had no issues sending the members the Counsel
10 B Memo referenced in paragraphs 58-60). Counsel B also said that he "fully expect[ed] members
11 will now be contacting Kirk for a status report." Over the next month, Flannery repeatedly urged
12 Counsel B to distribute the offer to Members for a vote. Each time, the attorney, acting on behalf of
13 and at the direction of Defendants, claimed that Kirk was in charge of doing that. However, neither
14 Kirk nor the other Individual Defendants sent Flannery's now third offer to the Members.

15         132.    On March 2, 2020—approximately a month after the written offer at 250% of fair
16 market value was made—Flannery followed up with Kirk's attorneys regarding the status of the
17 offer, given that Flannery had received no communication from Kirk, the other Individual
18 Defendants, or Counsel B, even though the offer was expiring in several days on March 6, 2020.

19         133.    In response to that follow-up, on March 2, Counsel B, acting on behalf of and at the
20 direction of Defendants, told Flannery that the "owners of these properties are not interested in selling
21 at this time"—even though in reality, at this point, the Members had not even been informed of the
22 offer, let alone voted on whether to accept or reject the offer.

23         134.    In response to this rejection, on March 12, a non-attorney representative of Flannery
24 (to honor Kirk's demand that its attorney should not contact unrepresented Members, even though
25 such request was unlawful) sent a courtesy letter to the Members thanking them for their time in
26 considering the offer, attaching the offer that had been purportedly rejected, acknowledging Flannery
27 was "notified by [Counsel B] that Mr. Beebe informed him that [they] as the owners of the LLCs

28

1  have voted to decline the offer," and inviting them to contact him if they changed their mind about
2  the offer in the future.

3      135.    On March 13, Counsel B emailed Flannery's attorney to scold Flannery for sending
4  the communication referencing a Member vote. The attorney first said:

> I was just forwarded a copy of a letter from Thomas Mather [the
> Flannery representative] to the LLC owners stating that I said the
> owners had voted not to sell. Please read my email below. It says they
> were not interested in selling at that time. I have no idea whether they
> made a formal vote and I did not suggest otherwise. This
> communication to the owners misstating a communication is most
> unfortunate and counterproductive.

9      136.    This email exposed the fact that Defendants rejected the offer without informing the
10 Members or calling a vote. The attorney and presumably Defendants were not happy about this being
11 exposed, and the attorney tried to cover that up by saying that his original message was intended to
12 draw a (nonsensical and misleading) distinction between voting not to sell and not having an interest
13 in selling (without conducting a vote to determine that lack of interest).

14     137.    Realizing that explanation made no sense, eight minutes later Counsel B emailed
15 Flannery stating: "My email to you says that 'the owners of these properties are not interested in
16 selling at this time.' The owners of the properties are the LLCs, not the LLC members! I chose my
17 words carefully."

18     138.    This further attempt at an explanation was no better than the first one. The Members
19 own the LLCs and the Members had never been presented with the offer, let alone asked to vote on
20 it. Regardless, the fact that the attorney emphasized that he "chose [his] words carefully" shows that
21 he was attempting to conceal the fact that the Members were not consulted, but still make Flannery
22 believe that a vote had taken place (so that it would back off and let Defendants continue their
23 fraudulent schemes). This is despite Flannery's request to Defendants and to their attorney that
24 Defendants involve the Members in considering the purchase offers, as the Operating Agreements
25 require given the significance of the offer.

26     139.    Later that same day, Counsel B, acting on behalf of and at the direction of Defendants,
27 communicated to Flannery that Defendants believed that by directly contacting the Members,
28 Flannery was intentionally interfering with contractual relations, and told Flannery to cease and

1 | desist. This attempt by Defendants to cut off communications violated their duties to the Members.

2 | Also, the Operating Agreements provide no support for a claim of intentional interference with

3 | contractual relations.

4 | 140.   On that same day, Defendants rushed out a communication to the Members

5 | attempting to explain the fact that Flannery's letter mentioned the Members declining Flannery's

6 | offer when no such event had taken place. Susan, acting on behalf of Defendants and with their

7 | approval, sent an email to the LLC Members on March 13, 2020, misrepresenting that they "all" had

8 | "recently agreed to refuse" the February 2020 purchase offer at issue, and instructing the Members

9 | to "discard/destroy" any offer they receive from Flannery. Susan, acting on behalf of Defendants and

10 | with their approval, also misrepresented that Kirby LLC's land "is not for sale because of our

11 | obligations associated with the gas storage project." This is a material misrepresentation because the

12 | landlord's obligations under the gas storage lease requires only that the owners not block access,

13 | which the Members could contractually require of new owners as part of any transaction. The

14 | misrepresentation is particularly notable because Counsel B had previously represented numerous

15 | other landowners on similar sales to Flannery, where such landowners retained income from wind

16 | turbines on their properties for similar periods into the 2050s. In such sales, Counsel B had expressed

17 | no reservations about his clients selling to Flannery or the security of the wind income they retained.

18 | Susan's email, sent on behalf of all Defendants and with their approval, states:

> If you have not already received it, you may soon receive a regurgitation of the Flannery offer to buy the ranch properties. This is the *same offer we all recently agreed to refuse.* Please discard/destroy whatever you may receive. We continue to believe this is a low ball offer. Their persistence in this recent move seems to substantiate our opinion that the properties are very desirable for whatever plans they have in mind, but for us at this price we all agreed it makes no sense. Our opinion is we should continue to engage with them as we have done over the past year and a half. In any event, *Kirby is not for sale because of our obligations associated with the gas storage project.*
>
> If they should eventually make an offer we would consider, we would still need to know more about them, their financial condition and the source of funds they use to make such purchases. To date they have refused to disclose anything. They have been informed by our attorney to direct all future correspondence to the LLC manager. We will keep you all informed and involved in responding to any future correspondence and/or offers.

1 (Emphasis added.)

2     141.   To compound the misrepresentation about the Kirby LLC gas storage project, the
3 reference to the Members all agreeing to refuse the offer was also a misrepresentation. *No Member*
4 *vote had taken place.* Susan, acting on behalf of Defendants and with their approval, misrepresented
5 this fact to make it seem to members that there was unanimity, confuse the Members into thinking
6 that they had acted, and to justify the Managers stonewalling Flannery. Counsel B admitted to
7 Flannery earlier that *same day* that no member vote had taken place and thus tacitly that this statement
8 was false. For example, GLLP (a Member of the LLCs) never received a copy of the offer from
9 Defendants or "agreed to refuse it," so it was not the case that they "all agreed to refuse" this offer,
10 but by the email above, Defendants made the Members believe that all other Members—including
11 GLLP—agreed to refuse the offer.

12     142.   In addition, Defendants' statement that *"we would still need to know more about*
13 *them, their financial condition and the source of funds they use to make such purchases"* was again
14 misleading. First, Defendants knew everything they needed to know about Flannery's "financial
15 condition" from the proof of funds letter attached to the offer, which was issued by the First Republic
16 Bank and stated, "This letter confirms that our client, Flannery Associates LLC, has cash on deposit
17 that exceeds $36,000,000." Flannery was clearly able to close on the purchase. Additionally,
18 Defendants knew from prior interactions with Flannery, that Flannery had in fact closed on many
19 purchases in the area, and that all sellers were paid and purchases closed without issues. Second,
20 Flannery told Kirk that it was a long-term investment vehicle for U.S. investors who were
21 diversifying their gains from the stock market. Purchases in real estate happen all the time where the
22 seller does not know the beneficial ownership of the buyer, including thousands of transactions
23 brokered every year by Kirk's employer, CBRE. Finally, First Republic Bank is a venerable
24 California institution that zealously guards its reputation and only works with reputable clients who
25 comply with extensive "know your customer" checks, and Defendants knew this or could have
26 learned this with minimum effort. Defendants' tactic was clearly intended to mislead and frighten
27 Members, without any factual basis, and without any regard to Defendants' fiduciary obligations to
28 the Members.

1      143.    The fact that Defendants' statements are without basis is further confirmed by the fact
2 that numerous other respected landowners in the area sold their properties to Flannery. For example,
3 one landowner who sold his property (of comparable size to the LLC's Land) to Flannery is part of
4 the family that founded, owned, and ran Rio Vista Bank for around a century until selling it in 2014.
5 For decades, this landowner was a member of the bank's board of directors. In addition, this
6 landowner was the developer who built a large part of Rio Vista. This landowner also retained his
7 wind income, using the same reservation of rights proposed to Kirby Hill LLC. Members would have
8 been very interested to learn that a successful businessman and developer in the area sold to Flannery.
9 Flannery informed Defendants of these facts, repeatedly, but Defendants concealed these facts from
10 the Members in the pursuit of their own agenda.

11      144.    In addition, Defendants selectively communicated with some Members about the
12 offer, although even this only happened because Flannery called Members and told them an offer
13 was coming. However, it appears that in these communications with certain Members, Defendants
14 did not provide the actual offer and misrepresented it to those Members by, at minimum, omitting
15 one of the most important terms of the offer, which is that the offer allowed Kirby LLC to retain the
16 income from the LGS gas storage lease for the remainder of the term (until 2055). Thus, given
17 Defendants' poisoning of the well and instructions, when Members received the letter from Flannery,
18 some discarded it without even reading it.

19      145.    The conduct of Defendants in handling this offer is notable given the timing. The
20 offer was delivered to Kirk Beebe on February 6, 2020, just as the COVID-19 pandemic was
21 beginning to spread in the United States. On February 6, 2020, the S&P 500 index closed at 3,334.
22 Flannery made an all-cash offer at 250% of fair market value, backed by a letter from First Republic
23 Bank. The offer expired on March 6, 2020. By March 6, 2020, the pandemic had spread around the
24 world, the world economy was shutting down, and the stock market was in free fall. On March 6,
25 2020, the S&P 500 index closed at 2,972. By March 20, 2020, the S&P 500 index closed at 2,305,
26 i.e., 31% below where it stood when Flannery made the offer six weeks earlier. Many of the
27 Members, including principals of GLLP, are retired and depend on their savings for living expenses,
28 with a substantial portion of those savings invested in the stock market. Yet, Defendants hid an all-

1  cash offer from the Members, disregarding the need that Members (again, many of which are very
2  elderly) might have had for the money, or the desire of any Members to sell the Land at a premium
3  and reinvest the proceeds into other assets that just got cheaper, like, for example, the stock market.

4      146.    On March 17, 2020, after receiving Susan's email, GLLP sent a letter to Susan that
5  called out the Managers' misrepresentations and expressed an interest in selling the Land (and in
6  receiving the information necessary to evaluate and consider any offers), "urg[ing] the LLC
7  Management to organize an owner attended meeting with a transparent report on the current plans . . .
8  for the Ranches and time to discuss with one another any concerns not being considered." The
9  communication also questioned the statement that there had been some sort of agreement to refuse
10 the Flannery offer. The email specifically stated, in relevant part:

11          *[W]e were a little taken back when the seemingly legitimate offer to
            buy the ranches was so nonchalantly discounted with the assertion that
12          "we all recently agreed to refuse."* What 'we' are you referring to?
            Thirty Six Million Dollars to procure the Ranches, without setting
13          aside current gas revenues, *does not seem like a decision to be made
            exclusive of the owners.*
14

15          . . . .

            We have no qualms regarding the underground management of the
16          3200 acres but we have concerns and questions that need to be
            addressed with the LLC Management and owners at large. This
17          undoubtedly is rooted in the lack of yearly Management reports as well
            as never having a owners meeting. This is reinforced by the
18          presumptive we all recently agreed' statement trying to ward off any
            interest in the Flannery offer.
19

20          . . . .

21          *. . . We need to be informed as to options and risks in order to manage
            our investments*—wouldn't you agree? And when an offer comes out
22          of the blue, do we just throw it in the trash can? All of us that are
            owners of the various ranches are getting older. And any management
23          of the ranches is going to get more difficult when passed to the next
            generation. . . .
24
            . . . .
25          In summary, we are not trying to "rock" the boat. But because of our
            ownership we would like to see where we are navigating. *I am urging
26          the LLC Management to organize an owner attended meeting with a
            transparent report on the current plans* (must be grand to exceed the
27          36 million offer) for the Ranches and time to discuss with one another
            any concerns not being considered. Further, a yearly report more
28

1           detailed than just K-2's [sic], would go a long way to ally [sic] any
          concerns regarding the future of the LLC Management.

2

(Emphasis added.)

3

    147.    Despite Susan having received the email quoted above, none of Defendants responded

4

to GLLP's email that called out their misrepresentations or adopted GLLP's suggestion.

5

    148.    On June 22, 2020, Kirk, acting on behalf of all Defendants and with their approval,

6

sent a letter to the Members that contained more misrepresentations, including that the properties

7

adjacent to the Land had been offered more money than was being offered to the LLCs. The letter

8

stated:

9

10           As all of you are aware, we have had significant interest in acquisition
          of all three ranches by an entity called Flannery Associates, *which will
11           not disclose their intended use of the properties, their source of funds,
          or the principals associated with the entity.* Over the last several
          months, their offering prices have dramatically increased, but they
12           continue to not disclose the information referenced above. In the last
          months, we were contacted by yet another real estate broker saying
13           that they represented Flannery and wanted to further discuss the
          properties. During that discussion, *we indicated again that we were
14           aware of adjacent properties that have been offered more money* and
          reiterated our desire to understand their intended use of the property
15           and source of funds. We will continue to keep you apprised of any
          further developments. *We further request that any inquiries that any
16           of you might receive be directed to us, so that we have a consistent
          message moving forward.*

17

18           . . . .

19           *Confidentially, there also appears to be significant interest from
          multiple industrial users of the Lambie Industrial Park.* Since both the
          Barnes and Lambie Ranches are adjacent to the Lambie Industrial
20           Park, it is our hope that if these uses come to fruition the value of our
          properties will dramatically increase as well.

21

22

23 (Emphasis added.)

24     149.    Kirk, acting on behalf of all Defendants and with their approval, first tried to mislead

25 the members by stating that Flannery "will not disclose their intended use of the properties, their

26 source of funds, or the principals associated with the entity." In addition to being irrelevant,

27 Defendants were also aware that Counsel B had handled many sales for other clients to Flannery and

28

1  that Flannery was a well-qualified, all-cash buyer paying above-market prices, and Counsel B never

2  had any issues when representing entities who sold to Flannery.

3    150.    Kirk's letter to the Members also contained a significant, material, and intentional

4  misrepresentation. Namely, there were not adjacent comparable properties that were offered more

5  money. If such an offer existed at all, then it had to be for a property zoned for industrial use, rather

6  than agricultural use, like the Land. Kirk made this misrepresentation intentionally to further

7  manipulate the Members into not selling to further Defendants' own agenda.

8    151.    Kirk's letter to the Members also contained a misleading statement related to the

9  Lambie Industrial Park. Between June 2020 and the filing of this complaint, i.e., in a period of more

10  than two years, this "significant interest from multiple industrial users" has resulted in no sales or

11  significant leases of parcels in the Lambie Industrial Park. Kirk, acting on behalf of all Defendants

12  and with their approval, was again just trying to mislead the Members to manipulate them into not

13  selling, in the pursuit of his own agenda.

14    152.    In particular, the industrial park next to Lambie and Barnes is about 1,200 acres. It

15  was created around 1990. Essentially all the land in the industrial park was initially owned by a single

16  family. Other than one sale of ~300 acres for ~$45,000/acre in 2016, there have not been any material

17  sales. Kirk concealed from the members that: (i) the owners of the park have been trying to sell their

18  other 900 acres continuously since 2016 and they have not sold a single acre; (ii) the owners of those

19  900 acres sold to Flannery a ~400-acre parcel situated immediately south of Barnes Ranch,

20  immediately west of the industrial park, and immediately north of Lambie Ranch, for approximately

21  $12,000/acre, and another 45-acre parcel immediately south-east of the industrial park, also for

22  approximately $12,000/acre (because being adjacent to an industrial park that has been largely vacant

23  for decades creates little if any incremental value); (iii) the buyer of the 300-acre parcel has not

24  developed the land since they bought it in 2016, and has not even applied for a permit to use the land;

25  (iv) the other 900 acres that are to be sold are vacant and used for sheep grazing; and (v) there is no

26  reasonable basis to conclude that more land may be added to the park, given that the county will not

27  approve such additions until the park is running out of land and given that in its 30 plus years of

28  existence, only about 50 out of 1,200 acres have been utilized (meaning that there is a thousand

1  years' worth of supply left at that rate). In contrast, in communications with Members, Kirk implied
2  on several occasions that their property might reasonably be rezoned and added to the park.

3        153.    In December 2020, Kirk, acting on behalf of all Defendants and with their approval,
4  sent another letter to the Members, containing another highly misleading, intentional misstatement.
5  Specifically, this letter said that "an adjacent landowner was offered, and rejected, an offer to
6  purchase at close to four times the cost per acre we were most recently offered. The potential
7  purchaser knows that we are aware of this offer as well." Kirk's statement was misleading because
8  there was no such offer for property comparable to the Land. If such an offer existed at all, then Kirk,
9  acting on behalf of all Defendants and with their approval, must have referenced an offer for a
10 property zoned for industrial use, not agricultural use like the Land. However, Kirk concealed this
11 fact from his communications to mislead the Members into thinking Flannery was offering other
12 people who owned comparable properties more money, and thereby ensuring that Members would
13 reject any other offers from Flannery, which suited Kirk's personal agenda.

