**EXHIBIT B**

F I L E D
Clerk of the Superior Court

DEC 1 4 2022

By _____
DEPUTY CLERK

1 LANCE A. ETCHEVERRY (SBN 199916)
  lance.etcheverry@skadden.com
2 ABRAHAM TABAIE (SBN 260727)
  abraham.tabaie@skadden.com
3 Skadden, Arps, Slate, Meagher & Flom, LLP
  525 University Avenue
4 Palo Alto, California 94301
5 Telephone: (650) 470-4500
  Facsimile: (650) 470-4570
6
7 Attorneys for Plaintiffs
  Arran LLC and Kingstree LLC, on behalf of themselves
8 and derivatively on behalf of Alex Cook Ranch, LLC

9

10               IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                       FOR THE COUNTY OF SOLANO   CMFF 426383 $435-

12                                                  FCS059348

13 Arran LLC and Kingstree LLC, on behalf of    ) Case No.: [_____]
   themselves and derivatively on behalf of Alex )
14 Cook Ranch, LLC,                             )
                                                ) COMPLAINT FOR:
15                     Plaintiffs,              )
                                                ) (1) BREACH OF FIDUCIARY DUTIES
16         v.                                   )     (DERIVATIVELY);
                                                )
17                                              ) (2) BREACH OF CONTRACT (VIOLATION
   Richard Hamilton, David Hamilton Jr., David  )     OF THE OPERATING AGREEMENT)
18 Hamilton Sr., Anastasia Hamilton, and        )     (DERIVATIVELY);
   Hamilton Bros,                               )
19                                              ) (3) VIOLATION OF GOOD FAITH AND
                                                )     FAIR DEALING (DIRECT);
20                     Defendants,              )
   and                                          ) (4) FRAUDULENT CONCEALMENT
21                                              )     (DERIVATIVELY);
   Alex Cook Ranch, LLC,                        )
22                                              ) (5) CONSTRUCTIVE FRAUD
                      Nominal Defendant.        )     (DERIVATIVELY);
23                                              )
                                                ) (6) CIVIL CONSPIRACY
24                                              )     (DERIVATIVELY);
                                                )
25                                              ) (7) AIDING AND ABETTING BREACH OF
                                                )     FIDUCIARY DUTY AND
26                                              )     CONSTRUCTIVE FRAUD
                                                )     (DERIVATIVELY);
27                                              )
                                                ) (8) BREACH OF CONTRACT (DIRECT);
28                                              )

─────────────────────────────────────────────
                    COMPLAINT

1

2         )   (9) VIOLATION OF CALIFORNIA UNFAIR
          )       COMPETITION LAW, CAL. BUS. &
3         )       PROF. CODE 17200 ET SEQ. (DIRECT);
          )       and
4         )
          )   (10) BREACH OF FIDUCIARY DUTIES
5         )       (DIRECT).
          )
6         )   JURY TRIAL DEMANDED
          )
7         )
          )
8         )
9         )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Arran LLC ("Arran") and Kingstree LLC ("Kingstree") (together, "Plaintiffs") bring this action on behalf of themselves, and as a derivative action in the name and on behalf of nominal defendant Alex Cook Ranch, LLC ("ACR"), against defendants Richard Hamilton and David Hamilton Jr. (together, the "Manager Defendants") and David Hamilton Sr., Anastasia ("Stacy") Hamilton, and Hamilton Bros (the "Other Defendants," and collectively with the Manager Defendants, "Defendants") for breaches of fiduciary duty, other duties and the law, and ACR's Operating Agreement, and for declaratory relief. Plaintiffs base their allegations on personal knowledge as to certain allegations and on information and belief as to all other allegations.

**INTRODUCTION AND OVERVIEW**

1.      Plaintiffs Arran and Kingstree were incorporated by Neil Hamilton, Owen Hamilton, and Sarah Nitta, first cousins of Defendants Richard Hamilton and David Hamilton Jr., and the nephews/niece of Defendant David Hamilton Sr., to hold Neil's, Owen's, and Sarah's interests in various parcels of agricultural land that they inherited and owned jointly with the Defendants.

2.      This action seeks damages, declaratory relief, and other relief to remedy the breaches of fiduciary duties and other wrongdoing by Defendants. The Manager Defendants are currently Managers of ACR. From ACR's incorporation in 2013 through the present, Defendants have engaged in schemes to further their own interests at the expense of ACR and its Members,[1] including Arran and Kingstree. With the agreement, support, and substantial encouragement of the Other Defendants, the Manager Defendants acted disloyally and in bad faith to ACR and its Members, and through misrepresentation and concealment, obtained advantages for themselves and the Other Defendants.

3.      As a result of Defendants' course of conduct, ACR and its Members suffered damages of at least $16,168,375, and also are entitled to punitive damages for the wrongful and outrageous conduct of Defendants.

4.      ACR is a limited liability company ("LLC") that owns agricultural land in Solano County, California.

5.      Defendants Richard Hamilton, David Hamilton Jr., and David Hamilton Sr. are Members of ACR. Defendants Richard Hamilton and David Hamilton Jr. are managers of ACR and

---

[1]   Members means members of ACR under its Operating Agreement.

1  have been so since ACR's formation in 2013.

2       6.    Richard Hamilton, Richard Hamilton's wife Stacy Hamilton, and David Hamilton

3  Jr.'s father, David Hamilton Sr., are partners in Hamilton Bros, a family ranching operation. Since

4  ACR was incorporated in 2013, the Manager Defendants have caused ACR to lease ACR's property

5  to Hamilton Bros.

6       7.    The Manager Defendants have breached their fiduciary duties by, among other things,

7  prioritizing the interests of Hamilton Bros, their own business, over those of ACR and its other

8  Members.

9       8.    First, the Manager Defendants have been leasing ACR's property to Hamilton Bros

10  at below-market rents. As set out in paragraphs 44-45, since ACR's incorporation in 2013, this

11  below-market lease has cost ACR almost $500,000, excluding interest and lost profits.

12       9.    Second, the Manager Defendants intentionally encumbered much of ACR's property

13  with conservation easements (a restriction on the use of the land) so that the land could never be used

14  for anything other than ranching, so that Hamilton Bros could be sure that they can continue leasing

15  the property indefinitely. These conservation easements have devalued ACR's property for the

16  personal benefit of Defendants. As set out in paragraph 65, the Manager Defendants' actions have

17  caused loss to ACR of at least $15,668,375.

18       10.   Third, when agreeing to sell these conservation easements, the Manager Defendants

19  never obtained the necessary consent of the Members of ACR as required under the Operating

20  Agreement.

21       11.   Fourth, the Manager Defendants breached their fiduciary duties, the law, and the

22  Operating Agreement by continuing to give Canon Station LLC ("Canon Station"), the buyer of the

23  conservation easements, more time to close the transaction, even when doing so was directly opposed

24  to the interests of ACR. The Manager Defendants first executed a contract for sale of conservation

25  easements on February 8, 2017, which called for the closing to occur no later than January 2019.

26  However, the Manager Defendants subsequently executed eight separate amendments and extensions

27  to the purchase agreement that gave Canon Station years of extra time to close the transaction. In the

28  end, it took until July 2022 for the sale of the conservation easements to fully close. However,

1  between 2017 when the first agreement was signed and the final closing in 2022, land prices in the
2  area more than quadrupled (from approximately $4,000/acre to as much as $17,125/acre) due to the
3  emergence of a new buyer, Flannery Associates LLC ("Flannery"). The Manager Defendants were
4  fully aware of these price increases, and of interest by Flannery to purchase ACR's property.
5  Therefore, when Canon Station repeatedly could not perform and asked the Manager Defendants for
6  extensions to the purchase agreement, the Manager Defendants should have either negotiated a
7  significantly higher sale price for the conservation easements, or let the purchase agreement expire,
8  so that ACR could capitalize on the increased land prices in the area. The Manager Defendants did
9  neither of those things—in fact, they did the opposite and repeatedly approved free or effectively
10  free extensions for Canon Station.

11       12.    Fifth, in direct breach of their fiduciary duties, the Manager Defendants actively
12  discouraged Flannery from making an offer on ACR's property, including by telling Flannery's
13  broker that "*they would rather put the properties under conservation.*"

14       13.    Sixth, the Manager Defendants affirmatively misrepresented and failed to disclose to
15  the Members the material information stated in paragraphs 11-12 while moving forward with the
16  conservation easements. The Manager Defendants withheld these facts from the Members and never
17  sought a vote on an extension of the purchase agreements because they knew that the Members would
18  not approve the extensions.

19       14.    Seventh, when other Members decided to sell their ownership interests in ACR, faced
20  with the prospect of losing control of ACR—and thus the ability to use it for their own personal
21  gain—the Manager Defendants sought to retain such control through improper means including by
22  breach of the Operating Agreement and the duty of good faith and fair dealing. Specifically, the
23  Manager Defendants refused to recognize valid purchasers as Members of ACR and advanced a
24  knowingly improper interpretation of the Operating Agreement to (i) scare other Members from
25  selling their ownership interests in ACR, and (ii) discourage prospective buyers from purchasing the
26  ownership interests by refusing to recognize them as Members of ACR. Despite the Manager
27  Defendants' efforts, 27 of the total 37 Members of ACR, who collectively owned approximately
28  66% of ACR, sold their ownership interests in ACR to Arran, Kingstree, and Diversified Land LLC

("Diversified"). The remaining 10 Members of ACR are all Defendants or immediate family members of Defendants.

15.   Eighth, following the above purchases, the Manager Defendants have continued to refuse to recognize Arran, Kingstree, and Diversified as Members of ACR.

16.   Ninth, the Manager Defendants have failed to recognize the nominations of new managers by Members Arran, Kingstree, and Diversified.

