UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLANNERY ASSOCIATES LLC, | No.  2:23-cv-00927-TLN-AC |
| Plaintiff, | |
| v. | **ORDER** |
| BARNES FAMILY RANCH ASSOCIATES, LLC, et al., | |
| Defendants. | |

This matter is before the Court on Defendants[1] Barnes Family Ranch Associates, LLC, et al.'s (collectively, "Defendants") Motion to Dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (ECF No. 78.)  Plaintiff Flannery Associates LLC ("Plaintiff") filed an opposition.  (ECF No. 80.)  Defendants filed a reply.  (ECF No. 82.)  On March 7, 2024, the Court held a hearing on Defendants' motion.  (ECF No. 106.)  For the reasons set forth below, the Court DENIES Defendants' motion.

///

///

///

---

[1]     The Court notes all named Defendants in this action, except Richard Anderson, are party to the instant motion.  Richard Anderson filed an Answer to Plaintiff's Complaint.  (ECF No. 53.)

1

1    **I.      FACTUAL AND PROCEDURAL BACKGROUND**

2          This case arises out of an alleged horizontal price-fixing conspiracy among landowners in

3    Solano County, California.  (ECF No. 1 at 3.)  Plaintiff is a Delaware-based limited liability

4    company that began purchasing rangeland properties in the Jepson Prairie and Montezuma Hills

5    area of Solano County in 2018, and Defendants[2] are landowners in Solano County.  (*Id*. at 3, 5,

6    9.)  At the time Plaintiff initiated this action, Plaintiff purchased or was under contract to

7    purchase approximately 140 properties in Solano County worth over $800 million.  (*Id*. at 5.)

8    With this land, Plaintiff states its goal is to create a "large holding of contiguous assembled

9    property under common ownership" in Solano County, where Plaintiff intends to build a

10   workable sustainable community that provides a solution to the well-documented California

11   housing crisis.  (*Id*. at 48; ECF No. 108 at 10.)

12         Since Plaintiff began purchasing land in Solano County in 2018, Plaintiff alleges it always

13   paid above fair market value for the properties it purchased in the area.  (ECF No. 1 at 5.)  As a

14   result, Plaintiff alleges it was the only purchaser of land in Solano County as "a vast majority of

15   landowners in the area took advantage of [Plaintiff's] above market offers and sold their

16   properties" to Plaintiff.  (*Id*. at 5, 46.)

17   ///

18   ─────────────────────
     [2]      In the Complaint, Plaintiff categorizes Defendants into the following three groups: (1) the
19   "BLK Defendants"; (2) the "Mahoney Defendants"; and (3) the "Anderson Defendants."  (*Id*. at
     6.)  Plaintiff also alleges another group of individuals, the "Hamilton Conspirators," were
20   involved in the events covered by this action, but "are not named as defendants in this [action]
     because under a settlement agreement with the Hamilton Conspirators dated March 31, 2023,
21   [Plaintiff] provisionally released its claims against the Hamilton Conspirators."  (*Id*. at 2.)

22         Since Plaintiff initiated this action, the Court notes Plaintiff entered into settlement
23   agreements with more than half of the named Defendants.  Specifically, on June 27, 2023,
     Plaintiff settled all claims against David Anderson, Carol Hoffman, and Deborah Workman and
24   dismissed these Anderson Defendants from this action with prejudice.  (ECF Nos. 73, 74.)  On
     October 17, 2023, Plaintiff settled all claims against the BLK Defendants and dismissed the BLK
25   Defendants from this action with prejudice.  (ECF Nos. 83, 84.)  On January 19, 2024, Plaintiff
     settled all claims against the Mahoney Defendants and dismissed the Mahoney Defendants from
26   this action with prejudice.  (ECF Nos. 100, 101.)  On March 6, 2024, Plaintiff settled all claims
27   against Ronald Gurule, an Anderson Defendant, and dismissed Ronald Gurule from this action
     with prejudice.  (ECF Nos. 104, 105.)  The Court notes there are twenty named Defendants
28   remaining in this action.

However, in late 2018, Plaintiff alleges a horizontal price-fixing conspiracy began among Defendants to drive up the price of land in Solano County to an even higher supracompetitive level.  (*Id.* at 3, 41.)  Specifically, Plaintiff alleges Defendants shared information with each other about price negotiations with Plaintiff regarding their land, colluded about how much they should sell their land to Plaintiff for, and collectively refused to sell their land for anything less than supracompetitive prices.  (*Id.* at 25–45.)  Plaintiff also alleges Defendants' conspiracy affected other Solano County landowners' decisions to sell their properties to Plaintiff.  (*Id.* at 8.)

As a result of Defendants' alleged price-fixing conspiracy, Plaintiff claims to have suffered, and will continue to suffer damages resulting from: (1) overpaying for property purchased from Defendants and their co-owners; (2) lost profits attributable to Plaintiff's inability to purchase property from Defendants that refused to sell to Plaintiff; (3) overpaying for property purchased from third parties; and (4) lost profits attributable to Plaintiff's inability to purchase property from third parties that refused to sell to Plaintiff.  (*Id.* at 9.)

