1  MATTHEW M. MARTINO (*pro hac vice*)
   matthew.martino@skadden.com
2  MICHAEL H. MENITOVE (*pro hac vice*)
   michael.menitove@skadden.com
3  EVAN LEVICOFF (*pro hac vice*)
   evan.levicoff@skadden.com
4  THOMAS J. SMITH (*pro hac vice*)
   thomas.smith@skadden.com
5  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   One Manhattan West
6  New York, New York 10001
   Telephone: (212) 735-3000
7  Facsimile: (917) 777-3000

8  LANCE A. ETCHEVERRY (SBN 199916)
   lance.etcheverry@skadden.com
9  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue
10 Palo Alto, California 94301
   Telephone: (650) 470-4500
11 Facsimile: (650) 470-4570

12 *Attorneys for Plaintiff*
   *FLANNERY ASSOCIATES LLC*
13

14              UNITED STATES DISTRICT COURT

15             EASTERN DISTRICT OF CALIFORNIA

16

17  Flannery Associates LLC,                Case No.: 2:23-cv-00927-TLN-AC

18              Plaintiff,                  **JOINT STATEMENT RE DISCOVERY
                                            DISAGREEMENT BETWEEN
19                                          PLAINTIFF FLANNERY ASSOCIATES
        v.                                  LLC AND BLK ENTITIES**
20

21

22  Barnes Family Ranch Associates, LLC, *et al*.,   Judge: Hon. Allison Claire
                                            Date: November 13, 2024
23              Defendants.                 Time: 10:00 A.M.
                                            Courtroom: 26
24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 45 and Local Rule 251, Plaintiff Flannery Associates LLC ("Flannery") and Non-Parties Kirk Beebe, Susan Beebe Furay, Barnes Family Ranch Associates, LLC, Barnes Family Ranch Corporation, Lambie Ranch Associates, LLC, Lambie Ranch Corporation, Kirby Hill Associates, LLC, and Kirby Hill Corporation (the "BLK Entities") submit this joint statement in connection with Flannery's Motion to Compel Production of Documents (ECF No. 135) responsive to Flannery's subpoenas served on the BLK Entities.

Specifically, Flannery moves to compel the BLK Entities to produce documents sent to or from Kirk Beebe's email account maintained by his employer—CB Richard Ellis, Inc. ("CBRE")—that are responsive to Flannery's requests, but that the BLK Entities have withheld or redacted based on attorney-client privilege claims.

## I.      THE NATURE OF THE ACTION AND FACTUAL DISPUTES

### A.      Flannery's Statement

#### 1.      Flannery's Claims in This Case and the Current Procedural Status

This is an antitrust action brought against Conspirators (as defined in Flannery's complaint) for illegally conspiring to fix prices for real property in Solano County, California.  Flannery is a Delaware LLC that began purchasing property in Solano County in 2018 in support of an initiative to create a new, walkable community in the area.  Conspirators are wealthy owners of rangeland properties in Solano County and consist of four groups:  the BLK Defendants (ECF No. 1 ¶¶ 35-47), which include the BLK Entities on which Flannery later served the subpoenas giving rise to this dispute; the Mahoney Defendants (*id.* ¶¶ 48-54); the Anderson Defendants (*id.* ¶¶ 55-79); and the Hamilton Conspirators (*id.* ¶¶ 80-91).  Beginning in 2018, Conspirators illegally agreed to eliminate competition, fix prices, and overcharge Flannery in purchasing their properties.  (*Id.* ¶¶ 7, 28, 35-79, 94-131, 257, 317.)

In the spring of 2023, Flannery uncovered Conspirators' illegal scheme through discovery in a separate case (the below-described State Court Action).  (*Id.* ¶ 22.)  Specifically, Flannery obtained "smoking gun" communications that directly evidence the conspiracy, including an exchange in which Conspirator Richard Hamilton texted Kirk Beebe: "In talking with [Defendant] Ian Anderson, *he agrees* that the *remaining property owners should be in agreement* on what we would want to

2

1  sell our properties.  So [Flannery's attorney] ***cannot play owners against owners***."  (*Id.* ¶ 22, Ex. A

2  (emphases added).)  Mr. Beebe responded: "***Agree***."  (*Id.* ¶ 23, Ex. A (emphasis added).)

3  After uncovering the conspiracy, Flannery filed its complaint in this case on May 18, 2023,

4  alleging violations of Section 1 of the Sherman Act, California's Cartwright Act, and California's

5  Unfair Competition Law.  (ECF No. 1 ¶¶ 314-39.)   Certain Defendants moved to dismiss the

6  complaint on July 11, 2023 (ECF No. 78), and the Court denied that motion in its entirety on March

7  29, 2024 (ECF No. 111).  The Court held that Flannery stated a claim against all Defendants through

8  both direct and circumstantial evidence.  (*Id.*)

9  All but three of the original forty Defendants have settled with Flannery.  The three remaining

10  Defendants are Richard Anderson, William Dietrich, and Paul Dietrich.

11  Pursuant to Judge Nunley's Initial Pretrial Scheduling Order (ECF No. 3), the current fact

12  discovery cutoff is December 16, 2024—i.e., 240 days after the last answer filed by Defendants (ECF

13  Nos. 112-15).

14  2.   The State Court Action Between Flannery and the BLK Entities

15  In *Gassy Lassy L.P. v. Barnes Family Ranch Corporation*, No. 34-2022-00329551-CU-FR-

16  GDS (Cal. Super. Ct. 2022) (the "State Court Action"), Flannery litigated against the BLK Entities

17  in the Superior Court of Sacramento County.  The State Court Action was filed in November 2022

18  and arose from Flannery's offers to buy land from the BLK Entities.  Gassy Lassy, a member of the

19  BLK Entities, sold a minority interest to Ranchlands LLC, an affiliate of Flannery.  Gassy Lassy then

20  offered to buy interests from other members of the BLK Entities, many of whom were apparently

21  interested in selling.  Gassy Lassy alleged that, *inter alia*, the Beebes falsely told those members that

22  such transfers were invalid and that Gassy Lassy's membership was suspended, preventing other

23  members from selling their interests to Gassy Lassy, and took other actions to deprive Gassy Lassy

24  of its voting rights and ability to transact with other members.  Gassy Lassy asserted claims against

25  the BLK Entities, including for breach of fiduciary duty, the implied covenant of good faith and fair

26  dealing, and fraud.

