MATTHEW M. MARTINO (*pro hac vice*)
matthew.martino@skadden.com
MICHAEL H. MENITOVE (*pro hac vice*)
michael.menitove@skadden.com
EVAN LEVICOFF (*pro hac vice*)
evan.levicoff@skadden.com
THOMAS J. SMITH (*pro hac vice*)
thomas.smith@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 777-3000

LANCE A. ETCHEVERRY (SBN 199916)
lance.etcheverry@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Attorneys for Plaintiff*
*FLANNERY ASSOCIATES LLC*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Flannery Associates LLC, | Case No.: 2:23-cv-00927-TLN-AC |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(D)** |
| v. | |
| Barnes Family Ranch Associates, LLC, *et al.*, | |
| Defendants. | Date:        March 20, 2025 |
| | Time:        2:00 p.m. |
| | Courtroom:  2, 15th Floor |
| | Judge:       Hon. Troy L. Nunley |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 1

    I.      FLANNERY'S ANTITRUST CLAIMS ............................................................... 1

    II.     THE DIETRICHS' INVOLVEMENT IN THE CONSPIRACY ......................... 2

    III.    FLANNERY'S EFFORTS TO OBTAIN DISCOVERY AND PENDING
          MOTION TO EXTEND THE DISCOVERY SCHEDULE ................................ 4

ARGUMENT ................................................................................................................................... 5

    I.      THE DIETRICHS' MOTION SHOULD BE DENIED BECAUSE IT IS
         PREMATURE AND PROCEDURALLY IMPROPER ....................................... 5

        A.      The Motion Should Be Denied Because Flannery Has Requested the
              Opportunity to Conduct Necessary Discovery .......................................... 5

        B.      The Dietrichs Flouted This Court's Meet-And-Confer Requirement ........ 9

    II.     IN ANY EVENT, MATERIAL QUESTIONS OF FACT PRECLUDE
         SUMMARY JUDGMENT ................................................................................ 10

        A.      The Dietrichs Misrepresent the Relevant Standard at Summary
              Judgment, Which Does Not Require Direct Evidence ............................. 10

        B.      The Dietrichs Fail to Meet Their Initial Burden to Come Forward
              With a Plausible Explanation for Their Conduct .................................... 13

             1.     The Child's Trust Does Not Meet the Dietrichs' Initial
                   Burden ..................................................................................... 13

             2.     The Dietrichs' Declarations Do Not Meet Their Initial Burden ....16

        C.      The Dietrichs Ignore the Significant Evidence Supporting a
              Reasonable Inference of the Dietrichs' Liability .................................... 17

CONCLUSION ............................................................................................................................. 20

i

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)..........................................................................................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................................5

*Austin Legal Video, LLC v. Deposition Solutions, LLC*,
    No. 1:23-CV-00421, 2023 WL 9105547 (W.D. Tex. Nov. 16, 2023) ..........................6, 7-8

*B&G Foods North America, Inc. v. Embry*,
    No. 2:20-CV-00526, 2024 WL 4133625 (E.D. Cal. Sept. 10, 2024) ...................................6

*Bellah v. American Airlines, Inc.*,
    No. CIV. S-08-0066, 2008 WL 2875449 (E.D. Cal. July 23, 2008) ....................................5

*Beltz Travel Service, Inc. v. International Air Transport Association*,
    620 F.2d 1360 (9th Cir. 1980) ..........................................................................................11

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    No. C-07-5944, 2017 WL 5957654 (N.D. Cal. Feb. 27, 2017) ...................................13, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................17-18

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) ....................................................................................12, 13

*City of West Sacramento v. R & L Business Management*,
    No. 2:18-CV-00900, 2019 WL 5457029 (E.D. Cal. Oct. 24, 2019) ...............................5, 9

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)..........................................................................................................18

*C-O-Two Fire Equipment Co. v. United States*,
    197 F.2d 489 (9th Cir. 1952) ............................................................................................11

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992)..........................................................................................................11

*Eden Environment Citizen's Group, LLC v. California Cascade Building Materials, Inc.*,
    No. 2:19-CV-01936, 2021 WL 4286464 (E.D. Cal. Sept. 21, 2021) ...............................5, 8

*ES Development, Inc. v. RWM Enterprises, Inc.*,
    939 F.2d 547 (8th Cir. 1991) ............................................................................................11

ii

*In re Flat Glass Antitrust Litigation*,
  385 F.3d 350 (3d Cir. 2004) ...................................................................................... 11-12

*Hamilton v. Willms*,
  No. CV F 02 6583, 2005 WL 8176406 (E.D. Cal. Apr. 14, 2005) ................................... 6, 8

*Matsushita Elecric Industrial Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................................. 10-12, 18

*Metabolife International, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001) ............................................................................................. 5

*Mike's Novelties, Inc. v. PIV Enterprises, Inc.*,
  No. 1:23-CV-01309, 2024 WL 1855719 (E.D. Cal. Apr. 26, 2024) ................................... 9

*Mollica v. County of Sacramento*,
  No. 2:19-cv-02017, 2022 WL 15053335 (E.D. Cal. Oct. 26, 2022) ................................... 9

*Mutual Fund Investors, Inc. v. Putnam Management Co.*,
  553 F.2d 620 (9th Cir. 1977) ........................................................................................... 12

*Nissan Fire & Marine Insurance Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ......................................................................................... 13

*O'Reilly v. O'Reilly*,
  No. B281375, 2017 WL 4510824 (Cal. Ct. App. Oct. 10, 2017) ..................................... 15

*Piro v. Piro*,
  No. D052776, 2009 WL 498195 (Cal. Ct. App. Feb. 27, 2009) ..................................... 15

*Poller v. Columbia Broadcasting System, Inc.*,
  368 U.S. 464 (1962) ....................................................................................................... 11

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ................................................................................................. 13, 16

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*,
  809 F.2d 626 (9th Cir. 1987) ........................................................................................... 18

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  No. 12-CV-4114, 2013 WL 3387652 (N.D. Cal. July 8, 2013) ................................... 18-19

*United States v. Foster*,
  711 F.2d 871 (9th Cir. 1983) ........................................................................................... 12

*United States v. Layton*,
  720 F.2d 548 (9th Cir. 1983) ........................................................................................... 12

*United States v. Nazemian*,
  948 F.2d 522 (9th Cir. 1991) ........................................................................................... 12

iii

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*,
    668 F.2d 1014 (9th Cir. 1981) ............................................................... 12

*Williams v. Huffman*,
    No. 2:11-CV-0638, 2012 WL 1414082 (E.D. Cal. Apr. 23, 2012) ....................................... 6

**STATUTES**

Cal. Prob. Code § 16200 ................................................................... 15-16

Fed. R. Civ. P. 56(d) ........................................................................ 5

iv

# INTRODUCTION[1]

Plaintiff Flannery Associates LLC ("Flannery") respectfully requests that the Court deny Defendants Paul Dietrich ("Paul") and William Dietrich's ("William") motion for summary judgment (ECF No. 147, "Motion" or "Mot.") because it is premature and, in any event, material facts remain in dispute. Flannery already moved the Court to amend the Scheduling Order to allow for additional discovery **nearly two months** before the Dietrichs filed their motion, and Flannery's motion remains pending before the Court. (ECF No. 141.) In the briefing for its motion to extend discovery, Flannery explained why additional time is needed to pursue discovery from former Defendants who have settled, and why that discovery is likely to adduce additional evidence of the extent of the Dietrichs' involvement in the conspiracy. (*See* ECF Nos. 141, 146.) Ignoring that pending motion and this Court's meet-and-confer requirements, the Dietrichs filed this Motion based on a purported lack of evidence of the Dietrichs' communications with Conspirators. Pursuant to Federal Rule of Civil Procedure 56(d), the Court should deny this Motion to allow Flannery to complete the discovery it has already requested the opportunity to pursue.