14       154.    One of GLLP's principals repeatedly attempted to discuss the offers with Kirk and
15 Kenneth Beebe, but they declined to even take the phone call despite that GLLP is a Member of the
16 LLCs to which Defendants owed fiduciary duties.

17       155.    Frustrated that Defendants were not providing information to Members, or explaining
18 their decision not to allow the Members to vote to sell the Land at above fair market value, GLLP
19 hired a broker to represent it in connection with its various holdings, including these LLCs. The
20 broker reached out to Kirk. In initial calls, Kirk, acting on behalf of all Defendants and with their
21 approval, was cordial, and admitted to the broker that "we need to sell," told the broker that "we
22 would be happy to work through you," that the broker could talk to any of the Members, and invited
23 the broker to ask Flannery for a live offer.

24       156.    On April 19, 2021, Flannery delivered to GLLP's broker a live offer by adding an
25 addendum to the February 2020 offer, which revived the offer through May 7, 2021, and which
26 provided a full set of agreements that would be used for the reservation of the LGS income, so that
27 Kirby LLC could be sure that the reservation would adequately protect the income, especially
28

1 because, as Flannery wrote in the cover email, these reservation agreements were expressly based on
2 the forms Flannery used for reservations of wind turbine income with Counsel B's other clients.

3      157.    When Flannery delivered the offer to the broker, the broker called Kirk Beebe.
4 Immediately, Kirk's demeanor changed. Acting on behalf of all Defendants and with their approval,
5 Kirk (1) expressly prohibited the broker from sharing the offer with GLLP, *which was the broker's*
6 *own initial client*, (2) prohibited the broker from sharing the offer with any other Members, and (3)
7 refused to accept a delivery of the offer from the broker. To emphasize the absurdity of Kirk's
8 direction, Kirk told the broker that the broker must not send the offer to Kirk, presumably so that
9 Kirk would have plausible deniability of not having received the offer later, and instead told the
10 broker to send the offer only to Counsel B. Kirk, acting on behalf of all Defendants and with their
11 approval, followed up with this email to the broker: "*[S]o there is no misunderstanding my*
12 *instructions when you called a few moments ago the offer is to be sent to [Counsel B] only. As the*
13 *managing member of the LLC please honor the instruction provided here and in our prior call and*
14 *correspondence.*"

15      158.    Kirk told the broker that because the broker received the offer on behalf of the LLCs,
16 the broker was legally obligated to follow Kirk's direction. The broker felt trapped between
17 conflicting obligations, and restricted from freely communicating with GLLP, his own client. As a
18 result, the broker withdrew from the representation. When the broker notified Flannery thereof,
19 Flannery sent the offer to Counsel B and his colleague who work with Defendants. Flannery received
20 no response.

21      159.    At this point, GLLP still did not have a copy of the April 19, 2021 offer. Afraid of
22 litigation from Defendants for sharing the offer with anyone but Counsel B, the broker would not
23 share the offer with GLLP, his own client. Flannery did not send the offer to GLLP directly due to
24 Kirk's admonition to Flannery against contacting unrepresented Members, which is a tool
25 Defendants have successfully used to control information flow.

26      160.    At this point, GLLP decided to hire its own legal counsel to examine the numerous
27 governance issues around these LLCs. Following that, GLLP's counsel could also communicate with
28

1 Flannery's attorney without violating Kirk's admonition. So, on May 10, 2021, Flannery finally
2 agreed to send GLLP's counsel a copy of the April 19, 2021 offer.

3     161.    Following review of the offer, GLLP was horrified at the fraudulent statements,
4 concealments, and breaches of fiduciary duty that they for the first time realized had occurred.
5 GLLP's counsel immediately contacted Defendants and Counsel B, telling them that Defendants
6 breached their fiduciary duties in connection with the April 19, 2021 offer and previous offers. After
7 this pressure, and after being called out by GLLP's attorneys for not acting in the LLCs' best
8 interests, Susan Furay finally shared the purchase offer with the Members, and called for a vote on
9 it, via an email sent on May 20, 2021. However, as with previous cases, Defendants manipulated the
10 vote by making numerous material misrepresentations. In a May 20, 2021 email signed by Kirk,
11 Susan, and Kenneth, Susan, acting on behalf of all Defendants and with their approval, made the
12 following intentional and material misrepresentations and omissions.

13         i.    Susan claimed that Defendants did not receive this April 19, 2021 offer
because Counsel B did not have reason to check his email for three
14               weeks and the second attorney who was copied on the email from
Flannery does not work with the LLCs. Both explanations were lies.
15               First, Kirk Beebe was copied on the April 19, 2021 offer. Second, the
idea of Counsel B not checking his email for three weeks is not
16               credible. Last, Counsel B copied the second attorney on
communications with Flannery in the past regarding the LLCs,
17               including on February 6, 2020, so the second attorney clearly
represented the LLCs.
18

19         ii.    Susan attached a copy of the offer, but completely left out the
transmittal email ("Transmittal Email") that Flannery sent to Counsel
20               B and to Kirk Beebe, which included numerous important facts, as set
out below. The full text of the relevant portions of the Transmittal
21               Email is as follows:

22                         Regarding the adjustments, you had mentioned that the
gas income reservation is very important to the owners,
23                         which we understand. Given that, I thought it would be
helpful to provide all the relevant documents upfront in
24                         Addendum #2, these being (i) the Grant Deed, (ii) the
Assignment of the Lodi Gas Storage Lease, and (iii) the
25                         notice letter we would send to Lodi Gas at closing
regarding ongoing payments. These documents are
26                         consistent with the closing documents Flannery has
used for wind/other income reservations in the area.
27                         Furthermore, I understand the LLCs are represented by
[Counsel B] out of Sacramento. We have now done a
28                         number of deals in which the seller was represented by
[Counsel B] and which included a wind income or

other income reservation, and all of those deals used the same or nearly the same Grant Deed, Assignment, and Notice as in the attached. As such, Seller's attorney are very familiar with these forms, and I hope that helps to resolve any concerns and streamline the process.

Regarding price, we understand that the Sellers are looking for a higher price than the $36,000,000 in the attached offer. As I told you, Flannery is willing to come up materially from the $36,000,000, depending on any other requested changes. As such, please send us a binding counter offer with their desired sales price, and we will evaluate it in light of any other modifications. In relation to pricing, as we discussed on the phone last week, I can confirm that Flannery is under contract to purchase +/- 405 acres in between Barnes and Lambie Ranch from the Emigh family. The price for those lands is $4.85M or $11,975/acre, which is near the maximum that Flannery paid for non-irrigated properties in the area (the max being ~$12,175/acre, also to the Emigh family on another purchase).

iii. Susan wrote that "This offer is not different from the cost per acre from the offer we declined a year ago. We have included the offer as an attachment." This is materially misleading because the cost per acre was the same, but in the omitted cover email, Flannery expressly stated that "Flannery is willing to come up materially from the $36,000,000."

iv. Susan wrote "We have had a few iterations to where the price is now $12,000 per acre, which is four to five times less, we believe, than is being considered for nearby properties." This was an intentional misrepresentation, for the same reasons explained above relating to the industrial park. In fact, Flannery had anticipated this misrepresentation because it provided an express representation to the LLCs in its Transmittal Email disclosing maximum prices Flannery had previously paid in the area. But Susan hid the Transmittal Email so she could make the above misrepresentation and manipulate the members to her own purposes.

v. Susan wrote "The Kirby lease with Lodi Gas Storage has a number of owner obligations that would preclude the sale of Kirby under any circumstances without risking future rental payments from Lodi Gas Storage." Such obligations do not exist. This was an intentional misrepresentation, as evidenced by the fact that Flannery's counsel later pointed to deeds recorded by other landowners who lease to LGS who have successfully severed such income from their land. In fact, the purchase offer included an assignment agreement with protections for the seller that were much more robust than on the other successfully completed assignments, and on forms previously approved by Counsel B for sales by his other clients.

42

vi.   In the Transmittal Email, Flannery stated that Counsel B represented numerous other sellers who sold to Flannery, including on transactions that included income reservations, and that the proposed income reservation agreements were based on Counsel B's forms. Susan left out the Transmittal Email so she could conceal these facts. This was done intentionally because Defendants held out Counsel B to the Members as a credible law firm, so if the Members knew that Counsel B represented other sellers and approved similar income reservations, it would have made Flannery a more credible buyer, and weakened Defendants domination over the Members.

vii.   Susan asked Members to choose to either "[d]ecline" or "[a]ccept" the offer, as if this was Flannery's best and final offer, while intentionally leaving out Flannery's Transmittal Email, which clearly said that Flannery would pay "materially" more than $36,000,000 and invited the LLCs to counter.

162.   Defendants intended to induce and did induce Members to vote against accepting the purchase offer by making these various material misrepresentations and concealments of material facts.

163.   On May 22, 2021, one of the principals of GLLP sent an email to the Members attempting to correct some of the false and misleading comments and omissions made in Defendants' May 20, 2021 letter. However, she received limited responses. GLLP later learned that the lack of response was because in a secret communication, Defendants told other Members that GLLP's contentions had no merit and instructed all Members to ignore communications from the owners of GLLP, effectively silencing the one voice that was questioning Defendants' actions. This is not the behavior of individuals and entities who owe fiduciaries duties to, and are looking out for the best interests of, the LLC and its Members. Rather, it is the behavior of actors bent on advancing their own interests and in direct contravention of their duties owed to Members.

164.   Thus, although GLLP became aware of some of Defendants' fraudulent statements, concealments, and breaches of fiduciary duty in mid-2021, the damage had already been done: Defendants convinced the Members not to vote to sell to Flannery, which meant that GLLP and all Members could not realize the full value of the Land.

165.   On May 24, 2021, an attorney for GLLP advised Counsel B, as Defendants' counsel, that in his opinion, Defendants breached their fiduciary duties. Counsel B claimed that it disagreed

1 with that position, but then Defendants replaced Counsel B as their lawyer with Counsel C, another
2 conflicted counsel beholden to the Individual Defendants, for matters related to the offers.

3     166.    On May 27, 2021, Flannery advised Counsel C, as Defendants' attorney, that the
4 statements they made related to the infeasibility of securely reserving the gas storage lease were false
5 and why, and invited a discussion if there were any reasons to doubt this. Defendants did not respond.

6     167.    On June 1, 2021, to buy time for Defendants, Counsel C asserted in a letter to
7 Flannery's counsel that Flannery's all-cash offers to purchase the Land had been confusing and
8 inappropriately linked to the sale of another property. None of this was true.

9     168.    On June 9, 2021, Kirk, acting on behalf of all Defendants and with their approval,
10 sent another letter to the Members containing yet more material misrepresentations. He falsely
11 "report[ed] that 100% of the ownership that responded voted not to proceed with the April 19, 2021
12 offer. One owner entity, representing 1/8 of the ranches, failed to respond to the request." This was
13 a false statement. In their email from May 22, 2021, the principals of GLLP responded and clearly
14 advocated for negotiation with Flannery and sale of the Land. Kirk, acting on behalf of all Defendants
15 and with their approval, made this misrepresentation to create a false sense of unanimity and squash
16 any dissent among the Members.

17     169.    On June 10, 2021, Flannery's counsel responded to the June 1, 2021 letter from
18 Defendants' counsel refuting many of the incorrect statements made by or on behalf of Defendants.
19 Further, due to the assertion that previous offers from Flannery were confusing, Flannery sent a new,
20 fourth, offer to Defendants on June 10, 2021. Again, in good faith, Flannery respected the request
21 from Defendants that the offer be sent to them only, and not to all of the Members (except for
22 Members who had by then retained separate legal counsel). This offer clearly explained why the gas
23 storage income could be reserved for Kirby LLC. As an alternative, the offer also included an option
24 for the LLCs to exclude Kirby Hill from the sale. Given that Defendants previously tried to induce
25 the Members not to sell by claiming that carbon sequestration was going to produce additional
26 income, the offer also represented that Flannery does not believe carbon sequestration is
27 commercially viable, but offered to reserve 50% of any royalties from carbon sequestration to the
28

1  LLCs for a period through 2055 (matching the duration of the reservation of the LGS income). Once
2  again, Flannery represented that it was comprised of U.S. investors.

3          170.    Defendants again attempted to hide the offer from the Members.

4          171.    However, this time, GLLP had a copy of the offer as Flannery delivered a copy to its
5  attorney. Outraged that eleven days later (June 21), Defendants had still not shared the purchase offer
6  with the Members, GLLP therefore sent an email to Kirk, Susan, and Kenneth, and all the Members
7  demanding to know why Defendants had not informed the Members about the purchase offers for
8  the Land they jointly owned via the LLCs.

9          172.    Kirk and Susan, on behalf of all Defendants and with their approval, responded by
10 sending the renewed offer to the Members, with the excuse that they had been traveling, which is
11 irrelevant given that the offer was delivered to them via email (so they clearly had a copy of it
12 regardless of travel). Had GLLP not questioned Defendants failure to share the offer, Defendants
13 would have again not sent the offer to the Members. Defendants' transmittal letter to the Members
14 also included misrepresentations and attempts to shed a negative light on Flannery, just like their
15 previous letters.

16         173.    These attempts largely succeeded. Given that the Members trust Defendants (as they
17 should trust their fiduciaries), they relied on the various material misrepresentations made by
18 Defendants over the course of several years, in deciding not to force negotiation on the offers and/or
19 not voting in favor of selling when asked. For example, on May 18, 2021, one Member sent another
20 Member this communication: "*As far as the offer to sell the ranches I trust and agree with Kirk
21 Beebe that the offer is still too low and that the LLC should hold out for now. He and Susan have
22 done the research on this Flannery Group and found that it has been buying up many adjacent
23 properties at much higher offers.*" This shows that Defendants made misrepresentations, the
24 misrepresentations were material, the Members relied on them, and given the fiduciary relationship,
25 such reliance was reasonable.

26 **Defendants Impermissibly Interfered With GLLP's Contracts With Other Members.**

27         174.    By late 2021, the owners of GLLP believed that the LLCs were being improperly run
28 and had lost all trust in Defendants. They also felt that the offers on the Land were a great opportunity

1 to realize a profit on this asset and use the funds for other purposes, but Defendants had induced
2 other Members into not selling the Land, and the Operating Agreements made it extremely hard to
3 sell individual interests in the LLCs instead. And they did not have the financial resources or
4 expertise to engage in a dispute with the Managers.

5      175.    After reviewing the Operating Agreements, the owners of GLLP recognized that they
6 did have one option for how to realize at least a portion of the value of their stake in the LLCs—they
7 could sell a minority stake in GLLP. This is permissible and authorized under the Operating
8 Agreements. Section 10.1.2 of the Operating Agreements states: "In the case of a Member which is
9 a corporation or other entity, any disposition of interests in such entity which amounts to a change
10 in ownership of more than fifty percent (50%) of the beneficial interests therein shall be deemed to
11 be a sale, exchange, transfer or assignment of an Interest in the Company for purposes of this Section
12 10.1.2." Therefore, if a sale of interests in GLLP does not "amount to a change in ownership of more
13 than fifty percent of the beneficial interests therein," it would not constitute a Transfer under the
14 Operating Agreements. Therefore, the Operating Agreements treated any sale of a minority interest
15 as a decision to be made solely by the Member, which did not require either approval or consent of
16 either the Manager or other Members. The owners of GLLP therefore sought a buyer for such
17 minority interest and found one in Ranchlands LLC, an affiliate of Flannery. On June 20, 2022,
18 owners of GLLP sold a minority stake in GLLP to Ranchlands LLC ("Ranchlands Purchase").

19      176.    Following the Ranchlands Purchase, GLLP contacted Steven W. Holt, another
20 Member of the LLCs who had previously expressed an interest in selling, to make an offer to
21 purchase Mr. Holt's interests in the LLCs.

22      177.    On June 24, 2022, Mr. Holt accepted the offer and entered into a Membership Interest
23 Purchase Agreement ("MIPA") with GLLP for the sale of his interests in the LLCs, which included
24 (i) 1.7361% of the issued and outstanding membership interests of Barnes LLC; (ii) 2.08335% of the
25 issued and outstanding membership interests of Lambie LLC; and (iii) 2.0833% of the issued and
26 outstanding membership interests of Kirby LLC (collectively, the "Holt Interests"). On July 1, 2022,
27 Mr. Holt conveyed, transferred, and assigned the Holt Interests to GLLP, which constituted a full

28

1    and complete transfer to GLLP of any and all rights associated with such assigned interests, including
2    voting rights under the Operating Agreements of the LLCs ("the Holt Sale").

3          178.   Section 10.3 of the Operating Agreements for the LLCs, which governs "Transfers to
4    Permitted Transferees," provides that "[a] Member may sell, transfer, or assign his Interest (or any
5    portion thereof) in the Company to any of the following Persons ('a Permitted Transferee') *without*
6    *the Consent of the Manager or any of the other Members and without having to first offer the*
7    *Interest to the other Members* . . . [to] any other Member of the Company." Operating Agreement
8    for the LLCs §§ 10.3, 10.3.4. (Emphasis added.) Thus, transactions between Members of the LLC
9    are plainly permitted under the Operating Agreement, and the Holt Sale was therefore expressly
10   permitted and authorized under Section 10.3.4 of the Operating Agreements of the LLCs.