17.   Tenth, the Manager Defendants have failed to comply with Arran's and Kingstree's request for books and records of ACR, in violation of California law and the Operating Agreement.

18.   In sum, the Manager Defendants have taken advantage of their positions as Managers. Instead of properly discharging their duties and looking out for the interests of ACR and all its Members, they have operated ACR largely for the benefit of themselves and their immediate families as owners of approximately 34% interest, at the expense of the other Members who own the remaining 66% of ACR. This lawsuit seeks to recover monetary damages for the Manager Defendants' actions, rescind or void the improper leases to Hamilton Bros, and obtain declaratory relief regarding the validity of recent Member transactions and other actions.

19.   The Other Defendants gave substantial assistance and encouragement to the Manager Defendants in engaging in the wrongful conduct described above. The Other Defendants had actual knowledge that the Manager Defendants were breaching their fiduciary duties and committing fraud in furtherance of their interests in Hamilton Bros. Among other conduct, to further their family's own ranching interests through Hamilton Bros, David Sr. and Stacy, in their roles as partners in Hamilton Bros, encouraged, supported, and facilitated the Manager Defendants to lease ACR's land to Hamilton Bros at below-market prices and in spite of the conflict of interest, and to unlawfully protect their family's access to ACR's land in breach of their duties to ACR and its Members and by the other wrongful conduct alleged herein.

## JURISDICTION

20.   Jurisdiction is proper in this Court under California Code of Civil Procedure § 1060 because an actual controversy has arisen between the parties relating to the legal rights and duties of the respective parties. Jurisdiction is also proper because the Court has general subject matter

1  jurisdiction under California Constitution, article VI, section 1, and no statutory exceptions to
2  jurisdiction exist.

3      21.   This Court has personal jurisdiction over the parties because Defendants reside in or
4  are incorporated in California. Moreover, the events, circumstances, and transactions that are the
5  subject of this action arose in and took place in the County of Solano.

6      22.   Venue is proper in this Court because Defendants Richard Hamilton, David C.
7  Hamilton Sr., Stacy D. Hamilton, and Hamilton Bros, reside in, or are incorporated and have their
8  principal place of business in Solano County, California. Moreover, the events, circumstances, and
9  transactions that are the subject of this action arose in and took place in the County of Solano.

10     23.   Section 9.01 of the Operating Agreement provides in part:

11          Any action to enforce or interpret this Agreement or to resolve disputes
            between the Members or by or against any Member shall be settled by
12          arbitration in accordance with the rules of the California Arbitration
            Act by a retired judge JAMS arbitrator. . . .
13
            Section 10.03 of the Operating Agreement also provides in part:
14
            This Agreement shall be construed and enforced in accordance with
15          the internal laws of the State of California.

16     24.   The Court may, and has good cause to, exercise jurisdiction over this matter despite
17  the Operating Agreement's arbitration provision. *Fitzhugh v. Granada Healthcare & Rehab. Ctr.,*
18  *LLC,* 150 Cal. App. 4th 469, 475 (2007) (acknowledging that the "Legislature has . . . authorized
19  trial courts to refuse enforcement of an arbitration agreement . . . when, as here, there is a possibility
20  of conflicting rulings" (citation omitted)). Specifically, Section 1281.2(c) of the California Code of
21  Civil Procedure provides that a Court may not enforce an arbitration agreement where "[a] party to
22  the arbitration agreement is also a party to a pending court action or special proceeding with a third
23  party, arising out of the same transaction or series of related transactions and there is a possibility of
24  conflicting rulings on a common issue of law or fact." *Id.* Here, the allegations set forth in this
25  complaint against the non-signatories to the Operating Agreement—including the Other
26  Defendants—arise out of the same transaction or series of related transactions and there is the
27  possibility of conflicting rulings and duplication of efforts. *See Cronus Invs., Inc. v. Concierge*
28  *Servs.,* 35 Cal. 4th 376, 393 (2005) (holding that Section 1281.2(c) gives courts "discretion not to

1  enforce the arbitration agreement . . . in order to avoid potential inconsistency in outcome as well as

2  duplication of effort" (citation omitted)). Indeed, if the arbitration provision in the Operating

3  Agreement were enforced, Plaintiffs would be litigating the claims against the Manager Defendants

4  in an arbitration, on the one hand, and the Other Defendants in this Court, on the other hand. Both

5  cases would relate to an overlapping set of facts and legal theories, which could result in conflicting

6  rulings between this Court and an arbitrator.

7  **THE PARTIES**

8  25.    Nominal defendant ACR is a limited liability company formed under the California

9  Revised Uniform Limited Liability Act. It was formed on November 1, 2013.

10  26.    Arran is a limited liability company incorporated under the laws of the State of

11  California. Arran has been a Member of ACR since September 26, 2022. It also is the assignee of all

12  claims, whether derivative or direct, related to ACR, from Brendan Reed and Christian Reed,

13  including certain claims Brendan Reed and Christian Reed acquired from their mother, Cinders Reed.

14  Brendan Reed, Christian Reed, and Cinders Reed were Members of ACR during the alleged wrongful

15  conduct described herein.

16  27.    Kingstree is a limited liability company incorporated under the laws of the State of

17  California. Kingstree has been a Member of ACR since September 26, 2022. It also is the assignee

18  of all claims, whether derivative or direct, related to ACR, from Quinn Gomes, including certain

19  claims Quinn Gomes acquired from his mother, Pamela Baird. Quinn Gomes and Pamela Baird were

20  Members of ACR during the alleged wrongful conduct described herein.

21  28.    Defendant Richard Hamilton is one of three Managers of ACR. Richard also is a

22  Member of ACR and separately is one of three partners in the ranching operation known as Hamilton

23  Bros. Stacy Hamilton (Richard's wife) also is a partner in Hamilton Bros.

24  29.    Defendant David Hamilton Jr. is one of three Managers of ACR.[2] David also is a

25  Member of ACR and his father, David Hamilton Sr., is a Member of ACR and one of three partners

26  in Hamilton Bros. David Hamilton Jr. is also one of the three managers of David Hamilton Properties,

27  LLC, which is an entity that holds David Hamilton Sr.'s partial tenant-in-common interests in various

28  ───────────────────
[2]  Warren Gomes Jr. had been the third manager of ACR since ACR's formation in 2013. He resigned on October 18, 2022.

1  other ranches near ACR, and that appears to hold David Hamilton Sr.'s interest in ACR and in
2  Hamilton Bros. David Hamilton Jr. is a beneficiary of Hamilton Bros either as a current beneficial
3  owner, or through his status as one of the presumptive heirs to the estate of his father, David Hamilton
4  Sr.

5      30.      Defendant David Hamilton Sr. is a Member of ACR and partner in Hamilton Bros.
6  His son, David Hamilton Jr., and nephew, Richard Hamilton, are two of three Managers of ACR.

7      31.      Stacy Hamilton is a partner in Hamilton Bros. Her husband, Richard, is a partner in
8  Hamilton Bros and one of the Managers of ACR. Stacy is also a family member to David Hamilton
9  Sr. and David Hamilton Jr.

10     32.      Hamilton Bros is a general partnership and ranching operation. Its three partners are
11 Richard Hamilton, David Hamilton Sr., and Stacy Hamilton.[3]

12                              **FACTUAL ALLEGATIONS**

13     33.      ACR owns approximately 2,257 acres of land in Solano County. One family
14 originally owned the land, but over time, the ownership was dispersed among many distant relatives
15 and some non-relatives. In 2013, the owners conveyed the land to a newly formed limited liability
16 company—ACR—in exchange for membership interests in ACR. ACR was created by the Operating
17 Agreement of ACR, dated as of November 1, 2013, as amended by Amendment No. One to
18 Operating Agreement, dated April 28, 2019, and by Amendment No. Two to Operating Agreement,
19 dated April 28, 2019 (such operating agreement as so amended, the "Operating Agreement").

20     34.      Hamilton Bros is a California-based general partnership that engages in the business
21 of ranching and farming. Hamilton Bros owns partial interests in the properties that it ranches/farms
22 with the balance owned by other co-owners. Defendants have taken advantage of these co-owners
23 for years. By setting up entities or other arrangements which give them actual or *de facto* control of
24 these properties, Defendants have directed the use of the land to benefit themselves and their family
25 business at the expense of their co-owners.

26     35.      ACR is an example of this control. By 2021, ACR was owned by 37 Members. 10 of
27 these Members were Defendants or their immediate family members, who collectively owned

28

---

[3] The partnership appears to interchangeably use the names "Hamilton Bros", "Hamilton Bros.", and "Hamilton Brothers".

approximately 34% of ACR. The 27 Members who own the remaining 66% of ACR were either extended relatives or unrelated to Defendants. Even though Defendants own only a minority interest, they have for many years run ACR to benefit primarily themselves and their family business, at the expense of the other Members.

36.     The Operating Agreement sets forth a governing structure and rules for ACR, including that it will be managed by three managers (the "Managers"), and sets out the duties of those Managers.

37.     Section 5.13 of the Operating Agreement provides:

> Managers shall exercise ordinary business judgment in managing the Company. Unless fraud, deceit, or a wrongful taking is involved, the Managers shall not be liable or obligated to the Members for any mistake of fact or judgment made by the Managers in operating the business of the Company that results in any loss to Company or its Members, and the Company shall indemnify and defend them with reasonable counsel in connection with any claims or damages arising from such acts within the scope of their duties as Manager.

38.     This case does not involve the Managers' mistake of fact or judgment and thus the limitation of liability and indemnification provision of Section 5.13 is inapplicable. Further, this provision does not, and under California law cannot, modify the standard duty of loyalty, duty of care, and duties of good faith and fair dealing applicable to the Manager Defendants.