On May 18, 2023, Plaintiff filed the instant action against Defendants, alleging three causes of action: (1) violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et seq*.; and (3) violation of the Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 *et seq*. (*Id*. at 1.)  On July 11, 2023, Defendants filed the instant motion to dismiss Plaintiff's Complaint under Rule 12(b)(6).  (ECF No. 78.)

## II.     STANDARD OF LAW

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to

3

define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court must give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570 (internal citation omitted).

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Thus, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss" for failure to state a claim. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (citations omitted).  Moreover, it is inappropriate to assume the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 680.  While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial

4

experience and common sense." *Id.* at 679.  Thus, only where a plaintiff fails to "nudge [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed.  *Id.* at 680 (internal quotations omitted).

In ruling on a motion to dismiss, a court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201.  *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (the court need not accept as true allegations that contradict matters properly subject to judicial notice).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)); *see also Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile).  Although a district court should freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint."  *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

### III.   ANALYSIS

Defendants move to dismiss Plaintiff's Complaint in its entirety.  (ECF No. 78.)  Specifically, Defendants argue: (1) the Sherman Act does not apply to conspiracies involving real property; (2) Plaintiff cannot establish antitrust standing under the Sherman Act; (3) Plaintiff fails to allege Defendants entered into an illegal horizontal price-fixing conspiracy; (3) Plaintiff fails to adequately allege its state law claims; and (4) Plaintiff fails to allege liability against certain individual Defendants.  (*Id.*)  The Court will address each of Defendants' arguments in turn.

///

///

A.    The Sherman Act and Real Property

Section 1 of the Sherman Act prohibits horizontal agreements among competitors that unreasonably restrain trade by restricting product, raising prices, or otherwise manipulating markets to the detriment of consumers.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).  Defendants argue Plaintiff cannot assert a claim against them under § 1 of the Sherman Act because landowners inherently cannot compete with other landowners and therefore, real property is not the type of commoditized product the Sherman Act regulates.  (ECF No. 78 at 21.)

In support of their argumnet, Defendants cite *Souza v. Estate of Bishop* for the proposition that "[i]n common parlance, the word 'commodity' is not used to describe real estate, and the dictionaries, both general and legal, defining 'commodity' use the word 'personal' and 'movable' and do not use the term 'real estate.'"  594 F. Supp. 1480, 1483, n.2 (D. Haw. 1984), *aff'd* 821 F.2d 1332 (9th Cir. 1987); (*see* ECF No. 78 at 21.)  However, in this passage quoted by Defendants, the *Souza* court interpreted the meaning of the word "commodity" as it relates to Hawaii's antitrust statute, not the Sherman Act.  *See id.*; Hawaii Rev. Stat. Ann. § 480-4(b)(1)–(3) (prohibiting the monopolization of trade or commerce in any "commodity").[3]  Section 1 of the Sherman Act does not include the word "commodity."  Rather, § 1 of the Sherman Act states, "***Every*** contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal."  15 U.S.C. § 1 (emphasis added).

///

---

[3]    In *Souza*, plaintiffs alleged defendants conspired to restrain trade by leasing rather than selling their land to Plaintiff.  594 F. Supp. at 1481.  In affirming the District of Hawaii's grant of summary judgment for Defendants, the Ninth Circuit noted "[w]e assume for the purposes of this opinion that the relevant section of the antitrust laws apply to the situation before us.  We question, however, whether Congress intended the antitrust laws to apply to the means by which a landowner conveys all or a portion of his bundle of rights in real property."  *Souza v. Est. of Bishop*, 821 F.2d 1332, 1134 n.1 (9th Cir. 1987).  At oral argument, Defendants argued this finding by the Ninth Circuit is "key" support for their argument.  (ECF No. 108 at 32.)  However, the Court is not persuaded because *Souza* is distinguishable from the instant case.  Plaintiff is not challenging "the means by which" Defendants sold their property to Plaintiff.  Rather, Plaintiff is challenging Defendants' decision to fix the price of land in Solano County.  While Defendants were under no obligation to sell their land to Plaintiff, Defendants were not free restrict the sale of land to Plaintiff in Solano County by fixing the price at supracompetitive levels.

While courts have always recognized that § 1 of the Sherman Act was intended to only prohibit unreasonable restraints of trade, the Court is unaware of any cases where a court has limited § 1 of the Sherman Act to conspiracies only involving "commodities" or a particular set of industries.  This is because "[t]he term 'restraint of trade' in the statute, like the term at common law, refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731 (1988); *see also Nat'l Collegiate Athletic Assn. v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984); *see, e.g.*, *Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911).  "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential." *Bus. Elecs. Corp.*, 485 U.S. at 732.