27  The BLK Entities filed counterclaims against Gassy Lassy, Ranchlands LLC, and Flannery,

28  alleging intentional interference with prospective economic relations and seeking a declaratory

3

1  judgment concerning Gassy Lassy's rights under the BLK Entities' operating agreements.

2  During the State Court Action, Flannery obtained discovery from Kirk Beebe's employer,

3  CBRE.   Among other things, CBRE produced its U.S. Employee Handbook describing the

4  company's policies governing the use of CBRE's "electronic communications systems," including

5  "e-mail systems."  (Menitove Decl., Ex. 1, CBRE Employee Handbook at 31.)  The handbook states:

6
> CBRE's electronic communication systems are tools for business communication.
7  The electronic communication systems and all information transmitted by, received
> from or stored in these systems are the sole property of CBRE.  Even though you
8  maintain a personal password, *you should have no expectation of privacy in*
> *connection with the use of any systems* or regarding any information created, stored
9  or transmitted by you.

10  (*Id.* (emphasis added).)

11  CBRE also produced its Standards of Business Conduct, which includes a section regarding

12  use of the company's "electronic communication systems, such as internet access, email, voice mail

13  and telephone services."  (Menitove Decl., Ex. 2, CBRE Standards of Business Conduct, at 41.)  The

14  Standards of Business Conduct state:

15
> Our policies that govern how our systems are to be used . . . *give CBRE the right to*
16  *monitor your use of our systems* and to block, intercept or *review any content or*
> *communications* that occur on or are stored in our systems.  *Your personal privacy*
17  *is not protected on our systems, and you should not expect it to be*.

18  (*Id.* (emphases added).)  Pursuant to CBRE's Corporate Responsibility Report, "all employees are

19  required to certify annually that they have access to the Standards of Business Conduct, have read

20  and understand it, and will adhere to all company policies."  (Menitove Decl., Ex. 3, CBRE 2021

21  Corporate Responsibility Report, at 84.)

22  CBRE also designated a corporate representative, Trevor Thorpe, who provided deposition

23  testify on behalf of the company.  Mr. Thorpe testified that CBRE's policies regarding use of the

24  company's communication systems, including email, are disseminated each year to all CBRE

25  employees, and the employees are required to affirm that they will abide by those policies.  (Menitove

26  Decl., Ex. 4, Thorpe Tr. at 86:10-24.)  Mr. Thorpe further testified that Mr. Beebe "was told" that

27  his CBRE emails would be subject to inspection, and this message was "perfectly stated in our

28  policies.  It was communicated to him."  (*Id.* at 99:8-10.)  Mr. Thorpe also testified that CBRE

4

1   expected that Mr. Beebe would be "familiar with our general rules and policies," would "agree[] to
2   our general rules and polic[ies]," and would "conduct himself according to our standards of business
3   conduct." (*Id.* at 93:3-19, 102:24-103:3.) Moreover, Mr. Thorpe testified that "based on [CBRE's]
4   policies, Mr. Beebe had no reasonable expectation of privacy in his emails . . . on CBRE's servers."
5   (*Id.* at 94:15-18.)

6              3.     The Settlement Between Flannery and the BLK Entities

7          On July 3, 2023, Flannery and the BLK Entities settled their claims against each other in this
8   case and the State Court Action by entering into a Purchase and Sale and Joint Release Agreement
9   (the "PSA"). Pursuant to the PSA, the parties agreed to release each other from any and all claims,
10  but the releases expressly exclude "conduct that occurs after the Effective Date" of the PSA (i.e.,
11  July 3, 2023). (Menitove Decl., Ex. 5, PSA § 5.3.)

12         Under the terms of the PSA, Mr. Beebe and Susan Beebe Furay agreed to undertake certain
13  "Continuing Discovery Obligations." For example, they agreed to produce messages on their phones
14  that hit on search terms intended to identify documents responsive to discovery requests served in
15  the State Court Action or related to allegations in this case. (*Id.* §§ 5.8(a)-(b).) They also agreed
16  that they would continue to preserve documents potentially relevant to this case and would "accept
17  service of any subpoena in [this case] and not argue that it is unenforceable or should be quashed."
18  (*Id.* § 5.8(c).)

19     **B.**    **BLK Entities' Statement**

20              1.     The Preparation and Presentation of this Joint Statement.

21         The BLK Entities are not parties to this lawsuit. On or about November 10, 2023, counsel
22  for Flannery caused non-party subpoenas to be served on the BLK Entities pursuant to Rule 45,
23  Federal Rules of Civil Procedure. The subpoenas were accompanied by an email from Andrew J.
24  Fuchs, one of Flannery's innumerable attorneys servicing this pending Federal Case. The email
25  stressed that the subpoenas did not require production of documents already produced in the State
26  Court Litigation that the parties had by then settled; it purported to affirm that settlement as it
27  stated: "We are serving these [subpoenas] pursuant to Section 5.8(c) of the Purchase
28  Agreement…." This statement is significant because it contradicts the very grounds upon which

1   Flannery has based this Motion to Compel production of further documents.  The statement also

2   confirms that the BLK Entitles are well within their rights in refusing to produce confidential

3   communications simply because Flannery claims that some waiver has occurred.

4        The BLK Entities, through counsel, sent a letter response to the subpoenas on November

5   27, 2023 in order to clarify their scope and to summarize the anticipated responses thereto.  Formal

6   Responses were made on December 8, 2023, in which prior privilege logs were referenced and

7   objections to production by virtue of the attorney client privilege were asserted.  Much later, on

8   April 11, 2024, certain amended Subpoenas were issued; certain conferences and discussions

9   ensued, and extensive further production at substantial expense and requiring significant effort was

10  arranged and actually occurred.  Throughout this entire process, the BLK Entities argued  that the

11  wholesale production of electronic documents maintained on a server of CBRE (the employer of

12  non-party Kirk Beebe) would not be made to the extent documents subject to attorney client

13  privilege were sought.  Yet a further privilege log is currently in preparation.

14       The sole purpose of this Motion to Compel is to force the production of attorney client

15  privileged communications which may exist on the CBRE server on the grounds of alleged waiver

16  of that privilege.