In the alternative, even if the Court entertains the Dietrichs' arguments on an incomplete factual record, the Court should still deny summary judgment. The Dietrichs err as a matter of law by arguing that an antitrust conspiracy can only be established through direct evidence. Compounding that error, the Dietrichs also fail to meet their initial burden to show a plausible justification for their behavior, relying on misrepresentations about trust documents and self-serving affidavits that raise material questions of fact. Finally, the Dietrichs ignore the significant direct evidence of the conspiracy's existence and the circumstantial evidence of the Dietrichs' involvement, which supports a reasonable inference that the Dietrichs did not act independently.

# BACKGROUND

## I.    FLANNERY'S ANTITRUST CLAIMS

Flannery brought this action against Conspirators (as defined in Flannery's complaint) for illegally conspiring to fix prices for real property in Solano County, California. (*See* ECF No. 1.) Flannery began purchasing property in Solano County in 2018 in support of an initiative to create

---

[1] Unless noted, internal quotations, citations, and alterations are omitted, and all emphases added.

1   projects including a new city, and a variety of new energy generation assets. Conspirators are

2   wealthy owners of rangeland properties in Solano County and consist of four groups: the BLK

3   Entities (*id.* ¶¶ 35-47); the Mahoney Defendants (*id.* ¶¶ 48-54); the Anderson Defendants (*id.* ¶¶

4   55-79); and the Hamilton Conspirators (*id.* ¶¶ 80-91). Flannery alleges that, beginning in 2018,

5   Conspirators illegally agreed to eliminate competition, fix prices, and overcharge Flannery in

6   purchasing their properties in violation of Section 1 of the Sherman Act, California's Cartwright

7   Act, and California's Unfair Competition Law. (*Id.* ¶¶ 7, 28, 35-79, 94-131, 257, 317.)

8       Direct evidence brought the Conspirator's illegal scheme to light. Flannery became aware

9   of the conspiracy after obtaining "smoking gun" communications through discovery in a separate

10  case (*id.* ¶ 22), including an exchange in which Conspirator Richard Hamilton texted Defendant

11  Kirk Beebe: "In talking with [Defendant] Ian Anderson, ***he agrees*** that the ***remaining property***

12  ***owners should be in agreement on what we would want to sell our properties***. So [Flannery's

13  attorney] cannot play owners against owners." (Statement of Disputed Facts ("SODF") ¶ 23.)

14  Mr. Beebe responded: "***Agree***." (*Id.*) Discovery has revealed other direct evidence including an

15  email from Conspirator Richard Hamilton describing "a very interesting call from [Defendant]

16  Kirk Beebe" in which they discussed how "Kirk wants to work together in addressing [Flannery's

17  attorney]" to gain "leverage" (*id.* ¶ 22), and text messages in which Conspirator Stacy Hamilton

18  wrote: "Rumor has it that flannery has paid ***$472350/acre. We are trying to purposely spread this***

19  ***rumor to mess with Flannery*** . . . . ***We [just] want people talking and then those thinking of***

20  ***selling to demand that price***" (*id.* ¶ 24).

21      Since Flannery filed its complaint, all but two of the original forty Defendants (and fifty

22  Conspirators) have now settled with Flannery.

23  ## II.    THE DIETRICHS' INVOLVEMENT IN THE CONSPIRACY

24      The two remaining Defendants, William and Paul, own real property in Solano County as

25  trustees of the Child's Trust. (ECF No. 151 ¶¶ 1-3.) They are also the income beneficiaries of the

26  Child's Trust and members of the class of principal beneficiaries, which also includes Paul's

27  children. (SODF ¶ 1.) The terms of the Child's Trust grant broad power to the trustees to sell trust

28  property. (*Id.* ¶¶ 2-3.) In discussions about the property, evidence suggests that Paul conveyed the

2

1    Dietrichs' positions to third parties.  (*Id.* ¶¶ 6, 17.)

2         Beginning in 2019, Flannery delivered multiple offers to the Dietrichs for Flannery to buy

3    their Solano County property.  (*Id.* ¶¶ 4-5, 10-11, 14.)  Flannery's attorney, Richard Melnyk,

4    discussed these offers with Paul on several occasions, and Flannery was given the impression that

5    the Dietrichs entertained Flannery's offers, but were not willing to sell at the time in part due to

6    their relationship with Defendant Ian Anderson.  (*Id.* ¶¶ 5, 9, 14, 26.)  Flannery made its

7    understanding clear in its communications with the Dietrichs (*id.*), and the Dietrichs did not

8    attempt to dispel these impressions or claim that they were constrained by the terms of the Child's

9    Trust.  The record contains evidence that Paul solicited William's thoughts about Flannery's offers,

10   including in an email in June 2021.  (*Id.* ¶ 15.)

11        The record contains evidence that the Dietrichs communicated with other Conspirators

12   about their property, including John Alsop, Nancy Roberts, Ian Anderson, and Richard Anderson.

13   (*Id.* ¶¶ 6-7, 12, 20-21; ECF No. 148 ¶ 3.)  For example, in July 2019, an email thread among John

14   Alsop, Paul, and William discussed Flannery's offers.  (SODF ¶¶ 4-5.)  In these emails, Paul

15   communicated that the Dietrichs did not currently plan to sell but considered the price offered by

16   Flannery "much greater than the current return would justify."  (*Id.*)  Paul also described "Flannery

17   info" provided by John Alsop as "verrrrry interesting!"  (*Id.*)  In August 2020, Ian Anderson wrote

18   to Nancy Roberts that "Paul Dietrich says he is not planning on selling at this time" in an email

19   encouraging Nancy Roberts, John Alsop, and Janet Zanardi to hold out on selling.  (*Id.* ¶ 12.)

20        In June 2022, one month before the "smoking gun" text messages, Defendant Richard

21   Anderson and Paul communicated about offers to lease parts of their land, and Richard Anderson

22   discussed these communications with Defendant Christine Mahoney.  (*Id.* ¶ 20.)  Richard Anderson

23   also sent Paul notes from a meeting among Christine Mahoney, Richard Anderson, and attorney

24   David Bowie about these offers.  (*Id.* ¶ 21.)  Christine Mahoney received David Bowie's contact

25   information from the Beebes, and Ian Anderson, John Alsop, Nancy Roberts, and Janet Zanardi

26   were likely attendees at this meeting.  (*Id.* ¶¶ 16, 18-19.)  One month later, Kirk Beebe forwarded

27   the "smoking gun" text exchange to David Bowie with a subject line stating "***we need to slow***

28   ***things down*** and ***make Melnyk play by our rules now***."  (*Id*. ¶ 23.)