11         179.   Following this transaction, GLLP sent two letters on July 18, 2022. First, it sent a
12   letter to the Managers advising them of the Ranchlands Purchase and the Holt Sale. GLLP notified
13   the Managers that Mr. Holt had sold to GLLP all of his membership interests in the LLCs, and
14   requested that the Mangers therefore direct all future communications and payments related to the
15   Holt Interests to GLLP. GLLP also notified the Managers that, after review of historical
16   communications, GLLP identified numerous inaccurate and misleading statements that the Managers
17   made to the Members over the years, and that GLLP would be reaching out to other Members of
18   LLCs directly to discuss various matters. GLLP also cautioned the Managers to refrain from claiming
19   that any purchases by GLLP from other Members may not comply with the Operating Agreements,
20   given that GLLP is a Permitted Transferee under Section 10.3 of the Operating Agreements and any
21   purchases by GLLP from other Members would thus comply with the Operating Agreements.
22   Finally, GLLP requested books and records of the LLCs, as discussed in paragraph 107.

23         180.   Second, GLLP sent a letter to Members informing them that because GLLP did not
24   receive any interest from the Managers or anyone else to buy its interests in the LLCs, the owners of
25   GLLP eventually agreed to realize at least a portion of the value of their stake in the LLCs by selling
26   what they could—i.e., a minority stake in GLLP—to Ranchlands LLC. The letter also informed the
27   Members that afterwards, GLLP purchased Mr. Holt's interests in the LLCs, and that GLLP was
28   interested in buying additional interests in the LLCs.

1    181.   Despite the fact that the Holt Sale was expressly permitted and authorized under the
2    terms of the Operating Agreement, Defendants have attempted to interfere with these transactions.
3    On July 19, 2022, Counsel C baselessly questioned the legality of the Holt Sale, suggesting that it
4    was not exempt from the "transfer restrictions" in the Operating Agreements, and also suggesting
5    that the Ranchlands Purchase was invalid.

6    182.   On July 28, 2022, Counsel C wrote another letter to GLLP again baselessly
7    questioning the status of GLLP's Membership in the LLCs and the legality of the Holt Sale. Among
8    other things, the Managers improperly demanded that GLLP provide (1) "the complete
9    documentation of the [Ranchlands Purchase] so that the Managing Members might make their own
10   independent analysis of its terms and effect in order to determine whether the transaction preserved
11   the status of [GLLP] as a Member" and (2) "[d]ocumentation of [the Holt Sale] . . . for review before
12   the Managing Members can recognize that purported purchase as a permitted transaction and then
13   adjust any interest which [GLLP] might possess."

14   183.   Defendants are abusing their power under the Operating Agreements by baselessly
15   demanding to see "the complete documentation" of the Ranchlands Purchase or otherwise
16   threatening to suspend or fail to recognize GLLP as a current Member of the LLC. The Operating
17   Agreements do not permit the Managers to demand such documents or suspend a Member. Section
18   10.1.2 of the Operating Agreements states: "In the case of a Member which is a corporation or other
19   entity, any disposition of interests in such entity which amounts to a change in ownership of more
20   than fifty percent (50%) of the beneficial interests therein shall be deemed to be a sale, exchange,
21   transfer or assignment of an Interest in the Company for purposes of this Section 10.1.2." Given that
22   Ranchland's purchase of the minority interest in GLLP did not "amount to a change in ownership of
23   more than fifty percent of the beneficial interests therein," it did not constitute "a sale, exchange,
24   transfer or assignment of an Interest" so as to require GLLP to "first offer[] the Interest (or portion
25   thereof) to the other Members" or the "consent of the Manager" and was thus permissible under the
26   Operating Agreements. Because no "Transfer" as defined in the Operating Agreements has occurred,
27   the Operating Agreements do not give the Managers the right to review documents "necessary or
28   desirable to effect the Transfer" under Section 10.1.3(iii) of the Operating Agreements.

1    184.    Nevertheless, to move past the issue, on October 6, 2022, GLLP transmitted to
2 Counsel C assignment agreements that show that Ranchlands LLC owns only 48.52% of GLLP's
3 beneficial interests, and therefore that no change in ownership of more than 50% of GLLP's
4 beneficial interests has occurred. In addition, GLLP provided the assignment of Mr. Holt's interest
5 in the LLCs to GLLP.

6    185.    Defendants responded on October 20, 2022, through a letter from Counsel C, in which
7 they continued to act in bad faith. First, as a pretext for continuing to deny GLLP its rights as a
8 Member, Defendants demanded from GLLP excessive additional documentation and information,
9 which they have no right to demand under either the Operating Agreement or the law. Second, despite
10 numerous written communications between GLLP and Counsel C that show otherwise, Defendants
11 falsely claimed that GLLP did not seek recognition of its Member rights prior to the purported
12 amendment and restatement of the Operating Agreements (discussed below). Third, Defendants
13 claimed in bad faith that because of the purported delay, even though the relevant transactions
14 predated the amendment and restatement, the Purported Amended Operating Agreements would
15 apply. Fourth, they asserted that the plain language of the Operating Agreements (which says that
16 transactions that result in change of less than 50% of beneficial ownership of Members do not
17 constitute a "Transfer") does not govern, but rather that there is a new concept of "control"—never
18 discussed in the existing Operating Agreements—and that even transactions under 50% constitute
19 "Transfers" if they result in a change of control. This assertion was made in bad faith and for self-
20 serving reasons, and in breach of Defendants' fiduciary duties to GLLP and to Steven Holt. As a
21 whole, this conduct shows Defendants are not acting as neutral Managers with fiduciary duties to the
22 Members, but rather pursuing their own agenda, which compels them to deny GLLP its Member
23 rights regardless of the terms of the existing Operating Agreements and the law.

24    186.    With respect to the Holt Sale, Defendants are ignoring the plain terms of Section
25 10.3.4 of the LLC Operating Agreements and are breaching the Operating Agreements to further the
26 Individual Defendants' self-interest. Section 10.3 of the Operating Agreements, which governs
27 "Transfers to Permitted Transferees," states: "A Member may sell, transfer, or assign his Interest (or
28 any portion thereof) in the Company to any of the following Persons ('a Permitted Transferee')

1 without the Consent of the Manager or any of the other Members and without having to first offer
2 the Interest to the other Members . . . [to] any other Member of the Company." Operating Agreement
3 for the LLCs §§ 10.3, 10.3.4. The Holt Sale falls squarely within this provision because the transfer
4 and assignment of the Holt Interests to GLLP were between Members of the LLC.

5      187.   Despite this, Defendants have failed to authorize or recognize the Holt Sale and
6 refused to adjust the interest that GLLP possesses on account of the Holt Sale. Defendants have cited
7 the Ranchlands Purchase and also unreasonably demanded to see documentation for the Holt Sale
8 that is neither "necessary or desirable to effect the Transfer."

9      188.   Defendants have thus breached the Operating Agreements and/or their obligations of
10 good faith and fair dealing under the Operating Agreement and their duties to GLLP and the other
11 Members by (1) claiming that GLLP's Membership Interest was suspended; (2) threatening to block,
12 invalidate, and not honor the Holt Sale; and (3) refusing to adjust the interest that GLLP possesses
13 on account of the Holt Sale. This is despite the self-executing nature of the Ranchlands Purchase,
14 which does not need the consent of Defendants or other Members to be valid, and permissibility of
15 the Holt Sale under the plain terms of the Operating Agreements.

16      189.   Defendants also are unlawfully interfering with GLLP's ability to transact with other
17 LLC Members who expressed a desire to sell their LLC interests to GLLP. In July 2022, GLLP began
18 presenting offers to other Members of the LLCs for the purchase of their interests in the LLCs, many
19 of whom expressed a desire to sell their LLC interests to GLLP ("Potential Sellers"). Defendants'
20 predominant motive in interfering with these transactions has been to serve their own interests over
21 the interests of the LLC, GLLP, or other Members, in breach of their fiduciary duties. Defendants
22 benefited and served their own self-interest in doing so because, among other things, they have
23 successfully sought to retain control of the LLCs and thus control of the Land, in their attempt to
24 conceal their past illegal conduct and preserve the hope of buying Members' interests prior to any
25 sale.

26      190.   Despite the Potential Sellers' desire to sell their LLC interests to GLLP (explained in
27 more detail below), Defendants have interfered with the Potential Sellers' ability to consider, discuss,
28 negotiate, or accept GLLP's offers. Defendants disparaged GLLP to the Potential Sellers and

1  thwarted the Potential Sellers' ability to consider, discuss, negotiate, or accept GLLP's offers to
2  purchase the Potential Sellers' LLC interests.

3       191.    For example, Defendants (1) falsely told Members that it was illegal to transact with
4  GLLP because GLLP was not a Member of the LLCs (despite the fact that GLLP *is* a Member of
5  each of the LLCs, and nothing in the Operating Agreement empowers the Managers to suspend the
6  Member status of a Member), (2) thwarted Members from contacting or negotiating directly with
7  GLLP by falsely telling those Members that all offers must go through Defendants or their counsel
8  and stripping Members of their autonomy to independently act on or transact regarding their LLC
9  interests (despite the clear clause in the Operating Agreements that permits Members to transfer
10 interests to other Members without the Consent of the Managers),[2] and (3) advised Members that
11 GLLP is making offers only to force the LLCs to sell the real property to Flannery, implying that
12 GLLP's offers are not real or are somehow illegal (which is clearly false since GLLP purchased the
13 Holt Interests in an all-cash transaction, without any further conditions).

14      192.    In addition, Defendants falsely told Members that GLLP's 2022 purchase offers to
15 the Members were "far worse" than the purchase offers that Flannery made in 2021. This is untrue:
16 Flannery's 2021 purchase offer to Members included $39,000,000 for the Members' interest in the
17 LLCs, in addition to the Member's ability to retain income from the LGS gas storage lease on the
18 Kirby property for the remainder of its term, which goes through 2055. In contrast, GLLP's 2022
19 purchase offer, which was based on a valuation for all three LLCs of approximately $62,840,000, is
20 about $23,840,000 higher than Flannery's 2021 offer, and also includes a cover letter stating that to
21 the extent that the gas storage lease on the Kirby property is not under a restructuring threat, GLLP
22 would be willing to offer even more money.

23      193.    Defendants also made material misrepresentations to Members about the
24 renegotiation of the LGS lease, as well as misstated the certainty of continual income from this lease
25 (despite having information to the contrary) in an attempt to keep Members from selling their

26

27 [2]      For example, Defendants and their counsel have misrepresented to Members that all offers
   (including offers to sell a Member's own LLC interests to another Member or other authorized
28 transactions under Section 10.3.4 of the Operating Agreement) must go through them since the
   Managers are vested with the exclusive management authority.

1 interests in the LLCs to GLLP. For example, Defendants misrepresented to the Members that the
2 renegotiation of the LGS lease on the Kirby property is expected and routine, and suggested that
3 income from this lease is guaranteed in the coming years by telling Members that it is impossible for
4 a big company like LGS's owner to default on payments, when in reality it is entirely possible and
5 there appears to be significant uncertainty about the future of the revenue stream from the LGS lease.

6    194.    Lastly, to prevent Members from losing trust in Defendants, Defendants
7 misrepresented their failure to record the quitclaim deeds for the Lambie and Barnes properties as
8 clerical errors rather than confess to their secret scheme to increase their effective ownership of the
9 Land.

10    195.    All of these misrepresentations were material and these tactics had the desired effect.
11 The Potential Sellers wanted to sell to GLLP but were dissuaded from doing so due to Defendants'
12 recent and prior misrepresentations.

13    196.    For example, in the spring of 2022, a Potential Seller told a representative for GLLP
14 that they wanted to sell all of their interests in the LLCs to GLLP to fund a new trust and the only
15 asset they have to fund such trust are their interests in the LLCs.

16    197.    Likewise, in July 2022, another Potential Seller told a representative for GLLP that
17 her children and husband wanted her to sell her interests in the LLCs to GLLP, and that she wanted
18 to as well.

19    198.    Around this same time, a third Potential Seller told a representative for GLLP that she
20 wanted to sell all of her interests in the LLCs to GLLP because her family could use the money for
21 other purposes. Later and more recently, the broker for the third Potential Seller called GLLP to say
22 that the client was interested in selling but was afraid of Defendants retaliation.

23    199.    Also around this same time, a fourth Potential Seller told a broker that she was open
24 to selling her family's interest in the LLCs and that GLLP's offer to purchase her interests looked
25 like a good offer.

26    200.    Also around this same time, a fifth Potential Seller was so flabbergasted by GLLP's
27 offer that she told GLLP's attorney that GLLP's offer must have had an error in it, because the
28

1  $265,000 that GLLP offered her for the purchase of her approximate 1% interest in the Kirby LLC

2  was "way too much" in light of the $12,000/year she received in income.

3      201.    Again, around this same time, in an email to Steven Holt, a sixth Potential Seller

4  expressed an interest in selling their LLC interests to GLLP because they "could use the money."

5      202.    Despite this interest, after the disinformation and disparagement campaign by

6  Defendants, Members do not believe they can or should sell to GLLP because of Defendants'

7  material misrepresentations. For example, when one Potential Seller was asked why they were no

8  longer interested in selling his LLC interests to GLLP—despite initially expressing such an

9  overwhelming desire to sell—the Potential Seller cited the above misrepresentations made by

10 Defendants. Other Potential Sellers and Members used almost verbatim language when describing

11 these reasons, making it clear that Defendants had been spreading their lies in an extensive and

12 concerted fashion. In so doing, Defendants intended to, and did, disrupt the relationship between

13 GLLP and the Potential Sellers and other Members, poisoning them against GLLP and making it

14 difficult for them to consider or discuss GLLP's offers, or negotiate or transact with GLLP.

15     203.    The Individual Defendants' predominant motive in interfering with GLLP's existing

16 contractual relationships and thwarting Members from contracting with GLLP was to serve their own

17 interests over the interests of the LLC, GLLP, or other Members. They acted out of their own self-

18 interest and personally benefited from this interference because they were able to retain control of

19 the LLC and thus control of the Land (which they have been using, and plan to continue using, for

20 their own personal benefit).

21 **Defendants Attempted To Remove GLLP as a Member.**

22     204.    Following the Ranchlands Purchase, Defendants eventually realized that GLLP

23 remained a valid Member, but with a new minority investor that had more financial resources. This

24 created two major problems for Defendants. First, GLLP could now enforce its Member rights, and

25 demand appropriate oversight and governance of these LLCs, which would expose Defendants'

26 illegal misconduct. Second, GLLP would be a possible buyer for other Members' interests, which

27 would completely break Defendants' plan to wait until other Members need to sell, and then buy

28 them out on the cheap. Now, GLLP would be around and able to offer such Members a fair price.

1  205.  In response, Defendants hatched a new plan—they would try to amend and restate the

2  Operating Agreements to strip GLLP of its Member status. Stripping GLLP of its Member status

3  would solve both of Defendants' problems. Without being a Member, GLLP would both find it more

4  difficult to enforce access to books and records, and lose its status as "Permitted Transferee," which

5  would prevent it from outbidding Defendants on any interests being sold by other Members.

6  206.  On September 14, 2022, Kirk and Susan Beebe, on behalf of Defendants sent a letter

7  addressed to "LLC Family Members" enclosing a letter from Counsel C dated September 13, 2022.

8  In the cover letter, Kirk and Susan Beebe wrote that they are "seek[ing] approval of two changes to

9  the operating agreement":

10  
11  
12  
13  

> The first is to limit voting rights to only family members as defined in section 3.17.1 of the operating agreement, which outlines a family member as a spouse, a sibling, a lineal descendant or ancestor of a member or any spouse thereof. The second is to change the super majority percentage from 75% to 60% to limit the ability of minor shareholders to block the will of the majority.

14  207.  Included in the package was also a "[l]etter from [Counsel C] with detailed back up

15  on the changes above and explanation of the Deed Recording mistake that exists on Lambie and

16  Barnes Ranches"; "Red lined versions of the operating agreement"; and "Clean versions of the

17  operating agreements with indicator showing where to sign." Defendants concluded their letter by

18  stating:

19  
20  

> We ask that you please review the enclosed and sign the clean copy of the operating agreements where indicated and return the signed operating agreements in the enclosed prepaid FedEx package at your earliest convenience.

21  
22  

> Once we have obtained the returned operating agreements, you will receive a PDF file or hard copy at your option of the three signed operating agreements.

23  
24  

> *If you have legal questions, please contact [Counsel C] per his letter*.

(Emphasis added.)

25  
26  208.  Defendants' suggestion that the Members contact Counsel C with legal questions was

27  itself a breach of Defendants' duties to the Members, as it suggests to Members that Counsel C

28

1 represents them, when he actually represents only Defendants' interests, and Defendants' interests
2 are conflicted with those of the Members.

3      209.    These communications are also misleading in that they imply an attorney-client
4 relationship between the Members and Counsel C although Counsel C does not represent any
5 members of the LLCs except for Defendants.