39.     Section 5.01 of the Operating Agreement provides that "all decisions concerning management of the Company shall be made by at least two Managers" except as otherwise stated in the agreement.

40.     At all times relevant to this dispute, two of the three Managers of ACR were Richard Hamilton and David Hamilton Jr. The Manager Defendants used their majority position and acted in concert to further the interests of themselves, their immediate family members, and Hamilton Bros.

41.     As Managers of ACR, at all times relevant to this dispute, the Manager Defendants owed fiduciary duties to ACR and its Members, meaning that they at all times had to act with the utmost good faith for the benefit of ACR and its Members. Under California law, a manager of an LLC "is obligated to act with the utmost loyalty and in the highest good faith when dealing with any member of the LLC . . . He may not obtain any advantage over . . . any other member of the LLC by

1 even the slightest misrepresentation or concealment." Under their duties, the Managers had to refrain
2 from undermining the LLC to gain a personal advantage or engaging in grossly negligent or reckless
3 conduct, intentional misconduct, or a knowing violation of law. Also, the duty of good faith and fair
4 dealing means that the managers of an LLC may not take actions to injure the right of the other
5 members to receive the benefits of the LLC.

6     42.    David Hamilton Jr., as the son David Hamilton Sr., has an inherent sense of loyalty
7 to his father and naturally seeks to ensure his father's financial security. In addition, David Hamilton
8 Jr. has a financial interest in his father's assets, either through a current beneficial interest, or as one
9 of his father's presumptive heirs, as evidenced by David Hamilton Jr. being a manager, along with
10 his father and sister, of David Hamilton Properties, LLC, his father's asset holding and estate
11 planning entity. Therefore, David Hamilton Jr. has a personal interest in ensuring that Hamilton Bros
12 maintains its favorable arrangement with its lessor, ACR.

13     43.    Because of their relationship to Hamilton Bros and pursuant to a common plan
14 developed amongst all Defendants, the Manager Defendants breached their duties to the detriment
15 of ACR and its Members.

16 **Below-Market Lease from ACR to Hamilton Bros**

17     44.    The Manager Defendants, acting as ACR's Managers, leased ACR's land to Hamilton
18 Bros at below-market rents, thereby enabling Hamilton Bros to use the land for their own ranching
19 operations, at a decreased cost, to the benefit of all Defendants, at the expense of ACR.

20     45.    The Manager Defendants have never provided copies of these leases to Members but
21 ACR's financial statements imply rent of approximately $15/acre/year, whereas rents on nearby
22 properties also used for livestock grazing are as high as $35/acre/year. This implies a loss to ACR of
23 approximately $47,000/year (lost rent of $21/acre multiplied by 2,257 acres of the ACR property).
24 The $47,000/year effectively acts as an improper subsidy from ACR to Hamilton Bros. Added up
25 since ACR's incorporation in 2013, this constitutes an unlawful subsidy to Hamilton Bros of nearly
26 half a million dollars, excluding interest and lost profits on such subsidy during this period.

27     46.    Hamilton Bros and its principals were aware that these leases were at below-market
28 rents, and entered into in breach of the Manager Defendants' fiduciary duties.

47.     For these reasons, the lease with Hamilton Bros is void and should be rescinded and voided. In addition, to compensate them for such below-market rents under the aforementioned leases, Members are entitled to the repayment of lost market value rent, plus interest.

**The Conservation Easements**

48.     A conservation easement is a landowner's agreement to limit any significant change in use on its property, including any development, while retaining private ownership of the land.

49.     For years, Defendants have been working on a scheme to use conservation easements to make ACR's land practically unusable for uses other than Hamilton Bros' ranching operations and thus devalue the property such that it would discourage buyers and other lessees, thereby putting Hamilton Bros in a position to continue leasing ACR's land at below-market rents indefinitely.

50.     To that end, on February 8, 2017 the Manager Defendants approved, and Richard Hamilton executed, on behalf of ACR, a purchase agreement with Canon Station, whereby Canon Station purchased the right to put conservation easements on approximately 1,235 out of a total of 2,257 acres of ACR's property, for a payment of $3,200/acre. Canon Station is a developer that needed to purchase the conservation easements as an offset against its project elsewhere in the region. The purchase agreement gave Canon Station until July 15, 2018 to complete the purchase, with an option for Canon Station to extend the closing until January 15, 2019.

51.     In early 2018, the Manager Defendants agreed to the First Amendment to the Canon Station deal, which restructured the conservation easement sale into two closings. Phase 1 of the deal involved selling 400 acres for $3,200/acre. Phase 2 involved selling the remaining 835 acres at an increased price of $3,700/acre, in exchange for Canon Station having more time to close. Phase 1 closed in April 2019. After the extensions, Canon Station had until August 1, 2019 to close Phase 2.

52.     By June 2019, Defendants knew that land prices in the area had increased dramatically due to Flannery acquiring property in the area. Flannery was paying approximately $10,000/acre for properties in the area, including adjacent to ACR's property, and had made multiple offers on other similar properties owned by some or all of Defendants. By virtue of initial discussions with Flannery's broker, Defendants also knew that Flannery was interested in acquiring ACR's property, even though as per paragraph 12, Defendants discouraged Flannery from making an offer on ACR's

1  property. Defendants therefore knew that the value of the 835 acres subject to Phase 2 closing was
2  now in the range of $10,000/acre.

3       53.    In June 2019, Canon Station informed the Manager Defendants that they were unable
4  to perform and close in August 2019, and asked for an extension to closing through March 31, 2020.
5  To properly fulfill their duties, the Manager Defendants should have either: (a) conditioned the
6  granting of an extension on Canon Station increasing the purchase price by $6,000/acre as the amount
7  by which land prices in the area have increased ($10,000/acre prices now less $4,000/acre when the
8  deal was originally agreed), or (b) refused to grant the extension, let the deal with Canon Station
9  lapse, and thereby retain these 835 acres as unencumbered land which was now valued at
10  approximately $10,000/acre.

11       54.    Instead, the Manager Defendants granted the extension to March 31, 2020 in
12  exchange for ACR receiving a payment of $50,000—about $60/acre. Given this immaterial payment,
13  there is only one plausible explanation for this action, which is that pursuant to Defendants' plan, the
14  Manager Defendants were not acting in the best interests of ACR, but rather in the best interests of
15  themselves, and their farming business, Hamilton Bros. The Manager Defendants gave Canon
16  Station this effectively free extension because the Manager Defendants wanted Canon Station to
17  close on the conservation easements regardless of whether that was in the best interests of ACR—
18  because closing on the conservation easements would forever prevent others from using the land,
19  and thereby allow Hamilton Bros to continue to use the land indefinitely (and pay below-market
20  rents while doing so). For his part, David Hamilton Jr. personally benefited from the conservation
21  easements by ensuring the health of Hamilton Bros, his father's business. In other words, the
22  Manager Defendants sacrificed the interests of ACR and its Members (to maximize the value of
23  ACR's property) to advance their and the other Defendants' personal interests (to secure the use of
24  ACR's property at low rents for Hamilton Bros).

25       55.    The same thing happened again in April 2020. By this point, it was well known to
26  Defendants that Flannery was paying around $12,000/acre for land in the area. And again, Canon
27  Station was unable to perform and close on Phase 2 and requested another extension of the
28  conservation easement deal. The Manager Defendants again agreed to grant this extension without

1  appropriate compensation. The Manager Defendants, based on a common plan with the other
2  Defendants, again did this instead of either negotiating more money for ACR or letting the deal lapse.
3  And they did it for the same reason: to prioritize their and the other Defendants' interests by limiting
4  the uses for and devaluating ACR's property, so they could continue controlling it and leasing it to
5  their family via Hamilton Bros.

6       56.    Phase 2 of the deal with Canon Station finally closed on July 12, 2022.

7       57.    In connection with the conservation easements, and as part of a common plan with
8  the other Defendants for their benefit, the Manager Defendants breached their duties to ACR and its
9  Members and violated the Operating Agreement and the law in three ways.

10       58.    First, the Manager Defendants never obtained the necessary consent of the Members
11  of ACR to: (i) enter into the purchase and sale agreement for the conservation easements (both Phase
12  1 and Phase 2), or (ii) execute the numerous amendments to the foregoing purchase and sale
13  agreement. Section 5.07(G) of the Operating Agreement requires a 70% approval to convey
14  easements such as these. The Manager Defendants never obtained such 70% approval, which is a
15  violation of the Operating Agreement. (Regardless, any approval would be invalid because the
16  Manager Defendants did not provide Members with the information necessary to properly evaluate
17  the sale.)

18       59.    Second, in connection with the Phase 2 sale and various extensions, the Manager
19  Defendants breached their duties by concealing and affirmatively misrepresenting material
20  information to the other Members. At the time of the June 2019 extension, the Manager Defendants
21  knew, but never informed the Members, that Flannery was purchasing land for approximately
22  $10,000/acre, and that Flannery previously told the Manager Defendants that it was interested in
23  purchasing ACR's property. The same thing happened again in April 2020. At the time of the April
24  2020 extension, the Manager Defendants knew, but never informed the Members, that Flannery was
25  now paying $12,000/acre. Each Defendant on their own could have disclosed the material
26  information to the Members, but none did so. The Manager Defendants, based on a common plan
27  with the other Defendants, withheld these facts from Members and never sought a vote because they
28  knew that once Members had all relevant facts, the Members would not approve the extensions. The

1 Manager Defendants never even provided Members of ACR with copies of the agreements with
2 Canon Station.

3    60.    Third, the Manager Defendants breached their fiduciary duties to Members by
4 entering into the conservation easements for an improper purpose, as explained above. It is clear that
5 as to Phase 2, the Manager Defendants knowingly and intentionally devalued the land with the
6 conservation easements when a significantly higher value was available for the land, i.e., letting the
7 Canon Station deal lapse, and selling to Flannery.