Accordingly, the Supreme Court held that horizontal price-fixing conspiracies are a per se violation of the Sherman Act, regardless of the industry in which the conduct occurred.  *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 349–51 (1982); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries.").  And both the Supreme Court and the Ninth Circuit have specifically found that the Sherman Act applies to horizontal price-fixing conspiracies involving real property.  *See McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 235 (1980) (vacating dismissal of Sherman Act claim involving an alleged "conspiracy among [real estate firms and brokers] to fix, control, raise, and stabilize prices for the purchase and sales of residential real estate …"); *see also United States v. Joyce*, 895 F.3d 673, 678 (9th Cir. 2018) (rejecting defendants argument that per se rule does not apply to a bid rigging conspiracy involving foreclosure auctions because the "activities took place in any particular industry or during a downturn in the broader economy").  Thus, where a plaintiff alleges "any combination which tampers with price structures," § 1 of the Sherman Act is applicable.  *Socony-Vacuum Oil Co.*, 310 U.S. at 221.

In the instant case, Plaintiff alleges Defendants eliminated its ability to purchase land in Solano County in a free and open market by engaging in conspiracy to fix the price for land at supracompetitive levels.  (*See* ECF No. 1 at 46) ("The price-fixing conspiracy has resulted in the

suppression and elimination of competition, leading to artificially high prices and fewer transactions"). Given the anticompetitive potential inherent in the price-fixing conspiracy alleged by Plaintiff, the Court finds Defendants' argument that § 1 of the Sherman Act does not apply to real property is unpersuasive.

> ### B.  Antitrust Standing

Defendants next argue the Court must dismiss Plaintiff's Sherman Act claim because Plaintiff lacks antitrust standing. (ECF No. 78 at 23.) Private suits to enforce the Sherman Act are authorized by § 4 of the Clayton Act (15 U.S.C. § 15(a)), which provides that "any person who shall be injured in his business . . . by reason of anything forbidden in the antitrust laws may sue …." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). Despite the broad language of this provision, the Supreme Court ruled Congress did not intend to afford a private remedy to everyone injured by an antitrust violation simply on a showing of causation. *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 535. Instead, antitrust laws are restricted to those who have "antitrust standing." *Id.*

To determine whether a party has antitrust standing, a court will weigh the following factors: (1) nature of the complainant's alleged injury; (2) directness of the injury; (3) speculative measure of harm; (4) risk of duplicative recovery; and (5) complexity in apportioning damages. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999). "To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor." *Id.* at 1055. "Instead, we balance the factors," *id.*, recognizing that "[a]ntitrust standing involves a case-by-case analysis." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996).

In the instant case, Defendants specifically argue Plaintiff does not have antitrust standing because Plaintiff's "alleged injuries are not the type of [injury] antitrust laws intended to forestall," "the alleged injuries are not direct," and "the alleged harm is too speculative." (ECF No. 78 at 23–27.) The Court will address each of Defendants' arguments in turn.

///

///

///

*i. Antitrust Injury*

A plaintiff's injury "must be of the type antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057. Antitrust laws were enacted for the protection of competition, not competitors. *Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 954 (9th Cir. 1994). Therefore, a private antitrust claim must allege an injury that results from the anticompetitive aspect of the defendant's conduct. *Id.* If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is per se illegal. *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001).

In the instant case, Defendants argue Plaintiff has not sufficiently it suffered an antitrust injury because Plaintiff fails to establish Defendants engaged in anticompetitive behavior. (ECF No. 78 at 24.) Specifically, Defendants argue their decision not to sell to Plaintiff was beneficial or neutral to competition because this conduct "prevented" Plaintiff from establishing a monopolistic ownership of Solano County land. (*Id.*) Plaintiff disagrees and argues Defendants misconstrue antitrust injury by placing the focus on Plaintiff's conduct, not Defendants'. (ECF No. 80 at 21.)

The Court agrees with Plaintiff. As stated previously, when assessing whether a plaintiff suffered antitrust injury, a court first considers whether the defendant's—not the plaintiff's—conduct is beneficial, neutral, or harmful to competition. *See Pool Water Prods.*, 258 F.3d at 1034. Thus, whether Plaintiff created a monopolistic hold over land in Solano County is inapposite to whether Plaintiff suffered an antitrust injury. Rather, the focus of this Court's inquiry is whether Plaintiff has sufficiently alleged its injury flows from Defendants' purported efforts to artificially raise prices for land in Solano County. *See Knevelbaard Dairies*, 232 F.3d at 988 (when "horizontal price fixing causes buyers to pay more . . . than the prices that would prevail in a market free of unlawful trade restraint, antitrust injury occurs").

In the instant case, Plaintiff sufficiently alleges Defendants and other third-party landowners engaged in an illegal agreement to only sell their properties to Plaintiff at supracompetitive prices, which caused Plaintiff to overpay for certain properties or not be able to

1  purchase other properties.  (ECF No. 1 at 4) (Defendants and their "illegal price-fixing conspiracy

2  have caused damages to [Plaintiff] from overpayment for properties.").  As the Ninth Circuit held

3  in *City of Oakland v. Oakland Raiders*, reducing output and increasing prices "are precisely the

4  kinds of harms to competition . . . antitrust laws were intended to prevent."  20 F.4th 441, 457–58

5  (9th Cir. 2021).