17       On Friday, October 11, 2024, at 7:52 pm (long after the business day – and week – had

18  ended), Flannery filed this subject Notice of Motion and Motion – without, however, any

19  accompanying documents or legal argument.  The email and attachments from Flannery's counsel

20  indicated the need to file a joint statement on October 22 and that Flannery would complete its

21  submittal of a draft Joint Statement by October 17.  On Saturday morning, the 12th, counsel for the

22  BLK Entities became aware of the Flannery Notice and Motion.  That same morning, he advised

23  Flannery's counsel that he was imminently leaving the office and would return on October 17 – but

24  that matters involving another case would consume that day.  Since BLK's attorney was scheduled

25  for dental surgery on October 21, the proposed filing of a Joint Statement on October 22 was

26  improbable.

27       Flannery did not submit a draft Joint Statement to the BLK Entities as promised on June 17.

28  Instead, it again emailed a draft Joint Statement – without referenced documents – after business

6

hours and after the end of the business week on Friday the 18th.  On Monday, October 21, the attorney for the BLK Entities remonstrated with Flannery's counsel over the complete lack of courtesy and fair play in demanding a same day response to a motion which Flannery had planned, researched and prepared all as a matter of its own leisure and convenience.  A cynical turn of mind would suggest that Flannery manipulated this process to its own advantage in a fashion designed to ensure the inability of the BLK Entities to fashion an appropriate opposition to this pending Motion.  Incidentally, dental surgery (at least as to another of its phases) was completed on October 21; however, it should come as no surprise that it was not possible to work on this Joint Statement until the very morning of the day on which Flannery has asserted it must be completed.

The practice of law requires compliance with any number of rules.  What makes the practice workable, is a system of professional courtesy and the administration of that system by judges exercising fairness and acting with sound discretion.  It is outrageous that Flannery has proceeded in this fashion to flog a Motion to Compel the production of yet more documents and to vitiate the sanctity of attorney client privileged communications – especially when the Motion is without merit and should be denied.

> 2.      California Law and the Settlement Agreement Dictate the Denial of this Motion;  Flannery is without any Authority for its Claims.

On or about July 3, 2023, Flannery, its affiliates, and the BLK Entities executed a certain Purchase and Sale and Joint Release Agreement (Settlement Agreement).  The Settlement Agreement permitted Flannery to purchase certain properties owned by the BLK Entities as it also settled and released all disputes and proceedings between the parties.  The State Court Action was dismissed on October 30, 2023; the BLK Entities were dismissed from this case on October 18, 2023.  Needless to say, Flannery's present attorneys were heavily involved in the negotiation and drafting of the Settlement Agreement.  Pursuant to Section 7.13 thereof, those attorneys represented that they had fully read the document and advised their client(s) of its import in all respects.

Pursuant to Section 7.4, all disputes, court proceedings, and other matters related in any fashion to the Settlement Agreement were and are matters to be determined in accordance with the

1 substantive laws of the State of California without regard to the conflicts of laws principles thereof.

2 Moreover, any court proceedings involving any matters related to the Settlement Agreement were

3 and are to be brought exclusively within the Superior Court of Sacramento County or the United

4 States District Court for the Northern District.

5         When Flannery's attorneys issued the Subpoenas which are the subject of this Motion, they

6 explained that the authority for the document production was Section 5.8 of the Settlement

7 Agreement.  This was an accurate statement since the breadth of the general releases found in

8 Article 5 released all known and unknown claims of any parties against any others, as the right to

9 pursue legal proceeding of any kind was also waived.  Indeed, Section 5.8 represented the only

10 possible "carve out" from what otherwise was as complete a settlement and release as the

11 combined energies of all of the attorneys for all parties could fashion.  That Section addressed

12 certain "Continuing Discovery Obligations".  In contrast to Flannery assertions in this Motion, the

13 Releases were all encompassing and the privileged documents it now seeks were all matters

14 addressed prior to the Settlement Agreement and have nothing to do with any kind of subsequent

15 activity which might not otherwise be barred.

16         As Flannery has gone to lengths to state, the issue of waiver of attorney client privilege as

17 to documents on a CBRE server is hardly new.  This same issue was raised in the State Court

18 Action.  Depositions were taken to discover employer policies from which it might be argued that

19 the attorney client privilege had been waived.  The BLK Entities objected to production of attorney

20 client communications on grounds of privilege and no motion was filed nor effort made to enforce

21 Flannery arguments regarding waiver – which it has now replicated in this Motion.

22         California Code of Civil Procedure Section 2031.310 expressly states that a party

23 demanding production waives any right to compel a further response if it fails to file a motion to

24 compel that response within 45 days of alleged failure by the other to adequately respond.  That

25 this statutory proscription is a serious matter is demonstrated by numerous cases – including *New*

26 *Albertsons, Inc. v. Superior Court*, 188 Cal. App. 4th 1403 (2008).  That case is an example of the

27 manner in which a deemed waiver of discovery rights cannot be avoided by means of an "end

28 around" or proverbial "second bite of the apple".  In *New Albertsons*, the defendant had allegedly

8

1   abused the discovery process, causing the trial court to impose evidence and issue sanctions in

2   exercise of its inherent power to control the litigation.  The alleged abuse consisted of inadequate

3   or incomplete responses to document production requests for video or photographic evidence of

4   existing conditions at a supermarket.  The appellate court held that the plaintiff had waived any

5   right to couple a further response to the demand by having failed to file a timely statutory motion.

6   Therefore, New Albertsons had no obligation to produce further documents responsive to the

7   demand.  That waiver could not be avoided by the equitable imposition of sanctions since the

8   statute afforded the <u>only</u> remedy for complaints regarding the adequacy of responsive production.

9       In this instance, Flannery brought no motion to compel the production of privileged

10  communications as to which it claimed there had been a waiver.  By statute, the Flannery claims

11  have been deemed waived.  That waiver has added weight as all disputes between the parties were

12  later settled, released and resolved, and the lawsuit in which the document production was pending

13  was dismissed with prejudice.

14      Flannery has argued that there was no litigation over the issue of waiver of the attorney

15  client privilege in the State Court Action such that there could be no collateral estoppel which

16  would bar a re-litigation of the issue in this forum.    This argument is woefully misguided as it also

17  misses the point.  The argument is not one of collateral estoppel but of substantive law.  Flannery

18  has agreed that California law governs this and all other disputes.  It has also agreed that all

19  disputes must be litigated in other named forums than this Court.  Pursuant to California law,

20  Flannery cannot assert its waiver argument and compel the production of attorney client privileged

21  communications because it failed to file a timely motion in the only court with authority to decide

22  the matter.  Arguments that Federal law applies and that this court and lawsuit present yet another

23  opportunity to litigate the matter ignore the applicable State discovery statutory scheme and the

24  case law that has foreclosed any and all efforts to avoid its application.  Further, it has waived the

25  right to pursue its argument due to its promises not to engage in any further proceedings of any

26  kind as a part of the Settlement Agreement.