**III.    FLANNERY'S EFFORTS TO OBTAIN DISCOVERY**
**AND PENDING MOTION TO EXTEND THE DISCOVERY SCHEDULE**

Since filing its complaint, Flannery has actively pursued discovery from Conspirators and third parties.  (ECF No. 141 at 4-9.)  Beginning in the fall of 2023, Flannery propounded requests for production on each of the 27 Defendants remaining in the litigation at that time and served 11 third-party document subpoenas.  (*Id.* at 4-5.)  Although discovery was stayed during the pendency of Defendants' unsuccessful motion to dismiss (ECF No. 99), Flannery promptly continued discovery after the motion was denied (ECF No. 141 at 5-8).  In parallel, Flannery progressed its case by engaging in settlement negotiations with the remaining Defendants, ultimately resolving its claims against all but the Dietrichs by November 2024.  (ECF Nos. 123, 131, 139.)  Flannery did not receive substantial document productions from the majority of former Defendants prior to the finalization of the respective settlement agreements.  (Menitove Decl. ¶¶ 8, 16, 22.)

When it became clear that Flannery would not reach a settlement with the Dietrichs, Flannery acted promptly to obtain additional evidence from former Defendants.  (ECF No. 141 at 8-9.)  Between December 4 and 9, 2024, Flannery propounded subpoenas on counsel for former Defendants Ronald Gurule, Richard Anderson, David Anderson, Carol Hoffman, Deborah Workman, John Alsop, Nancy Roberts, Janet Zanardi, Ned Anderson, Glenn Anderson, Janet Blegen, Robert Anderson, Stan Anderson, Lynne Mahre, Amber Bauman, Christopher Wycoff, and Neil Anderson.  (Menitove Decl. ¶¶ 29-31.)

On December 9, 2024, Flannery filed a motion requesting a six-month extension of fact discovery to allow Flannery to pursue document discovery from former Defendants, as well as any warranted follow-up discovery.  (ECF No. 141.)  That motion was fully briefed as of January 2, 2025.  (ECF Nos. 144, 156.)

Flanery has not yet received document productions in response to its December 2024 subpoenas from most of the recipients.  (Menitove Decl. ¶¶ 32-33.)  Flannery seeks this discovery to uncover the extent of the Dietrichs' communications with Conspirators and involvement in the conspiracy.  (*Id.* ¶¶ 2, 4.)

4

<u>ARGUMENT</u>

I.  **THE DIETRICHS' MOTION SHOULD BE DENIED<br><u>BECAUSE IT IS PREMATURE AND PROCEDURALLY IMPROPER</u>**

   A.  **The Motion Should Be Denied Because Flannery Has<br><u>Requested the Opportunity to Conduct Necessary Discovery</u>**

   This Court should deny summary judgment as premature in light of Flannery's pending request for additional discovery, which is targeted at facts relevant to the central issue raised in the Dietrichs' Motion—the extent of their involvement in the conspiracy.  Pursuant to Federal Rule of Civil Procedure 56(d), when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may: (1) defer considering the motion or deny it; [or] (2) allow time to . . . take discovery."  Fed. R. Civ. P. 56(d).  Although the rule "facially gives judges the discretion to disallow discovery . . . the Supreme Court has restated the rule as ***requiring***, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'"  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (interpreting then-Rule 56(f), which became Rule 56(d) after 2010 amendments that did not change its text) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).  "[W]here the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course."  *Bellah v. Am. Airlines, Inc.*, No. CIV. S-08-0066, 2008 WL 2875449, at *1 (E.D. Cal. July 23, 2008).

   Denial of summary judgment under Rule 56(d) is warranted when the nonmoving party "make[s] '(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists.'"  *Eden Env't Citizen's Grp., LLC v. Cal. Cascade Bldg. Materials, Inc.*, No. 2:19-CV-01936, 2021 WL 4286464, at *9 (E.D. Cal. Sept. 21, 2021) (Nunley, J.) (denying summary judgment to allow for additional discovery).  As this Court has explained, "[c]ourts usually employ a 'generous approach toward granting [Rule 56(d)] motions.'"  *Id.*  (quoting *City of West Sacramento v. R & L Bus. Mgmt.*, No. 2:18-CV-00900, 2019 WL 5457029, at *1-2 (E.D. Cal. Oct. 24, 2019)).  Accordingly, courts in the Eastern District routinely deny motions for summary judgment that are filed before

5

1   the nonmoving party has completed its discovery efforts.  *See, e.g.*, *Williams v. Huffman*, No. 2:11-

2   CV-0638, 2012 WL 1414082, at *2 (E.D. Cal. Apr. 23, 2012) (denying summary judgment

3   because of pending discovery motion); *B&G Foods N. Am., Inc. v. Embry*, No. 2:20-CV-00526,

4   2024 WL 4133625, at *1 (E.D. Cal. Sept. 10, 2024) (denying summary judgment in light of recent

5   decision granting plaintiff's motion to extend discovery); *Hamilton v. Willms*, No. CV F 02 6583,

6   2005 WL 8176406, at *5 (E.D. Cal. Apr. 14, 2005) (denying summary judgment where "it was not

7   completely unreasonable for Plaintiffs to not have conducted all relevant discovery by" when

8   defendants filed their motion).  Additionally, allowing full discovery before summary judgment is

9   "particularly important" in antitrust cases because "[e]ven a successful antitrust plaintiff will

10  seldom be able to offer direct evidence of a conspiracy and such evidence is not a requirement."

11  *Austin Legal Video, LLC v. Deposition Sols., LLC*, No. 1:23-CV-00421, 2023 WL 9105547, at *4

12  (W.D. Tex. Nov. 16, 2023) (denying summary judgment as premature).

13          Here, the Dietrichs' motion for summary judgment should be denied as premature because

14  Flannery's pending motion requesting additional time for discovery easily meets the liberal

15  standard under Rule 56(d), and Flannery identifies specific additional discovery likely to produce

16  evidence relevant to the Dietrichs' Motion.  ***First***, Flannery's request for additional discovery prior

17  to the Dietrichs' filing of their Motion is timely.  Flannery's motion to amend the scheduling order

18  was filed on December 9, 2024 (ECF No. 141), before the scheduled close of fact discovery, and

19  nearly two months before the Dietrichs' motion for summary judgment was filed on February 7,

20  2025 (ECF No. 147).  Flannery has also timely reasserted its request for additional discovery in this

21  opposition, its response to the Dietrichs' Statement of Undisputed Facts, and the Menitove

22  Declaration, in compliance with L.R. 260(b) and Fed. R. Civ. P. 56(d).  Moreover, Flannery's

23  request to fully develop the factual record as to the Dietrichs' involvement in the conspiracy is also

24  timely in light of the diligence that Flannery has exhibited over the course of the litigation.  (*See*