6      210.    The September 13, 2022 letter from Counsel C, sent on behalf of and at the direction
7 of Defendants, stated in relevant part:

8                    1.      The Reasons for Amendment and Restatement:

9           The Companies (and the pre-existing limited partnerships) were
            formed to streamline management, maintain operations, and enhance
10          investments in each of the three ranches originally owned by the
            Barnes Family: The Barnes Family Ranch; Lambie Ranch; and Kirby
11          Hill (Ranch Properties). It can be challenging to maintain family
            ownership of agricultural properties and the entire Family has been
12          fortunate in its historic natural gas production from the Ranch
            Properties and current ownership and operation of the gas storage
13          facilities at Kirby Hill pursuant to lease. These circumstances have
            allowed all Family members productive returns as Members of the
14          Companies as they have also permitted Family ownership and
            control to be constant.
15
            The original operating agreements all imposed restrictions on
16          transfers of membership interests. Such restrictions are common;
            they were certainly intended to sustain family ownership and control
17          of the Ranch Properties through the Companies. *As it has turned out,
            however, the existing restrictions are insufficiently binding to ensure*
18          *that decision making authority continues to rest ultimately with the*
            *members of the Barnes Family.* This is not a good thing. The original
19          intent of transfer restrictions was certainly to maintain control in
            order to best achieve the best results desired by and reflected in
20          decisions made by the Family as a whole. *That original intent might*
            *well be negated if the current forms of transfer restrictions and*
21          *voting by members are not amended and restated.*

22          It should be emphasized that proposed amendments of transfer
            restrictions are not intended to inflexibly bind all members and the
23          Companies to the current status quo. They are intended to provide
            more flexibility in addressing membership transfers and in decision
24          making while preserving voting control within the Family.

25          *Overall, the reasons for the proposed amendment and restatement of*
            *operating agreements is to ensure that the Companies speak with one*
26          *voice — the voice, ultimately, of a super majority of Family — and*
            *Company — Members.*
27
                     2.      The Proposed Amendments:
28

Although a fair number of provisions of the operating agreements require change, *the principal overall effect of the proposed amendment and restatement is to restrict voting power to Family Members.* There is no prohibition against a sale of membership interests to non-family third party transferees; those transferees will simply have economic interests without voting rights. *Transfers amongst Family members even those who might not currently be Members of the Companies — might proceed without restriction as has always been the case. If Family members, such permitted transfers would include voting rights.*

. . . .

### 3.   Correction of Recording Issues:

When the former limited partnerships which owned the Ranch Properties were converted to the form of the Companies, mistakes were made in recorded title. Kirby Hill was corrected during the process of finalizing the gas storage reservoir lease. Lambie Ranch and Barnes Family Ranch — of record — still reflect the old recording mistakes. Essentially, the law firm which handled the original 1988 transactions by which direct ownership of the Ranch Properties was converted to indirect ownership through limited partnerships created co-tenancy interests held by the Beebe family (through their family corporations) with those same limited partnerships (for which the Beebe family served as general partners). The overall percentage interests held by the Beebe family were consistent and appropriate in all instances. The mistake was in the structure used. Because the Companies acquired all of their interests by conversion, the existing record mistakes were carried over as to structure with an inadvertent additional mistake related to percentage interest. These matters were simply not recognized at the time. The mistakes exist of record but are not substantive - in the sense that all Members of all Companies have always received all distributions to which they have been entitled regardless of the record title mistakes.

The record title mistakes as to Barnes Family Ranch and Lambie Ranch will be corrected as a part of this process of amendment and restatement. As noted, Kirby Hill was corrected years ago.[3]

### 4.   Recommendation:

Management recommends that the amendment and restatement of the operating agreements be approved. Management believes that such action will preserve Family control and decision-making and avoid piecemeal and divisive actions which can only harm the overall interests of all Family members. In essence, Management believes that the proposed amendments to the operating agreements are all consistent with the intent of the original Family members when the Companies were all first created...

---

[3]   Counsel C's explanation about the quitclaim deed recording, sent at the direction of Defendants, is not plausible on its face, as described in paragraph 76. *See also supra* at ¶¶ 53-77.

1        Should there be any questions, please contact me.

2  (Emphasis added.)

3      211.   Defendants sent the foregoing communications to all Members *except GLLP.* A week

4 later, and after Defendants had secured signatures from other Members, one of the recipients

5 forwarded the communication to GLLP.

6      212.   On September 20, 2022, GLLP's attorney wrote to Counsel C questioning why GLLP

7 was not provided with the proposed amendments. Counsel C, on behalf of Defendants and acting at

8 their direction, responded in an invective-laden letter, including the statement:

9
10         My intent was to send it last week. It happened that I was out of the office in celebration of my wife's birthday -something which might have violated some sort of instruction from you, for all I know. Materials were sent to Gassy Lassy in care of your office at about the same time that materials were sent to Members of the Companies. Not everything was mailed at exactly the same time. Nor must it be.
11
12

13      213.   Counsel C is claiming that by happenstance he and Defendants intended to but forgot

14 to timely send the proposed Operating Agreement to GLLP (the only Member whose membership

15 interests are stripped in the proposed amendments), but somehow happened to send those same

16 documents to all other Members a week earlier. Clearly this was part of Defendants' plan—not to

17 send the materials to GLLP until the proposed amendments were a fait accompli. Indeed, the

18 postmark on the mailing to GLLP is dated September 19, 2022, and the package was sent by FedEx

19 Saver, such that it did not reach GLLP until September 23, 2022. In contrast, it appears that Kirk

20 Beebe mailed the FedEx packages to other members on September 14, 2022, for overnight delivery

21 on September 15, 2022. As explained below, by the time GLLP received this package, most Members

22 had already had the materials for over a week and some may have returned their signed copies. Also,

23 to underscore that GLLP was treated differently in this amendment process, Defendants and Counsel

24 C omitted the letter from Counsel C and cover note from Kirk and Susan Beebe in GLLP's package.

25 Defendants' plan was to prevent GLLP from knowing how Defendants were explaining and

26 positioning the proposed Operating Agreements to the other Members so that GLLP could not fight

27 concealment and misrepresentations until it was too late and the new Operating Agreements had

28 been adopted.

1  214.   Counsel C followed by claiming that GLLP had not provided the required
2  documentation to demonstrate that it remains a Member and that "if Gassy Lassy purports to cast a
3  vote, then its status must be verified as only Gassy Lassy as originally constituted is presently
4  recognized as a Member of the Companies. Off hand, I cannot see any particular reason why anyone
5  should pay any attention to your demands."

6  215.   The Defendants' plan of forcing through the new Operating Agreements by having
7  Members sign them without independent counsel, and by doing so before GLLP had time to review
8  the changes and discuss them with other Members, appears to have worked.

9  216.   On September 24, 2022, Kirk emailed the Members (excluding GLLP) informing
10 them that 75% of the Members had approved the changes to the Operating Agreement. This email is
11 another example evidencing that Defendants arranged for the Members (other than GLLP) to be
12 informed of the proposed changes to the Operating Agreements and to return the executed signature
13 pages before GLLP was informed and could provide Members with accurate information about the
14 effect of the changes.

15 217.   The Purported Amended Operating Agreements are invalid and unlawful for
16 numerous, independent reasons. First, the Managers did not obtain the necessary approval to amend
17 the Operating Agreements, including because the Managers improperly included their own interests
18 (which is not permitted under Section 7.12 of the Operating Agreements due to the Managers'
19 conflicts) and excluded GLLP's Membership interest. Second, the proposed amendments violate
20 GLLP's Membership rights under the Operating Agreements, render the Operating Agreements
21 impermissibly indefinite, and breach duties of good faith and fair dealing. Third, the proposed
22 amendments are inconsistent with and violate various provisions of the Operating Agreement. For
23 example, Section 7.3.3(ix) of the Operating Agreements requires a super-majority of Members to
24 "establish different classes of Members." There is no mention of the vote needed to demote a
25 Member to only a holder of an economic interest, implying that it is not permitted by the Operating
26 Agreements. As another example, Section 7.3.3(i) provides certain protections for Members that
27 would be circumvented by stripping GLLP of its Member status. Fourth, advancing and approving
28 the amendments violates the Managers' fiduciary duties to GLLP. Finally, even if the amendments

1  to the Operating Agreements are valid, they cannot be retroactive to strip GLLP of its Membership,
2  as Defendants are trying to do. Nothing in the amendments indicates that the provisions apply
3  retroactively to a transaction already completed. Such retroactive application is both unlawful and
4  contrary to normal rules of contract interpretation. The Managers' efforts to do so is therefore in
5  breach of the Operating Agreements.

6  **Defendants Attempted to Fraudulently Obtain Authorization for Compensation to Defendants,**
7  **and then Refused to Disclose Their Compensation**

8          218.   The proposed changes to the Operating Agreements accomplished even more. In
9  Section 2 of the Counsel C letter dated September 13, 2022, Counsel C, on behalf of Defendants,
10 represented to the Members that all changes to the Operating Agreements related solely to the two
11 proposed amendments regarding voting. Their representation was false, and again fraudulent, in at
12 least two material regards, which are discussed in this section and in the next.

13         219.   The first concealed change was on pages 13-14, Section 7.3.7 of the proposed
14 Operating Agreement for Kirby LLC, where Defendants inserted a concept of a new "Facilities Fee"
15 and inserted this new language:

16             In the addition to the foregoing Property Management Fee, the Members
17             approved the payment of additional management fees related to the
               development, maintenance, management, and investment in a gas storage
18             reservoir under, across, and over portions of the Property. The payment of
               such fees dates from and is related to the execution of that certain Gas
19             Storage Lease and Agreement, dated March 17, 2005, as Amended and
               Restated November 23, 2007.
20
           220.   First, this language clearly has nothing to do with the amendments regarding voting,
21
   and this change was therefore concealed from the Members by the September 13 and September 14
22
   letters from Counsel C and the Defendants, respectively.
23
           221.   Second, to GLLP's knowledge, in the 17 years that LGS has been operating its project
24
   on the Kirby Hill property, the Managers have *never, not even once,* disclosed or even mentioned
25
   the concept of a "Facilities Fee"—let alone received an approval for it from the Members.
26

27

28

1    222.    Third, the inserted language is concerning because it appears intentionally vague and
2  broad, and essentially purports to retrospectively ratify a set of unknown payments to the Defendants
3  going back to 2005, i.e., more than 17 years.

4    223.    In his September 20, 2022 email to Counsel C referenced in paragraph 212, an
5  attorney for GLLP asked about this concealed provision, and requested a list of all payments related
6  to the LGS project to Defendants and their affiliates. In the ensuing email exchange, Counsel C
7  repeatedly deflected and evaded the question, but never provided the list of payments.

8    224.    In his October 6, 2022 letter to Counsel C, attorney for GLLP reiterated the concern
9  about the lack of disclosure with regards to payments to Defendants in connection with the LGS
10  project, and included the following request for information:

11         Copies of all communications that Kirby Hill Associates, LLC, any
12         "Manager-related persons" (as defined below), or any representative or
           agent acting on behalf of any of the foregoing, including [Counsel C]
13         (collectively, "KHA Parties"), received from or sent to Lodi Gas Storage or
           its affiliates or any representative or agent acting on behalf of any of the
14         foregoing (collectively, "LGS Parties"), at any time since January 1, 2000,
           including but not limited to (i) copies of all proposals exchanged by the
15         parties in connection with the original 2005 lease, the restated 2007 lease,
16         or any subsequent restructuring discussions, and (ii) copies of all
           agreements now or previously in existence between any LGS Party and any
17         KHA Party, and (iii) list of all payments from any LGS Party received by
           any KHA Person since January 1, 2000. "Manager-related persons" means
18         (1) Janet Beebe, Kenneth Beebe, Kirk Beebe, Susan Beebe, Kirby Corp,
           Lambie Corp, Barnes Corp, [Counsel C's firm], or [Counsel C]; or (2) any
19         spouse, lineal descendants, or other family member (except for non- Beebe
20         members of BLK) of any of the parties listed in (1); or (3) any person, trust,
           or entity affiliated with, or in anyway beneficially co-owned by, any of the
21         parties listed in (1) or (2).

22    225.    In his response from October 20, 2022, Counsel C again stonewalled and refused to
23  provide any of this information whatsoever.

24    226.    The concealed introduction of the "Facilities Fee" language into the Purported
25  Amended Operating Agreements, the seemingly intentional broadness and vagueness of the added
26  language, and the unexplained, repeated refusal by Counsel C to provide the list of payments, taken
27  together, raise serious questions about whether Defendants have, over the last 17 years, received
28  compensation in excess of what was disclosed to, and approved by, the Members.

**Defendants Attempted to Create a Backdoor To Dissolve the LLCs**

227.    Paragraphs 32-36 describe how during the original Limited Partnerships, Defendants structured the transactions such that they owned the vast majority of their interest in the Land directly, rather than through the Limited Partnerships, such that if they were ever removed, Defendants would own almost their entire interest in the Land directly, meaning that they could therefore exert incredible leverage over the Limited Partnerships. Put differently, Defendants knew that the LP Agreements they drafted were so one-sided and unfair that they would themselves never want to be limited partners under such LP Agreements.

228.    When the Limited Partnerships were converted into the LLCs in 2003, Defendants should have lost this optionality by virtue of quitclaiming their interests into the LLCs. However, Defendants preserved these rights by failing to record the quitclaims. Doing so both doubled the Defendants' record ownership and meant that with respect to the original half of their ownership, they retained the power to own those interests directly and not be subject to the LLC's Operating Agreements.

229.    Following the Ranchlands Purchase, Defendants realized that this created another major threat to their scheme.

230.    First, because GLLP discovered the missing quitclaims, and demanded this be corrected, the Defendants lost the ability to hold a portion of their interest in the Land directly.

231.    Second, because GLLP now had the resources to demand proper corporate governance and started asking uncomfortable questions about how the LLCs have been run to date, Defendants realized that eventually, the Members could turn on them, and replace them as Managers. If that happened, Defendants would end up in the very position they feared, i.e., rather than using the one-sided Operating Agreements to dominate other Members through their powers as Managers, someone else could be the Manager, and the Defendants would have to live under these those same Operating Agreements as "mere" Members.

232.    To get rid of this threat, Defendants came up with a new scheme. They would use the process of amending the Operating Agreements, described to the Members as being just about the issues of voting and family ownership, to create an exit door for themselves.

1    233.    To do this, Defendants modified Section 7.3.5 of the Operating Agreements, whereby

2 this section remained exactly the same, except that Defendants inserted the words "or voluntary

3 resignation," such that this section now read:

> "Upon the Consent of a Majority in Interest of the Members, the Company
> shall remove a Manager as set forth in Article XX and select a successor
> manager. Upon the Consent of all the Members, the Company shall select a
> successor Manager and continue after the Manager ceases to be a Manager
> other than by removal **or voluntary resignation**. The consent or approval
> of the Manager is not necessary to authorize these actions."

8 (Emphasis added.)

9    234.    The insertion of these words plainly has nothing to do with the issues of voting and

10 family ownership, and this change was therefore concealed from the Members by the September 13

11 and September 14 letters from Counsel C and the Defendants, respectively.

12    235.    The effect of this change is simple. If Defendants lose control over the Members,

13 either because enough of the Members sold to GLLP, or because the Members realize the extent of

14 Defendants' misconduct and turn against them, Defendants now have an escape hatch. Under 7.3.5,

15 after "voluntary resignation" of a Manager, the "[c]onsent of all the Members" is required to select

16 a new Manager. Thus, Defendants can resign whenever it suits them and refuse to consent to the

17 selection of a new Manager. This would put the LLCs on path to dissolution and liquidation, which

18 would presumably involve the LLCs conveying the Land back to the Members as tenants-in-

19 common, as was the case before 1988. The net effect of this would be to avoid what Defendants have

20 always feared—to be subject to the same LP Agreements/Operating Agreements they have imposed

21 on others, but this time not as the General Partner/Manager, but just as a Member.

22                          **DERIVATIVE ALLEGATIONS**

23    236.    GLLP brings certain causes of action derivatively in the right of and for the benefit

24 of the LLCs to redress injuries suffered, and to be suffered, by the LLCs as a direct result of the

25 wrong complained of herein.

26    237.    The LLCs are named as nominal defendants in this case solely in a derivative

27 capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise

28 have.

1  238. GLLP has been a Member continuously during the wrongs complained of herein and
2  continues to hold its Membership interests at present. This is sufficient to satisfy the
3  contemporaneous and continuous ownership rules of derivative actions in California.

4  239. GLLP has delivered to Defendants a true copy of the complaint that GLLP proposes
5  to file under Section 17709.02(a)(2) of the California Corporations Code.

6  240. GLLP will adequately and fairly represent the interests of the LLCs and its Members
7  in prosecuting and enforcing their rights.

8  241. Because of the facts set forth throughout this Complaint, demand on the Managers—
9  the Corporate Defendants—to institute this action is not necessary. Such a demand would have been
10 a futile and useless act, and GLLP has not made (and should be excused from making) a pre-filing
11 demand on the Managers to initiate this action.