8    61.    Now that both Phase 1 and Phase 2 have closed, ACR received a total of $1,280,000
9 for Phase 1 ($3,200/acre for 400 acres) and a total of $3,089,500 for Phase 2 ($3,700/acre for 835
10 acres). In addition, the 1,235 acres encumbered by a conservation easement are worth about
11 $1,111,500 ($900/acre for 1,235 acres). ACR therefore realized a total value of $5,481,000 for these
12 1,235 acres.

13    62.    In contrast, if the Manager Defendants had followed approvals required under the
14 Operating Agreement, and their fiduciary duties under the Operating Agreement and the law, the
15 agreements for conservation easements would likely never have been approved, signed, or extended,
16 and these 1,235 acres would still be unencumbered today.

17    63.    On May 13, 2022, Flannery closed on a purchase of a 146-acre property adjacent to
18 ACR's land. According to the recorded grant deeds, Flannery paid $2,500,000, or approximately
19 $17,125/acre.

20    64.    Without the conservation easements, these 1,235 acres would therefore be worth at
21 least the $17,125/acre that Flannery paid for the neighboring property, or $21,149,375 in total.

22    65.    As a result, the Manager Defendants caused ACR a loss of at least $15,668,375
23 ($21,149,375 less $5,481,000).

24 **Defendants' Conduct With Respect to Flannery's Offers to Buy the Land**

25    66.    In October 2021, Flannery delivered a formal offer to ACR to purchase all of ACR's
26 real property for a premium of roughly three times fair market value for both unencumbered land
27 ($12,500/acre offered vs. approximately $4,000/acre fair market value), and for land encumbered by
28 conservation easements ($3,000/acre offered vs. under $900/acre fair market value). The offer was

all-cash, and Flannery included a proof of funds for the entire amount from its bank, First Republic Bank. By its terms, the offer was set to expire on November 12, 2021.

67.     Having received no response and with the deadline approaching, on November 8, 2021, Flannery followed up with the Managers by email:

> I am following up on my email below since the ACR offer is expiring this Friday, November 12th. Can you please let me know where the LLC stands on this? Should we schedule a conference call for the four of us to discuss it this week or do you have an attorney I should be in contact with?
>
> I also wanted to let you know that several of your family members who are selling Flannery their interests in the other family properties have been asking me about what's going on with the ACR Offer. And some of them are asking whether if the LLC doesn't sell the real property, if Flannery would just buy out their membership interests in ACR LLC instead. I have told them that we can't answer that question without seeing the operating agreement, and that in either case, Flannery would strongly prefer to purchase the real property, but we are being asked.

68.     On November 8, 2021, David Hamilton Jr. responded on behalf of the Manager Defendants with an email that stated:

> As one of the co-managers, I am responding to your recent email on behalf of Alex Cook Ranch LLC. We had acknowledged to you that we (the LLC managers) had received the offer from Flannery Associates dated October 20, 2021 and at this time Alex Cook Ranch LLC is not in a position to entertain the offer because of ongoing efforts to close escrow on a conservation easement related to the subject property. Flannery's proposed transaction would delay the close on the conservation easement due to regulatory oversight and approvals. Alex Cook Ranch LLC needs to close that easement to fulfill its contract obligations and its moral obligations with Canon Station LLC, its grantee. Once the conservation easement closes, Alex Cook Ranch LLC would be willing to revisit any interests of purchase of LLC properties.

69.     On November 9, 2021, Flannery's attorney responded via email:

> Thank you for getting back to me. Based upon your email, I am taking it that Canon Station has now exercised their option to close on the conservation easement. Is that correct? If so, how much of the property did they exercise on, and when is it scheduled to close? We would need to know the answer to these questions in order to evaluate whether any revising of an offer would be possible.

70.     The Manager Defendants did not respond to this email. So, on November 10, 2021, Flannery emailed the managers again:

Further to the below, I realized that there is likely a simple solution to the problem you outline below regarding regulatory oversight and approvals. If that is the issue, we can simply agree on a very long escrow that will accommodate the finalization of the conservation easement. That way, ACR can control the closing of the conservation easements and avoid any delays on that front, my client can get the capital allocated and committed now when they are looking to do so, and those ACR LLC members who wish to see the property sold can get certainty that a sale is happening.

I understand that this solution isn't immediately obvious since most buyers would not want to wait a long time to close, but Flannery's primary concern is committing the capital and knowing where it is going. If the money needs to sit in escrow/in a bank in the meantime, that's fine. Flannery has used this flexibility extensively with other sellers, many of whom kept escrows open for over a year until they found a 1031 Exchange property they liked. Keeping the escrow open here would be exactly the same, except that instead of letting the seller take time to find a 1031 property, we would be letting you complete the closing of your conservation easements.

Since that would resolve the problem you described, can we please schedule a call to discuss the offer now?

71.     The Manager Defendants never responded to this email. They never responded because regardless of what the majority of Members wanted, the Manager Defendants did not want to lose control of ACR's land for use by Hamilton Bros. The explanation regarding the conservation easement sale was just a pretext to avoid any sale, so when Flannery proposed a solution that completely resolved the stated concerns, the Manager Defendants had no legitimate response to Flannery.

72.     Given that the offer was significantly above fair market value, for essentially all assets of ACR, and all-cash, it would be customary for the managers of any LLC in this situation to engage in negotiations with the buyer, obtain the best possible offer, and then propose such best negotiated offer (alongside a recommendation from the managers, even if such recommendation was not to sell) to the Members for a vote.

73.     Instead, the Manager Defendants ignored Flannery's emails, refused to even discuss the offer, and then intentionally omitted material information in their correspondence to Members regarding Flannery's offer. They provided Flannery's offer to the Members, including the original email that conveyed the offer, while intentionally omitting the email exchange described in paragraphs 67-70 above, which proposed an effective solution to the concerns regarding the pending

1  sale of the conservation easements. Instead of being truthful with the Members, the Manager

2  Defendants told Members that the conservation easements prevented the sale of the property, that

3  Flannery would not buy the land with the conservation easement sale pending, and that ACR could

4  not sell the property while the conservation easement sale was pending. This was false, and

5  intentionally so. The Manager Defendants knew that Flannery was willing to buy the entire 2,257

6  acres including the land subject to the conservation easements (though clearly at a reduced price for

7  such acreage), and that Flannery had proposed a solution that resolved the Manager Defendants'

8  stated (but bogus, pretextual) concerns. To conceal this, the Manager Defendants did not send to

9  Members the portion of the email exchange that showed as much.

10 **Defendants Attempted to Block Lawful Sales by Members and Attempted to Unlawfully Deny**

11 **the Purchasers Status as Members of ACR**

12     74.     When Members of ACR learned about some of the Manager Defendants' conduct,

13 including in handling the Flannery offer, the Members decided to sell their LLC interests in ACR

14 instead.

15     75.     When the Manager Defendants learned about such sales, they attempted to block

16 them, even though such sales were legitimate and fully compliant with the Operating Agreement.

17 This is yet another example of Defendants acting unlawfully to advance their personal interests over

18 their duties to ACR. Because Defendants fear losing control of ACR and thus losing the ability to

19 lease ACR's land to Hamilton Bros at below-market rents, they improperly and intentionally sought

20 to block plainly permissible sales of ownership interests in ACR.

21     76.     Section 1.02 of the Operating Agreement, which governs "Authorized Transfers,"

22 provides:

23         "AUTHORIZED TRANSFERS" means, with respect to any
           Ownership Unit or any element thereof, any Transfer as follows,
24         provided that the transferee first signs a counterpart of this Agreement,
           agreeing to be bound by its terms:
25
           a. To any Member of the Company;
26
           b. To any Member's spouse, issue, sibling, registered domestic partner
27         or trust;
28         c. To the Company;

        d. Transfers of not more than 5,000 Class "A" Units and 5,000 Class "B" Units[.]

77.    On June 14, 2022, Diversified Land LLC ("Diversified"), purchased a total of 437.5 Class "A" Ownership Units and 3,055.92 Class "B" Ownership Units from Colin Nitta, Alexander Nitta, Joel Nitta, Vincent Hamilton, Jeremy Hamilton, Andrew Hamilton, and Steve Hamilton, all of whom were Members of ACR at the time of the acquisition ("June 14 Acquisition").

78.    The June 14 Acquisition was permitted and authorized by the Operating Agreement. Because this acquisition was not more than 5,000 Class "A" Units and 5,000 Class "B" Units, it constituted an "Authorized Transfer" under Section 1.02(d) of the Operating Agreement, which provides that a transfer of Ownership Units is an "authorized transfer" if the transfer is "not more than 5,000 Class 'A' Units and 5,000 Class 'B' Units."

79.    Further, on June 15, 2022, pursuant to Section 1.02 of the Operating Agreement, Diversified signed a counterpart signature page to the Operating Agreement, agreeing to be bound by its terms. On this same day, Diversified emailed and mailed via Federal Express the applicable assignment agreements for the June 14 Acquisition, as well as its counterpart signature page and agreement to be bound by the Operating Agreement, to ACR at its principal office. Thus, by virtue of the June 14 Acquisition, Diversified became a Member of ACR on June 14, 2022.

80.    On June 16, 2022, and now a Member of ACR, Diversified made an offer to purchase 15,626.89 Class "A" ACR Ownership Units and 14,223.89 Class "B" ACR Ownership Units from Neil Hamilton III and Janet Gusukuma, 7,900 Class "A" ACR Ownership Units and 6,723.89 Class "B" ACR Ownership Units from Owen and Mary Hamilton, and 7,750 Class "A" ACR Ownership Units and 6,723.89 Class "B" ACR Ownership Units from Sarah and John Nitta, all of whom were Members of ACR at the time of the acquisition. After negotiations, the offer was accepted and the purchase closed on June 17, 2022 (the "June 17 Acquisition").