6         Thus, the Court finds Plaintiff has sufficiently alleged antitrust injury.

7                          *ii.   Directness of Plaintiff's Injury*

8         The second factor in the antitrust standing inquiry "looks to whether [the plaintiff's]

9  alleged injury was the direct result of [the defendant's] allegedly anticompetitive conduct."  *Am.*

10  *Ad Mgmt.*, 190 F.3d at 1058.  This factor focuses on "the chain of causation between [the

11  plaintiff's] injury and the alleged restraint" of trade.  *Id.*  The harm may not be "derivative or

12  indirect" or "secondary, consequential, or remote."  *City of Oakland*, 20 F.4th at 458.

13         In the instant case, Plaintiff alleges four categories of injuries it suffered because of

14  Defendant's conduct: (1) overpayment to Defendants; (2) overpayment to third-party landowners

15  in Solano County; (3) lost profits for land Defendants refused to sell to Plaintiff; and (4) lost

16  profits for land third-party landowners in Solano County refused to sell to Plaintiff.  (ECF No. 1

17  at 9.)

18         Defendants first argue Plaintiff is responsible for its overpayment for land it purchased

19  from Defendants and other third-party landowners because Plaintiff set the supra-competitive

20  market price for land in Solano County "through aggressive unsolicited above-market offers and

21  by paying well-above market value."  (ECF No. 78 at 25.)  In opposition, Plaintiff contends direct

22  purchasers "plainly have standing to recover collusive overcharges," and "such injuries are direct

23  and certain."  (ECF No. 80 at 21.)  Plaintiff further claims the "willingness to pay some premiums

24  does not entitle Defendants to conspire and artificially inflate prices to an even higher level."  (*Id.*

25  at 22.)

26         As an initial matter, with regards to Plaintiff's overpayment for land purchased from

27  Defendants, the Court notes all Defendants who sold their land to Plaintiff have now settled with

28  Plaintiff.  Nevertheless, "direct purchasers plainly have 'standing to recover any collusive

10

overcharges.'"  *City of Oakland*, 20 F.4th at 458 (citation omitted).

With regards to Plaintiff's overpayment for land purchased from third parties, the Court finds such injuries are also direct.  The focus of this Court's antitrust standing analysis is "whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct," not plaintiff's conduct.  *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001).  Moreover, contrary to Defendants' assertions, the Ninth Circuit does not prohibit recovery for overpayment to third parties "where plaintiffs are only one step removed from defendants in the distribution chain."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 6246736, at *8 (N.D. Cal. Oct. 26, 2016).  This is because "[s]uccessful cartels increase the market price for a price-fixed good, not just their own price …."  *Id.* at *6.  "The injuries that result from conspirators' impact on the market are directly caused by their collusive conduct regardless of the supplier that sells the good."  *Id.*

In the instant case, Plaintiff alleges Defendants' conduct "influenced the decisions of many landowners in the area to demand higher supracompetitive prices before selling."  (ECF No. 1 at 49–51.)  The Court finds this sufficiently establishes Defendants' anticompetitive conduct had a market-wide effect of driving up the price of land in Solano County, causing Plaintiff to overpay for land it purchased.

Finally, Defendants argue "[Plaintiff's] claim that it lost profits when it was unable to acquire land from Defendants and third parties fails as a matter of law" because the "nonpurchaser" damages Plaintiff seeks are not available in this Circuit.  (ECF No. 78 at 26.)  Specifically, Defendants rely on *City of Oakland* for the proposition that the injuries suffered by actual purchasers are more direct than the injuries suffered by non-purchasers who were priced out of the market.  20 F.4th at 458 (finding plaintiff did not have antitrust standing because there were more direct victims than plaintiff of defendant's anti-competitive conduct).

The facts at issue in *City of Oakland* are distinguishable from the facts alleged by Plaintiff.  Plaintiff is not simply a nonpurchaser who was priced out of the market to purchase land in Solano County.  Rather, throughout the Complaint, Plaintiff alleges it was the sole target of a price-fixing conspiracy initiated by Defendants against Plaintiff.  (*E.g.*, ECF No. 1 at 8.)

11

1    Neither Plaintiff nor Defendants identify any other possible victims of Defendants'

2    anticompetitive conduct.  (*See id*. at 5 ("not a single other buyer has emerged who would offer

3    even a fraction of the prices and terms that [Plaintiff] was offering").)  Moreover, Plaintiff draws

4    a direct causal link between Defendants' anticompetitive conduct towards Plaintiff and its

5    inability to complete prospective purchases of land from Defendants and third parties.  (*E.g.*, ECF

6    No. 1 at 32 ("the Mahoney Defendants refused to enter into the swap transaction with [Plaintiff]

7    until [Plaintiff] de facto guaranteed that it would purchase the Emigh Industrial Property at a

8    supracompetitive price").)  Thus, the Court finds Plaintiff's alleged damages for lost profits are

9    direct.

10          Accordingly, the Court finds Plaintiff sufficiently alleges the damages it seeks flow

11   directly from Defendants' conduct.

12                            *iii.   Speculative Measure of Harm*

13          Finally, the third factor considers whether Plaintiff's damages are "so speculative as to

14   call into question the existence of a link between the defendant's allegedly anticompetitive

15   behavior and the plaintiff's injury."  *Am. Ad Mgmt., Inc*, 190 F.3d at 1059.