27      Flannery has based its anti-trust case and pursued this Motion on the most flimsy of

28  premises.  Rule 45 emphasizes the importance of avoiding undue burden and expense on persons

1    made subject to subpoena.  Yet, the BLK Entities have been subject to significant expense and

2    effort due to incessant demands by Flannery and its refusal to abide by the terms of the Settlement

3    Agreement and/or the past failure to litigate the waiver issue in the only proper forum designed for

4    that purpose.  All of this has occurred because Flannery has seized upon on a single word response

5    made by Kirk Beebe – Agree - in response to an unsolicited text from another non-party.  Flannery

6    has long had the one word response and the brief text that elicited it.   This Motion and all of the

7    preceding conferences and discussions as well as productions are without justification and in clear

8    conflict with the intent of Rule 45 as to non-parties to litigation.

9         "Continuing Discovery Obligations" is the title of Section 5.8 of the Settlement Agreement.

10   Except as therein set forth, Flannery waived any rights to issue subpoenas and to file this Motion.

11   For purposes of this Motion, Flannery has conveniently ignored the foregoing.  It was more

12   forthright in its initial statement of the basis for its issuance of the subpoenas when its attorneys

13   then justified the requested document productions as being authorized by the Settlement

14   Agreement.    The Settlement Agreement is inconvenient to the presentation of this Motion

15   because it compels a different forum for litigation of the issue, applies a different substantive law

16   than Flannery now urges, and releases claims and promises to avoid proceedings which Flannery

17   now wishes to pursue.

18        Flannery admits the only issue outstanding is that of attorney client privilege waiver.  It

19   claims the right to litigate the waiver issue under Federal Law and without regard to the prior State

20   Court Action in which the same claims  were very much at issue.     This Motion is merely another

21   attempt by Flannery to avoid the application of a Settlement Agreement to which it is a party and

22   California substantive law which forecloses the litigation of the claims it has currently presented to

23   this Court.

24              3.    There Has Been No Substantive Waiver of Attorney Client Privilege.

25        Communications between a lawyer and client which are intended to be confidential are

26   protected from disclosure pursuant to the attorney -client privilege under California law.  *Dawe v.*

27   *Corrections USA*, 263 F.R.D. 613 (E.D. Cal 2009).  In fact, it has been held that the trial court

28   lacks authority to order the objection waived even if the responding party fails to serve a privilege

10

1  log, serves an untimely privilege log, or serves a privilege log that fails either to adequately

2  identify the document to which the objection purportedly applies or provide sufficient factual

3  information for the propounding party to evaluate the objection.  *Catalina Island Yacht Club v.*

4  *Superior Court*, 242 Cal. App. 4th 1116 (2015).  All that is needed is the assertion of the privilege.

5  The attorney-client privilege may be waived, but only by the holder of the privilege.

6  *McDermott Will & Emery, LLP v. Superior Court*, 10 Cal. App. 5th 1083 (2017).  The inadvertent

7  release of documents is not a "disclosure" of the documents waiving the attorney -client privilege.

8  *Newark Unified School Dist. v. Superior Court*, 190 Cal. App. 3d 721 (2015).  The exclusive

9  means by which the attorney-client privilege may be waived are when the holder of the privilege,

10  without coercion, and in a nonconfidential context, discloses a significant part of the

11  communication or consents to such disclosure by anyone and where there is then a failure to claim

12  the privilege in any proceeding in which the holder has the legal standing and opportunity to do so.

13  *Motown Record Corp. v. Superior Court*, 155 Cal. App. 3d 482 (1984).

14  Under California law, the scope of waiver of privilege is narrowly defined and information

15  required to be disclosed must fit strictly within the confines of waiver.  *Sony Computer*

16  *Entertainment America Inc. v. Great American Ins. Co.*, F.R.D. 632 (N.D. Cal 2005).  The

17  disclosure of privileged communication must involve some measure of choice and deliberation on

18  the part of the privilege holder.  *Id.*  The privilege holder's characterization of his or her intent in

19  disclosing a privileged communication is an important consideration in determining whether the

20  holder has waived the privilege.  *Id.*  In determining whether an inadvertent disclosure waived the

21  privilege, the trial court must examine the subjective intent of the privilege holder and any

22  manifestation of the holder's intent to disclose the information.  Intention is critical because waiver

23  requires an intention to voluntarily waive a known right.  *Id.*  A third party's disclosure of

24  privileged information did not waive attorney client privilege since the third party was not the

25  holder of the privilege."  *Id.*

26  In this instance, Flannery's argument is deceptively simple.  Kirk Beebe used an email

27  system owned by his employer to communicate with his attorneys, among others.  By virtue of no

28  more than that use, Flannery argues that he was without expectation of privacy and must be

1  deemed to have waived any and all claims of privilege.  Obviously, however, CBRE, as the

2  employer, is not seeking to compel access to privileged communications.  Only Flannery, as a party

3  with no connection either to the email system or the employer  has sought to compel production of

4  privileged communications in which the employer has neither interest nor stake.

5       The privileged communications were not distributed or sent to anyone other than the

6  intended recipients.  There can be no objective or subjective inference of an intentional waiver of

7  confidentiality by Kirk Beebe as the holder of the privilege.  Just because an argument of waiver of

8  privilege exists as to CBRE as the owner of the email system does not mean that any third party

9  might plunder the depts of confidential communications between attorney and client.

10      Flannery has cited a number of federal cases for the proposition that some general waiver of

11  confidentiality has occurred.  That is not California law – which requires some knowing and

12  intentional waiver for privilege to be suspended.  Those cases do not address the issues of statutory

13  waiver or release as posed elsewhere in this Joint Statement.  There is certainly no public policy

14  that would promote the waiver of the attorney client privilege in this instance; there is no equitable

15  basis for Flannery's demands; and Flannery availed itself of the benefits of the Settlement

16  Agreement and must now live with its burdens and responsibilities as well.

17      Flannery has cited *Alamar Ranch, LLC, v. County of Boise* (2009) 2009 WL 3669741 as its

18  pre-eminent authority to the effect that Kirk Beebe might have had no expectation of privacy such

19  that his attorney client privilege must be deemed waived.  There is no 9th Circuit case on point; the

20  Idaho District Court certainly did not apply California law to its determination of waiver.  Reliance

21  on an expectation of privacy approach to privilege waiver as did the Idaho court is a slippery slope

22  inconsistent with California law.  It should not be applied in this instance.