25  ECF No. 141-1 at 10-13.)  Flannery has actively pursued its claims since this litigation began,

26  resulting in the exchange of thousands of pages of document discovery, along with the resolution

27  of its claims against 38 of the 40 originally named Defendants via settlement.  (*Id.*)

28          ***Second,*** Flannery identifies the specific information it seeks through additional discovery,

6

which consists of "documents in response to subpoenas served on third parties formerly named as Defendants in this action, including any necessary motion practice and follow-up discovery." (ECF No. 141 at 2.) Flannery is specifically seeking the extension to pursue additional information about the extent of the Dietrichs' communications with other Conspirators, influence on their decision making, and involvement in the conspiracy. (Response to Statement of Undisputed Facts ¶¶ 7-10, 13-14, 17-23; Menitove Decl. ¶¶ 2, 4.) Flannery is also asking for the ability to conduct relevant follow-up discovery, which may include depositions necessary to resolve material questions of fact about the extent to which the Dietrichs communicated and coordinated negotiating strategy with other Conspirators. (*Id.* ¶ 3.) This discovery includes documents from individuals with whom the record shows the Dietrichs communicated regarding their land or Flannery's offers, including John Alsop, Nancy Roberts, and Richard Anderson. (*See supra* p. 3.)

**Third**, the additional information Flannery seeks is highly relevant to determining the merits of the Dietrichs' motion for summary judgment. The Dietrichs request summary judgment on the basis that Flannery does not have "specific evidence of participation as to" the Dietrichs (Mot. at 4), arguing that the Court should grant summary judgment because the Dietrichs "never had any discussions with any of the other property owners" about Flannery's offers or prices (*id.* at 7). The Dietrichs further purport to justify summary judgment by arguing that "Flannery has not identified any specific evidence, no emails, no texts, no letters, no handwritten note, no witness testimony . . . that the Dietrichs had discussions or communications with anyone." (*Id.* at 10; *see also id.* at 18 (arguing that "[t]here is no evidence that William and Paul talked about prices or land sales or Flannery's offers with anyone").) In other words, rather than advancing legal arguments, the Dietrichs focus entirely on factual questions about whether and how they communicated with other Conspirators and their motivations in responding to Flannery's offers. The additional discovery identified by Flannery is targeted directly at adducing a full factual record of the extent of the Dietrichs' communications with other Conspirators—the factual question that serves as the primary justification for the Dietrichs' motion. Indeed, the present situation is highly similar to other cases in which antitrust defendants have prematurely attempted to obtain summary judgment by "declar[ing] that [they] never communicated with the other Defendants regarding [the

7

conspiracy]" and that they had "an alternate reason" for their conduct. *Austin Legal Video, LLC*, 2023 WL 9105547, at \*4. Those are quintessential questions of fact and "exactly what discovery is for." *Id.*; *see also Hamilton*, 2005 WL 8176406, at \*5 (denying summary judgment motion brought by RICO defendant based on plaintiff's request for discovery to see "evidence concerning the level of participation [the moving party] had in the [conspiracy]").

*Fourth*, Flannery has amply demonstrated "some basis for believing that the information sought actually exists." *Eden*, 2021 WL 4286464, at \*9. As explained in Flannery's briefing in support of its motion to amend the scheduling order, the past record of discovery in this case shows that evidence of a Defendant's involvement in the conspiracy is often revealed through documents produced by other Conspirators. (ECF No. 141-1 at 13-14.) For example, the "smoking gun" communications that first provided direct evidence of the conspiracy were revealed in this way. (*See* SODF ¶ 23.) And further discovery from third parties thus far has revealed additional direct evidence of the extent to which the Conspirators "work[ed] together" against Flannery. (*Id.* ¶¶ 22, 24.) Discovery has also revealed evidence that the Dietrichs communicated with formerly named Defendants, including John Alsop, Richard Anderson, Nancy Roberts, and Ian Anderson. (*See supra* p. 3.) The strong evidence that Flannery has elicited in discovery so far provides a reason to believe additional discovery will yield additional evidence. (*See supra* pp. 2-3.)

The Dietrichs' contention that additional discovery will not yield relevant evidence because it is "duplicative" (Mot. at 13) is belied by the record and provides no basis to rule on summary judgment before the factual record has been fully developed. Flannery's requests for discovery are not duplicative because they include an additional request for communications with Solano County landowners, many of the third-party subpoena recipients have not produced any documents in response to Flannery's discovery requests, and others made only *de minimis* productions. (*See* ECF No. 146 at 6.) The Dietrichs also ignore that the record of discovery in this litigation shows that the recipients of discovery requests have frequently produced additional documents after Flannery has followed up on initial responses. To give but one example, Paul himself initially represented on March 14, 2024, that he only possessed six pages of responsive documents, but ultimately produced 50 pages of documents in response to follow-up from Flannery. (Menitove

8

1  Decl. ¶¶ 8, 21.)  In any event, denial of a Rule 56(d) application based on the nonexistence of the

2  identified information is only proper "where it is clear that the evidence sought is almost certainly

3  nonexistent."  *City of West Sacramento*, 2019 WL 5457029, at *2.  While the Dietrichs include

4  over a full page of rhetorical questions insinuating that additional evidence will not be adduced

5  from the requested discovery (Mot. at 12-14), their desperation to prevent Flannery from further

6  developing the record undermines this rhetoric.

7         Because Flannery has made a timely application to seek specific relevant information that

8  there is some basis for believing exists, this Court should deny the Motion until Flannery's

9  requested additional discovery is complete.

10         **B.       The Dietrichs Flouted This Court's Meet-And-Confer Requirement**

11         The Dietrichs' motion for summary judgment is procedurally improper for the separate

12  reason that the Dietrichs failed to comply with this Court's requirement that they meet and confer

13  with Flannery before filing their motion.  Pursuant to this Court's standing order, "[p]rior to filing a

14  motion . . . counsel shall engage in a pre-filing meet and confer to discuss thoroughly the substance

15  of the contemplated motion."  *See* Hon Troy L. Nunley Civil Standing Order.  Courts regularly

16  vacate motions when the moving party fails to comply with identical requirements.  *See, e.g.*,

17  *Mollica v. Cnty. of Sacramento*, No. 2:19-CV-02017, 2022 WL 15053335, at *2 (E.D. Cal. Oct. 26,

18  2022) (vacating motion because email sent the day of filing did not comply with meet-and-confer

19  requirement); *Mike's Novelties, Inc. v. PIV Enters., Inc.*, No. 1:23-CV-01309, 2024 WL 1855719,

20  at *2 (E.D. Cal. Apr. 26, 2024) (vacating motion to dismiss because "[a]ttorneys are not excused

21  from their obligation to meet and confer simply because they believe meeting and conferring would

22  probably not moot an anticipated motion").