12 242. GLLP is required to show only that a majority of the Managers cannot exercise
13 independent objective judgment about whether to bring this action or whether to vigorously
14 prosecute this action. Here each LLC has had only one Manager, which has at all relevant times been
15 controlled completely by the Individual Defendants. The Corporate Defendants and Individual
16 Defendants are named as defendants in this complaint.

17 243. Each of Defendants committed, approved and/or permitted the wrongs alleged herein
18 to have occurred and participated in efforts to conceal or disguise those wrongs from the Members
19 and are therefore not disinterested parties. They did so to further their own interests at the expense
20 of the LLCs and its Members and continue to derive substantial economic benefit from the wrongs
21 complained of herein and continue to favor their own interests over the LLCs' and its Members'
22 interests.

23 244. This lack of independence and/or the financial benefits received by the Managers
24 render them incapable of impartially considering a demand to commence and vigorously prosecute
25 this action, which would expose them to substantial liability and loss of income.

26
27
28

1

**CLAIMS FOR RELIEF**

2

**FIRST CAUSE OF ACTION**

3

**(DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR BREACH OF CONTRACT)**

4      245.    GLLP repeats and realleges each of the allegations set forth in the preceding

5  paragraphs.

6      246.    The Members, including GLLP, on the one hand, and Defendants, on the other,

7  entered into the LLCs' Operating Agreements. The Corporate Defendants entered into the

8  agreements directly, and the Individual Defendants entered into the agreements as the controllers and

9  alter egos of the Corporate Defendants. Defendant Janet Beebe signed the agreements on behalf of

10  the Corporate Defendants.

11      247.    The Members, including GLLP, complied with all, or substantially all, of the material

12  terms in the Operating Agreements, including contributing their interests in the Land to the LLCs.

13      248.    The Operating Agreements:

14

15      i.      Required Defendants to "[P]erform its managerial duties in good faith,
                in a manner it reasonably believes to be in the best interests of the

16              Company and its Members, and with such care, including reasonable
                inquiry, as an ordinarily prudent person in a like position would use

17              under similar circumstances." Operating Agreement for the LLCs
                § 7.4.

18

19      ii.     Prohibited Defendants from "tak[ing] any action outside the ordinary
                course of business . . . without first giving the other Members at least

20              ten (10) days' written notice of the proposed action." Operating
                Agreement for the LLCs § 7.3.4.

21

22      iii.    Require Defendants to "direct all operators of oil and gas operations
                on the Property to distribute Royalties directly to the Members in

23              proportion to the Company Percentages." Operating Agreement for
                the LLCs § 9.3.1.

24      249.    As described in detail above, Defendants breached the Operating Agreements by

25  failing to adhere to the duties and responsibilities set forth in the Operating Agreements. With regards

26  to Sections 7.4 and 7.3.4, Defendants breached these provisions by failing to properly consider, and

27  notify and advise Members of, above-fair-market-value purchase offers, and declining such offers

28  without giving notice of the offers, or their rejection of them, to the Members, as alleged in

1 | paragraphs 113-173. In addition, Defendants breached these provisions by failing to inform the
2 | Members of material information about the LGS lease, as alleged in paragraphs 81-103 above.

3 |     250.    Defendants also breached Section 7.4 by amending the Operating Agreements, and
4 | without informing the Members of the effects of such changes, as alleged in paragraphs 78-80 and
5 | 218-226.

6 |     251.    As to Section 9.3.1, Defendants breached these provisions by not directing LGS to
7 | directly pay the Members, as alleged in paragraphs 81-83.

8 |     252.    The Members were harmed by these breaches, including, but not limited to, their
9 | inability to make decisions based on full and accurate information about the LLCs, delays in
10 | receiving the income to which they were entitled, and failure to receive proceeds pursuant to a sale
11 | of the Land.

12 |     253.    GLLP, on behalf of the LLCs, has no adequate remedy at law.

13 | **SECOND CAUSE OF ACTION**

14 | **(DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**
15 |

16 |     254.    GLLP repeats and realleges each of the allegations set forth in the preceding
paragraphs.
17 |

18 |     255.    The Members, including GLLP, on the one hand, and Defendants, on the other,
19 | entered into the Operating Agreements. The Corporate Defendants entered into the agreements
20 | directly, and the Individual Defendants entered into the agreements as the controllers and alter egos
21 | of the Corporate Defendants. Defendant Janet Beebe signed the agreements on behalf of the
22 | Corporate Defendants.

23 |     256.    The Members, including GLLP, complied with all, or substantially all, of the material
24 | terms in the Operating Agreements, including contributing their interests in the Land to the LLCs.

25 |     257.    All conditions required for Defendants' performance had occurred.

26 |     258.    Defendants breached the implied covenant of good faith and fair dealing because they
27 | failed to provide Members material information that they needed to make an informed vote on
28 | whether to negotiate and possibly accept the various purchase offers, as well as the Purported

65
COMPLAINT

1 | Amended Operating Agreements, both via concealment and misrepresentations, as described above
2 | in paragraphs 113-173 and 204-235.

3 |     259.    The Members were harmed by Defendants' conduct. Misled by misinformation
4 | provided by Defendants and lacking truthful description of the business realities, the Members did
5 | not vote to sell the Land at the generous price offered, thereby not receiving the proceeds that they
6 | otherwise would have received had the LLCs sold the Land. Similarly, the Members purportedly
7 | approved the Purported Amended Operating Agreements.

8 |     260.    GLLP, on behalf of the LLCs, has no adequate remedy at law.

9 | **THIRD CAUSE OF ACTION**

10 | **(DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES)**

12 |     261.    GLLP repeats and realleges each of the allegations set forth in the preceding
paragraphs.

    262.    Pursuant to Sections 17701 and 17704 of the California Corporations Code and otherwise under California law, Defendants owe, and at all relevant times have owed, fiduciary obligations to GLLP and the other Members. The Corporate Defendants owe fiduciary duties to the LLCs and its Members by virtue of their position as Managers of the LLCs. The Individual Defendants owe fiduciary duties to GLLP by virtue of their control of the Land to the advantage of themselves and their families at the expense of the LLCs, GLLP, and the other Members. The Individual Defendants also established a confidential relationship and therefore owe fiduciary duties to the LLCs, GLLP, and the other Members. The Individual Defendants knowingly undertook to act on behalf and for the benefit of the LLCs, GLLP, and the other Members. Because of this arrangement, the LLCs and Members relied on the Individual Defendants' misrepresentations about the status and affairs of the LLCs. By reason of their fiduciary relationships, Defendants owe the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor, and disclosure to GLLP and the other Members.

    263.    In addition to the fiduciary duties set out under California law, pursuant to Section 7.4 of the Operating Agreement, the Managers owed GLLP, the LLCs, and other Members a

1  fiduciary duty that included, but was not limited to, performing their managerial duties in good faith
2  and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position
3  would use under similar circumstances. Similarly, the Managers also owed a duty to refrain from
4  causing any loss or damage to GLLP, the LLCs, and the other Members that was the result of the
5  Managers' fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation
6  of law.

7      264.    Defendants took advantage of the LLCs, GLLP, and vulnerable Members. Defendants
8  exercised control over the LLCs, GLLP, and the other Members by purporting to act on behalf of the
9  LLCs and Members, and making reassurances that they were acting in their best interests, when
10  Defendants were in fact entirely or predominantly acting for their own self-interests. Defendants'
11  conduct coupled with the LLCs', GLLP's, and the other Members' vulnerabilities, rendered the latter
12  effectively unable to protect themselves.

13      265.    Defendants each knowingly and intentionally violated and breached their fiduciary
14  duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to GLLP and the
15  other Members by, among other things:

16
17          i.      failing to properly consider, disclose to Members, and put to a vote
                    purchase offers, as alleged in paragraphs 113-173;

18
19          ii.     misrepresenting and concealing material information in connection
                    with the purchase offer to make it less likely the Members would vote
20                  to sell the Land, as alleged in paragraphs 113-173;

21          iii.    misrepresenting and concealing material information in connection
                    with the purchase offers GLLP sent to the Members to purchase their
22                  interests in the LLCs to make it less likely that Members would sell
                    their interests in the LLCs to GLLP, as alleged in paragraphs 113-173;
23

24          iv.     making reassurances to Members that they were acting in their best
                    interests when Defendants were engaged in discussions with a
25                  potential buyer for the Land, without disclosing Defendants' conflict
                    of interest and fraudulent scheme, and concealing this scheme from
26                  the Members so as to prevent their discovery of it, as alleged in
                    paragraphs 113-173;
27

28

v.    being grossly negligent when negotiating the LGS lease, including an extreme departure from the duty of care by failing to perform minimal diligence or research on LGS or on the gas storage market, failing to negotiate for Kirby LLC terms that were competitive with those that LGS had with Acampo landowners (all of which was publicly available), and instead entering into a lease that was at best 49% of the rent LGS pays in Acampo, as alleged in paragraphs 84-96, and by claiming to Members that the rent under the lease would increase when they knew or should have reasonably known that the opposite was likely the case, as alleged in paragraphs 97-103;

vi.    retaining conflicted counsel for the LLCs and failing to disclose conflicts of interest, as alleged in paragraphs 46-52;

vii.    increasing their record ownership of the Land by not recording the quitclaim deeds that they had agreed to execute for the land that belonged to the LLCs, as alleged in paragraphs 53-77, 194 and 228;

viii.    removing a provision for a "without cause" removal of the Manager from the Operating Agreements for the benefit of Defendants in connection with the restructuring of the LPs into LLCs, while setting up the restructuring to minimize the chances that the Members discover this change (including the retention of a reputable but conflicted counsel), as alleged in paragraphs 78-80;

ix.    failing to disclose to the Members material information about the LGS lease, including its potential restructuring, as alleged in paragraphs 97-103; and

x.    failing to disclose to the Members material information about the Purported Amended Operating Agreements, as alleged in paragraphs 204-235.

266.    As a direct and proximate result of the duty breaches alleged herein, the LLC and its Members have sustained and will sustain significant damages. Harm from these breaches of fiduciary duty include, but are not limited to, loss of the profit that would have been derived by selling the Land, loss of income the LLCs otherwise would have received from LGS, loss of ability for the majority of the Members to change the Manager of the LLCs without cause, and loss of rights and value of Member interests due to the changes to the Operating Agreements.

267.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the LLCs, GLLP, and the Members of the LLCs.

268.     Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Members' rights, and therefore GLLP, on behalf of the LLCs, is entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

269.     GLLP, on behalf of the LLCs, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR INTENTIONAL MISREPRESENTATIONS)

270.     GLLP repeats and realleges each of the allegations set forth in the preceding paragraphs.

271.     As set forth herein, Defendants made numerous misrepresentations related to the sale of the Land, Flannery's offers to purchase the Land and voting on purchase offers, and the LGS lease, among other things, including:

    i.    As alleged in paragraph 126, in connection with Flannery's 2020 offer, on February 5, 2020, Susan Beebe, on behalf of all Defendants and with their approval, falsely represented in an email to the Members of the LLCs, without any factual basis, that there could be "extensive legal problems for the family" if the would-be purchaser (i.e., Flannery) were "a foreign entity," and that Flannery refused to state whether its investors were "foreign." In fact, Flannery expressly told Kirk Beebe that it was a U.S. entity with U.S. investors, and the cover letter to Flannery's offer stated as much. Additionally, there is no basis for a claim that selling the Land to a foreign entity would lead to any legal problems, as Kirk Beebe clearly knew given that he works as a commercial real estate broker, and especially because Defendants were aware that the venerable First Republic Bank had vouched for Flannery and represented that it had the cash on hand to fulfill its all cash offer. Additionally, Susan Beebe, on behalf of all Defendants and with their approval, in the February 5, 2020 email to the Members, misrepresented and mischaracterized Flannery's delivery of the 2020 offer to the Members as improper, referring to it as "unsolicited phone calls" that were "harassment." In addition, Susan, on behalf of all Defendants and with their approval, falsely suggested to Members that such contact was improper or illegal by stating that Defendants would be contacting a law firm about directing Flannery to stop contacting the Members and that "further contact must be directed through [Counsel B]" so as to "cease the harassment of LLC members." However, there was nothing improper or illegal under the Operating Agreements or law about Flannery's delivery of its 2020 offer, or the fact that Flannery was reaching out directly to the Members with this offer, and Counsel B did not represent the Members in their personal capacities. Lastly, Susan, on behalf of all Defendants and with their

69

1

2

3

4

5

6

approval, in her February 5, 2020 email to Members misleadingly stated that Flannery failed to "supply any information about who the people are behind the inquiring company . . . and/or what their source of money or any other details are surrounding their interest in the ranches." This was misleading given Flannery had provided proof of funds and had said that its investors were based in the United States, yet Susan suggested that there were grounds to suspect there were material problems. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ii.     As alleged in paragraph 140, on March 13, 2020, Susan Beebe, on behalf of all Defendants and with their approval, sent an email to the LLC Members misrepresenting that they "all" had "recently agreed to refuse" the February 2020 purchase offer at issue, and instructing them to "discard/destroy" any offer they receive from Flannery, even though no Member vote had taken place. In fact, Counsel B, acting on behalf of and at the direction of Defendants, admitted to Flannery earlier that *same day* that no member vote had taken place and thus tacitly that this statement was false. Susan Beebe, on behalf of all Defendants and with their approval, also misrepresented in this same email that Kirby LLC's land "is not for sale because of our obligations associated with the gas storage project," which is a material misrepresentation because the landlord's obligations under the gas storage lease requires essentially that the owners not block access or otherwise interfere, which is an obligation of landlord that Flannery would assume by default after purchasing the property, and which Flannery offered to additionally assume as per separate contractual arrangement. In fact, Counsel B had previously represented other landowners on other sales to Flannery, which included the exact same issues in connection with such landowners reserving to themselves income from wind turbines, which were indeed resolved through an agreement by Flannery not to interfere and to indemnify the sellers against any losses caused by Flannery as the new owner. Susan Beebe, on behalf of all Defendants and with their approval, also misrepresented in this same email that Defendants "would still need to know more about [Flannery], their financial condition and the source of funds they use to make such purchases," despite Flannery providing Defendants proof of funds and ample information regarding Flannery's financial condition, as described in paragraph 140. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth.

23

24

25

26

27

28

iii.    As alleged in paragraph 148, on June 22, 2020, Kirk Beebe, on behalf of all Defendants and with their approval, sent a letter to the Members that falsely stated that Defendants "were aware of adjacent properties that have been offered more money," despite that there were not actually any adjacent properties that Flannery offered more money for. Kirk Beebe, on behalf of all Defendants and with their approval, also misrepresented in this same letter that there was "significant interest from multiple industrial users of the Lambie Industrial Park," when in reality, there have been no new sales or significant leases of parcels in the Lambie Industrial Park since 2016. Kirk, on behalf of all

Defendants and with their approval, also misrepresented in this same email that Flannery "will not disclose their intended use of the properties, their source of funds, or the principals associated with the entity," despite Flannery providing Defendants proof of funds, Counsel B having handled many sales for other clients to Flannery and never having any issues with representing entities who sold to Flannery, and knowing Flannery was a well-qualified, all-cash buyer paying above-market prices. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth. These misrepresentations are particularly outrageous because Kirk works as a commercial real estate broker at CBRE, and therefore knows that private investors frequently purchase properties without disclosing any of the information Kirk listed whatsoever—in fact, Kirk's own employer, CBRE, likely handles hundreds of such transactions every year.

iv.  As alleged in paragraph 153, in December 2020, Kirk Beebe, on behalf of all Defendants and with their approval, sent a letter to the Members that falsely stated that "an adjacent landowner was offered, and rejected, an offer to purchase at close to four times the cost per acre we were most recently offered," when there was no such offer for property comparable to the Land. If such offer existed at all, then it had to be for a property zoned for industrial use, rather than agricultural use like the Land. Defendants knew that these statements were materially misleading when they made them, or made the misrepresentations recklessly and without regard for their truth.

v.  In connection with the 2021 offer, each of Defendants made or caused to be made misrepresentations to the Members as described in paragraph 161, including, for example, on May 20, 2021, Susan Beebe, Kirk Beebe, and Kenneth Beebe, on behalf of all Defendants and with their approval, falsely stated that the sale would negatively impact the income they earned from the gas storage leases on the land—income on which the Members rely and do not want to lose; that the gas storage leases on the land would generate much higher income in the future; there were adjacent properties that were offered more money; and that the land was worth much more than it actually was, based on comparisons to nearby industrially zoned property. On May 20, 2021, Susan Beebe, acting on behalf of all Defendants and with their approval, sent an email to the Members that made numerous misrepresentations, including falsely stating that they were sharing with the Members and attaching to the email Flannery's April 19, 2021 purchase offer, when in reality Susan purposely failed to attach the Transmittal Email to her email, which included material information about Flannery's offer and which directly contradicted the fraudulent misrepresentations contained in Susan's email. Among other things, in Susan's May 20, 2021 email, Susan, on behalf of all Defendants and with their approval, falsely stated that Flannery's "offer is not different from the cost per acre from the offer we declined a year ago. We have included the offer as an attachment." However, the full offer (including the Transmittal Email) was not attached, the cost per acre was not the same, and in the omitted Transmittal Email, Flannery expressly stated that it was "willing to come up materially from the