81.    The June 17 Acquisition was likewise permitted and authorized by the Operating Agreement. The June 17 Acquisition constituted an "Authorized Transfer" under Section 1.02(a) of the Operating Agreement, which provides that a transfer of Ownership Units is an "Authorized Transfer" if the transfer is "to any Member of the Company." Because Diversified was a member of

ACR at the time of the June 17 Acquisition, the acquisition constituted an "Authorized Transfer" under Section 1.02(a) of the Operating Agreement. Thus, just like the June 14 Acquisition, the June 17 Acquisition was expressly permitted and authorized as an "Authorized Transfer" under the Operating Agreement.

82.     Under the Operating Agreement, an "Authorized Transfer" does not require the consent of the Managers or Members of ACR to be effective. Nor does an "Authorized Transfer" give rise to a right of first refusal or advance notice obligation under Section 7.02 of the Operating Agreement. Thus, the June 14 Acquisition and June 17 Acquisition were authorized and permitted under the plain terms of the Operating Agreement.

83.     On June 24, 2022, counsel for ACR, at the direction of the Manager Defendants, wrote a letter (the "Membership Status Letter") to Diversified contending that Diversified was not a Member of ACR. ACR asserted that the June 14 Acquisition did not result in Diversified becoming a Member of ACR and thus the June 17 Acquisition "was invalid and should be set aside." Counsel for ACR, at the direction of the Manager Defendants, claimed that "Member" is defined in the Operating Agreement "as those who initially signed the Operating Agreement," that Diversified "is not a signatory to the original Operating Agreement, or any amendment thereto," and thus the transactions constituted an "Unauthorized Transfer" under the Operating Agreement. The letter asserted that the only way to become a Member is through Section 7.02 of the Operating Agreement ("Unauthorized Transfers") and Diversified merely received Ownership Units but the sellers of the Ownership Units remain Members.

84.     In this letter, the Manager Defendants misstate the Operating Agreement to benefit themselves at the expense of the other Members. Section 1.02 of the Operating Agreement requires a purchaser to execute and sign a counterpart to the Operating Agreement for the purchase of less than 5,000 Ownership Units to be an Authorized Transfer. Diversified became a Member once it purchased the units and signed a counterpart to the Operating Agreement and agreed to be bound by its terms. Further, the transfer process under Section 7.02, on which counsel for ACR (at the direction of the Manager Defendants) relies for the supposed process to become a new Member, does not actually mention becoming a new Member, but solely refers to transferring Ownership Units. Thus,

1  the Manager Defendants' argument makes no sense because there is no difference between the
2  Authorized Transfer and Unauthorized Transfer sections of the Operating Agreement in regard to
3  the process of being a Member. Moreover, under their nonsensical argument, the Operating
4  Agreement does not provide *any* way to become a Member—whether through an "Authorized
5  Transfer" or otherwise. The Manager Defendants have sought to invalidate the June 14 Acquisition
6  and June 17 Acquisition based on inapplicable provisions in the Operating Agreement to further the
7  Manager Defendants' self-interest.

8      85.    On June 24, 2022, at the same time when counsel for ACR wrote the Membership
9  Status Letter, the Managers of ACR sent a letter to all Members of ACR which attempted to scare
10  them from selling their Ownership Units to Diversified. The letter was based on the same unfounded
11  and self-serving arguments described in paragraphs 83-84.

12      86.    However, the Members of ACR other than Defendants and their immediate families,
13  as well as attorneys for such Members, disagreed with the Managers' position and self-serving
14  interpretation of the Operating Agreement, as evidenced by the fact that the following Members sold
15  all of their Ownership Units to Diversified: David Simmons, Lynda and Frederick Haring, Holly
16  Bacon, Richard Constable, Steven Constable, Jenna Hamilton, Jon Hamilton, Kim Hamilton, Dana
17  Hamilton, Cynthia Faust, Pamela Baird and Cinders Reed.

18      87.    Separately, in September 2022: (a) Arran purchased Ownership Units in ACR from
19  Brendan Reed and Christian Reed, both of whom were Members of ACR at the time of the purchase,
20  and (b) Kingstree purchased Ownership Units in ACR from Quinn Gomes, who was a Member of
21  ACR at the time of the purchase. Arran and Kingstree informed ACR's counsel about these
22  acquisitions on September 26, 2022 ("September 22 Acquisitions").

23      88.    The September 26 Acquisitions were permitted and authorized by the Operating
24  Agreement. Because these acquisitions were not more than 5,000 Class "A" Units and 5,000 Class
25  "B" Units, they constituted an "Authorized Transfer" under Section 1.02(d) of the Operating
26  Agreement, which provides that a transfer of Ownership Units is an "authorized transfer" if the
27  transfer is "not more than 5,000 Class 'A' Units and 5,000 Class 'B' Units."

28

89.     Further, as explained in the letter to ACR's counsel on September 26, 2022, the assignment agreements from Brendan Reed, Christian Reed, and Quinn Gomes to Arran and Kingstree already include provisions such that they expressly serve as Arran's and Kingstree's counterpart signature pages to ACR's Operating Agreement (as amended), and therefore comply with Section 7.05 of the Operating Agreement, and thus, on September 26, Arran and Kingstree became Members of ACR and bound by the Operating Agreement.

90.     On September 26, 2022, Arran, Kingstree, and Diversified delivered a response to ACR's counsel with regards to the Membership Status Letter, which included legal analysis substantially similar to that set out in paragraphs 76-84 above. The Manager Defendants responded on October 4, 2022, through an email from ACR's counsel, where they continued to take an evasive stance and delay acknowledging Arran, Kingstree, and Diversified as Members of ACR.

91.     On November 4, 2022, the final two Members of ACR (except for Defendants and their immediate families) sold to Diversified: Warren Gomes Jr., individually, and Warren Gomes Jr., as Trustee of the Henry Wilkinson Trust. Given that Warren Gomes Jr. served as the third Manager of ACR (alongside the Manager Defendants) between 2013 and 2022, the fact that Warren Gomes Jr. evidently agreed that a sale to Diversified was permitted under the Operating Agreement provides yet another piece of evidence that Defendants' attempt to stop Members of ACR from selling was based on nothing but a pretext, and done to serve their own interests.

**Defendants Obstruct and Delay the Nominations of New ACR Managers**

92.     On September 26, 2022, Arran, Kingstree, and Diversified Land notified the Manager Defendants that they were nominating themselves for Managers in advance of the October 1, 2022 nomination deadline under the Operating Agreement (for a term beginning on January 1, 2023).

93.     Section 5.02 of the Operating Agreement provides that "[e]ach Manager shall serve until the earlier of: (A) Manager's resignation, retirement, death or disability; or (B) Expiration of Managers' Terms, which expire on the following dates: [(1)] Manager "A": January 1, 2015 and every six calendar years thereafter on January 1; [(2)] Manager "B": January 1, 2017 and every six calendar years thereafter on January 1; [and (3)] Manager "C": January 1, 2019 and every six calendar years thereafter on January 1." Operating Agreement § 5.02.

94.     Amendment No. One of the Operating Agreement amended this provision such that:

> [a]ll Manager Terms will expire on January 1 of each Calendar Year (January 1 to December 31), beginning January 1, 2020. On every January 1 all Manager Terms will automatically renew and extend for one more calendar year unless before October 1 of any year a Member nominates in writing one or more new candidates to be a Manager. In this event, an Election will be held prior to January 1 of the coming year to select the Managers for the coming year. If there are only three candidates who wish to be Managers for the coming year then no election will be held.

95.     Pursuant to the Operating Agreement, on September 26, 2022, in a letter to ACR's counsel, Arran, Kingstree, and Diversified provided notice of their nominations of Arran, Kingstree, and Diversified as new Managers of ACR, and requested that Defendants provide written ballots for each of the three Manager elections pursuant to Section 5.03(a) of the Operating Agreement. To prevent a claim that former owners remain Members as indicated in the Membership Status Letter, Plaintiffs provided voting proxies from Pamela Baird, Cinders Reed, Brendan Reed, Christian Reed, and Quinn Gomes, appointing Arran, Kingstree, and Diversified as their attorneys-in-fact. Arran, Kingstree, and Diversified also made the same nominations pursuant to these proxies on behalf of each of Pamela Baird, Cinders Reed, Brendan Reed, Christian Reed, and Quinn Gomes. Additionally, Arran, Kingstree, and Diversified each accepted such nomination to serve as a Manager of ACR starting from January 1, 2023.

96.     On October 4, 2022, counsel for Defendants responded to the September 26, 2022 letter, stating:

> ACR's Managers acknowledge receipt of the nominations in your letter. ACR's Managers have timely received in writing two additional nominations for David Hamilton and Richard Hamilton. Now that the nomination period has ended, the Managers will prepare to act on each nomination in accordance with the terms of the ACR Operating Agreement and applicable law. These preparations will be done so that if the membership, unit transfer, and other issues in dispute outlined in our letters support moving forward with an election before January 1, 2023, ACR will be in a position to hold the election.

97.     Defendants' refusal to hold an election, and statement that ACR will only do so "if the membership, unit transfer, and other issues in dispute outlined in our letters support moving forward with an election before January 1, 2023," is in breach of the Operating Agreement, and Manager Defendants' fiduciary duties and duties of good faith and fair dealing.