16          As an initial matter, the Court finds Plaintiff's alleged damages for overpayment to

17   Defendants and third parties for the land it purchased from them is not speculative "because it can

18   be measured directly by the overcharge."  *Hexcel Corp. v. Ineos Polymers, Inc.*, No.

19   209CV05334MRPRNB, 2010 WL 11520539, at * 4 (C.D. Cal. Feb. 23, 2010).

20          With regards to Plaintiff's alleged damages for lost profits, as discussed above, the Court

21   finds Plaintiff sufficiently alleges its lost profit damages flow directly from Defendants' decision

22   to only sell to Plaintiff at supracompetitive levels.  However, Defendants are correct that these

23   damages are speculative "to the extent they presume that any non-selling Defendant [or third

24   party] would have sold their land at some unspecified price-point" to Plaintiff.  (ECF No. 82 at

25   11.)  For Plaintiff to recover lost profit damage for the land it was not able to purchase, "[w]e

26   require a reasonable level of certainty before we will confer antitrust standing on such

27   consumers."  *City of Oakland*, 20 F.4th at 460.

28   ///

                                              12

1    In the instant case, Plaintiff does allege with a reasonable level of certainty that

2    Defendants and third parties would have sold their properties to Plaintiff, but for Defendants'

3    anticompetitive conduct.  For example, Plaintiff alleges that in an email exchange between

4    Defendants and third parties, Susan Beebe Furay writes "[Plaintiff's] hyper aggressive behavior

5    seems to indicate that we are in a very good position and it is best not to engage with them at this

6    point. ***No one is suggesting that we don't sell, the question is when and at what price***. Several of

7    the other major land owners in the area are basically taking their time as well and not engaging

8    with [Plaintiff]."  (*See* ECF No. 1-1 at 2–3 (emphasis added).)  While it is unclear exactly which

9    landowners Susan Beebe Furay is referring to, her choice of words provides the Court with a

10   reasonable level of certainty that Defendants and other Solano County landowners were willing

11   and motivated to sell their land to Plaintiff.

12   In reply, Defendants argue even if the Court finds Plaintiff sufficiently alleged landowners

13   would have sold to Plaintiff, whether Plaintiff would have made a profit is still speculative.  (ECF

14   No. 108 at 23.)  In support, Defendants cite *Toscano v. PGA Tour, Inc.* for the proposition that a

15   request for damages cannot be based on "speculation and guesswork."  201 F. Supp. 2d 1106,

16   1124 (E.D. Cal 2002.However, the motion before the court in *Toscano* was a motion for summary

17   judgment, not a motion to dismiss.  Indeed, whether Plaintiff would make a profit if it were able

18   to purchase land from the non-sellers is an evidentiary issue, which the Court cannot resolve at

19   the motion to dismiss stage.  Thus, the Court finds Plaintiff sufficiently alleges that the damages it

20   seeks are not speculative.

21   Accordingly, the Court finds Plaintiff has antitrust standing to pursue its claims against

22   Defendants.

23   C.    The Alleged Horizontal Price-Fixing Agreement

24   Defendants next move to dismiss Plaintiff's Sherman Act claim because Plaintiff fails to

25   sufficiently allege there was a horizontal price-fixing agreement among Defendants. (ECF No. 78

26   at 18.)  To prevail on a Sherman Act § 1 claim, Plaintiff must show: "(1) there was an agreement,

27   conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable

28   restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected

13

interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir.1996).  A
Sherman Act § 1 claim "requires a complaint with enough factual matter (taken as true) to
suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  An agreement or conspiracy in
violation of § 1 can be alleged through direct evidence or through parallel conduct coupled with
"plus factors."  *In re Musical Instruments*, 798 F.3d at 1193.  In the instant case, the Court finds
Plaintiff sufficiently pleads both direct and circumstantial evidence of an agreement between
Defendants to fix the price at which they would sell their land to Plaintiff.

*i.  Direct Evidence of the Alleged Conspiracy*

To plead direct evidence of an agreement, a complaint must "include sufficient facts
supporting the existence of a conspiracy, beyond the conclusory allegation that a conspiracy did
exist." *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, No. 1:09-cv-00560-LJO-SMSx, 2011
WL 2678879, at *5 (E.D. Cal. July 7, 2011).  Plaintiff argues the text message exchange between
Richard Hamilton (a Hamilton Conspirator) and Kirk Beebe (a BLK Defendant) constitutes direct
evidence of the horizontal price-fixing agreement among Defendants.  (ECF No. 80 at 13.)

The Court agrees with Plaintiff.  In the exchange, Richard Hamilton states, "In talking
with Ian Anderson, he agrees that the remaining property owners should be in agreement on what
we would want to sell our properties. So [Plaintiff's Attorney] cannot play owners against
owners. I think we should have a meeting in the next two weeks to talk about [Plaintiff]."  (ECF
No. 1-1 at 2–3.)  Contrary to Defendants' arguments, this text message exchange, coupled with
Plaintiff's Exhibits B[4] and C,[5] sufficiently alleges "who, did what, to whom (or with whom),
where, and when."  (ECF No. 78 at 18 (quoting *In re Musical Instruments*, 798 F.3d at 1194).)