23      It is noteworthy that the concept of "expectation of privacy" as a measurement of potential

24  waiver of privilege is something to which the Federal Courts have spoken.  In *Quon v. Arch*

25  *Wireless Operating Co.,, Inc.* (9th Cir. 2008) reversed by *City of Ontario v. Quon* (2010) 130 S Ct.

26  2619, the Ninth Circuit considered the claim that an employee had a reasonable expectation of

27  privacy in his text messages despite ownership by his employer of the text pager on which he

28  issued personal text messages.  The employee claimed that the operational reality was that there

1  was no access or auditing of employee's texts despite employer ownership and warnings regarding

2  a lack of privacy.  The issue was not a privilege waiver but an unreasonable search under the

3  Fourth Amendment.  Still, the case provides some guidance for consideration of this motion.  The

4  Ninth Circuit found that the search of text messages was unreasonable in violation of the Fourth

5  Amendment despite the [similar] circumstances [to this case].  It based that finding on its

6  determination that the employee had an expectation of privacy despite employer ownership.  The

7  Supreme Court reversed the Ninth Circuit on the ground that the search was not unreasonable.  The

8  Court declined to resolve the issue of a reasonable expectation of privacy as it determined that care

9  must be undertaken in considering the whole concept of equipment owned by an employer in the

10  context of emerging technology and its role in society.  In other words, there is no basis for the

11  type of universal "waiver" of privilege for which Flannery argues in this Motion.

12       *Homes v. Petrovich Development Company, LLC* (2011) 191 Cal App 4th 1047 is a

13  California case involving the alleged waiver of attorney client privilege by an employee who

14  utilized her employer's email system to communicate confidentially with her attorney in a lawsuit

15  against that very employer.  The employer utilized warnings similar to those of CBRE in this case.

16  The Court properly noted that the burden of proof to establish waiver was that of the opponent to

17  the claim of privilege.  Pursuant to Code of Civil Procedure Section 917, the attorney client

18  privilege is not lost because it is communicated by electronic means or because persons involved in

19  the delivery, facilitation or storage of electronic communication may have access to the content of

20  the communication.  In the case, however, the Court did find waiver of the privilege.  It noted that

21  the employer issued warnings and the employee used the employer's own system to communicate

22  with her attorney regarding a lawsuit against that same employer.  This was likened to an attorney

23  in one of a defendant's conference rooms, in a loud voice, with the door open, proclaiming

24  confidential information and yet unreasonably expecting that the conversation overheard would be

25  privileged.

26       In this case, CBRE owned the system that was used by Kirk Beebe.  Yet, CBRE had no

27  interest or stake in any communications which utilized the system.  That CBRE, in some

28  circumstances, might claim a privilege waiver has no conceivable application to

13

1  Flannery  as a third party with no access rights to the system or warning that it might seize

2  confidential communications.  Waiver is a knowing act.  Nothing in these circumstances might

3  justify this Court in determining that the attorney client privilege was waived as to Flannery –

4  which has and has had no means of accessing the information it seeks without a court order

5  overruling the assertion of privilege.

6       There is no legal support for Flannery's contentions that the attorney client privilege as to

7  confidential communications has been waived by the mere fact that Kirk Beebe used his

8  employer's email system for communication purposes.

9  **II.**     **DETAILS OF THE DISCOVERY CONFERENCES**

10       **A.**     **Flannery's Statement**

11       1.     Service of the Subpoenas and the Parties' Meet-and-Confers

12       Flannery and Defendants, including all Defendants remaining in this case, completed their

13  Rule 26(f) conference on September 19, 2023.  With discovery open, Flannery served subpoenas on

14  the BLK Entities in November 2023.

15       On December 8, 2023, the BLK Entities served responses and objections to Flannery's

16  subpoenas, claiming that all documents responsive to the subpoenas had been produced during the

17  State Court Action.  (Menitove Decl., Ex. 6.)  On December 18, 2023, counsel for Flannery sent a

18  letter to counsel for the BLK Entities asking to meet and confer, while explaining that Flannery's

19  subpoenas were broader in scope than the document requests served in the State Court Action.

20  (Menitove Decl., Ex. 7.)  Counsel for Flannery also noted that based on discovery in the State Court

21  Action, any emails sent to or from Mr. Beebe's CBRE email account could not be privileged.  (*Id.*)

22       Shortly thereafter, on December 21, 2023, the Court granted Defendants' motion to stay all

23  discovery, including third-party discovery, during the pendency of their motion to dismiss.  (ECF

24  99.)  The Court ordered that the stay would last for 100 days or until the motion to dismiss was

25  decided.  (*Id.*)  The stay expired with the denial of the motion to dismiss on March 29, 2024.  (ECF

26  No. 111.)

27       On April 11, with the stay lifted, Flannery sent amended subpoenas to counsel for the BLK

28  Entities, who accepted service of those subpoenas.  (Menitove Decl., Ex. 8, Subpoena to Kirk Beebe;

14

Menitove Decl., Ex. 9, email from D. Bowie to M. Menitove (May 2, 2024).)  On April 23, counsel for Flannery and counsel for the BLK Entities met and conferred regarding the subpoenas.  The BLK Entities agreed to run search terms to identify documents responsive to Flannery's subpoenas.  With regard to Mr. Beebe's CBRE emails, the BLK Entities took the position that Flannery was collaterally estopped from arguing that Mr. Beebe had waived privilege over those emails, writing: "The matter was resolved in the State Court litigation and you are not entitled to a second chance." (Menitove Decl., Ex. 10, email from D. Bowie to M. Menitove (Apr. 23, 2024).)  Counsel for Flannery responded that Flannery "disagree[d] that this privilege issue was resolved in the state court litigation; it simply was not adjudicated in any respect."  (*Id.*, email from M. Menitove to D. Bowie (Apr. 24, 2024).)  While Flannery recognized that the parties were "at impasse," Flannery stated that it would wait to raise the issue with the Court in connection with any other issues arising from the BLK Entities' anticipated document production.  (*Id.*)

Flannery and the BLK Entities then engaged in protracted negotiations, which the BLK Entities repeatedly delayed by failing to timely respond.  To give but one example, on April 23, 2024, Flannery first asked whether the BLK Entities' discovery vendor still possessed data collected in connection with the State Court Action.  The BLK Entities did not respond to this simple question until May 21, nearly one month later, and only after Flannery repeated its question in *six different emails*.  (*Id.*, email correspondence between M. Menitove and D. Bowie (Apr. 24, 2024 to May 21, 2024).)  As a result of the BLK Entities' non-responsiveness, it took several months—and repeated follow-up correspondence from Flannery—before they produced documents responsive to the subpoenas.