23         Here, the Dietrichs did not provide any notice at all before filing their motion.  (Menitove

24  Decl. ¶ 35.)  This open flouting of the Court's order is particularly striking because during the

25  parties' September 17, 2024 meet-and-confer, the Dietrichs ***expressly disclaimed*** the possibility

26  that they would file any summary judgment motions.  (*Id.* ¶ 24.)  With no warning, the Dietrichs

27  proceeded to file their Motion more than a month after the pending motion to amend the discovery

28  schedule was fully briefed, and without ever attempting to discuss Flannery's interrogatory

9

1  responses, the Dietrichs' new interpretation of a 2013 document purportedly describing the Child's

2  Trust, or the proper timing of a summary judgment motion in light of the pending extension

3  request.  Because the Dietrichs ignored the Court's order, the parties could not ensure that "the

4  briefing [would be] directed only to those substantive issues requiring resolution by the Court."

5  Hon. Troy L. Nunley Civil Standing Order.  This failure provides another basis for the Court to

6  deny this motion as premature.

7  **II.    IN ANY EVENT, MATERIAL QUESTIONS
   OF FACT PRECLUDE SUMMARY JUDGMENT**

8

9      Although this Court should deny summary judgment as premature because additional

10 discovery is needed to develop the factual record, the Dietrichs also fail to justify summary

11 judgment on the merits.  The Dietrichs' motion consistently misrepresents the applicable legal

12 standard as requiring direct evidence of each conspirator's involvement to survive summary

13 judgment, asking the court to impose improper additional burdens on Flannery and ignoring the

14 reasonable inferences permitted by the evidence.  Compounding these legal errors, the Dietrichs

15 fail to make an initial showing of a plausible reason for their conduct because both the Child's

16 Trust and the Dietrichs' self-serving affidavits are subject to numerous material factual disputes,

17 such that the burden of production does not shift to Flannery.  The Dietrichs also mischaracterize

18 the weight of evidence currently in the record, which directly shows the existence of the alleged

19 conspiracy and raises material questions of fact about the Dietrichs' involvement.

20     **A.    The Dietrichs Misrepresent the Relevant Standard at
       Summary Judgment, Which Does Not Require Direct Evidence**

21

22     The Dietrichs misstate the legal standard, arguing that Flannery purportedly bears a

23 "burden . . . to produce specific, direct evidence tending to show that the Dietrichs were not

24 engaging in permissible behavior" if the Dietrichs make an initial showing of "plausible, justifiable

25 and permissive reasons for their" conduct.  (Mot. at 7; *see also id.* at 4 (purporting to require

26 "unambiguous, specific, explicit evidence of the Dietrichs' participation"); *id*. at 5-6 (arguing that

27 Flannery "cannot rely . . . on circumstantial evidence")).  The Dietrichs purport to base this

28 standard on *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), and its

10

1  progeny, but even the Dietrichs concede that these cases involve "plaintiff[s] relying solely on

2  circumstantial evidence" (Mot. at 6)—which is facially inconsistent with the "direct evidence only"

3  framework proposed by the Dietrichs.

4        Contrary to the Dietrichs' assertions, it is "well established that the proof and evidence in

5  an antitrust conspiracy case is, in most cases, circumstantial." *C-O-Two Fire Equip. Co. v. United*

6  *States*, 197 F.2d 489, 494 (9th Cir. 1952); *see also, e.g.*, *ES Dev., Inc. v. RWM Enters., Inc.*, 939

7  F.2d 547, 553 (8th Cir. 1991) ("[I]it is axiomatic that the typical conspiracy is rarely evidenced by

8  explicit agreements, but must almost always be proved by inferences that may be drawn from the

9  behavior of the alleged conspirators."). As the Ninth Circuit has explained, "were the law

10  otherwise, [antitrust] conspiracies would flourish." *C-O-Two Fire Equip. Co.*, 197 F.2d at 494.

11  For that reason the Supreme Court has long recognized that "summary procedures should be used

12  sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is

13  largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v.*

14  *Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *see also Beltz Travel Serv., Inc. v. Int'l Air*

15  *Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980) ("In antitrust cases, these general standards are

16  applied even more stringently and summary judgments granted more sparingly.").

17        The Dietrichs err in contending that *Matsushita* forecloses the possibility of surviving

18  summary judgment based on circumstantial evidence. As the Supreme Court has made clear in

19  subsequent opinions, "*Matsushita* . . . did not introduce a special burden on plaintiffs facing

20  summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504

21  U.S. 451, 468 (1992). Rather, "*Matsushita* demands only that the nonmoving party's inferences be

22  ***reasonable*** in order to reach the jury, a requirement that was not invented, but merely articulated,

23  in that decision." *Id.* *Matsushita* also involved a counterintuitive theory of the case in which

24  plaintiffs sought to prove an antitrust conspiracy "through evidence of . . . ***price-cutting*** activities,"

25  a strategy that is "the very essence of competition." 475 U.S. at 594. In circumstances where the

26  alleged conduct is facially anticompetitive, as here, "*Matsushita* does not create any presumption in

27  favor of summary judgment for the defendant." *Eastman Kodak*, 504 U.S. at 478; *see also In re*

28  *Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004) (holding that in the context of price-

11

1    fixing "more liberal inferences from the evidence should be permitted than in *Matsushita* because

2    the attendant dangers from drawing inferences recognized in *Matsushita* are not present").  The

3    Ninth Circuit's reasoning in *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999), is

4    consistent with this jurisprudence.  There, plaintiffs sought to prove a defendant's participation in

5    an antitrust conspiracy based on normally procompetitive behaviors like trade association

6    membership and increasing production output (albeit at rates plaintiffs argued were too slow).  *Id.*

7    at 1097-98, 1100-01.  That is a far cry from the conspiracy in this case, which was a facially

8    anticompetitive scheme to charge Flannery supracompetitive prices.

9           The Dietrichs also err by citing inapposite and irrelevant case law to attempt to impose

10   additional burdens on Flannery.  For example, they argue (Mot. at 8) that Flannery must show "the

11   specific intent of each [coconspirator] to restrain trade" based on *William Inglis & Sons Baking Co.*

12   *v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981), but the cited passage in that case

13   deals with the irrelevant question of whether it is possible for a parent company to conspire with its

14   subsidiary.  *Id.* at 1055; *see also Mut. Fund Invs., Inc. v. Putnam Mgmt. Co.*, 553 F.2d 620, 625

15   (9th Cir. 1977) (cited Mot. at 8) (explaining requirement of plurality of actors in context of

16   intraenterprise conspiracy doctrine).  Similarly, the Dietrichs cite irrelevant cases involving

17   criminal conspiracies in an attempt to conjure a so-called "in furtherance of the conspiracy"

18   requirement for circumstantial evidence at summary judgment.  (Mot. at 11 (citing *U.S. v.*

19   *Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991) (criminal conspiracy to distribute heroin); *U.S. v.*

20   *Foster*, 711 F.2d 871, 875 (9th Cir. 1983) (similar); *U.S. v. Layton*, 720 F.2d 548, 556 (9th Cir.

21   1983) (criminal conspiracy to murder congressman)).)  Far from explaining the standards for civil

22   antitrust conspiracy cases at summary judgment, these cases instead deal with the admissibility of

23   statements of co-conspirators pursuant to the hearsay exception in Federal Rule of Evidence

24   801(d)(2)(E).  *See Nazemian*, 948 F.2d at 529; *Foster*, 711 F.2d at 875; *Layton*, 720 F.2d at 555-56.