$36,000,000 offer." Additionally, in this same email, Susan, on behalf of all Defendants and with their approval, asked Members to choose to either "[d]ecline" or "[a]ccept" the $36,000,000 offer, falsely suggesting to Members that this was Flannery's best and final offer, while intentionally leaving out Flannery's Transmittal Email, which, to the contrary, clearly stated that Flannery would pay "materially" more than $36,000,000 and invited the LLCs to counter on their offer. Additionally, in her email, Susan, on behalf of all Defendants and with their approval, falsely stated that the reason for the one-month delay in sharing Flannery's April 19, 2021 offer with the Members was because the principal attorney working with Defendants did not have reason to check his email for three weeks and the second attorney at the law firm does not work with the LLCs. But these explanations were lies, because Kike Beebe was copied on the April 19, 2021 offer, and both attorneys were copied on the communications with Flannery. Susan, on behalf of all Defendants and with their approval, also falsely stated that Defendants "had a few iterations to where the price is now $12,000 per acre, which is four to five times less, we believe, than is being considered for nearby properties." However, in the very omitted Transmittal Email, Flannery expressly disclosed the maximum prices they paid in the area and, as explained above, the cost per acre was the same. Lastly, in her May 20, 2021 email, Susan, on behalf of all Defendants and with their approval, falsely stated that the "Kirby lease with Lodi Gas Storage has a number of owner obligations that would preclude the sale of Kirby under any circumstances without risking future rental payments from Lodi Gas Storage," when no such obligations existed and Defendants knew this, as described in paragraph 161. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth.

vi.    As alleged in paragraph 163, on May 22, 2021, one of the principals of GLLP sent an email to the Members attempting to correct some of the false and misleading comments and omissions made in Defendants' May 20, 2021 letter. However, the principal received limited responses. GLLP later learned that the lack of response was because in a secret communication around that date, Defendants told other Members that GLLP's contentions had no merit and instructed all Members to ignore any and all communications from the owners of GLLP, effectively silencing the one voice that was questioning Defendants' actions. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth.

vii.   As alleged in paragraphs 168, on June 9, 2021, Kirk Beebe, on behalf of all Defendants and with their approval, sent another letter to the Members falsely stating "that 100% of the ownership that responded voted not to proceed with [Flannery's April 19, 2021 offer]. One owner entity, representing 1/8 of the ranches, failed to respond to the request." This was a false statement because the principals of GLLP responded and clearly advocated for negotiation with Flannery and sale of the Land. Kirk, acting on behalf of all Defendants and with their approval, made this misrepresentation willfully and intentionally, with

the intent to create a false sense of unanimity and squash any dissent among the Members. Defendants knew that these statements were not true when they made them, or made the misrepresentations recklessly and without regard for their truth.

viii.   As alleged in paragraph 172, Kirk and Susan, on behalf of all Defendants and with their approval, sent the June 20, 2021 offer to the Members, with the false excuse that they had not been able to send it previously due to travel (when they clearly received the offer via email and could have forwarded it), and the same variety of misrepresentations as in their previous letters.

ix.   As alleged in paragraphs 174-203, on various dates after July 18, 2022, Kirk, on behalf of all Defendants and with their approval, told Members that GLLP was not a Member of the LLCs and thus they could not sell their interests to GLLP. Defendants knew that the Operating Agreements did not give them the power to suspend GLLP as a Member and that those agreements permit Member-to-Member transactions.

x.   As alleged in paragraphs 10-11 and 205-235, in September 2022, Defendants falsely represented that the only changes to the Operating Agreements related to voting rights and that the reason for the changes was to protect "family" interests.

272.   As a result of their fiduciary relationship with the Members, Defendants had a duty of candor and to provide accurate information.

273.   Defendants intended for the Members to rely on these misrepresentations in voting to reject the purchase offer.

274.   The Members reasonably relied on Defendants' misrepresentations in voting to reject the purchase offer.

275.   The Members' reliance on Defendants' misrepresentations was a substantial factor in causing the Members to not sell the Land to GLLP.

276.   Ultimately, their reliance on Defendants' misrepresentations resulted in their loss of the profit that would have been derived by the LLCs and its Members by selling the Land.

277.   Defendants also misrepresented that Defendants would quitclaim the land that they owned directly to the LLCs in connection with the limited partnerships being restructured into LLCs in 2003.

278.   In addition, on February 24, 2003, in the Counsel B Memo, Counsel B, acting at the direction of Kenneth and Janet Beebe, and as agent for, with the approval of, on behalf of all Defendants and with their approval, represented as to the Members of the LLCs on Defendants' behalf that Defendants agreed to quitclaim the ownership interest the Corporate Defendants held in the Land directly, and that the quitclaim deeds were executed accordingly: "[A]ny property interests the corporate general partners held outside the partnerships were to be transferred to the limited liability companies" and that "[t]he property records could have been more clear but suggested that the corporate general partners still owned a small percentage of the properties of the three companies. *We cured that problem by having the corporations quitclaim their interests in the properties to the limited liability companies*." (Emphasis added.)

279.   In addition, on July 28, 2022, Counsel C, as agent for, with the approval of, on behalf of, and acting at the direction of all Defendants and with their approval, represented to GLLP that the "matter [of the quitclaim deed recording] will be administratively corrected."

280.   Again, in a letter September 14, 2022 letter attaching a September 13, 2022 letter from Counsel C, Kirk and Susan Beebe, on behalf of all Defendants and with their approval, represented to the Members that the quitclaim recording issue that was not "substantive," and further represented that the "record title mistakes as to Barnes Family Ranch and Lambie Ranch will be corrected as part of this process of amendment and restatement" to the Operating Agreements.

281.   Defendants knew that these statements were not true when they made them, or when Counsel B and Counsel C made them on their behalf, and made these misrepresentations recklessly and without regard for their truth.

282.   However, despite this agreement and representation to the Members, and contrary to what Defendants and their agents represented to the Members, Defendants failed to execute the quitclaims they had agreed to execute, and as discussed in paragraph 77, as of the filing of this complaint, it appears Defendants have still not recorded the quitclaims.

283.   Defendants and their agents intended for the Members to rely on all of these misrepresentations and the Members justifiably relied on them.

1    284.    Because Defendants are fiduciaries of the LLCs, GLLP, and the other Members, the

2  delayed accrual rule applies, limiting any duty of inquiry into Defendants' actions that comprise the

3  causes of action.

4    285.    The Members have been and are being harmed by Defendants' actions due to the

5  uncertainty created over ownership of the LLCs.

6    286.    Defendants' actions were undertaken with fraud, malice, or oppression, or with a

7  conscious disregard for Members' rights, and therefore GLLP, on behalf of the LLCs, is entitled to

8  an award of exemplary and punitive damages against Defendants, and each of them, in an amount

9  according to proof.

10    287.    GLLP, on behalf of the LLCs, has no adequate remedy at law.

11    **FIFTH CAUSE OF ACTION**

12    **(DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR FRAUDULENT CONCEALMENT)**

13

14    288.    GLLP repeats and realleges each of the allegations set forth in the preceding

15  paragraphs.

16    289.    With respect to the conversion of the Limited Partnerships into the LLCs, Defendants

17  concealed that there were actual material differences between the LP Agreements and Operating

18  Agreements. This scheme was concealed from Members, who did not uncover it, as alleged in

19  paragraphs 37-45. In particular, the unauthorized changes to the governing documents mean that the

20  Corporate Defendants could only be removed as Managers "for cause," whereas under the LP

21  Agreements, the Corporate Defendants could be removed as general partners "with or without

22  cause."

23    290.    Because Defendants are fiduciaries of the LLCs, GLLP, and the other Members, the

24  delayed accrual rule applies, limiting any duty of inquiry into Defendants' actions that comprise the

25  causes of action.

26    291.    The Members have been and are being harmed by Defendants' actions. The Members

27  are entitled to reformation of the Operating Agreements to reflect their understanding with

28  Defendants.

1    292.    Defendants also intentionally failed to disclose to GLLP or the other Members of the
2    LLCs that Defendants failed to record the quitclaim deeds that they promised they would record in
3    connection with a reorganization of the LLCs, as alleged in paragraphs 53-77, 194, and 228.

4    293.    Defendants intended to deceive the Members into believing that they would record
5    the quitclaim deeds that they had promised despite having no intention of doing so and actually
6    planning to later misappropriate the Land from the Members. Had the Members known this
7    concealed information, they would have demanded that Defendants record the quitclaim deeds, or
8    they would not have approved the reorganization. The Members were harmed by Defendants'
9    concealment through the danger that the LLCs' ownership interests are not clear. Defendants'
10   concealment was a substantial factor in causing this harm to the Members.

11   294.    Defendants were fiduciaries of the LLCs and the Members and intentionally failed to
12   disclose that they changed the provision in the Operating Agreements regarding "no cause" removal
13   of the Managers, as alleged in paragraphs 78-80.

14   295.    Defendants intended to deceive the Members into thinking that the Operating
15   Agreements did not change materially from the LP Agreements. Had the Members known this
16   concealed information, they would not have approved the Operating Agreements. The Members
17   were harmed by Defendants' concealment by losing the ability to change the Manager without cause.
18   Defendants' concealment was a substantial factor in causing this harm to the Members.

19   296.    Defendants were fiduciaries of the LLCs and the Members and intentionally failed to
20   disclose the following facts to the Members:

21
22          i.      Various offers by Flannery were made to purchase the Land at well
                    above fair market value.
23
24          ii.     In its February 2020 offer, the would-be purchaser offered to let Kirby
                    LLC retain 100% of its income from the Lodi Gas Storage ("LGS")
25                  lease.

26          iii.    All of the attorneys representing the LLCs were conflicted by
                    representing the Corporate Defendants and the Individual Defendants.
27
28          iv.     The April 19, 2021 purchase offer on which Defendants held a vote
                    was delivered with the Transmittal Email that explicitly said it was not

76

the best and final offer and that Flannery would consider counters for a higher purchase price, and other material information about Flannery's offer which directly contradicted the fraudulent misrepresentations contained in Susan's email, as alleged in paragraph 161.

v.      Counsel B represented numerous other sellers who sold to Flannery, including on transactions that included income reservations, so as to avoid making Flannery appear as a more credible buyer.

vi.     In connection with his position at CBRE, Kirk knows that it is industry standard for private LLCs to transact without knowing the source of the funds being used.

vii.    That respected landowners in the area sold their properties to Flannery without incident and successfully reserved their income from activities similar to the LGS lease.

viii.   The industrial park adjacent to Barnes LLC and Lambie LLC was unlikely to make Barnes LLC and Lambie LLC more valuable.

ix.     The LGS lease was at a major risk of being restructured, and its income significantly cut.

x.      LGS pays Acampo landowners significantly more than it pays Kirby LLC.

xi.     That contrary to Kirk's letter, LGS's new owner was unlikely to lead to an increase in royalties because the new owner bought LGS at a fraction of the cost to the prior owner, indicating that the expected future value of LGS, and therefore of the royalties, had been severely diminished.

xii.    The Kirby Hill quitclaim deed was filed in 2006 (but not deeds for Lambie LLC and Barnes LLC).

xiii.   Transactions related to Lambie LLC that would have showed that Defendants were executing documents that showed Lambie Ranch being owned by both Lambie LLC and Lambie Corp, in direction contradiction to the Counsel B Memo.

xiv.    Defendants instructed Members to ignore GLLP's communications, even though GLLP was raising valid considerations for the Members.

xv.    The changes to the Operating agreements in September 2022 were in furtherance of Defendants' plan to buy the other Members' interests at significant discounts.

297.    The Members did not know of these concealed facts.

298.    Defendants intended to deceive the Members into formally or informally rejecting the purchase offers.

299.    Had the Members known this concealed information, they would have voted to negotiate and ultimately accept the purchase offer.

300.    The Members were harmed by Defendants' concealment via the loss of the profit that would have been derived by selling the Land.

301.    Defendants' concealment was a substantial factor in causing this harm to the Members.

302.    Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Members' rights, and therefore GLLP, on behalf of the LLCs, is entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

303.    GLLP, on behalf of the LLCs, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR CONSTRUCTIVE FRAUD, CAL. CIV. CODE § 1573)

304.    GLLP repeats and realleges each of the allegations set forth in the preceding paragraphs.

305.    Corporate Defendants are the Managers of the LLCs and therefore had fiduciary relationships with the LLCs.

306.    The Individual Defendants established a confidential relationship with the Members and at all relevant times owed fiduciary obligations to the LLCs, GLLP, and the other Members, including by imposing one-sided LP Agreements and later, Operating Agreements, and continually making reassurances that they were acting in the LLCs and Members' best interests. The Individual

1  Defendants' conduct coupled with the Members' vulnerability rendered the latter group effectively

2  unable to protect themselves.

3      307.    Defendants acted on the Members' behalf for purposes of making decisions on behalf

4  of the LLCs.

5

6      308.    As a result of Defendants' confidential and fiduciary relationship, Defendants owed

7  GLLP, the LLCs, and other Members of the LLCs a duty to make a full disclosure of all material

8  facts, including that:

9      i.    Defendants were fiduciaries of the LLCs and the Members and intentionally
            failed to disclose to GLLP and the other Members of the LLCs that the
10          Individual Defendants had a secret plan to purchase the Members' interest in
            the LLCs for cents on the dollar, which Defendants executed by creating
11          transfer restrictions and other control provisions in the Operating Agreements
            that would force the Members, earlier or later, to sell their interest to
12          Individual Defendants on the cheap, as alleged in paragraphs 6-9, 32-45, 53-
            77, and 116-117.

13

14     ii.    Defendants, including Kirk Beebe and Susan Beebe Furay, acting on behalf
            of all Defendants and with their approval, decided to conceal or misrepresent
15          purchase offers made in early and late 2018, February 2020, December 2020,
            April 19, 2021, and June 10, 2021, as alleged in paragraphs 113-173.

16

17     iii.    Defendants, including Kirk Beebe acting on behalf of all Defendants and with
            their approval, decided to not hold votes on most of the aforementioned
18          purchase offers.

19     iv.    Defendants, including Kirk Beebe, Susan Beebe Furay, and Kenneth Beebe,
            acting on behalf of all Defendants and with their approval, when forced to
20          hold votes on the April 19, 2021 and the June 10, 2021 offer, manipulated the
            vote through concealment and material misrepresentations by making
21          misrepresentations and omissions regarding the terms and circumstances of
            the offers as set forth in paragraphs 156-172.
22

23     v.    The aforementioned offers made to purchase the Land were at above fair
            market value, and the Transmittal Email to the April 19, 2021 offer expressly
24          said that the would-be purchaser would pay "materially" more and invited a
            counter offer at a higher purchase price.
25

26     vi.    The LGS lease was at a major risk of being restructured and its income
            significantly cut.
27

28     vii.    The changes to the Operating Agreements and their purposes.

1  309.  Defendants breached their duty to GLLP, the LLCs, and other Members of the LLCs,
2  including by affirmatively concealing and/or failing to disclose the above material facts.

3  310.  Defendants' affirmative concealment and/or failures to disclose had a tendency to
4  deceive and did in fact deceive GLLP, the LLCs, and other Members of the LLCs.

5  311.  Defendants gained an advantage by their breach of duty, including by preventing a
6  disruption to their multi-decade fraudulent scheme of enriching themselves, usurping all control of
7  the Land, and furthering their plan of forcing other Members to eventually sell their interest to
8  Defendants at a bargain price so that Defendants could reap significant profits.

9  312.  GLLP, the LLCs, and other Members of the LLCs justifiably relied on Defendants,
10  who could have reasonably expected that GLLP, the LLCs and the other Members would have relied
11  on Defendants, including by virtue of their confidential and/or fiduciary relationship, their
12  continually holding themselves out as having superior knowledge and special information about the
13  subject matter, and their assurances that they were acting in the LLCs' and Members' best interests.

14  313.  In reliance on Defendants' affirmative concealment and/or failures to disclose, GLLP,
15  the LLCs, and other Members were misled to their prejudice and suffered damage, including, but not
16  limited to, the loss of profit that would have been derived by selling the Land, in amounts to be
17  shown according to proof.

18  314.  Defendants' concealment was a substantial factor in causing this harm to the
19  Members.

20  315.  Defendants' actions were undertaken with fraud, malice, or oppression, or with a
21  conscious disregard for Members' rights, and therefore GLLP, on behalf of the LLCs, is entitled to
22  an award of exemplary and punitive damages against Defendants, and each of them, in an amount
23  according to proof.

24  316.  GLLP on behalf of the LLCs, has no adequate remedy at law.

25  ## SEVENTH CAUSE OF ACTION

26  ## (DIRECT CLAIM FOR BREACH OF CONTRACT)

27  317.  GLLP repeats and realleges each of the allegations set forth in the preceding
28  paragraphs.

1    318.    GLLP, as one of the Members, and Defendants, entered into the LLCs' Operating

2 Agreements. The Corporate Defendants entered into the agreements directly, and Individual

3 Defendants entered into the agreements as the controllers and alter egos of Corporate Defendants.

4 Defendant Janet Beebe signed the agreements on behalf of the Corporate Defendants.

5    319.    GLLP complied with all, or substantially all, of the material terms in the Operating

6 Agreements, including contributing their interests in the Land to the LLCs.

7    320.    The Operating Agreements:

8         i.    Required Defendants to "[P]romptly deliver to [GLLP, upon its
              request], at the expense of the Company, a copy of the information
9             required to be maintained hereunder," including tax returns and copies
              of the LLCs' financial statements. Operating Agreement for the LLCs
10            §§ 15.1.4, 15.1.6, 15.2.