**Defendants' Refusal to Provide Books and Records**

98.  Defendants have improperly withheld from Plaintiffs the financial and corporate records of ACR.

99.  The Operating Agreement provides that "Managers shall keep the books and records of the Company." Operating Agreement § 5.08. Such information includes: "(A) A current list of the full name and last known business or residence address of each Member; (B) A copy of the Articles of Organization, as amended; (C) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent tax years; (D) Executed counterparts of this Agreement, as amended; (E) Any powers of attorney under which the Articles of Organization or any amendments thereto were executed; (F) Financial Statements of the Company for the six most recent fiscal years; and (G) The Books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years." *Id.* § 6.03. Such information additionally includes the LLC's "[co]mplete books of accounts of the Company's business, in which each Company transaction shall be fully and accurately entered" and "financial books and records of the Company . . . kept on the cash method of accounting," as well as "[a] balance sheet and income statement of the Company . . . following the close of each fiscal year." *Id.* §§ 6.01, 6.02.

100.  The Operating Agreement requires the Managers to "keep or cause to be kept" such books and records "[a]t all times during the existence of the Company, and beyond that period if a Super Majority of the Class 'A' and/or Class 'B' Ownership Units as appropriate deems it necessary." *Id.* § 6.03.

101.  The Operating Agreement requires that the books and records "***shall be open to inspection and copying by each Member*** or the Member's authorized representatives ***on reasonable Notice during normal business hours***." *Id.* § 6.01 (emphases added).

102.  In addition, Sections 17704.10(b)(1) and 17701.13 of the California Corporations Code provide the Members of ACR with statutory rights to examine the books and records of ACR.

103.  On October 5, 2022, Arran and Kingstree sent Defendants a demand for the books and records of ACR pursuant to Article VI of the Operating Agreement and its statutory books and records rights under the California Revised Uniform Limited Liability Company Act, including but

1  not limited to Sections 17704.10 and 17701.13 of the California Corporations Code, for purposes of
2  assessing the financial and legal status of ACR. The request also stated that Plaintiffs could accept
3  delivery of the requested documents by either providing a data room link that enabled Defendants to
4  upload these documents or by inspecting and copying the documents in physical form at a pre-agreed
5  time and location.

6      104.   Rather than making available to Plaintiffs copies of the requested information as
7  required, Defendants refused to provide any books or records, and concocted unlawful excuses for
8  such behavior with their attorney.

9      105.   This has prevented Plaintiffs from understanding the actions Defendants have taken
10  with respect to ACR, understanding the value of ACR, and from making fully informed decisions
11  about its interests in ACR. This has violated the Operating Agreement and California law by refusing
12  to provide books and records to Plaintiffs.

13                                    **DERIVATIVE ALLEGATIONS**

14      106.   Plaintiffs bring this action derivatively in the right of and for the benefit of ACR to
15  redress injuries suffered, and to be suffered, by ACR and its Members as a direct result of the
16  violations of federal and state law, including breaches of fiduciary duty, by the Manager Defendants.

17      107.   ACR is named as a nominal defendant in this case solely in a derivative capacity.

18      108.   The assignments described in paragraph 26 (to Arran) and paragraph 27 (to Kingstree)
19  are from parties who were Members of ACR at the time of the unlawful conduct alleged in this
20  complaint. These assignments are sufficient to satisfy the contemporaneous and continuous
21  ownership rules of derivative actions in California. In California, "[a]ssignability of things in action
22  is now the rule; nonassignability, the exception." *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d
23  389, 393 (1976) (alteration in original) (quoting *Rued v. Cooper*, 109 Cal. 682, 693 (1893)); *see* Cal.
24  Civ. Code § 954 ("A thing in action, arising out of the violation of a right of property, or out of an
25  obligation, may be transferred by the owner.").

26      109.   Plaintiffs have delivered to ACR and ACR's managers a true copy of this complaint,
27  pursuant to Section 800(b)(2) of the California Corporations Code.

28

110.     Plaintiffs will adequately and fairly represent the interests of ACR and its Members in prosecuting and enforcing their rights.

111.     Because of the facts set forth throughout this complaint, demand on the Managers to institute this action is not necessary. Such a demand would have been a futile and useless act, and Plaintiffs have not made and should be excused from making a pre-filing demand on the Managers to initiate this action.

112.     The Manager Defendants are the only Managers of ACR because the third Manager, Warren Gomes Jr., resigned from his role as Manager of ACR on October 18, 2022. The Manager Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action because they are not able to impartially consider the merits of a demand without being influenced by improper considerations, including suing themselves, their family members, and their family business.

113.     In facilitating and continuing the conservation easement sale and related transactions, the Manager Defendants failed to fully disclose the circumstances of the conservation easement sale to the Members. The Manager Defendants knowingly and intentionally violated the process for approving such a transaction under Section 5.07(G) of the Operating Agreement, to which they are signatories as Managers of ACR. Because they acted without the approval of the Members pursuant to Section 5.07(G) of the Operating Agreement, the Manager Defendants did not act on an authorized basis.

114.     The Manager Defendants also did not act in good faith and in the interest of ACR when they refused to negotiate and present to the Members truthfully and with full disclosure of the relevant facts the offer made by Flannery in October 2021 because the status quo benefitted Hamilton Bros (at the expense of ACR). Furthermore, David Hamilton Jr., in acting on behalf of the managers in his November 8, 2021 response to Flannery's offer, justified his rejection of the offer in substantial part because he felt bound to his personal "moral obligation" to Canon Station—a completely unrelated third party—which he placed above the interests of ACR, in a clear breach of his fiduciary duties.

115. As a result, the Manager Defendants are not disinterested at the time of the filing of this action. Each of the Manager Defendants committed, approved, and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Members. They did so to further their own and family's economic and other interests at the expense of ACR and its Members and continue to derive substantial economic benefit from the wrongs complained of herein and continuing to favor their own interests over ACR's and its Members' interests, including because of the relationship between Richard Hamilton, David Hamilton Sr., David Hamilton Jr., Stacy Hamilton, and Hamilton Bros. The Manager Defendants' conduct described above raises at minimum a reasonable doubt that they are disinterested parties.

116. This lack of independence and the financial benefits received by the Manager Defendants render them incapable of impartially considering a demand to commence and vigorously prosecute this action, including to sue themselves for breaching their fiduciary duties and other wrongful conduct and to sue family members for aiding and abetting those breaches and related conspiracy, as that would expose them and their family to substantial liability and impact their family business.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST THE MANAGER DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES)

117. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

118. Each of the Manager Defendants owed and owes ACR and its Members fiduciary obligations. By reason of their fiduciary relationships, the Manager Defendants owed and owe ACR and its Members the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor, and disclosure.

119. As set out in paragraphs 11 and 50-60, Defendants each knowingly and intentionally violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor, and disclosure to ACR and the Members by, among other things, giving Canon Station free

1 | or effectively free extensions to purchase the conservation easements despite the availability of a
2 | significantly higher value for the land, to further the Manager Defendants' personal interests of
3 | leasing ACR's land to Hamilton Bros. Further, as set out in paragraphs 13, 58-59, and 73, the
4 | Manager Defendants concealed numerous material facts (that also made their affirmative
5 | representations materially misleading) to prevent the Members from properly considering the merits
6 | of entering into the sale of conservation easements in the first place, and of later providing such
7 | extensions, instead of alternative uses for the land.

8 |   120. As set out in paragraphs 66-73, to the detriment of ACR, after Flannery made an offer
9 | on all of ACR's property at a price significantly above fair market value, it would be customary for
10 | managers to engage in negotiations with Flannery, obtain the best possible offer, and then propose
11 | such best negotiated offer (alongside a recommendation from the managers, even if the
12 | recommendation was not to sell) to the Members of ACR for a vote. Instead, the Manager Defendants
13 | ignored Flannery's emails, refused to even discuss the offer, and never asked the Members of ACR
14 | what they thought about the offer. After Members began asking the Manager Defendants about the
15 | offer, the Manager Defendants gave false, misleading, and incomplete information.

16 |   121. As set out in paragraphs 8 and 44-47, the Manager Defendants breached their
17 | fiduciary duties to ACR and its Members through self-dealing and conflicts of interest, including
18 | leasing ACR's land to their family business at below-market rents, at an annual loss to ACR of
19 | approximately $47,000 (this being effectively an improper subsidy from ACR to Hamilton Bros).

20 |   122. In breach of their fiduciary duties to ACR and its Members, the Manager Defendants
21 | put their own interests ahead of the interests of ACR and its Members.

22 |   123. As a direct and proximate result of the breaches of duty alleged herein, ACR has
23 | sustained and will sustain significant damages, including, but not limited to, loss of rental profits.

24 |   124. As a result of the misconduct alleged herein, the Manager Defendants are liable to
25 | ACR.

26 |   125. In addition, all leases and other arrangements entered into with the Manager
27 | Defendants and their affiliates, including Hamilton Bros, should be rescinded and voided.

28 |

126.   The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

127.   Plaintiffs, on behalf of ACR, have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST THE MANAGER DEFENDANTS FOR VIOLATION OF OPERATING AGREEMENT RELATED TO CONSERVATION EASEMENTS)

128.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

129.   The Operating Agreement is a valid contract that Plaintiffs and the Manager Defendants are bound by and parties of.

130.   As set out in paragraphs 88-89, Arran and Kingstree, as Members of ACR, are parties to the Operating Agreement and have complied with its provisions.

131.   Section 5.07(G) of the Operating Agreement requires a 70% approval by Members for granting of easements over four years in duration.

132.   As set out in paragraphs 48-65, the Manager Defendants breached Section 5.07(G) of the Operating Agreement by conveying *perpetual* easements on 1,235 acres of ACR's land without presenting complete information to Members and without obtaining Member approval.

133.   As a direct and proximate result of the Manager Defendants' breaches of the Operating Agreement alleged herein, ACR has sustained and will sustain significant damages, including, but not limited to, monetary damages, loss of rental profits, devaluation of property, and business opportunity cost.