---

[4]    In an exchange between Christine Mahoney (a Mahoney Defendant) and Kirk Beebe (a
BLK Defendant), Christine Mahoney states, "I heard you talked with Hamiltons[.] ***That's great
we can support each other***!"  (ECF No. 1-1 at 5) (emphasis added).

[5]    In an exchange between Susan Beebe Furay (a BLK Defendant), other BLK Defendants,
and third parties, Susan Beebe Furay states, "[Plaintiff's] hyper aggressive behavior seems to
indicate that we are in a very good position and it is best not to engage with them at this point. ***No
one is suggesting that we don't sell, the question is when and at what price. Several of the other
major land owners in the area are basically taking their time as well and not engaging with
[Plaintiff]***."  (ECF No. 1-1 at 7) (emphasis added)

14

Specifically, this direct evidence creates a plausible inference that the Hamilton Conspirators, the BLK Defendant, the Mahoney Defendants, and the Anderson Defendants agreed amongst themselves to not only coordinate with each other on how much to sell their land to Plaintiff for, but also when would be the most opportune time to do so.

While Defendants are correct that these statements do not reveal "Defendants mutually agreed not to sell below a particular price per acre," (ECF No. 78 at 18), these statements do reveal there was some sort of agreement among Defendants to fix the price of land in Solano County. Moreover, the law is clear, at this stage in the proceedings, Plaintiff must only allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Twombly*, 550 U.S. at 556. With these text message and email exchanges among Defendants, Plaintiff has done so and more, and the Court finds it is reasonable to expect further discovery will reveal additional details such as "when and at what price" Defendants and other landowners would have sold their land to Plaintiff for. (See ECF No. 1-1 at 7.)

Finally, Defendants argue that the text messages and emails between Defendants do not constitute direct evidence of a conspiracy because they were "created in the summer of 2022, almost four years after the conspiracy allegedly commenced." (ECF No. 78 at 19.) However, Defendants' timing argument does not negate the plausible inference that there was an illegal price-fixing agreement among Defendants. *See B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010, at *7 (N.D. Cal. Sept. 30, 2016). At the very least, the timing of these statements evidences a continuing conspiracy among Defendants that lasted well past the summer of 2022.

Thus, the Court finds Plaintiff alleges more than sufficient "evidentiary facts to support [the] conclusion" that Defendants entered into an illegal horizontal price-fixing conspiracy. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

///

///

///

///

*ii.   Indirect Evidence of the Alleged Conspiracy*

Additionally, Plaintiff argues "Flannery … plausibly alleges the conspiracy through circumstantial evidence, including that Defendants engaged in 'parallel conduct' coupled with 'plus factors'" that evidences a horizontal price-fixing agreement.  (ECF No. 80 at 15 (citing *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 324 F. Supp. 3d 1142, 1148 (S.D. Cal. 2018)).)

The Ninth Circuit distinguishes between "permissible parallel conduct from impermissible conspiracy by looking for certain 'plus factors.'"  *In re Musical Instruments*, 798 F.3d at 1194.  "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."  *Id*.  "If pleaded, they can place parallel conduct 'in the context that raises a suggestion of preceding agreement.'"  *Id*. (quoting *Twombly*, 550 U.S. at 557.)

In the instant case, Plaintiff alleges the Mahoney Defendants, the Anderson Defendants, the BLK Defendants, and the Hamilton Conspirators individually adopted a policy of refusing to sell their property to Plaintiff except at supracompetitive prices between 2018 and 2023.  (ECF No. 1 at 54.)  Specifically, Plaintiff alleges on the same day BLK Defendants wrote to each other "No one is suggesting that we don't sell, the question is when and at what price," the BLK Defendants and Anderson Defendants decided to back away from ongoing negotiations with Plaintiff regarding the sale of their land.  (*Id*. at 7.)  Such behavior is parallel because it is evidence of "competitors adopting similar policies around the same time in response to similar market conditions."  *In re Musical Instruments*, 798 F.3d at 1193.

Furthermore, Plaintiff alleges plausible "plus factors," including: (1) a common motive among Defendants to drive up prices; (2) Defendants taking actions against their own self-interest; and (3) the exchange of confidential information among Defendants.  (ECF No. 80 at 16–17.)

First, a clear common motive to conspire when coupled with other "plus factors" creates a strong inference of a plausible price-fixing agreement.  *See Markson v. CRST Int'l, Inc.*, No. 517CV01261VAPSPX, 2019 WL 6354400, at *5 (C.D. Cal. Mar. 7, 2019); *Persian Gulf Inc.*,

324 F. Supp. 3d at 1148.  In the instant case, Plaintiff sufficiently alleges Defendants had a common motive "to drive up prices to supracompetitive levels" because Defendants "wanted to make hundreds of millions" rather than the tens of millions they would have made if they sold into a competitive market.  (ECF No. 1 at 3.)