In August 2024, the BLK Entities finally produced documents responsive to Flannery's subpoenas.  These documents were identified using search terms that Flannery provided and that were broader than the terms previously applied (pursuant to the parties' agreement under the PSA) to search Mr. Beebe's and Susan Beebe Furay's phones.  Upon reviewing the BLK Entities' production, Flannery noticed that documents had been redacted for privilege, including emails sent to and from Mr. Beebe's CBRE account.

On September 27, 2024, counsel for Flannery asked whether the BLK Entities would provide

15

a privilege log and whether they were still asserting privilege over Mr. Beebe's CBRE emails, despite the CBRE policies disclosed during the State Court Action.  On October 3, the BLK Entities responded, stating that they would continue to assert privilege over Mr. Beebe's CBRE emails and would prepare a privilege log.  The BLK Entities argued that Flannery could not challenge their privilege claims because "Flannery Associates made no attempt to challenge the assertion of privilege in the State Court Action and that lawsuit has since been dismissed with prejudice and all issues have been superseded by the Purchase and Settlement Agreement." (Menitove Decl., Ex. 11, Letter from D. Bowie to M. Menitove (Oct. 3, 2024) at 2.)  The BLK Entities further argued that under the PSA, Flannery "agreed not to sue or engage in further proceedings and it waived any rights to compel Mr. Beebe and his family members to do anything beyond the few listed discovery duties." (*Id.*)

2.  <u>The Filing of This Motion and Preparation of This Joint Statement</u>

On October 11, 2024, Flannery filed its original motion to compel production of the documents at issue here.  (ECF No. 133.)  Flannery sent a draft of its portion of this Joint Statement to the BLK Entities on October 18, and Flannery requested that the BLK Entities return their portions of the Joint Statement by the original filing deadline of October 23.  (Menitove Decl., Ex. 12, email from M. Menitove to D. Bowie (Oct. 18, 2024).)  The BLK Entities complained that this schedule did not leave sufficient time to draft their arguments (*see id.*, email from D. Bowie to M. Menitove (Oct. 21, 2024)), even though they have been on notice for months regarding Flannery's positions—which were articulated in Flannery's December 18, 2023 letter and during the parties' April 23, 2024 meet-and-confer.

After the BLK Entities complained about the timing of the Joint Statement, Flannery offered to provide them additional time—until October 29—to complete their portions of the Joint Statement.  (*Id.*, email from M. Menitove to D. Bowie (Oct. 22, 2024).)  The ***BLK Entities rejected that offer*** and stated that they were comfortable filing on October 23.  (*Id.*, email from D. Bowie to M. Menitove (Oct. 23, 2024).)  Nevertheless, the BLK Entities then devoted several paragraphs in their portions of the Joint Statement to complaining that they had insufficient time to prepare their arguments, notwithstanding Flannery's offer of an extension.  (*See id.*, email from M. Menitove to

16

1  D. Bowie (Oct. 23, 2024).)

2       After receiving the BLK Entities' portions of the Joint Statement on October 23, Flannery stated

3  that it would amend its sections of the Joint Statement to inform the Court of Flannery's offer to

4  extend the briefing schedule, unless the BLK Entities agreed to withdraw their arguments attacking

5  Flannery for purportedly failing to provide them sufficient time to prepare their arguments.  (*Id.*)

6  The BLK Entities did not respond.  And because Flannery did not receive consent from the BLK

7  Entities to file the completed Joint Statement, Flannery instead filed an amended Notice of Motion

8  on October 23, providing the parties an extra week to agree on a consolidated Joint Statement.  (ECF

9  No. 135.)

10      On October 24, the BLK Entities served a privilege log providing certain limited

11 information about documents withheld or redacted based on assertions of privilege.  (Menitove

12 Decl., Ex. 13.)  Although this log did not contain any description of the nature or subject matter of

13 the purportedly privileged documents, Mr. Beebe's CBRE email address was logged in the "From,"

14 "To," or "CC" field on 145 entries, reflecting 87 documents that were redacted and 58 documents

15 that were withheld in full.  (*Id.*)[1]

16      On October 29, the BLK Entities provided their consent to file the Joint Statement.

17      **B.      BLK Entities' Statement**

18      The BLK Entities generally agree with the Flannery summary of Discovery Conference

19 Details. They would note that the Responses to Subpoenas were preceded by an explanatory letter to

20 which there was never a response.  They would also note that Flannery's attorneys expressly cited

21 as their authority for service of the subpoenas the Settlement Agreement – which they have since

22 completely ignored.  Additionally, the BLK Entities have spent thousands of dollars in providing

23 additional documents responsive to all documentary requests.  Indeed, the only dispute of which the

24 BLK Entities are aware is that surrounding the production of attorney-client communications to

25 which they have objected.

26

27 ────────────────

28 [1] Flannery reserves the right to challenge the sufficiency of the BLK Entities' privilege log, but any
dispute regarding the sufficiency of the log is not yet ripe for this Court's consideration.

17

III.     **DISPUTED DISCOVERY REQUESTS**

The parties do not dispute any of the requests for production contained in Flannery's subpoenas to the BLK Entities.  Instead, the parties dispute whether the BLK Entities have produced all responsive documents in response to those subpoenas.  Flannery contends that the BLK Entities have failed to do so because they have improperly asserted privilege over documents sent to or from Mr. Beebe's CBRE email account.  The BLK Entities disagree.

A.     **Flannery's Position**

The BLK Entities cannot establish that documents sent to or from Mr. Beebe's CBRE account are privileged because he had no reasonable expectation of privacy in light of CBRE's policies.

As a threshold matter, because the Court has federal question jurisdiction over this case arising under the Sherman Act (ECF No. 1 ¶ 1), federal law applies to the privilege claims at issue here.  *See Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies.").  Indeed, courts in the Ninth Circuit deciding privilege disputes in federal question cases—including this Court—routinely reject arguments that "rel[y] entirely on California statutes and California cases applying California's law of privilege."  *See, e.g.*, *Saud v. State of California*, No. 14-cv-2536 GEB AC, 2016 WL 2927591, at *2 (E.D. Cal. May 19, 2016) (Claire, J.).  The BLK Entities miss the mark by basing their assertion of privilege on inapplicable California state law.