25   This evidentiary rule does not speak to the reasonable inferences that may be drawn from

26   circumstantial evidence.

27          This Court should ignore the Dietrichs' attempt to artificially conjure higher evidentiary

28   standards at summary judgment and instead apply the well-settled legal framework for evaluating

                                                12

1   such motions.  As the Dietrichs concede, this framework requires that the moving party meet its

2   initial burden of production to "rebut an allegation of conspiracy by showing a plausible and

3   justifiable reason for its conduct that is consistent with proper business practice."  (Mot. at 6

4   (quoting *In re Citric Acid*, 191 F.3d at 1090).)  Only if the Dietrichs meet this initial burden,

5   Flannery then "must produce admissible evidence to show that a genuine issue of material fact

6   exists."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2017 WL 5957654, at *2

7   (N.D. Cal. Feb. 27, 2017).  In considering whether the parties meet their respective burdens, the

8   Court should apply settled summary judgment standards, under which the Court "must draw all

9   reasonable inferences in favor of the nonmoving party, and it may not make credibility

10  determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

11  150-51 (2000).  The Court "must [also] disregard all evidence favorable to the moving party that

12  the jury is not required to believe."  *Id.*  Applying these familiar standards, the Dietrichs fail to

13  meet their initial burden of production by either "producing affirmative evidence negating an

14  essential element of the nonmoving party's claims" (Mot. at 9 (citing *Adickes v. S.H. Kress & Co.*,

15  398 U.S. 144 (1970))), or "showing that the nonmoving party did not have enough evidence to

16  carry its ultimate burden of persuasion at trial," *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

17  F.3d 1099, 1104 (9th Cir. 2000) (cited Mot. at 9).

18       **B.    The Dietrichs Fail to Meet Their Initial Burden to**
             **Come Forward With a Plausible Explanation for Their Conduct**
19

20       The Dietrichs do not meet their initial burden of production by "providing evidence that

21  rebuts Flannery's circumstantial claims" (Mot. at 9), because the evidence the Dietrichs provide in

22  support of their motion is subject to genuine disputes of material fact and indeed contradicted by

23  the record.  The Dietrichs purport to meet their initial burden of production based on "the

24  constraints and terms of the Child's Trust" (*id.*) and the self-serving affidavits submitted by the

25  Dietrichs (*id.* at 7).  Neither is sufficient to show "a plausible and justifiable reason for [their]

26  conduct that is consistent with proper business practice."  *In re Citric Acid*, 191 F.3d at 1090.

27       1.    The Child's Trust Does Not Meet the Dietrichs' Initial Burden

28       The Child's Trust does not show a plausible justification for the Dietrichs' conduct because

13

it does not prevent them from selling.  Although the Dietrichs submit various misrepresentations of the Trust as "undisputed facts" (*see* ECF No. 151 ¶¶ 4-6, 15-16), the underlying evidence contradicts each of these conclusory assertions.  As Flannery already pointed out to the Dietrichs, including in briefs filed in this Court, the Dietrichs misrepresent the terms of the Trust.  (ECF No. 146 at 7-8.)  While the Trust contains no provision creating a "life estate" for the Dietrichs, it does contain several provisions that ***expressly negate*** the Dietrichs' assertions.  Section 9.4 of the Trust expressly grants the trustee "the power to . . . sell (for cash or on deferred payments with or without security), convey, exchange, partition [and] divide . . . trust property" (SODF ¶ 2), while Section 9.6 grants the trustee "the power to invest and reinvest the trust estate in every kind of property, real, personal, or mixed" (*id.* ¶ 3).  These broad powers to sell and reinvest the trust estate are not in conflict with the provisions of the trust that state that "the trustee shall distribute the trust estate to the child's then-living descendants" when the Dietrichs die.  (Trust § 7.8, ECF No. 148-1 at 15-16.)  Instead, the natural reading of the trust document grants the trustees broad powers, to sell, invest, or reinvest the trust estate, which will then be distributed in whatever form it exists to the child's descendants free of the trust at the Dietrichs' death.

In their motion, the Dietrichs do not acknowledge these provisions of the trust, notwithstanding the fact that Flannery has drawn them to their attention multiple times.  Indeed, the Dietrichs do not cite any provision of the trust to support their representation that they meet their initial burden of production because "they only 'own' life estates."  (Mot. at 9.)  In their statement of purportedly "undisputed facts," the Dietrichs only point generally to Section 7 of the trust and two paragraphs of a purported plan of distribution.  (*See* ECF No. 151 at 2 (citing P. Dietrich Decl. Ex. A).)  Section 7 of the trust does not support these "facts" because its requirement that the trust estate be distributed to the Dietrichs' children after their deaths is not inconsistent with the broad powers of sale and investment conferred by Section 9 of the trust.  The purported "plan of distribution" also fails to support the Dietrichs' reading because the two "WHEREAS" paragraphs they cite merely state that "Article 7 of the Trust provided for equal division of the Child's Trust properties to be held in separate shares for [the Dietrichs] for their lifetime, and upon their death, the shares are distributed outright and free of trust" to the Dietrichs' Descendants.  (ECF No. 149-

14

1, Plan of Distribution at 2.)  This plan of distribution is dated 2013, almost 20 years after the trust document, and it is not even properly executed, as there is no signature from one of the four beneficiaries.  (*Id.* at 3-4.)  In any event, these paragraphs also do not state that the trust estate must be distributed in kind.

Notably, the Dietrichs do not cite any legal authority in support of their contorted reading of the trust.  This is not surprising because courts in California routinely reject conclusory arguments that broad powers to sell and reinvest a trust estate are somehow limited based on purported constraints that are not supported by the trust document.  *See Piro v. Piro*, No. D052776, 2009 WL 498195, at *3 (Cal. Ct. App. Feb. 27, 2009) (denying challenge to sale of real property assets of trust because challenger "raise[d] no coherent argument explaining how sale of the Trust assets either violates the terms of the Trust or is barred by any provision of law"); *O'Reilly v. O'Reilly*, No. B281375, 2017 WL 4510824, at *3-4 (Cal. Ct. App. Oct. 10, 2017) (trust provision requiring real property to be "distributed" to children after trustee's death did not require transfer of title but also allowed sale and distribution of proceeds).

Similarly baseless is the Dietrichs' conclusory argument that selling the property "would place them in an adversarial relationship with the Child's Trust beneficiaries" such that "[t]hey have no individual motive for participating in the alleged conspiracy."  (Mot. at 10-11.)  First, this contention is factually incorrect because the Dietrichs are ***both*** income beneficiaries ***and*** members of the class of principal beneficiaries of the Child's Trust.  (SODF ¶ 1.)  The Dietrichs thus make the bizarre argument that they would be adversaries with themselves if they decided selling the property was in the best interests of themselves and Paul's children.  This argument is particularly baffling because documentary evidence shows that the Dietrichs indeed viewed Flannery's offers as providing better returns than the land could otherwise produce, such that a decision to sell would not be counter to their fiduciary duties to the class of beneficiaries.  (*See id.* ¶ 6 (Paul wrote in 2019 "the price [offered by Flannery] was much greater than the current return would justify").)  Second, the Dietrichs do not provide any support for their contention that they would need to "independently convince[] a state probate court" to sell the property.  (Mot. at 10.)  To the contrary, the California Probate Code provides that "***without the need to obtain court***

15

1  *authorization*" a trustee has "[t]he powers conferred by the trust instrument."  Cal. Prob. Code

2  § 16200.  Third, even if these assertions were not factually baseless, the Dietrichs still do not

3  explain why a conspirator could not be motivated to fix prices to benefit his children or his

4  brother's children.  At minimum, the Dietrichs' motive is a factual question disputed by the parties.