11        ii.   Required Defendants to "[P]rovide such financial and other
              information relating to the Company or any other Person in which the
12            Company owns, directly or indirectly, an equity interest, as a Member
              may reasonably request." Operating Agreement for the LLCs § 15.4.
13

14   321.    On July 18, 2022, GLLP sent Defendants a request for information pursuant to

15 Sections 15.2 and 15.4 of the Operating Agreements and its statutory books and records rights under

16 the California Corporations Code, for purposes of assessing the financial and legal status of the

17 Companies. The request stated that GLLP could accept delivery of the requested documents by either

18 providing a data room link that enabled Defendants to upload these documents or by inspecting and

19 copying the documents in physical form at a pre-agreed time and location. Defendants breached the

20 Operating Agreements by refusing to provide documents to GLLP required thereunder.

21   322.    GLLP was harmed by these breaches, including, but not limited to, their inability to

22 make decisions based on full and accurate information about the LLCs. GLLP is entitled to specific

23 performance.

24   323.    In addition, Section 10.1.2 of the Operating Agreements states: "In the case of a

25 Member which is a corporation or other entity, any disposition of interests in such entity which

26 amounts to a change in ownership of more than fifty percent (50%) of the beneficial interests therein

27 shall be deemed to be a sale, exchange, transfer or assignment of an Interest in the Company for

28 purposes of this Section 10.1.2." As stated in paragraphs 175-183, the sale of a minority interest in

1 GLLP did not "amount to a change in ownership of more than fifty percent of the beneficial interests
2 therein," it did not constitute "a sale, exchange, transfer or assignment of an Interest" so as to require
3 GLLP to "first offer[] the Interest (or portion thereof) to the other Members" or the "consent of the
4 Manager" and was thus permissible under the Operating Agreements.

5     324.   Despite the inapplicability of Section 10.1.2, Defendants called into question the
6 status of GLLP as a Member of the LLCs and purported to suspend GLLP as a Member of the LLCs
7 absent Defendants' review of the Ranchlands Purchase agreements, even though nothing in the
8 Operating Agreements would enable or allow Defendants to take such action.

9     325.   Section 10.3 of the Operating Agreements, which governs "Transfers to Permitted
10 Transferees," states: "A Member may sell, transfer, or assign his Interest (or any portion thereof) in
11 the Company to any of the following Persons ('a Permitted Transferee') without the Consent of the
12 Manager or any of the other Members and without having to first offer the Interest to the other
13 Members . . . [to] any other Member of the Company." Operating Agreement for the LLCs §§ 10.3,
14 10.3.4. The Holt Sale falls squarely within this provision because the transfer and assignment of the
15 Holt Interests to GLLP were between Members of the LLC. Despite this, Defendants have failed to
16 authorize or recognize the Holt Sale, unreasonably demanded to see documentation that is neither
17 "necessary or desirable to effect the Transfer," and refused to adjust the interest that GLLP possesses
18 on account of the Holt Sale absent Defendants' review of the agreements for both the Ranchlands
19 Purchase and the Holt Sale (collectively, "Transaction Documents")—despite the self-executing
20 nature of the Ranchlands Purchase and Holt Sale transactions, which do not need the consent of
21 Defendants or other Members to be valid.

22     326.   Further, Defendants have now claimed that GLLP is no longer a Member of the LLCs,
23 under several pretenses, none of which are valid, as discussed in paragraphs 204-217. One basis for
24 this claim is that Purported Amended Operating Agreements stripped GLLP of its Membership.
25 However, as set out in paragraphs 204-235, these amendments are invalid because they were adopted
26 in breach of Defendants' duties (as alleged herein) and because those amendments conflict with and
27 are not permitted under other terms of the Operating Agreements.

28

1    327.    Defendants' actions also are in breach of Section 7.4 of the Operating Agreements,
2   which provides that the "Manager shall perform its managerial duties in good faith, in a manner it
3   reasonably believes to be in the best interests of the Company and its Members, and with such care,
4   including reasonable inquiry, as an ordinarily prudent person in a like position would use under
5   similar circumstances."

6    328.    As a direct and proximate result of the breaches of duty alleged herein, GLLP has
7   sustained and will sustain significant harm, and is entitled to, among other things, specific
8   performance by the Managers recognizing (i) GLLP as a Member of the LLCs, (ii) GLLP's
9   acquisition and assignment of the Holt Interests as valid, permitted, and authorized under Section
10   10.3.4 of the Operating Agreements, (iii) the interests that GLLP possesses in the LLCs on account
11   of the Holt Sale, and (iv) damages related to GLLP's inability to consummate purchases of other
12   Members' interests while treated as a non-Member.

13                                  **EIGHTH CAUSE OF ACTION**

14   **(DIRECT CLAIM FOR VIOLATION OF SECTIONS 17704.10(B)(1) AND 17701.13 OF**
**THE CALIFORNIA CORPORATIONS CODE)**
15
16    329.    GLLP repeats and realleges each of the allegations set forth in the preceding
     paragraphs.
17
18    330.    Sections 17704.10(b)(1) and 17701.13 of the California Corporations Code provide
     the Members of the LLCs with statutory rights to examine the books and records of the LLCs.
19
20    331.    On July 18, 2022, GLLP sent Defendants a request for information pursuant to
21   Sections 15.2 and 15.4 of the Operating Agreements and its statutory books and records rights under
22   the California Corporations Code for purposes of assessing the financial and legal status of the
23   Companies. The request stated that GLLP could accept delivery of the requested documents by either
24   providing a data room link that enabled Defendants to upload these documents, or by inspecting and
     copying the documents in physical form at a pre-agreed time and location.
25
26    332.    Rather than making available to GLLP copies of the requested information as
     required, Defendants refused to provide any books or records.
27

28

                                              83

1  333.    This has prevented GLLP from understanding the actions Defendants have taken with
2  respect to the LLCs, understanding the value of its ownership of the LLCs, and from making fully
3  informed decisions about its interests in the LLCs.

4  **NINTH CAUSE OF ACTION**

5  **(DIRECT CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF THE DUTY OF
GOOD FAITH AND FAIR DEALING)**
6
7  334.    GLLP repeats and realleges each of the allegations set forth in the preceding
paragraphs.
8
9  335.    A covenant of good faith and fair dealing is implied as a matter of law in the Operating
Agreements of the LLCs.
10
11  336.    The obligation of good faith and fair dealing extends to the assertion, settlement and
litigation of contract claims and defenses. *See* Restatement (Second) of Contracts § 205 (Am. L. Inst.
12  1981).
13
14  337.    The obligation of good faith and fair dealing is violated by dishonest conduct such as
15  conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding,
harassing demands for assurances of performance, rejection of performance for unstated reasons,
16  abuse of a power to determine compliance, and falsification of facts. *See id.* It also extends to dealing
17  that is candid but unfair, such as taking advantage of the necessitous circumstances of the other party
18  to extort a modification of a contract without legitimate commercial reason. *See id.*
19
20  338.    Defendants have breached the implied covenant of good faith and fair dealing by
concocting a fictitious dispute, calling into question the status of GLLP as a Member of the LLCs,
21  and suspending GLLP as a Member of the LLCs absent Defendants' review of the Transaction
22  Documents (where nothing in the Operating Agreements would enable or allow the Individual
23  Defendants to do so).
24
25  339.    Defendants also breached their duties of good faith and fair dealing in trying to amend
the Operating Agreements to exclude GLLP as a Member, despite that these amendments were
26  improper, harmed GLLP's interests, benefitted Defendants' interests, significantly devalued GLLP's
27

28

1 | interests, and impaired GLLP's rights to participate in the governance of the LLCs as a voting
2 | Member.

3 |     340.    Further, by intentionally interfering with and thwarting GLLP's plainly permissible
4 | acquisition and assignment of the Holt Interests, failing to authorize or recognize the Holt Sale,
5 | unreasonably demanding to see documentation that is neither "necessary or desirable to effect the
6 | Transfer," and refusing to adjust the interest that GLLP possesses on account of the Holt Sale absent
7 | Defendants' review of the Transaction Documents—despite the self-executing nature of the
8 | Ranchlands Purchase and the Holt Sale, which do not need the consent of Defendants or other
9 | Members to be valid—Defendants have breached the covenant of good faith and fair dealing.

10 |     341.    As a proximate result of these breaches, GLLP has been damaged in amounts to be
11 | proven at trial.

12 | **TENTH CAUSE OF ACTION**

13 | **(DIRECT CLAIM AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY**
14 | **DUTIES)**

15 |     342.    GLLP repeats and realleges each of the allegations set forth in the preceding
16 | paragraphs.

17 |     343.    Pursuant to Sections 17701 and 17704 of the California Corporations Code and
18 | otherwise under California law, Defendants owe, and at all relevant times have owed, fiduciary
19 | obligations to GLLP, as a Member. The Corporate Defendants owe fiduciary duties to the LLCs and
20 | its Members by virtue of their position as Managers of the LLCs. The Individual Defendants owe
21 | fiduciary duties to GLLP by virtue of their control of the Land to the advantage of themselves and
22 | their families at the expense of the LLCs, GLLP, and the other Members. The Individual Defendants
23 | also established a confidential relationship and therefore owe fiduciary duties to GLLP, the LLCs,
24 | and other Members. The Individual Defendants knowingly undertook to act on behalf and for the
25 | benefit of the LLCs, GLLP, and the other Members. Because of this arrangement, the LLCs and
26 | Members relied on the Individual Defendants' misrepresentations about the status and affairs of the
27 | LLCs. By reason of their fiduciary relationships, Defendants owe the highest obligation of loyalty,
28 | good faith, due care, oversight, fair dealing, candor, and disclosure to GLLP.

344. In addition to the fiduciary duties set out under California law, pursuant to Section 7.4 of the Operating Agreement, the Managers owed GLLP, the LLCs, and other Members a fiduciary duty that included, but was not limited to, performing their managerial duties in good faith and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. Similarly, the Managers also owed a duty to refrain from causing any loss or damage to GLLP, the LLCs, and the other Members that was the result of the Managers' fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law.

345. Defendants exercised control over the LLCs, GLLP, and the other Members by purporting to act on behalf of the LLCs and Members, and making reassurances that they were acting in their best interests, when Defendants were in fact entirely or predominantly acting for their own self-interests. Defendants' conduct coupled with the LLCs', and GLLP's, and the other Members' vulnerabilities rendered GLLP effectively unable to protect themselves.

346. Defendants each knowingly and intentionally violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor, and disclosure to GLLP by, among other things:

        i. Intentionally delaying notice to GLLP of the proposed Operating Agreements so that GLLP could not effectively inform Members of the effects of the proposed amendments;

        ii. Failing to disclose (and concealing) the effects of the amendments to Members—specifically, the effects of the amendments on GLLP; and

        iii. Initiating and purporting to amend the Operating Agreements to deprive GLLP of its Member status.

347. As a direct and proximate result of the duty breaches alleged herein, GLLP has sustained and will sustain significant damages. Harm from these breaches of fiduciary duty include, but are not limited to, loss of rights and value of Membership due to the changes to the Operating Agreements and inability to consummate purchases of other Members' interests while treated as a non-member.

1    348.    As a result of the misconduct alleged herein, the Individual Defendants are liable to
2  GLLP.

3    349.    Defendants' actions were undertaken with fraud, malice, or oppression, or with a
4  conscious disregard for GLLP's rights, and therefore GLLP is entitled to an award of exemplary and
5  punitive damages against Defendants, and each of them, in an amount according to proof.

6                              **ELEVENTH CAUSE OF ACTION**

7      **(DIRECT CLAIM AGAINST ALL DEFENDANTS FOR INTENTIONAL
8        INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)**

9    350.    GLLP repeats and realleges each of the allegations set forth in the preceding
10  paragraphs.

11    351.    The Members of the LLCs (other than GLLP), on the one hand, as co-Members and
12  also as potential sellers of their LLC interests, and GLLP, on the other, were in an economic
13  relationship that was likely to have resulted in an economic benefit to GLLP resulting from the sale
14  of the Members' interests in the LLCs, as well as the assignment of their interests in the LLCs and
15  all rights associated with such interests, including voting rights.

16    352.    GLLP, or its predecessors, and the other Members of the LLCs, have been co-partners
17  and then co-Members since at least the 1980s, and as such have an existing economic relationship.
18  Many co-members are also extended family members. GLLP knows, based on conversations with
19  many of the Members, that numerous Members had wanted to sell their interests in the LLCs before
20  Defendants interfered.

21    353.    GLLP, who was interested in purchasing the interests of other Members, sent
22  purchase offers to all Members. Many of the Members expressed an initial interest and enthusiasm
23  around GLLP's purchase offers and began negotiations with GLLP, developing an even further
24  economic relationship that would have resulted in an economic benefit to GLLP, barring Defendants'
25  interference.

26    354.    Defendants interfered with GLLP's economic relationships with the Potential Sellers
27  by fraudulently misrepresenting key elements of GLLP's purchase offers, information about GLLP,
28  consequences of transacting with GLLP, the financial condition of the LLCs, of the LGS lease, and

1  the fair market value of the Land, all with the intention of deterring Members from selling their
2  interests to GLLP for their own personal benefit rather than considering what was in the best interest
3  of the Members or LLCs, in breach of their fiduciary duties, among other tortious conduct.
4  Specifically, and as described in paragraphs 174-203, Defendants and counsel for Defendants
5  intentionally (1) misrepresented to Members that it was illegal to transact with GLLP because GLLP
6  was not a Member of the LLCs (despite the fact that GLLP *is* a Member of each of the LLCs), (2)
7  thwarted Members from contacting or negotiating directly with GLLP by misrepresenting to those
8  Members that all offers must go through Defendants or their counsel and stripping Members of their
9  autonomy to independently act on or transact regarding their LLC interests (despite the clear clause
10 in the Operating Agreements that permits Members to transfer interests to other Members without
11 the Consent of the Managers), (3) misrepresented to Members that GLLP's 2022 purchase offers to
12 the Members were "far worse" than the purchase offers that Flannery made in 2021, when they were
13 at least commensurate and likely better, (4) made misrepresentations to Members regarding the
14 renegotiation of the LGS lease, as well as misstated the certainty of continual income from this lease
15 (despite information to the contrary), (5) misrepresented the Individual Defendants' failure to record
16 the quitclaim deeds for the Lambie and Barnes properties as clerical errors rather than confess to
17 their secret scheme to increase their effective ownership of the Land, and (6) falsely alleged that
18 GLLP would not purchase LLC interests and only made the offers to force the LLCs to sell the Land
19 to Flannery, not only without factual basis, but in direct contradiction of facts they knew, which is
20 that GLLP purchased the Holt Interests for cash, without any further conditions, in direct
21 contradiction of such assertions by Defendants.

22        355.    In addition, the wrongful conduct described above breached Defendants' fiduciary
23 duties to the Members.

24        356.    Separately, Defendants' wrongful conduct violated California's Unfair Competition
25 Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, including specifically the unlawful, unfair, and fraud
26 prongs.

27

28

1    357.  Finally, Defendants breached the Operating Agreements, duties of good faith and fair
2  dealing, and fiduciary duties in purporting to amend the Operating Agreements to exclude GLLP as
3  a Member.

4    358.  In so doing, Defendants intended to, and did, disrupt the relationship between GLLP
5  and the Potential Sellers, who were otherwise interested in selling their interests in the LLCs to
6  GLLP, such that these Members could not consider, discuss, negotiate, or transact on and accept
7  GLLP's purchase offers.

8    359.  Defendants were aware of the importance of GLLP's business relationships with the
9  Potential Sellers, and Defendants' actions and communications were intentional and aimed at
10  discouraging and preventing the Potential Sellers from transacting with GLLP.

11    360.  Defendants' actions and communications undermined and interfered with GLLP's
12  existing contractual relationships with the Potential Sellers and also tarnished GLLP's reputation and
13  good will in the LLCs by calling into question the legitimacy and legality of their ability to offer and
14  negotiate the purchase of the Potential Sellers' interests in the LLCs.

15    361.  Defendants' predominant motive in interfering with these transactions is to serve their
16  own interests over the interests of the LLCs, GLLP, or other Members. Defendants benefited and
17  served their own self-interest in doing so because, among other things, they were able to retain
18  control of the LLCs, and to thus continue to conceal their fraudulent schemes, continue to deny
19  anyone access to the LLCs' books and records, to generally run the LLCs without oversight or even
20  basic governance, and to continue to attempt to buy out other Members for cents on the dollar prior
21  to any sale of the Land.

22    362.  GLLP was harmed by Defendants' interference via the loss of the ability to purchase
23  the Potential Sellers' interest in the LLCs, as well as the loss of the ability to acquire the rights
24  associated with such interests, including voting rights in the LLCs.

25    363.  Defendants' tortious conduct described above was a substantial factor in causing this
26  harm to GLLP.