134.   As a result of the misconduct alleged herein, the Manager Defendants are liable to ACR.

135.   Plaintiffs, on behalf of ACR, have no adequate remedy at law.

### THIRD CAUSE OF ACTION

### (DIRECT CLAIM AGAINST THE MANAGER DEFENDANTS FOR VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING)

136.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

137.    A covenant of good faith and fair dealing is implied as a matter of law in the Operating Agreement.

138.    The obligation of good faith and fair dealing extends to the assertion, settlement, and litigation of contract claims and defenses. *See* Restatement (Second) of Contracts § 205 (1981).

139.    The obligation of good faith and fair dealing is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, harassing demands for assurances of performance, rejecting performance for unstated reasons, abusing power to determine compliance, and falsifying facts. *See id.* It also extends to dealing that is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract without legitimate commercial reason. *See id.*

140.    By engaging in the conduct described herein, the Manager Defendants have breached the implied covenant of good faith and fair dealing.

141.    Specifically, by intentionally interfering with and attempting to thwart plainly permissible sales of Ownership Units by Members in ACR, and failing to permit and recognize the acquisitions, so as to continue to use and control the land for the Manager Defendants' own personal gain through Hamilton Bros, the Manager Defendants have breached the covenant of good faith and fair dealing.

142.    In addition, the Manager Defendants have breached the implied covenant of good faith and fair dealing by concocting a fictitious dispute based on inapplicable provisions in the Operating Agreement about which they had full and complete knowledge and understanding.

143.    As a proximate result of these breaches, Plaintiffs have been damaged.

**FOURTH CAUSE OFACTION**

<u>(DERIVATIVE CLAIM AGAINST THE MANAGER DEFENDANTS<br>FOR FRAUDULENT CONCEALMENT)</u>

144.  Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

145.  The Manager Defendants concealed material information from Members. Because they owed Members fiduciary duties, the Manager Defendants had a duty to provide the Members with relevant, material information about the Manager Defendants' conflicts of interest, the conservation easements, increasing local land values, and Flannery's interest in ACR's land, including its October 2021 offer. They intentionally withheld certain material information.

146.  As alleged in paragraphs 11 and 48-65, the Manager Defendants had a plan to use ACR to benefit themselves (through Hamilton Bros), rather than benefit all Members. The Manager Defendants knew that giving Canon Station more time to purchase the conservation easements did not maximize the value of ACR's property, because selling to Flannery would have produced much higher value, but they gave Canon Station extensions regardless to benefit themselves through Hamilton Bros.

147.  As another example, the Manager Defendants concealed that Hamilton Bros was paying significantly below-market rents to ACR. Indeed, as part of their scheme to conceal this fact, the Manager Defendants did not provide Members of ACR with copies of leases between Hamilton Bros and ACR.

148.  The Members relied on the Manager Defendants being truthful with them. The Members did not have knowledge of market-rate rents in the area, or of communications between the Manager Defendants and Flannery, and expected that the Manager Defendants were providing complete and accurate material information. Had they known the truth, they would have objected to the Managers' actions that devalued ACR's property, such as providing extensions to Canon Station or leasing ACR's property to Hamilton Bros at below-market rents.

149.  Thus, in breach of their duties to ACR and its Members, the Manager Defendants put their own interests ahead of the interests of ACR and its Members.

150.   As a direct and proximate result of the breaches of duty alleged herein, ACR has sustained and will sustain significant damages.

151.   As a result of the misconduct alleged herein, the Manager Defendants are liable to ACR.

152.   In addition, all leases and other arrangements entered into with the Manager Defendants and their affiliates, including Hamilton Bros, should be rescinded and voided.

153.   The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

154.   Plaintiffs, on behalf of ACR, have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST MANAGER DEFENDANTS FOR CONSTRUCTIVE FRAUD)

155.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

156.   As discussed above, the Manager Defendants owed Members fiduciary duties, including a duty of care and the fullest disclosure of material facts concerning transactions impacting ACR's land.

157.   The Manager Defendants, unlawfully, in violation of their fiduciary duties and through self-dealing, (1) caused ACR to enter into leases at below-market rents with the Manager Defendants' family-business, Hamilton Bros, (2) intentionally granted to Canon Station extensions and amendments to the purchase agreement for conservation easements, even when doing so was not in the best interests of ACR—because doing so was in the best interests of Hamilton Bros, and therefore of Manager Defendants, and (3) withheld Flannery's interest in purchasing ACR's property from the Members.

158.   The Manager Defendants concealed material information from Members. Because they owed Members fiduciary duties, the Manager Defendants had a duty to provide the Members

with relevant, material information about the Manager Defendants' conflicts of interest, ACR's leases with the Hamilton Bros, the conservation easement transactions, increasing land values in the area, and Flannery's interest in ACR's property.

159.    As alleged in paragraphs 51-55 and 59, the Manager Defendants knew that by late 2018, due to the emergence of Flannery as a new buyer in the area, the purchase agreement that ACR signed with Canon Station did not maximize value of ACR's property, and it was not in the best interests of ACR to provide Canon Station with any extensions. However, the Manager Defendants concealed all this from Members.

160.    As another example, as alleged in paragraphs 8 and 44-47, the Manager Defendants concealed that for many years they leased ACR's land to Hamilton Bros, their family business, at below-market rents. Indeed, as part of their scheme to conceal this fact, the Manager Defendants did not provide Members of ACR with copies of leases between Hamilton Bros and ACR.

161.    Additionally, the Manager Defendants concealed from the Members the full versions of both the initial purchase agreement for conservation easement with Canon Station, and the full versions of all subsequent amendments.

162.    As alleged in paragraphs 11 and 48-65, the Manager Defendants had a plan to use ACR to benefit themselves, rather than all Members.

163.    The Members did not have knowledge of material facts set out in paragraphs 11 and 48-65, and expected that the Manager Defendants were providing complete and accurate material information. Had they known the truth, they would have objected to the Managers' actions that devalued ACR's property, such as providing extensions to Canon Station or leasing ACR's property to Hamilton Bros at below-market rents.

164.    In this manner, the Manager Defendants defrauded ACR and its Members to their detriment and prejudice by concealing material information.

165.    Thus, in breach of their duties to ACR and its Members, the Manager Defendants put their own interests ahead of the interests of ACR and its Members, and maximized their own interests and the interests of their own family members to the deliberate detriment of ACR and its Members.

166.   As a direct and proximate result of these actions, ACR has and will sustain significant damages, including, but not limited to, monetary damages, loss of rental profits, devaluation of property, and business opportunity cost.

167.   As a result of the misconduct alleged herein, the Manager Defendants are liable to ACR.

168.   In addition, all leases and other arrangements entered into with the Manager Defendants and their affiliates, including Hamilton Bros, should be rescinded and voided.

169.   The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

170.   Plaintiffs, on behalf of ACR, have no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST MANAGER DEFENDANTS FOR CIVIL CONSPIRACY)

171.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

172.   The Manager Defendants owe fiduciary duties to Plaintiffs by virtue of their position as Managers of ACR and through their use of control of ACR's property to the advantage of themselves and their families at the expense of ACR.

173.   The Manager Defendants agreed to a common plan and design to commit a tortious act, i.e., to take various actions as described above in Counts I through V, as set out in paragraphs 117-154, to the detriment of ACR and its Members in breach of their fiduciary duties, the Operating Agreement, and other laws, and fraud.

174.   The Manager Defendants took the various actions as described above in Counts I through V to the detriment of ACR and its Members in breach of their fiduciary duties, the Operating Agreement, and other laws, and fraud.

175.   The Manager Defendants conspired among themselves to engage in the wrongful conduct described above. The Manager Defendants participated in the conspiracy by receiving the benefits as a result of the misconduct described above. The Manager Defendants committed their wrongful acts for the benefit of themselves and with each other's awareness and substantial assistance and encouragement.

176.   As a result of the misconduct alleged herein, the Manager Defendants are liable to ACR.

177.   In addition, all leases and other arrangements entered into with the Manager Defendants and their affiliates, including Hamilton Bros, should be rescinded and voided.

178.   The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

179.   Plaintiffs, on behalf of ACR, have no adequate remedy at law.

### SEVENTH CAUSE OF ACTION

### (DERIVATIVE CLAIM AGAINST DAVID HAMILTON SR., STACY HAMILTON, AND HAMILTON BROS FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES AND CONSTRUCTIVE FRAUD)

180.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

181.   The Manager Defendants breached their fiduciary duties to ACR and committed fraud, as set out in Counts I through V, and the Other Defendants gave substantial assistance and encouragement to the Manager Defendants in engaging in the wrongful conduct described above.

182.   The Other Defendants knew that the Manager Defendants were breaching their fiduciary duties and committing fraud.

183.   David Hamilton Sr., in his role as a Member of ACR and a partner in Hamilton Bros with Richard and as father of David Jr., had actual knowledge of Richard's and David Jr.'s wrongful acts, fraud, and breaches of fiduciary duties in furtherance of their interests in the business of Hamilton Bros.

184.    Stacy Hamilton, in her role as a partner in Hamilton Bros with her husband Richard and David Hamilton Sr. (father of David Hamilton Jr.), had actual knowledge of Richard's and David Jr.'s wrongful acts, fraud, and breaches of fiduciary duties in furtherance of their interests in the business of Hamilton Bros.

185.    Hamilton Bros, as the partnership run by Richard Hamilton, Stacy Hamilton, and David Hamilton Sr., also had actual knowledge of Richard's and David Jr.'s wrongful acts, fraud, and breaches of fiduciary duties in furtherance of their interests in the business of Hamilton Bros and its family ranching operation.