Second, Plaintiff also alleges Defendants acted against their own self-interest when they declined Plaintiff's offers that were well above the average market price for land in Solano County.  (*See, e.g.*, *id*. at 26–29, 33–34.)  Defendants are correct that there may be many explanations for why individual Defendants ultimately decided not to sell their properties to Plaintiff.  (*See* ECF No. 82 at 8.)  After all, Defendants were under no obligation to sell their properties to Plaintiff.  However, Plaintiff is "not required to disprove all possible explanations to survive a motion to dismiss."  *Persian Gulf Inc.*, 324 F. Supp. 3d at 1154.  At a later stage in these proceedings, a reasonable juror may be convinced that Defendants had non-anticompetitive motivations for refusing to sell to Plaintiff, but at the motion to dismiss stage, Defendants alternative explanations do not undo the reasonable plausibility that Defendants refused Plaintiff's above-market price offers because they were engaged in an illegal price-fixing conspiracy.  *See B & R Supermarket*, 2016 WL 5725010, at *8.

Third, "the exchange of information may be considered a plus factor that supports a finding of conspiracy."  *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, No. 22-15231, 2023 WL 4677017, at *3 (9th Cir. July 21, 2023).  In the instant case, Plaintiff sufficiently alleges Defendants shared confidential information with each other regarding Plaintiff, including non-public pricing information and Plaintiff's negotiation tactics.  (*See, e.g.*, ECF No. 1 at 45 ("[T]he BLK Defendants repeatedly brought up the fact that [Plaintiff] was under contract to purchase [a Mahoney Defendants' Property] for $43,560/acre. This purchase did not close and was not recorded in public records until April 20, 2023.).)  While Defendants are again correct that there is nothing illegal about neighbors discussing how much they sold their property for, "it is also true that 'the exchange of price information alone can be sufficient to establish combination or conspiracy.'"  *In re Cal. Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2022 WL 19975276, at *12 (N.D. Cal. Nov. 7, 2022) (quoting *In re Static Random Access Memory (SRAM) Antitrust*

*Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008)).  Thus, the Court finds Plaintiff sufficiently alleges parallel behavior and sufficient plus factors to indicate a plausible horizontal price-fixing conspiracy among Defendants.

Accordingly, the Court concludes Plaintiff has sufficiently alleged a horizontal price-fixing agreement among Defendants.  For all the foregoing reasons, the Court DENIES Defendants' motion to dismiss Plaintiff's Sherman Act claim.

### D.  Plaintiff's State Law Claims

Defendants next argue Plaintiff's "Cartwright Act claim fails for the same reasons as its Sherman Act claim."  (ECF No. 78 at 29.)  Defendants also argue Plaintiff's "UCL cause of action must be dismissed because it is dependent upon [Plaintiff's] failed antitrust claims."  (*Id.*)  Plaintiff disagrees and argues its state law claims are adequately pled because Plaintiff sufficiently alleged its Sherman Act claim against Defendants.  (ECF No. 80 at 26.)

The Court agrees with Plaintiff.  The Cartwright Act is "California's equivalent to the Sherman Act," *William O. Gilley Enter., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 661 (9th Cir. 2009), and "the analysis under the Cartwright Act is identical to that under the Sherman Act." *Name.Space, Inc. v. Internet Corp. of Assigned Names and No.*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).  Given the Court finds Plaintiff sufficiently alleged a Sherman Act claim against Defendants and Defendants have provided no arguments specific to Plaintiff's Cartwright Act claim, the Court DENIES Defendants' motion to dismiss Plaintiff's Cartwright Act claim.

Additionally, Plaintiff's UCL claim is entirely derivative of Plaintiff's Cartwright Act claim and Defendants provide no independent basis to dismiss Plaintiff's UCL claim.  (*See* ECF No. 1.)  Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's UCL claim.

### E.  Sufficiency of Allegations Against Individual Defendants

Finally, Defendants argue, regardless of whether the Court finds Plaintiff sufficiently alleged both its Sherman Act and state law claims, the Court should dismiss certain individual Defendants who acted on behalf of LLCs and trusts.  (ECF No. 78 at 27.)  Additionally, Defendants argue "[t]he Complaint fails to plead factual allegations to establish that the following defendants had a role in the alleged conspiracy: William C. Dietrich; Paul Dietrich; John Alsop;

Nancy Roberts; Ronald Gurule; Ned Anderson; Either Neil Anderson (there are two); Maryn Anderson; Glenn Anderson; Janet Blegen; Robert Anderson; Stan Anderson; Lynne Mahre; Sharon Totman; Amber Bauman; Christopher Wycoff; and Janet Zanardi." (*Id.* at 28.)

As an initial matter, the Court notes Christine Mahoney is the only Defendant named in this action who is a member or manager of an LLC. (ECF No. 1 at 11.) However, not only did Plaintiff not sue Christine Mahoney in her capacity as manager of the El General Partner LLC, but Plaintiff also settled all claims against Christine Mahoney. (ECF No. 101.) Therefore, Defendants' arguments regarding the sufficiency of allegations against those who acted on behalf of LLCs are moot.