Similarly, the BLK Entities erroneously contend that Section 7.4 of the PSA requires (1) the application of California state privilege law to this dispute and (2) Flannery to somehow seek to enforce compliance with the subpoenas in state court.  In reality, Section 7.4 of the PSA applies only to claims "arising out of or relating to the subject matter of [the PSA]."  (Bowie Decl. at 19.)  And this dispute does not arise from the PSA, but from subpoenas served nine months after the execution of the PSA.  Moreover, the BLK Entities fail to cite any authority to support their suggestion that parties can contractually elect to apply state privilege law in federal litigation based on federal question jurisdiction.

Under the applicable federal law of privilege, "[t]he party asserting the privilege bears the burden to prove each element" of the privilege claim, including that the privilege has not been

18

waived.  *See Wallis v. Centennial Ins. Co.*, No. 2:08-cv-2558 WBS AC, 2013 WL 434441, at *4 (E.D. Cal. Feb. 1, 2013) (Claire, J.); *see also Alamar Ranch, LLC v. Cnty. of Boise*, No. 09-cv-004-S-BLW, 2009 WL 3669741, at *2 (D. Idaho Nov. 2, 2009) ("As part of this burden, [a third party asserting privilege] must prove that the privilege has not been waived.").  When, as here, a party asserts privilege over documents sent to or from a work email account that an employer has the right to monitor, courts routinely hold that the party waived any privilege over such documents because the party had no reasonable expectation of privacy.  *See, e.g.*, *Alamar Ranch*, 2009 WL 3669741, at *4 (holding that third party "waived" privilege over emails "sent directly from her company's e-mail address" because "[i]t is unreasonable for any employee in this technological age" to expect such emails to remain private); *Am. Career Coll., Inc. v. Medina*, No. 21-cv-00698 PSG SK, 2022 WL 18142503, at *1-2 (C.D. Cal. Dec. 9, 2022) (employee "waived the attorney-client privilege by sending to or from his work email account otherwise facially privileged emails" (collecting cases)); *Bingham v. Baycare Health Sys.*, No. 8:14-cv-73-T-23 JSS, 2016 WL 3917513, at *4, *7 (M.D. Fla. July 20, 2016) (same and collecting cases); *United States v. Finazzo*, No. 10-cr-457 RRM RML, 2013 WL 619572, at *7-13 (E.D.N.Y. Feb. 19, 2013) (same and collecting cases); *Chechele v. Ward*, No. 10-cv-1286-M, 2012 WL 4481439, at *2 (W.D. Okla. Sept. 28, 2012) (same); *Hanson v. First Nat'l Bank*, No. 10-cv-0906, 2011 WL 5201430, at *6-7 (S.D.W. Va. Oct. 31, 2011) (same).

The decision in *Alamar Ranch* is particularly instructive as to the impropriety of the BLK Entities' privilege assertions here.  In that case, the plaintiff subpoenaed a third party's employer "to obtain copies of . . . emails [the third party] had sent or received through her work address," including emails with her counsel.  *Alamar Ranch*, 2009 WL 3669741, at *2.  After the employer produced the documents to the plaintiff, the third party's counsel invoked the attorney-client privilege to "demand[] the return of the documents."  *Id.*  The district court held that "e-mails sent to [the third party's] work e-mail" were "unprotected by any privilege," explaining that the privilege analysis was "simple" because the employer "put all employees . . . on notice that their e-mails would (1) become [the employer's] property, (2) be monitored, stored, accessed and disclosed by [the employer], and (3) should not be assumed to be confidential."  *Id.* at *4.  Consequently, it was objectively "unreasonable" for the third party to believe that such emails would remain private, rendering

19

1    irrelevant her "assertion that [she] did not subjectively intend to waive the privilege" because she

2    was "unaware that her computer e-mails were ever monitored by the [employer]."  *Id.* at *3-4

3    (citation omitted); *see also Bingham*, 2016 WL 3917513, at *6 (holding that a party's "subjective

4    belief that e-mails he accessed on his workplace account were confidential" was irrelevant because

5    "the question is not whether he thought or believed his communications were confidential but rather

6    whether his expectation was reasonable under the circumstances").

7         Similarly instructive is the decision in *Medina*, which also held that an employee "waived the

8    attorney-client privilege by sending to or from his work email account otherwise facially privileged

9    emails."  2022 WL 18142503, at *1.  As in *Alamar Ranch*, the district court ruled that the employee

10   had "no reasonable expectation of privacy in emails he sent to or from his work account" because

11   the employer had a policy stating that: (1) "'[t]here shall be no expectation of privacy when using

12   the [employer's] email system,'" and (2) "'[e]mail messages and attachments are the property of the

13   [employer] and not private communications, *whether created or received*, and may be subject to

14   review by the [employer] at any time.'"  *Id.*  As the district court explained, "[c]ourts have found

15   waiver with even less evidence."  *Id.*  Echoing the reasoning of *Alamar Ranch*, the court further

16   stated:

17        It is unreasonable for any employee in this technological age . . . to believe that her
          e-mails, sent directly from her company's e-mail address over its computers, would
18        not be stored by the company and made available for retrieval.  That principle, stated
          in 2009 [in *Alamar Ranch*], holds even greater weight in 2022.
19

20   *Id.* (citation omitted).

21        The outcome here should be no different because CBRE's policies confirm that Mr. Beebe

22   had no reasonable expectation of privacy—and thus waived any privilege—when using CBRE's

23   email system to communicate with his personal attorneys.  Indeed, CBRE's Employee Handbook

24   clearly states that employees "should have ***no expectation of privacy*** in connection with the use of

25   any systems or regarding any information created, stored or transmitted by [the employee]."

26   (Menitove Decl., Ex. 1, CBRE Employee Handbook at 31 (emphasis added).)  CBRE's Standards of

27   Business Conduct further state that its "policies that govern how [its] systems are to be used  . . . give

28   CBRE the ***right to monitor*** [an employee's] use of [its] systems and to block, intercept or review

                                                      20

any content or communications that occur on or are stored in [its] systems," such that employees "***should not expect***" that their "***personal privacy***" is "protected on [CBRE's] systems." (Menitove Decl., Ex. 2, at 41 (emphases added).)  Moreover, CBRE's corporate representative testified that Mr. Beebe: (1) was expected to "agree to" and be "familiar with [CBRE's] general rules and policies"; (2) "was told" that his CBRE emails would be subject to inspection; and (3) "***had no reasonable expectation of privacy in his emails*** . . . on CBRE's servers." (Menitove Decl., Ex. 4, Thorpe Tr. at 93:3-19, 94:15-18, 102:24-103:3 (emphases added).)