5      Because the Dietrichs' characterizations of the Child's Trust are undermined by the record

6  and unsupported by the law, the existence of the trust does not suffice to meet the Dietrichs' initial

7  burden of production at summary judgment.

8          2.    The Dietrichs' Declarations Do Not Meet Their Initial Burden

9      The Dietrichs' declarations do not show a plausible explanation for their conduct because

10  they are contradicted by other documentary evidence, including the Dietrichs' own inconsistent

11  statements.  The Dietrichs claim these declarations "rebut" Flannery's allegations, including

12  because they state that the Dietrichs believed they were constrained by the terms of the Trust, and

13  because they state that they were not involved in the conspiracy.  (Mot. at 7.)  But under well-

14  settled legal standards at summary judgment, the Court "must disregard all evidence favorable to

15  the moving party that the jury is not required to believe."  *Reeves*, 530 U.S. at 150-51.  Thus,

16  because they are contradicted by the record evidence, the declarations are entitled to no weight.

17      The Dietrichs' representations about their "beliefs" regarding their Child's Trust do not

18  meet the Dietrichs' initial burden of production because they are contradicted by both the

19  documentary evidence regarding the trust (*see supra* pp. 14-15) and the Dietrichs'

20  communications, which suggest they did not view themselves as constrained by the trust.  For

21  example, former Defendant Ian Anderson told former Defendant Nancy Roberts in August 2020

22  that "Paul Dietrich says he is not planning on selling ***at this time***" in an email in which Ian

23  Anderson encouraged Nancy Roberts to refrain from selling.  (SODF ¶ 12.)  This statement

24  contradicts the Dietrichs' contention in their declarations that they believed they could ***never*** sell

25  the property, and at the least raises a material question of fact about the Dietrichs' beliefs about the

26  trust.  Similarly, the documentary evidence shows that, in his discussions with Flannery's

27  representatives, Paul suggested that, "at the time [in 2018], [Paul was] not looking to consider an

28  offer . . . given . . . [Paul's ] ***desire to continue leasing it to Mr. Ian Anderson***."  (SODF ¶¶ 4-5.)

16

1    And when Paul wrote to William in June 2021 about Flannery's "Lastest [sic] offer for Rio Vista,"

2    he asked "Any thoughts you would care to share?"—which is inconsistent with the Dietrichs'

3    purported belief that they were barred from considering Flannery's offers.  (*Id.* ¶ 15.)

4        The Dietrichs' conclusory denials of communications with other Conspirators or

5    involvement in the conspiracy also fail to meet their initial burden of production because they are

6    contradicted by the record.  For example, William claims that he "never had any discussions or

7    communications with the other landowners or Defendants regarding Flannery" (ECF No. 149 ¶ 4),

8    but the record shows that William was included in a July 2019 email thread with John Alsop and

9    Paul about Flannery's offers (SODF ¶ 7).  Likewise, Paul's representation that "Ian Anderson and

10   [Paul] had [only] a brief conversation about Flannery after the lawsuit was filed" in May 2023

11   (ECF No. 148 ¶ 4), is expressly contradicted by Ian Anderson's description of discussions with

12   Paul about the offers in ***August 2020***.  (SODF ¶ 12.)  Similarly, the Dietrichs claim that Paul did

13   not speak for William (ECF No. 149 ¶ 7), but in the above-mentioned email thread, Paul did

14   exactly that, responding to John Alsop on behalf of both Dietrichs that "we received an offer too,

15   no plans to sell" (SODF ¶ 6).  The record also contains evidence that Paul made statements on

16   William's behalf in response to other offers.  (*Id.* ¶ 7.)

17       Rather than meeting their initial burden to provide evidence of a plausible, justifiable, and

18   pro-competitive explanation for their conduct, the trust documents and Dietrich declarations

19   instead raise key material questions of fact about the Dietrichs' motives and communications.

20   Because the Dietrichs fail to meet their initial burden, the Motion should be denied.

21       **C.    The Dietrichs Ignore the Significant Evidence**
             **Supporting a Reasonable Inference of the Dietrichs' Liability**
22

23       The Dietrichs also do not justify summary judgment under *Celotex* by "point[ing]" to

24   Flannery's discovery responses.  (Mot. at 9.)  As a threshold matter, a *Celotex* analysis is

25   inappropriate because, by its terms, it applies only "after adequate time for discovery."  *Celotex*

26   *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Indeed, the Court in *Celotex* expressly held that

27   "potential problem[s] with . . . premature motions can be adequately dealt with under

28   Rule 56([d]) . . . if the nonmoving party has not had an opportunity to make ***full discovery***."  *Id.* at

                                              17

1   326; *cf. Matsushita*, 475 U.S. at 578 (ruling on summary judgment "[a]fter several years of detailed

2   discovery" and "Final Pretrial Statements" were filed); *see also T.W. Elec. Serv., Inc. v. Pac. Elec.*

3   *Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987) (cited Mot. at 5) (explaining that *Celotex*

4   warrants summary judgment "[i]f the plaintiff does not produce . . . evidence or ***provide a reason***

5   ***for not doing so under Rule 56([d])***").  Although a *Celotex* inquiry is thus premature (*see supra*

6   § I), the Dietrichs also ignore the reasonable inferences supported by the evidence thus far.

7           The Dietrichs disregard the significant direct evidence of the conspiracy that Flannery has

8   adduced.  Though they concede that "there may be circumstantial evidence that a conspiracy

9   existed amongst other landowners" (Mot. at 12), the Dietrichs fail to recognize the remarkable

10  quantity of direct evidence of the conspiracy, including the July 2022 "smoking gun" texts in

11  which Conspirator Richard Hamilton texted Defendant Kirk Beebe: "In talking with [Defendant]

12  Ian Anderson, ***he agrees*** that the ***remaining property owners should be in agreement on what we***

13  ***would want to sell our properties***.  So [Flannery's attorney] cannot play owners against owners."