27

28

1      364.    Defendants' actions were undertaken with fraud, malice, or oppression, or with a

2 conscious disregard for Members' rights, and therefore GLLP is entitled to an award of exemplary

3 and punitive damages against Defendants, and each of them, in an amount according to proof.

4                              **TWELFTH CAUSE OF ACTION**

5  **(DERIVATIVE AND DIRECT CLAIM AGAINST THE INDIVIDUAL DEFENDANTS**
                              **FOR CIVIL CONSPIRACY)**

6

7      365.    GLLP repeats and realleges each of the allegations set forth in the preceding

8 paragraphs.

9      366.    Each of the Individual Defendants owe, and at all relevant times have owed,

10 confidential and/or fiduciary obligations to GLLP, the LLCs, and the other Members. As corporate

11 officers of the Corporate Defendants, as individuals, or both, Individual Defendants also have a legal

12 duty not to defraud GLLP, the LLCs, and other Members.

13      367.    Each of the Individual Defendants knowingly and willfully entered into an agreement

14 and conspiracy to commit tortious acts, i.e., to take various actions, including as described in Counts

15 3-6 and 10-11, to the detriment of GLLP, the LLCs, and the other Members of the LLCs, in breach

16 of their fiduciary duties.

17      368.    Each of the Individual Defendants did take the various actions, including as described

18 in Counts 3-6 and 10-11, pursuant to the aforementioned agreement and conspiracy to the detriment

19 of GLLP, the LLCs, and the other Members of the LLCs in breach of their legal, confidential, and

20 fiduciary duties.

21      369.    Each of the Individual Defendants directly ordered, authorized, and participated in

22 their tortious conduct.

23      370.    As a proximate result of the Individual Defendants' conspiracy to commit tortious

24 acts as herein alleged, GLLP, the LLCs, and the other Members have been damaged in an amount to

25 be proven at trial.

26      371.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

27 the LLCs, GLLP, and the Members of the LLCs.

28

1    372.    Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for GLLP's and Members' rights, and therefore GLLP, on behalf of itself and the LLCs, is entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

373.    GLLP, on behalf of the LLCs, has no adequate remedy at law as to the derivative claims for civil conspiracy.

## THIRTEENTH CAUSE OF ACTION

## (DERIVATIVE AND DIRECT CLAIM AGAINST THE CORPORATE DEFENDANTS FOR CIVIL CONSPIRACY)

374.    GLLP repeats and realleges each of the allegations set forth in the preceding paragraphs.

375.    Each of the Corporate Defendants owe, and at all relevant times have owed, fiduciary obligations to the LLCs, GLLP, and the other Members. As the managing members of the LLCs, the Corporate Defendants also have a legal duty not to defraud GLLP, the LLCs, and other Members.

376.    Each of the Corporate Defendants knowingly and willfully entered into an agreement and conspiracy to commit tortious acts, i.e., to take various actions, including as described in Counts 3-6 and 10-11, to the detriment of GLLP, the LLCs, and the other Members of the LLCs, in breach of their fiduciary duties.

377.    Each of the Corporate Defendants did take the various actions, including as described in Counts 3-6 and 10-11, to the detriment of the LLCs, GLLP, and the other Members of the LLCs in breach of their legal and fiduciary duties.

378.    Each Corporate Defendant directly ordered, authorized, and participated in the other Corporate Defendants' tortious conduct.

379.    As a proximate result of the Corporate Defendants' conspiracy to commit tortious acts as herein alleged, GLLP, the LLCs, and the other Members have been damaged in an amount to be proven at trial.

380.    As a result of the misconduct alleged herein, the Corporate Defendants are liable to the LLCs, GLLP, and the Members of the LLCs.

1  381.  Defendants' actions were undertaken with fraud, malice, or oppression, or with a
2  conscious disregard for GLLP's and other Members' rights, and therefore GLLP, on behalf of itself
3  and the LLCs, is entitled to an award of exemplary and punitive damages against Defendants, and
4  each of them, in an amount according to proof.

5  382.  GLLP, on behalf of the LLCs, has no adequate remedy at law as to the derivative
6  claims for civil conspiracy.

7  **FOURTEENTH CAUSE OF ACTION**

8  **(DERIVATIVE AND DIRECT CLAIM AGAINST KIRK BEEBE FOR AIDING AND
9  ABETTING BREACHES OF FIDUCIARY DUTIES)**

10  383.  GLLP repeats and realleges each of the allegations set forth in the preceding
11  paragraphs.

12  384.  To the extent that Kirk Beebe did not directly commit certain breaches of fiduciary
13  duties, he aided and abetted breaches of duties by the Corporate Defendants and remaining Individual
14  Defendants.

15  385.  The Corporate Defendants and remaining Individual Defendants breached their
16  fiduciary duties to GLLP, the LLCs, and the Members of the LLCs as set out in Counts 3 and 10.

17  386.  Kirk Beebe in his role as the CEO of the LLCs, as a director and officer of the
18  Corporate Defendants since at least 2011, as the son of Janet and Kenneth Beebe, and as the brother
19  of Susan Beebe Furay, had actual knowledge of the Corporate Defendants' and remaining Individual
20  Defendants' wrongful acts and breaches of fiduciary duties in furtherance of their interests and in
21  conflict with the best interests of GLLP, the LLCs, and the LLCs' Members.

22  387.  Kirk provided substantial assistance and encouragement to the Corporate Defendants'
23  and remaining Individual Defendants' breaches, and did so with knowledge that these Defendants
24  were breaching their fiduciary duties. As alleged in paragraphs 20 and 40-45, as an officer of the
25  LLCs, including as CEO, as a director of the Corporate Defendants since at least in 2011, and as an
26  officer of the Corporate Defendants since at least 2011, Kirk directed the LLCs to take the actions or
27  refrain from taking the actions described herein that caused the breaches of fiduciary duties,
28  developed plans with the other Individual Defendants to take advantage of the other Members, made

1  certain communications (e.g., misrepresentations regarding Flannery offers and the amendments to
2  the Operating Agreements) to Members or third parties in furtherance of those plans, worked with
3  and encouraged the other Individual Defendants to craft communications that they made (e.g.,
4  concealment regarding the adoption of the new Operating Agreements in 2003) to Members or third
5  parties in furtherance of those plans, and refrained from fulfilling his fiduciary duties in acting in the
6  Members' best interests (by, for example, not calling a vote on the Flannery transactions or informing
7  the Members of complete and accurate information about the Flannery offers) in furtherance of those
8  plans.

9      388.   As a result of the misconduct alleged herein, Kirk Beebe is liable to the LLCs, GLLP,
10  and the Members of the LLCs.

11     389.   Kirk's actions were undertaken with fraud, malice, or oppression, or with a conscious
12  disregard for GLLP and other Members' rights, and therefore GLLP, on behalf of itself and the LLCs,
13  is entitled to an award of exemplary and punitive damages against Kirk in an amount according to
14  proof.

15     390.   GLLP, on behalf of the LLCs, has no adequate remedy at law as to the derivative
16  claims for aiding and abetting.

17                          **FIFTEENTH CAUSE OF ACTION**

18  **(DERIVATIVE AND DIRECT CLAIM AGAINST KENNETH BEEBE FOR AIDING AND
    ABETTING BREACHES OF FIDUCIARY DUTIES)**
19
20     391.   GLLP repeats and realleges each of the allegations set forth in the preceding
    paragraphs.
21
22     392.   To the extent that Kenneth Beebe did not directly commit certain breaches of
    fiduciary duties, he aided and abetted the Corporate Defendants' and remaining Individual
23
    Defendants' breaches of duties.
24
25     393.   The Corporate Defendants and remaining Individual Defendants breached their
    fiduciary duties to GLLP, the LLCs, and the Members of the LLCs as set out in Counts 3 and 10.
26
27     394.   Kenneth Beebe in his role as husband of Janet Beebe, as father of Kirk Beebe and
    Susan Beebe Furay, and as an individual who has held himself out as managing the LLCs at all
28

1  relevant times, including sending communications to the Members purporting to act on their behalf
2  and of the Managers, had actual knowledge of the Corporate Defendants' and remaining Individual
3  Defendants' wrongful acts and breaches of fiduciary duties in furtherance of their interests and in
4  conflict with the best interests of GLLP, the LLCs, and the LLCs' Members.

5      395.    Kenneth provided substantial assistance and encouragement to the Corporate
6  Defendants' and remaining Individual Defendants' breaches and did so with knowledge that these
7  Defendants were breaching their fiduciary duties. As alleged for example in paragraphs 23 and 40-
8  45, as an individual who has held himself out as managing the LLCs at all relevant times, including
9  sending communications to the Members purporting to act on their behalf and of the Managers,
10 Kenneth directed the LLCs to take the actions or refrain from taking the actions described herein that
11 caused the breaches of fiduciary duties, developed plans with the other Individual Defendants to take
12 advantage of the other Members, made certain communications to Members or third parties in
13 furtherance of those plans (e.g., misrepresentations regarding Flannery offers), worked with and
14 encouraged the other Individual Defendants to craft communications that they made to Members
15 (e.g., concealment regarding the adoption of the new Operating Agreements in 2003) or third parties
16 in furtherance of those plans, and refrained from fulfilling his fiduciary duties in acting in the
17 Members' best interests (by, for example, not calling a vote on the Flannery transactions or informing
18 Members of the complete and accurate contents of Flannery offers) in furtherance of those plans.

19     396.    As a result of the misconduct alleged herein, Kenneth Beebe is liable to the LLCs,
20 GLLP and the Members of the LLCs.

21     397.    Kenneth's actions were undertaken with fraud, malice, or oppression, or with a
22 conscious disregard for GLLP's and other Members' rights, and therefore GLLP, on behalf of itself
23 and the LLCs, is entitled to an award of exemplary and punitive damages against Kenneth in an
24 amount according to proof.

25     398.    GLLP on behalf of the LLCs, has no adequate remedy at law as to its derivative claim
26 for aiding and abetting.

27

28

## SIXTEENTH CAUSE OF ACTION

### (DERIVATIVE AND DIRECT CLAIM AGAINST SUSAN BEEBE FURAY FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES)

399.    GLLP repeats and realleges each of the allegations set forth in the preceding paragraphs.

400.    To the extent that Susan Beebe Furay did not directly commit certain breaches of fiduciary duties, she aided and abetted the Corporate Defendants' and remaining Individual Defendants' breaches of duties.

401.    The Corporate Defendants and remaining Individual Defendants breached their fiduciary duties to GLLP, the LLCs, and the Members of the LLCs as set out in Counts 3 and 10.

402.    Susan Beebe Furay in her role as an officer of the LLCs, including as secretary and partner, as a director of the Corporate Defendants since at least in 2011, as an officer of the Corporate Defendants since at least in 2011, as the daughter of Janet and Kenneth Beebe, and as the sister of Kirk Beebe, had actual knowledge of the Corporate Defendants' and remaining Individual Defendants' wrongful acts and breaches of fiduciary duties in furtherance of their interests and in conflict with the best interests of GLLP, the LLCs, and the LLCs' Members.

403.    Susan provided substantial assistance and encouragement to the Corporate Defendants' and remaining Individual Defendants' breaches, and did so with knowledge that these Defendants were breaching their fiduciary duties. As alleged for example in paragraphs 21 and 40-45, as an officer of the LLCs, including as president, as a director of the Corporate Defendants since at least in 2011, and as an officer of the Corporate Defendants since at least 2011, Susan directed the LLCs to take the actions or refrain from taking the actions described herein that caused the breaches of fiduciary duties, developed plans with the other Individual Defendants to take advantage of the other Members, made certain communications (e.g., misrepresentations regarding Flannery offers and the amendments to the Operating Agreements) to Members or third parties in furtherance of those plans, worked with and encouraged the other Individual Defendants to craft communications that they made (e.g., concealment regarding the adoption of the new Operating Agreements in 2003) to Members or third parties in furtherance of those plans, and refrained from fulfilling her fiduciary

1  duties in acting in the Members' best interests (by, for example, not calling a vote on the Flannery
2  transactions or informing the Members of complete and accurate information about the Flannery
3  offers) in furtherance of those plans.

4          404.    As a result of the misconduct alleged herein, Susan Beebe Furay is liable to the LLCs,
5  GLLP and the Members of the LLCs.

6          405.    Susan's actions were undertaken with fraud, malice, or oppression, or with a
7  conscious disregard for GLLP's and other Members' rights, and therefore GLLP, on behalf of itself
8  and the LLCs, is entitled to an award of exemplary and punitive damages against Susan in an amount
9  according to proof.

10         406.    GLLP on behalf of the LLCs, has no adequate remedy at law as to the derivative claim
11  for aiding and abetting.

12                                **SEVENTEENTH CAUSE OF ACTION**

13        **(DERIVATIVE AND DIRECT CLAIM AGAINST JANET BEEBE FOR AIDING AND
                          ABETTING BREACHES OF FIDUCIARY DUTIES)**
14

15         407.    GLLP repeats and realleges each of the allegations set forth in the preceding
16  paragraphs.

17         408.    To the extent that Janet Beebe did not directly commit certain breaches of fiduciary
18  duties, she aided and abetted the Corporate Defendants' and remaining Individual Defendants'
19  breaches of duties.

20         409.    The Corporate Defendants and remaining Individual Defendants breached their
21  fiduciary duties to GLLP, the LLCs, and the Members of the LLCs as set out in Counts 3 and 10.

22         410.    Janet Beebe in her role as an officer of the LLCs, including as president, as a director
23  of the Corporate Defendants since at least in 2011, as an officer of the Corporate Defendants since
24  at least 2011, as the mother of Susan Beebe Furay and Kirk Beebe, and as the wife of Kenneth Beebe,
25  had actual knowledge of the Corporate Defendants' and remaining Individual Defendants' wrongful
26  acts and breaches of fiduciary duties in furtherance of their interests and in conflict with the best
27  interests of GLLP, the LLCs, and the LLCs' Members.

28

411.    Janet provided substantial assistance and encouragement to the Corporate Defendants' and remaining Individual Defendants' breaches, and did so with knowledge that these Defendants were breaching their fiduciary duties. As alleged for example in paragraphs 22 and 40-45, as an officer of the LLCs, including as president, as a director of the Corporate Defendants since at least in 2011, and as an officer of the Corporate Defendants since at least 2011, Janet directed the LLCs to take the actions or refrain from taking the actions described herein that caused the breaches of fiduciary duties, developed plans with the other Individual Defendants to take advantage of the other Members, made certain communications (e.g., misrepresentations regarding Flannery offers) to Members or third parties in furtherance of those plans, worked with and encouraged the other Individual Defendants to craft communications that they made (e.g., concealment regarding the adoption of the new Operating Agreements in 2003) to Members or third parties in furtherance of those plans, and refrained from fulfilling her fiduciary duties in acting in the Members' best interests (by, for example, not calling a vote on the Flannery transactions or informing the Members of complete and accurate information about the Flannery offers) in furtherance of those plans.

412.    As a result of the misconduct alleged herein, Janet Beebe is liable to the LLCs, GLLP and the Members of the LLCs.

413.    Janet's actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Members' rights, and therefore GLLP, on behalf of itself and the LLCs, is entitled to an award of exemplary and punitive damages against Janet in an amount according to proof.

414.    GLLP, on behalf of the LLCs, has no adequate remedy at law as to its derivative claim for aiding and abetting.

## **PRAYER FOR RELIEF**

WHEREFORE, GLLP requests entry of judgment in its favor and against Defendants as follows:

(a)    Actual damages to be proven at trial, exemplary damages, punitive damages, treble damages, and such other relief as available under the law;

(b)    Pre-judgment and post-judgment interest on such monetary relief;

1    (c)    Injunctive relief, including specific performance, and declaratory relief that GLLP
2 remains a member of the LLCs and the Holt Sale was valid, and that Defendants must take steps to
3 recognize the Holt Sale;

4    (d)    Injunctive relief, including specific performance, and declaratory relief that GLLP's
5 books and records demands are valid and that Defendants must comply with those demands;

6    (e) Reformation of the Operating Agreements to add back the "without cause" removal of the
7 Manager, which was improperly removed by Defendants between 2001 and 2003 contrary to the
8 understanding of the Members;

9    (f)    Injunctive relief, including specific performance, and declaratory relief preventing the
10 revisions to the Operating Agreements proposed by Defendants in September 2022, including
11 Defendants' improper attempt to pass restated Operating Agreements, and recognition that the LLCs
12 continue to be bound by the Operating Agreements dated May 15, 2001;

13    (g)    Injunctive relief, including specific performance, and declaratory relief directing
14 Defendants to quitclaim their interests in Barnes Ranch and Lambie Ranch to the LLCs, as described
15 above; and

16    (h)    The costs of bringing this suit, including reasonable attorneys' fees to the extent
17 afforded by law or contract or the Operating Agreements;

18    (i)    All other relief to which GLLP may be entitled at law or equity.

## JURY DEMAND

20 GLLP demands a jury trial of all issues for which there is a right to trial by a jury.

21 DATED: November 8, 2022

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____

LANCE A. ETCHEVERRY
ABRAHAM A. TABAIE
Attorneys for Plaintiff
Gassy Lassy L.P., Individually and Derivatively on
behalf of LLCs

COMPLAINT