186.    David Sr., Stacy, and Hamilton Bros provided substantial assistance and encouragement to the Manager Defendants' breaches of fiduciary duty and fraud, and their conduct was a substantial factor in causing harm to Plaintiffs. Among other conduct, to further their family's own ranching interests through Hamilton Bros, David Sr. and Stacy, in their roles as partners in Hamilton Bros, encouraged, supported, and helped facilitate the Manager Defendants to lease ACR's land to Hamilton Bros at below-market prices and in spite of the conflict of interest, and to unlawfully protect their family's access to ACR's land in breach of their duties to ACR and its Members by, among other things, encumbering the land with perpetual conservation easements, stonewalling buyers who were offering a much better value on the land, making misrepresentations and omissions of material fact to the Members to eliminate the threat of such offers to the family business, and blocking legitimate acquisitions of Ownership Units in ACR so as to retain the ability to use and control the land for Hamilton Bros, their family business. As a result of the misconduct alleged herein, David Hamilton Sr., Stacy Hamilton, and Hamilton Bros are liable to ACR.

187.    In addition, all leases and other arrangements entered into with the Manager Defendants and their affiliates, including Hamilton Bros, should be rescinded and voided.

188.    The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

189.    Plaintiffs, on behalf of ACR, have no adequate remedy at law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EIGHTH CAUSE OF ACTION**

**(DIRECT CLAIM AGAINST THE MANAGER DEFENDANTS FOR BREACH OF CONTRACT)**

190.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

191.   Arran and Kingstree, as Members of ACR, and the Manager Defendants, entered into the Operating Agreement.

192.   Arran and Kingstree complied with all, or substantially all, of the material terms in the Operating Agreement.

193.   The Operating Agreement requires that books and records "shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours," that "[e]ach Member . . . shall be entitled to examine the books and records of the Company," and that Managers "shall keep or cause to be kept" such books and records "[a]t all times during the existence of the Company, and beyond that period if a Super Majority of the Class 'A' and/or Class 'B' Ownership Units as appropriate deems it necessary." Operating Agreement §§ 6.01, 6.03, 10.16. As described in paragraphs 98-105, such books and records include, among other things, financial and corporate records of ACR.

194.   On October 5, 2022, Arran and Kingstree sent Defendants a request for information pursuant to Article VI of the Operating Agreement and its statutory books and records rights under the California Revised Uniform Limited Liability Company Act, including but not limited to Sections 17704.10 and 17701.13 of the California Corporations Code, for purposes of assessing the financial and legal status of ACR. The request stated that Plaintiffs could accept delivery of the requested documents by either providing a data room link that enabled the Manager Defendants to upload these documents or by inspecting and copying the documents in physical form at a pre-agreed time and location.

195.   Defendants breached the Operating Agreement by refusing to provide the requested books and records to Arran and Kingstree.

196.    Arran and Kingstree were harmed by this breach, including, but not limited to, because they were unable to make decisions based on full and accurate information about ACR. Arran and Kingstree are entitled to specific performance.

197.    In addition, as set out in paragraphs 74-91, the Manager Defendants are improperly refusing to recognize Arran and Kingstree as Members of ACR in breach of the Operating Agreement.

198.    Additionally, as set out in paragraphs 92-97, the Manager Defendants are improperly refusing to acknowledge the nominations by Arran and Kingstree of Arran, Kingstree, and Diversified as new managers of ACR in breach of the Operating Agreement.

199.    As a direct and proximate result of the two breaches of duty alleged in the two proceeding paragraphs, Arran and Kingstree have sustained and will sustain significant harm, and are entitled to, among other things, specific performance by the Manager Defendants to recognize (i) that the acquisition of Ownership Units in ACR by Arran and Kingstree are "Authorized Transfers" within the meaning of Section 1.02 of the Operating Agreement, (ii) that the assignment agreements for Arran and Kingstree purchases were valid, permitted, and authorized under the Operating Agreement, and thus are binding on the Manager Defendants and ACR, (iii) that Arran and Kingstree are Members of ACR, and (iv) that the nominations of Arran, Kingstree, and Diversified as Managers of ACR are valid.

200.    As a result of the misconduct alleged herein, the Manager Defendants are liable to Arran and Kingstree for specific performance and damages, in amounts to be proven at trial.

**NINTH CAUSE OF ACTION**

**(DIRECT CLAIM AGAINST THE MANAGER DEFENDANTS FOR VIOLATIONS OF SECTIONS 17704.10(b)(1) AND 17701.13 OF THE CALIFORNIA CORPORATIONS CODE)**

201.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

202.    Sections 17704.10(b)(1) and 17701.13 of the California Corporations Code provide the Members of ACR with statutory rights to examine the books and records of ACR.

1    203.   On October 5, 2022, Arran and Kingstree sent Defendants a request for information
2  pursuant to Article VI of the Operating Agreement and its statutory books and records rights under
3  the California Revised Uniform Limited Liability Company Act, including but not limited to
4  Sections 17704.10 and 17701.13 of the California Corporations Code, for purposes of assessing the
5  financial and legal status of ACR. The request stated that Plaintiffs could accept delivery of the
6  requested documents by either providing a data room link that enabled Defendants to upload these
7  documents or by inspecting and copying the documents in physical form at a pre-agreed time and
8  location. Defendants breached the Operating Agreement by refusing to provide the requested books
9  and records to Arran and Kingstree as required.

10    204.   Rather than making available to Arran and Kingstree copies of the requested
11  information as required, Defendants refused to provide any books or records.

12    205.   Arran and Kingstree were harmed by the Manager Defendants' refusal to provide
13  books and records by being prevented from understanding the actions Defendants have taken with
14  respect to ACR, understanding the value of its ownership of ACR, and from making fully informed
15  decisions about its interests in ACR.

16                          **TENTH CAUSE OF ACTION**

17        **(DIRECT CLAIM AGAINST THE MANAGER DEFENDANTS FOR BREACH OF
                              FIDUCIARY DUTIES)**
18

19    206.   Plaintiffs incorporate by reference and re-allege each and every allegation contained
20  above, as though fully set forth herein.

21    207.   Each of the Manager Defendants owed and owes its Members, including Plaintiffs,
22  fiduciary obligations. By reason of their fiduciary relationships, the Manager Defendants owed and
23  owe Arran and Kingstree the highest obligation of loyalty, good faith, due care, oversight, fair
24  dealing, candor, and disclosure.

25    208.   The Manager Defendants each knowingly and intentionally violated and breached
26  their fiduciary duties of loyalty, good faith, due care, fair dealing, and candor to Arran and Kingstree
27  by, among other things:

28        (i)   Refusing to acknowledge the nominations by Arran and Kingstree of Arran,
                Kingstree, and Diversified as new managers of ACR, as set out in paragraphs 92-97;

(ii)   Refusing to recognize the acquisitions of Ownership Units in ACR by Arran and Kingstree, as set out in paragraphs 74-91;

(iii)   Refusing to recognize Arran and Kingstree as Members of ACR, as set out in paragraphs 74-91; and

(iv)   Refusing to provide Arran and Kingstree access to the books and records of ACR, as set out in paragraphs 17 and 98-105.

209.   The Manager Defendants took each of the acts outlined in the paragraph above for their own personal and business interests, and to the detriment of Arran and Kingstree's interests.

210.   As a direct and proximate result of the duty breaches alleged herein, Arran and Kingstree have sustained and will sustain significant damages. Harm from these breaches of fiduciary duty include, but are not limited to, their inability to make decisions based on full and accurate information about ACR, and their inability to carry out actions that are within their rights as Members of ACR. Arran and Kingstree are entitled to specific performance and damages.

211.   The Manager Defendants' actions were undertaken with fraud, malice, or oppression, or with a conscious disregard for Plaintiffs' rights, and therefore Arran and Kingstree are entitled to an award of exemplary and punitive damages against Defendants, and each of them, in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants as follows:

(a)   Actual damages to be proven at trial, exemplary damages, punitive damages, treble damages, and such other relief as available under the law;

(b)   Ordering the Manager Defendants to disgorge all profits from their improper use of ACR's property;

(c)   Pre-judgment and post-judgement interest on such monetary relief;

(d)   The rescission and voiding of all leases and other arrangements entered into between ACR and the Manager Defendants and their affiliates, including Hamilton Bros;

(e)   A declaratory judgment and order that (i) the acquisition of Ownership Units in ACR by Arran and Kingstree are "Authorized Transfers" within the meaning of Section 1.02 of the

1  Operating Agreement, (ii) the assignment agreements for Arran's and Kingstree's acquisitions were

2  valid, permitted and authorized under the Operating Agreement, and thus are binding on the Manager

3  Defendants and ACR, (iii) Arran and Kingstree are Members of ACR in good standing, and (iv) the

4  Manager nominations are valid;

5      (f)     Injunctive relief, including specific performance, and declaratory relief ordering ACR

6  to recognize the validity of the election of the managers nominated by Arran and Kingstree, including

7  Arran, Kingstree and Diversified, or provide other relief as appropriate under the circumstances;

8      (g)     Injunctive relief, including specific performance, and declaratory relief that the books

9  and records demands are valid and that Defendants must comply with those demands;

10      (h)     The costs of bringing this suit, including reasonable attorneys', accountants', and

11  experts' fees and expenses to the extent afforded by law or contract or the Operating Agreement; and

12      (i)     All other relief to which Plaintiffs may be entitled at law or in equity.

13                                **JURY DEMAND**

14      Plaintiffs demand a jury trial of all issues for which there is a right to trial by a jury.

15  DATED: December 14, 2022          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

16

17                          By: _____
                                LANCE A. ETCHEVERRY
18                              ABRAHAM A. TABAIE
                                Attorneys for Plaintiffs
19                              Arran LLC and Kingstree LLC, on behalf of
                                themselves and derivatively on behalf of Alex Cook
20                              Ranch, LLC

21

22

23

24

25

26

27

28