With regards to those Defendants who acted on behalf of trusts, Defendants specifically argue "for Flannery to maintain claims against any trustee in her individual capacity, the Complaint must plead that they personally engaged in unlawful conduct." (ECF No. 78 at 27.) While Defendants are correct that under California law "[a] trustee … cannot be held personally liable under … section 18002 for any torts committed in the course of his administration of the trust, unless the party seeking to impose such personal liability on the trustee demonstrates that the trustee intentionally or negligently acted or failed to act in a manner that establishes personal fault," *People v. Braum*, 49 Cal. App. 5th 342, 364 (2020), the Court notes California law is inapplicable to whether Plaintiff sufficiently alleged those acting on behalf of trusts violated § 1 of the Sherman Act. Thus, the Court will only address Defendants' arguments as they pertain to Plaintiff's state law claims.

In opposition, Plaintiff maintains "Flannery alleges all individual Defendants participated in the conspiracy." (ECF No. 80 at 24 (citing ECF No. 1 at 11–14).) The Court agrees with Plaintiff. Throughout the Complaint, Plaintiff alleges all named Defendants intentionally formed "a secret conspiracy to drive up prices to supracompetitive levels by eliminating the free market competition in the sale of properties that would have otherwise occurred among the Conspirators." (ECF No. 1 at 3.) Moreover, nowhere in the Complaint does Plaintiff allege the trustee Defendants were acting in a representative or fiduciary capacity when they engaged in the alleged conspiracy. Rather, Plaintiff alleges the trustee Defendants personally engaged in the

1    alleged conspiracy.  (*See, e.g.*, ECF No. 1 at 37 ("But Richard Anderson, Carol Hoffman,

2    Deborah Workman, and David Anderson refused to sell unless Flannery agree to pay them a

3    supracompetitive price of approximately $17,200/acre.").)  Thus, the Court finds Plaintiff makes

4    sufficient allegations against those who acted on behalf of trusts.

5         Finally, Defendants argue Plaintiff has not made sufficient allegations against certain

6    Anderson Defendants under *Twombly* because Plaintiff does not allege what role these

7    Defendants had in the alleged conspiracy.  (ECF No. 78 at 28.)  In opposition, Plaintiff argues

8    Defendants "misstate pleading burdens in arguing that Flannery lacks plausible allegations

9    regarding certain Anderson Defendants—namely, William Dietrich, Paul Dietrich, John Alsop,

10   Nancy Roberts, Ronald Gurule, Ned Anderson, Neil Anderson, Neil Anderson, Maryn Anderson,

11   Glenn Anderson, Janet Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Sharon Totman,

12   Amber Buman, Christopher Wycoff, and Janet Zanardi."  (ECF No. 80 at 25.)

13        The *Twombly* plausibility standard requires only "facts such as a 'specific time, place, or

14   person involved in the alleged conspiracies.'"  *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550

15   U.S. at 565 n.10) .  The purpose of this requirement is "to give a defendant seeking to respond to

16   allegations of a conspiracy an idea of where to begin," *id.*, not to force a plaintiff to allege the

17   entirety of the conspiracy before discovery.  Accordingly, "[c]ourts in this district do not require

18   plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant

19   allegations; instead they require plaintiffs 'to make allegations that plausibly suggest that each

20   Defendant participated in the alleged conspiracy.'"  *In re Cathode Ray Tube (CRT) Antitrust*

21   *Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (quoting *In re TFT-LCD (Flat Panel)*

22   *Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009)).

23        With the benefit of discovery through a separate litigation, the Court finds Plaintiff has

24   sufficiently alleged there is a reasonable possibility each of the Anderson Defendants participated

25   in the alleged conspiracy.  Specifically, Plaintiff alleges Ian Anderson told other Defendants that

26   "he agree[ed] that the remaining property owners should be in agreement on what we would want

27   to sell [their] properties" for.  (ECF No. 1-1 at 2.)  Plaintiff further alleges "[m]ost of the

28   Anderson Defendants (such as Paul Dietrich, Nancy Roberts, and Richard Anderson) repeatedly

20

implied to Flannery they would sell once Defendant Ian Anderson did" and "all of the Anderson Defendants are closely related." (ECF No. 1 at 42.) Moreover, Plaintiff provides detailed allegations regarding which Anderson properties were involved in the alleged conspiracy, the terms of the price negotiations for each property, and which Anderson Defendants participated in these negotiations. (*Id*. at 33–39.) Thus, the Court finds not only has Plaintiff alleged the Anderson Defendants had multiple opportunities to collude against Plaintiff, but also that there were actual agreements among Anderson Defendants and other alleged conspirators. While Plaintiff will need to eventually provide evidence of each Defendants' participation in the alleged horizontal price-fixing conspiracy, Plaintiff's allegations are enough at the motion to dismiss stage to suggest each Defendant participated in the alleged conspiracy. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014).

Accordingly, the Court DENIES Defendants' motion to dismiss certain individual Defendants from this action.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss. (ECF No. 78.) Defendants' answer is due not later than twenty-one (21) days from the electronic filing date of this Order.

IT IS SO ORDERED.

Date: March 28, 2024

Troy L. Nunley
United States District Judge

21