Thus, given CBRE's clearly stated policies, Mr. Beebe had no reasonable expectation of privacy when communicating via his CBRE account, and any privilege over emails sent to or from that account has been waived.  The BLK Entities do not—because they cannot—dispute any of the facts regarding CBRE's policies, which alone defeat their privilege claims.  Nor have they argued that Mr. Beebe was unaware of CBRE's policies.  In any event, consistent with the holding in *Alamar Ranch* and other similar decisions, it would be irrelevant for Mr. Beebe to contend that he was unaware of CBRE's policies or that he did not subjectively intend to waive privilege.

Instead, the BLK Entities have argued that: (1) the PSA between Flannery and the BLK Entities bars Flannery from challenging any privilege assertion; and (2) Flannery is estopped from raising this dispute because Flannery did not litigate the issue before the State Court Action settled.  Both contentions are meritless.

***First***, the BLK Entities erroneously assert that Flannery released or waived its right to challenge their privilege assertions by entering into the PSA.  Specifically, they argue that, except for the "Continuing Discovery Obligations" included in Section 5.8 of the PSA, Flannery "waived any rights to issue subpoenas and to file this Motion." (*See supra* § I.B.2.)  But the release in the PSA plainly cannot bar Flannery from seeking relief regarding the BLK Entities' privilege assertions in response to subpoena requests served ***after*** the PSA was executed.  After all, the PSA's release provisions expressly exclude "conduct that occurs after the Effective Date" of the PSA (i.e., July 3, 2023).  (Menitove Decl., Ex. 5, PSA § 5.3.)  And while the PSA required the BLK Entities to undertake certain "Continuing Discovery Obligations," ***there is nothing*** in the PSA limiting Flannery's ability to seek discovery from the BLK Entities in this case, or limiting Flannery's ability

21

to challenge the sufficiency of the BLK Entities' production—including privilege assertions.  To the contrary, the PSA limits the BLK Entities' rights to object to discovery because it requires Mr. Beebe to "accept service of any subpoena" in this case "and not argue that it is unenforceable or should be quashed." (*Id.* § 5.8(c).)  In sum, Flannery did not release or waive any right to challenge Mr. Beebe's privilege assertions in responding to the subpoena he agreed to accept.

*Second*, the doctrine of collateral estoppel does not save Mr. Beebe from his privilege waiver because it "does not apply to those issues that could have been raised, but were not," in a prior litigation. *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th. Cir. 2019); *Woods v. Portee*, No. 86-cv-2945, 1988 WL 21178, at *1 (9th Cir. 1988) (holding that "a mere 'opportunity'" to raise an issue in a prior case "is not enough to trigger the doctrine of collateral estoppel"); *see also* Restatement (Second) of Judgments § 27 cmt.(e) (no estoppel "in a subsequent action as to issues which might have been but were not litigated and determined in the prior action").  Instead, the doctrine only bars re-litigation of matters that were "***actually litigated and decided*** in the previous action," *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1031 (9th Cir. 2001) (emphasis added), and "[c]ollateral estoppel is inappropriate if there is any doubt" on that score, *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir. 1989).

Here, the BLK Entities cannot establish collateral estoppel because they simply cannot show that the question of whether Mr. Beebe's CBRE emails are privileged was adjudicated in the State Court Action.  No motion relating to that privilege assertion was briefed—let alone decided.  In fact, the BLK Entities have expressly conceded that "Flannery Associates made no attempt to challenge the assertion of privilege in the State Court Action."  (Menitove Decl., Ex. 11, Letter from D. Bowie to M. Menitove (Oct. 3, 2024) at 2.)  Perhaps recognizing the lack of any estoppel here, the BLK Entities attempt to pivot in their portion of the Joint Statement by claiming the argument "is not one of collateral estoppel but of [California state] substantive law," citing the California Code of Civil Procedure.  (*See supra* § I.B.2.)  But in any event, Flannery **could not have litigated** the privilege dispute currently before this Court in the State Court Action, given that the BLK Entities' privilege assertions in this case are in response to different document requests than those in the State Court Action, and their privilege assertions are governed by a different body of law (i.e., federal law, as

22

1 | opposed to the California state law applicable in the State Court Action).

2 |      For these reasons, Flannery respectfully requests that the Court grant its motion to compel

3 | the BLK Entities to produce documents sent to or from Mr. Beebe's CBRE email account that are

4 | responsive to Flannery's subpoena requests, but have been withheld based on privilege claims.

5 |     **B.**    **BLK Entities' Position**

6 | The arguments of the BLK Entities have been summarized in the earlier portions of this Joint

7 | Statement.

8 |

9 | Dated: October 30, 2024

By:    */s/ Michael H. Menitove*

Matthew Martino (*pro hac vice*)
matthew.martino@skadden.com
Michael H. Menitove (*pro hac vice*)
michael.menitove@skadden.com
Evan Levicoff (*pro hac vice*)
evan.levicoff@skadden.com
Thomas J. Smith (*pro hac vice*)
thomas.smith@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

Lance A. Etcheverry (SBN 199916)
lance.etcheverry@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Attorneys for Plaintiff*
*Flannery Associates LLC*

Dated: October 29, 2024

By:   s/ David J. Bowie
    *David J. Bowie, Attorney*
    *(as authorized on Oct. 29, 2024)*

BLK Entities

**PROOF OF SERVICE**

**CASE NO.: 2:23-CV-00927-TLN-AC**

I am employed in the County of New York, State of New York.  I am over the age of 18 and not a party to the within action; my business address is One Manhattan West, New York, New York 10001.

On October 30, 2024, I served the foregoing document described as

**JOINT STATEMENT RE DISCOVERY DISAGREEMENT BETWEEN PLAINTIFF FLANNERY ASSOCIATES LLC AND BLK ENTITIES**

via electronic mail to the counsel of the interested parties as follows:

| | |
|---|---|
| David J. Bowie | dave@bowieschafferlaw.com |
| Eric C. Schaffer | eric@bowieschafferlaw.com |

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on October 30, 2024 at New York, New York.

/s/ *Michael H. Menitove*
Michael H. Menitove

24