14  (SODF ¶ 23.)  Discovery also has resulted in additional direct evidence of the conspiracy,

15  including the July 23, 2022 email in which Richard Hamilton described a discussion with Kirk

16  Beebe about "working together" with the Andersons, Mahoneys, and Beebes to gain "leverage"

17  against Flannery.  (*Id.* ¶ 22.)  Likewise, discovery revealed the July 29, 2022 text message in which

18  Stacy Hamilton described a plan to "purposely spread" specific false information about prices

19  Flannery paid so "those thinking of selling . . . demand that price."  (*Id.* ¶ 24.)

20          The Dietrichs contend that this evidence should be disregarded because "an inference" must

21  be made to connect that evidence to the Dietrichs, but "plaintiffs should be given the full benefit of

22  their proof without tightly compartmentalizing the various factual components and wiping the slate

23  clean after scrutiny of each." *In re CRT*, 2017 WL 5957654, at *2 (quoting *Cont'l Ore Co. v.*

24  *Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)).  For example, the court in *In re*

25  *TFT-LCD (Flat Panel) Antitrust Litigation* denied summary judgment for a defendant who argued

26  that "smoking gun" evidence of conspiratorial meetings did not include the defendant in question,

27  because the court recognized "circumstantial evidence from which a jury could conclude that [the

28  defendant] was informed of the decisions reached at [those meetings] through bilateral

18

1  communications with other [conspirators]."  No. 12-CV-4114, 2013 WL 3387652, at *1 (N.D. Cal.

2  July 8, 2013) (rejecting defendant's analogy to *In re Citric Acid*).

3        Here, too, the record contains circumstantial evidence from which a jury could conclude

4  that the Dietrichs were informed of the agreements evidenced in the "smoking gun"

5  communications.  For example, Defendant Richard Anderson sent Paul notes summarizing a June

6  2022 meeting attended by at least Richard Anderson, Christine Mahoney, and attorney David

7  Bowie, and likely also attended by John Alsop, Janet Zanardi, and Nancy Roberts.  (SODF ¶¶ 19-

8  21.)  The Dietrichs contend that the subject matter of this meeting was "unrelated" to Flannery

9  (Mot. at 15), but they ignore that just one month later, in July 2022, Kirk Beebe sent the "smoking

10  gun" text message described above to David Bowie by email, with a subject line stating "***we need***

11  ***to slow things way down*** and ***make Melnyk play by our rules now*.**"  (SODF ¶ 23.)  Notably, Kirk

12  Beebe is also the person who put Christine Mahoney in contact with David Bowie.  (*Id.* ¶ 16.)

13  Updates from other Conspirators about meetings with David Bowie, particularly in such close

14  temporal proximity to direct evidence of the conspiracy showing Bowie's involvement, is

15  undoubtedly relevant to whether a jury could infer that the Dietrichs were informed of decisions

16  reached by the Conspirators in other communications facilitated by David Bowie.  For similar

17  reasons, the fact that Richard Anderson contemporaneously texted Christine Mahoney in June 2022

18  to "let [her] know that [his] cousin Paul Dietrich just got a phone call" about a leasing offer (*id.* ¶

19  20) further supports an inference that the Dietrichs were involved in the Conspirators'

20  communications coordinating their responses to offers on their real property.  Indeed, Christine

21  Mahoney responded to this text by stating "***this is just the beginning*.**"  (*Id.*)

22        The Dietrichs also refuse to acknowledge inferences permitted by evidence that the

23  Dietrichs, John Alsop, Nancy Roberts, and Ian Anderson communicated with each other regarding

24  Flannery's offers over a period of years.  For example, the record contains evidence of July 2019

25  emails, which included John Alsop, Paul, and William, in which: (1) Paul communicated with John

26  Alsop about the position of both Dietrichs on Flannery's offer, (2) Paul stated that the Dietrichs

27  considered the price offered by Flannery "much greater than the current return would justify," (3)

28  the Dietrichs received information about Flannery from John Alsop, and (4) Paul described that

19

"Flannery info" as "verrrrry interesting!"  (*Id.* ¶¶ 6-7.)  Notably, only two days after this information was sent by John Alsop to the Dietrichs, Nancy Roberts separately sent the same links to Ian Anderson.  (*Id.* ¶ 8.)  The next year, in August 2020, Ian Anderson then encouraged Nancy Roberts not to accept Flannery's offers in an email in which he stated "Paul Dietrich says he is not planning on selling at this time," which Nancy Roberts promptly forwarded to John Alsop and Janet Zanardi.  (*Id.* ¶ 12.)  The Dietrichs attempt to downplay the significance of these communications considering them independently, but a jury could reasonably infer that these communications support an inference that the Dietrichs engaged in a pattern of communication and coordination with John Alsop, Ian Anderson, and Nancy Roberts regarding Flannery's offers.

The Dietrichs likewise attempt to ignore the inferences permitted by the contents of Flannery's purchase offers to the Dietrichs.  These documents raise material questions of fact about the Dietrichs' negotiations with Flannery.  As explained above, these documents show that from Flannery's earliest outreach to the Dietrichs, Paul invoked Ian Anderson's name in negotiations with Flannery.  (SODF ¶¶ 4-5; *see supra* pp. 16-17.)  This both excludes an inference that the Dietrichs were acting based on purported constraints in the Child's Trust and supports an inference that the Dietrichs were in fact aligned with Ian Anderson on their responses to Flannery's offers.  Flannery's March 2020 offer also shows Flannery's contemporaneous impression that its phone call with Nancy Roberts was relevant to the positions of not only Nancy Roberts, but also John Alsop, Janet Zanardi, and the Dietrichs.  (*Id.* ¶ 11.)  The May 2021 offer, meanwhile, shows that "following up on . . . conversations with Paul," Flannery "underst[ood] that [Paul and William] entertained selling, but had reservations about Flannery's plans for your property."  (*Id.* ¶ 14.)  The record is devoid of evidence that the Dietrichs attempted to dispel any of these understandings.  These documents thus rebut the Dietrichs' conclusory assertions in their declarations that they did not entertain Flannery's offers, and while the Dietrichs may dispute the proper inferences to be drawn from these documents, that is a quintessential question of fact for the jury to resolve.

## **CONCLUSION**

For the foregoing reasons, Flannery respectfully requests that the Court deny the Motion.

20

1    Dated: February 21, 2025                    By:  ___/s/ *Michael H. Menitove*___

2                                                Matthew Martino (*pro hac vice*)
                                                 matthew.martino@skadden.com
3                                                Michael H. Menitove (*pro hac vice*)
                                                 michael.menitove@skadden.com
4                                                Evan Levicoff (*pro hac vice*)
                                                 evan.levicoff@skadden.com
5                                                Thomas J. Smith (*pro hac vice*)
                                                 thomas.smith@skadden.com
6                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
7                                                One Manhattan West
                                                 New York, New York 10001
8                                                Telephone: (212) 735-3000
                                                 Facsimile: (917) 777-3000
9
                                                 Lance A. Etcheverry (SBN 199916)
10                                               lance.etcheverry@skadden.com
                                                 SKADDEN, ARPS, SLATE,
11                                                 MEAGHER & FLOM LLP
                                                 525 University Avenue
12                                               Palo Alto, California 94301
                                                 Telephone: (650) 470-4500
13                                               Facsimile: (650) 470-4570

14                                               *Attorneys for Plaintiff*
                                                 *Flannery Associates LLC*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

PL.'S MEM. IN OPP. TO DEFS.' MOT. FOR SUMMARY JUDGMENT                    CASE NO. 2:23-CV-00927-TLN-AC